IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS COMPUTER RESEARCH, LLC., )<br>    *Plaintiff and* )<br>    *Counterclaim Defendant,* )<br>                             )<br>   v.                               )<br>                             )<br>GOOGLE INC., )<br>    *Defendant, and* )<br>                             )<br>FISH & RICHARDSON P.C., )<br>    *Defendant, Counterclaimant* )<br>    *and Third Party Plaintiff,* )<br>                             )<br>   v.                               )<br>                             )<br>SCOTT HARRIS, )<br>    *Third-Party Defendant and* )<br>    *Counterclaimant,* )<br>                             )<br>   v.                               )<br>                             )<br>FISH & RICHARDSON P.C., )<br>    *Defendant, Counterclaimant* )<br>    *Third-Party Plaintiff and* )<br>    *Counterclaim-Defendant.* ) | Case No. 07 C 5081<br><br>**JURY TRIAL DEMANDED**<br><br>Honorable Rebecca R. Pallmeyer<br>Mag. Judge Maria Valdez |

## **SCOTT HARRIS' COUNTERCLAIM AGAINST FISH & RICHARDSON P.C.**

Scott C. Harris counterclaims against Fish & Richardson PC ("Fish") as follows:

1.      This counterclaim involves Fish's tortious interference with Scott Harris' prospective economic advantage through its unwarranted and intentionally false assertion of contrived ownership and other claims made against him that challenge his lawfully obtained rights in his inventions and patents. Mr. Harris also asserts a claim for defamation per se for the intentionally false statements Fish made to the press after it forced his resignation and for statements made to professional associates that injured

Mr. Harris' reputation and professional standing.  Mr. Harris also asserts a claim against Fish for the wrongful withholding of wages under California law.

## THE PARTIES

2.  Scott C. Harris is a resident of Rancho Santa Fe, San Diego County, California, and was an employee at Fish & Richardson from 1994 until his forced resignation on September 14, 2007.

3.  Fish is a professional corporation headquartered at 225 Franklin Street, Boston, Massachusetts  02110-2804 but with offices throughout the United States.  Fish conducts substantial business in this judicial district, has represented its clients in this judicial district (including clients in lawsuits brought before this Court) and has asserted a claim against Mr. Harris in this Court.

## JURISDICTION AND VENUE

4.  Jurisdiction exists under 28 U.S.C. §§ 1332 and 1367.  The amount in controversy greatly exceeds $75,000.

5.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

## BACKGROUND

6.  Scott Harris was an employee at Fish for approximately 14 years before his forced resignation on September 14, 2007.  Mr. Harris worked for Fish as a patent attorney, predominately in the area of obtaining patents for clients.  Mr. Harris was one of the highest billing Fish attorneys, and had among the highest origination numbers of any Fish attorney.

7. A reason for his success as a patent attorney is that Mr. Harris, like many of his clients, is a prolific inventor in his own right. Mr. Harris made his first invention at the age of 12, and spent his lifetime in the pursuit of technology innovations. He first attended Duke University and then George Washington University, where he received a degree in electrical engineering. Mr. Harris later worked as an electrical engineer in the communications and software fields and thereafter attended George Washington University Law School to pursue his interest in the patent law where he graduated and became a patent attorney. He is admitted to practice before the United States Patent and Trademark Office ("PTO").

8. Mr. Harris, at the invitation of respected professionals in the field of intellectual property, has taught various topics in patent law and practice to attorneys and technologists. He has taught basic patent law and has presented a primer class on software patenting to more than 30 companies. He has been invited to present a class on patent cost reduction via outsourcing and has taught one-hour class called "Patents for Kids," a program designed to teach young people about intellectual property. Mr. Harris' patent lectures have taken place throughout the country. Mr. Harris has also been extensively quoted in national and local publications concerning issues involved with patent law. Mr. Harris was named the top patent prosecuting attorney in the *IP Law & Business* "Patent Hall of Fame" in 2003.

9. Until September 12, 2007, Mr. Harris also was a faculty member of Patent Resources Group ("PRG"), a prestigious patent law education organization founded by Professor Irving Kayton of George Washington University Law School in 1969. PRG explains the quality of its faculty as follows:

> One of the important characteristics of PRG is our exceptional faculty. Only the best patent attorneys, litigators and strategists are permitted to teach at Patent Resources Group. In fact, we know of no other patent law training program that has a waiting list of highly accomplished would-be instructors.

Professor Kayton personally invited Mr. Harris to join the PRG faculty and, since 2002, Mr. Harris has played an integral role in its programs. Until September 12, 2007, Mr. Harris also was identified on PRG's website as a faculty member.

### Fish Was Well Aware Of -- And Assented To -- Mr. Harris' Personal Inventorship Activities

10.   Mr. Harris has invented many new technologies, and has been awarded 27 issued United States Patents and has pending approximately 80 patent applications in diverse fields of technology. Many of those patents and applications were sold to different companies that license and enforce Mr. Harris' patents. Most of the sales of Mr. Harris' patents were carried out by Mr. Harris at Fish's insistence. At all times during his tenure at Fish, Fish attorneys -- including those responsible for firm management -- were aware of Mr. Harris' personal inventorship activities. Indeed, at or about the time Mr. Harris joined Fish, he informed (now retired) Fish attorney Charles Winchester, then Fish's Ethics Chairman, that (1) he had made inventions, (2) he was currently prosecuting his own patent applications on those inventions before the PTO, and (3) he would continue to invent while associated with Fish. Mr. Winchester responded that the firm saw no problem with that, and that it was not unusual for patent prosecution attorneys to seek their own patents; indeed, others at Fish had done so before and after Mr. Harris did.

11.   Thereafter, Mr. Harris also sought the advice of a Fish administrator, Judy Filamond, who then headed Fish's "Practice Systems" group. Ms. Filamond likewise

4

advised Mr. Harris that she saw no problems with his personal inventorship activities, and saw no reason why his inventions should be integrated into Fish's patent prosecution docketing system.

12.     Mr. Harris' inventorship activities were open and well known within Fish. At no time did Mr. Harris conceal his inventorship activities from Fish. As an example, a co-inventor on one of his patents (U.S. Patent No. 6,664,896) is the wife of former Fish Managing Partner John Gartman.

13.     Mr. Harris also prominently displayed plaques of some of his patents, including U.S. Patent Nos. 5,339,174 and 5,438,436, in his office. Anyone entering Mr. Harris' office would have seen that he was the sole inventor on the displayed patents and that such activity was taking place while he was associated with Fish. Many Fish attorneys – including the Managing Partner of the San Diego office -- came into Mr. Harris' office and saw such plaques on his wall.

14.     Mr. Harris also provided his U.S. Patent Office PKI (Public Key Infrastructure) certificate to Fish, and allowed Fish to store this certificate in a way that allowed every person in every Fish office to obtain access to this certificate. This enabled any Fish attorney to check the status of his patent filings. That certificate was associated with Fish's customer number and also with Mr. Harris' personal customer number, which enabled the user to view all of Mr. Harris' personal filings. According to the PTO:

> You can log in to the Patent Office's website using your certificate, and get access to all the customer numbers and cases, associated with that certificate. For example, you can review Pending and Patented Application Information, Prosecution History, Status and Location and other things about the cases.

5

15. Mr. Harris also used examples of his personal patent prosecution in public presentations to other Fish attorneys. After one such presentation in 2005, an attorney in Fish's Dallas office, Wes Musselman, specifically asked him about the example Mr. Harris discussed (related to automatic detection of cell phones at gas pumps) because another Fish client was interested in filing a patent application on similar technology. Mr. Harris confirmed that the cited example was for one of his own patents, and gave Mr. Musselman the patent number (U.S. Patent No. 6,222,458).

16. In early 2005, Mr. Harris sought oversight of the PTO's actions by the Court of Appeals for the Federal Circuit on one of his pending patent applications (In re Scott C. Harris, Federal Circuit Appeal No. 05-1247), contending that the PTO was applying the wrong legal standard of patentability in examining business method claims. Like many intellectual property firms, Fish closely monitors events in the PTO and Federal Circuit Court of Appeals. During that court action, in or around May of 2005, Fish attorney John Dragseth sent an email to many or all Fish attorneys, discussing that lawsuit and specifically identifying the application as belonging to Mr. Harris.

17. In April of 2006, Mr. Harris also submitted public comments to the PTO's proposed rule changes on continuing applications in which he acknowledged his status as an inventor:

> These comments are responsive to Proposed Rules for Changes to Practice on Continuing Applications, (Federal Register Vol 71, no 1, pp 48-61). These comments are made by Scott C. Harris, individually, as a registered patent attorney (Reg number 32,030), ***and also as an independent inventor on numerous issued and pending patents.*** These comments are not made on behalf of Fish & Richardson PC, the law firm with which I am associated (emphasis added).

These comments were publicly posted, and still can be viewed on the PTO website at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/harris.pdf. Mr. Harris said the same thing in his comments on examination of claims (http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_claims/harrisscott.pdf). These comments are viewed by thousands of patent attorneys, and it is inconceivable that they were overlooked by Fish or all of its attorneys who practice in this area.

18.     At no time did Mr. Harris use any client information in the prosecution of his patents.  To the contrary, Mr. Harris even assigned at least two of his patents on which he was only a co-inventor to Fish's clients precisely to avoid any contention that he personally benefited from client information.

19.     As was the practice at Fish, other attorneys employed at Fish likewise were inventors on their own patents.  A well-known example is that of Tom Woolston, who prosecuted his own patents while at Fish  Those very patents were the basis for Woolston's founding of MercExchange (as in eBay v. MercExchange, 126 S.Ct. 1837 (2006)), a company of which the Managing Partner of Fish's San Diego office, John Phillips, is a co-owner.

20.     Other attorneys sought and filed their own patents while at Fish, including Tim Pham, who has since left Fish to work for Google.

21.     Neither the "employment agreement" under which Fish principals are employed, nor any firm policy, written or unwritten, prohibited Mr. Harris or any other firm employee or principal from making inventions and/or obtaining patents on inventions.

7

**Fish Clears Mr. Harris Of Wrongdoing,
 But Forces Him To Leave The Firm Nonetheless**

22.  In March 2007, Dell Computer allegedly complained to Fish that it had been sued for infringement of a patent (U.S. Patent No. 6,704,791) by Mr. Harris and his exclusive licensee, Memory Control Enterprise ("MCE").  Thereafter, on March 19, 2007, Mr. Harris was contacted by John Steele, Fish's Ethics and Conflicts Director and Special Counsel.  Mr. Steele told Mr. Harris that Dell was a client of Fish and, for that reason, Mr. Harris could not be a party in any lawsuit against Dell.  Mr. Harris later learned that Dell may not, in fact, have been a client of the Fish firm at that time.  When Mr. Harris inquired of Mr. Steele by email whether Dell was, in fact, a Fish client, Mr. Steele chose not to respond.  Mr. Harris told Mr. Steele about all of his patents and applications.  At that time, Mr. Steele indicated (like all others at Fish over the years who Mr. Harris had told about his patents and applications) that this was not a problem, but instructed Mr. Harris to get all his pending patent applications into the Fish conflicts system.  Beginning on March 21, 2007, he began doing so to satisfy that demand.

23.  On April 10, 2007, Mr. Steele asked Mr. Harris for an update on ownership of the '791 patent.  At that time, MCE simply had an exclusive license under the patent and Mr. Harris retained all ownership rights.  Mr. Harris told Mr. Steele that he would form a separate company and transfer title to it and also withdraw from the pending litigation personally.  Mr. Steele informed Mr. Harris that he had outside counsel look into the issue of whether Mr. Harris had done anything unethical or inappropriate in obtaining the '791 patent and pursuing litigation against Dell.  He conceded to Mr. Harris that the investigation cleared Mr. Harris of any wrongdoing.

8

24. On April 22, 2007, Mr. Harris sent an email to Mr. Steele informing him that he had formed a separate company to own the '791 patent, and that he was going to assign the '791 patent to that company so it could be formally substituted for him as a plaintiff in the lawsuit against Dell. Later that day, Mr. Harris received an email from Mr. Steele saying: "Scott, thanks for hopping on this. Let's talk Monday." On Monday, April 23, 2007, Mr. Harris again informed Mr. Steele that he was about to assign the '791 patent to a separate company, but Mr. Steele told Mr. Harris "to hold off for now." Mr. Harris complied with his directive.

25. A week later, on May 1, 2007, Mr. Harris received a telephone call from Mr. Steele and Kathi Lutton, another Fish attorney. Mr. Steele and Ms. Lutton told Mr. Harris that he had two choices: (a) drop the lawsuit against Dell or (b) leave Fish. Ms. Lutton further ordered Mr. Harris to dismiss the suit against Dell or to sell whatever interest he had in the '791 patent and also to sell any other patents he owned within the next few days. Mr. Harris told Ms. Lutton that he had never seen a patent sale happen in such a short amount of time. Ms. Lutton agreed, but told Mr. Harris that he had to sell all of his patents anyway. Ms. Lutton warned Mr. Harris to "weigh [your] options carefully."

26. Based upon Fish's demands, Mr. Harris took immediate steps to sell his patents and pending patent applications to third parties. The timing of Fish's demand, however, required that Mr. Harris seek and accept less than optimum terms of sale. Eventually, Mr. Harris was able to find purchasers for some of his patents and pending applications, one of which was Illinois Computer Research LLC ("ICR"), which acquired the '252 patent and U.S. Patents Nos. 7,231,050, 7,194,624 and 7,069,313, as well as

9

U.S. Patent Applications Nos. 09/569,816 and 09/669,959 and any continuations from and reissues or reexaminations of these patents and applications. Purchasers of other of Mr. Harris' patents included Bar Tex Research, LLC, Innovative Biometric Technology LLC, Innovative Patented Technology, LLC, Parker Innovative Technologies and Virginia Innovative Technology, LLC. Any prospective purchaser of patents determine value by identifying a list of users of the relevant technology for each patent and prospective purchasers did so, including organizations that routinely purchase patents from inventors.

27. After the sale of his patents to ICR, ICR sent a letter to Google on August 29, 2003, stating that it was infringing the '252 Patent. Google is a client of Fish and, on information and belief, Google immediately complained to Fish and sought its help in having the infringement claim withdrawn.

### Fish Not Only Fires Mr. Harris, But Seeks To Damage His Professional Reputation And The Value Of His Patent Portfolio

28. Even though Fish had demanded that Mr. Harris sell these patents, and Mr. Harris had used his best efforts to comply with that directive, Fish immediately attempted to pressure, punish and intimidate Mr. Harris anyway. On September 6, 2007, Mr. Steele told Mr. Harris that, if he proceeded with litigation against anyone enforcing his patents, Fish would claim that he copied ideas from firm clients and otherwise violated ethics rules.

29. Fish then embarked on a campaign to damage Mr. Harris' professional reputation and cast a cloud over his patent portfolio, all to reassure potential infringers that Fish would assist in undermining the value of that portfolio.

30. Specifically, on September 12, 2007, before Fish had even demanded Mr. Harris' resignation, PRG notified him that (1) it had received a call from a Fish official, and (2) it was terminating Mr. Harris from its faculty and removing him from the PRG website. This, alone, greatly damaged Mr. Harris' professional standing.

31. Then, later on September 12, 2007, Fish's Managing Partner, Peter Devlin, demanded the resignation of Mr. Harris within 24 hours. Mr. Harris reluctantly complied with that demand. Such demand was an effort to punish Mr. Harris for his inventorship activities and to signal that Fish would assist in undermining the value of Mr. Harris' patent portfolio.

32. As part of that effort, on September 13, 2007, Fish, through its "Ethics Director" Steele, telephoned the employment lawyer for Mr. Harris, Ms. Lynne Lasry, and made a number of claims and demands. In that conversation, Fish claimed that it – and not Mr. Harris – owned Mr. Harris' patents. Fish asserted that "the patents are being held in constructive trust for the firm." Fish demanded that Mr. Harris "get these patents back" and insisted on seeing all of Mr. Harris' privileged communications with the Niro law firm, which had represented Mr. Harris. Fish, through Steele, also stated that, if Mr. Harris pursued patent infringement litigation, Mr. Harris would face inequitable conduct claims and his life could be made "miserable."

33. Then, or about September 21, 2007, Fish gave the media a prepared statement, falsely charging that Mr. Harris' patent activities were "not authorized". As alleged above and below, Mr. Harris' actions were in fact authorized by the firm. Indeed, Mr. Harris sold his patents at the express demand of Fish. On information and belief, in September and early October of 2007, Fish continued to make the same false

11

statements to third parties, all in an effort to undermine the assertion of Mr. Harris' patent portfolio against infringers. For good measure in early October 2007, Fish publicly made the same declaration to the National Law Journal ("Harris was involved in outside business ventures that were not authorized by the firm…."). This statement (like the others) was false.

34. On information and belief, before filing this lawsuit, Fish also improperly told Google and others that it had ownership rights in Mr. Harris' patents, a fact that encouraged Google and others not to accept and pay for a license under the Harris patents or to pay far less than the actual value of a license.

35. Fish's false ownership claims and statements that Mr. Harris had engaged in unlawful ("not authorized") activities regarding his patents brought the expectancy of licensing Mr. Harris' patent portfolio on reasonable terms to a screeching halt.

36. Fish knew that its ownership and other claims were baseless. As alleged above, from the very beginning, Mr. Harris fully disclosed his personal inventorship activities to Fish, and Fish expressly and implicitly gave its blessing to those activities. As alleged above, Mr. Harris was quite open about his inventorship activities, and those activities were publicized and widely known within the firm. In one case, twelve lawyers at Fish were given power of attorney to act on Mr. Harris' behalf in connection with the '252 patent. In addition, Fish was clearly on actual and constructive notice of all Mr. Harris' inventorship activities. Fish personnel had access to detailed information about each and every one of Mr. Harris' patents via his PKI certificate. Fish personnel used this access virtually every day, and could have viewed information about his patents at any time. All Fish attorneys were likely actually on notice of, Mr. Harris' comments on

the rule changes in which indicated that he "was an independent inventor on numerous issued and pending patents". This alone is enough to show that Fish knew that Mr. Harris was an inventor and had and was obtaining his own patents while employed by Fish. Moreover, Mr. Harris had already been cleared of any wrongdoing in Fish's internal ethics investigation. Finally, Mr. Harris had sold many of his patents and pending applications to third parties at Fish's insistence. This was also known to Fish.

37. Even then, Fish continued to exert pressure on Harris and assert its fabricated claims of ownership, this time through several conversations between Mr. Harris' employment counsel, Ms. Lasry, and Fish's outside counsel, Jenner & Block, in September and early October 2007. During those conversations, Fish: (1) continued to assert that it owns the Harris patents and all of its clients are entitled to "paid-up licenses"; (2) demanded that this lawsuit be dismissed; (3) demanded that Mr. Harris "renegotiate" his Agreement with ICR; (4) refused to discuss the sums due Mr. Harris; and (5) made another reference to inequitable conduct. Fish also improperly cancelled Mr. Harris' health insurance coverage in clear violation of Federal Law, prior to offering him coverage under COBRA. Medical insurance was not reinstituted until almost a month and a half after Mr. Harris' forced termination.

### **Fish's Use Of "Firm Resources" Contention**

38. Fish falsely represented to Mr. Harris that its "ownership" rights are purportedly based on its contention that Mr. Harris used "firm resources" in obtaining his patents.

39. In actuality, Mr. Harris personally handled his inventorship activities on his own time, and at no time did such activities interfere with his billable work. Indeed, Mr.

Harris' billable hours were, for all the years in question, above the goal set by Fish as the required number of hours to be billed per year. He routinely billed 1,900 to 2,000 hours per year. In a firm where many attorneys did not meet their billing goals, this often placed Mr. Harris in the top 25% highest billers at Fish. Moreover, Mr. Harris never used any firm personnel during employment hours to assist him in any way with any of his personal patent filings, with the exception of those filings which were done on behalf of firm clients.

40.     In fact, Mr. Harris worked on his personal patent filings, responses and formalities for the most part at home, on his own time, using his own computers and other resources. As alleged above, he had a separate customer number with the PTO for his personal patent filings to avoid confusion between those filings and Fish's filings. That customer number was associated with the same PKI certificate which Fish's customer numbers were associated – evidencing Mr. Harris' practice of making his personal inventorship activities open and well known within Fish. He also had his own separate deposit account, which he personally funded, and which he used to pay fees to the PTO that were due for his personal patent filings. None of his work on personal patent filings in any way interfered with his work as a patent attorney for Fish.

41.     Fish's contention about "firm resources" is directly at odds with its own policies. Fish, like many large firms, is dependent upon its lawyers billing a high number of billable hours. In that regard, and to facilitate the achievement of billable hours goals, Fish recognized that it is inevitable that its attorneys will have to transact business regarding outside commercial ventures, investments, family matters and charitable activities in the course of a normal day at the office. Fish allowed and even

14

encouraged the use of "firm resources" (secretaries, paper, telephones, computers) for such activities as long as it facilitated billable hour production. For example, attorneys routinely would copy and mail personal papers at Fish, such as tax returns. They would pay bills at work using the Fish computer. They would use "firm resources" for other purposes that were in fact wholly personal. Fish allowed this kind of use. In fact, Fish allowed charging certain personal items such as copies and mailings to an attorney's "personal account", which would then be deducted from the attorney's paycheck.

42.     Fish's contention about "firm resources" also is at odds with its actual practices and the numerous examples of non-firm commercial dealings by its attorneys. Mr. Steele conceded to Mr. Harris that many Fish attorneys had what he called "side businesses" on which they conducted personal work activities from their offices at Fish. Mr. Harris is aware of numerous examples, including that of Mr. Phillips, the Managing Partner of the San Diego office, who is co-owner of MercExchange. Other examples include: (1) Steve Stodgill, an attorney in the Dallas office who purportedly has a number of outside business deals, some with noted entrepreneur Mark Cuban; (2) John Schnurer, an attorney in the San Diego office, who purportedly crafted, and personally benefited from, several non-firm real estate deals; and (3) Charles Heiken, an attorney with significant business relationships with Bose corporation. Fish's contention is also contradicted by the express language in the "employment agreement" which it filed in this case. Section 4b of that agreement states the limits placed on outside activities of employees to be limited only to those activities that "impinge substantially on time or energy normally required for business of the corporation". Examples given are things like "holding public office". Nowhere does this or any other section of the employment

agreement reference (much less limit) the employee's rights to file patent applications for their own inventions.  Moreover, Mr. Harris' billing history while at Fish – which was always found satisfactory to management and was never below the set billing "goal" – clearly demonstrates that his other activities did not impinge on his time or energy for his Fish work.

### COUNT I

### TORTIOUS INERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST FISH

1-42.  Mr. Harris restates Paragraphs 1-42 as Paragraphs 1-42 of Count I.

43.  Mr. Harris' sale of many of his patents and pending applications to third parties was at Fish's demand and insistence.  The purpose of such sales was to facilitate the licensing and enforcement of Mr. Harris' patent portfolio by entities other than Mr. Harris personally.

44.   Mr. Harris has a valid business expectancy of financially benefiting from the licensing and enforcement of his patent portfolio.

45.  Fish has knowledge of that expectancy, indeed, it has so pled in its claim against Mr. Harris.

46.  Fish has purposefully, intentionally and wrongfully interfered with Mr. Harris' legitimate expectancy (without justification) by, among other things, wrongfully asserting ownership and "unauthorized venture" claims for not just the '252 patent, but for all of his personal inventorship activities, thereby casting a cloud over, and interfering with the ownership of, the entirety of Mr. Harris' patent portfolio.

47.  Fish made and publicized such claims prior to asserting them in litigation.

48.     Mr. Harris has been damaged by Fish's actions.  Indeed, potential licensees of Mr. Harris' patents already have pointed to Fish's ownership claims as a purported reason why they do not need a license or why the amount of any payment for a license should be greatly discounted.  Fish's actions have greatly diminished the value of Mr. Harris' patents.

## COUNT II

## DEFAMATION

1-48.    Mr. Harris restates Paragraphs 1-48 of Count I as Paragraphs 1-48 of Count II.

49.     Fish's statements to the press and other third parties were false, and Fish knew them to be false.

50.     Fish made the statements with actual malice.

51.     Fish's statements constitute defamation per se, and Mr. Harris' professional reputation has been damaged.

52.     If Fish followed through with its stated intention to claim that Mr. Harris copied his inventions from firm clients (to Google, for example), that, too constitutes defamation per se.  Mr. Harris does not yet know precisely what Fish told PRG that prompted his termination from the PRG faculty, but such statements also were likely defamatory and false and Mr. Harris already has been damaged thereby.

## COUNT III

## VIOLATION OF THE CALIFORNIA LABOR CODE

1-52.    Mr. Harris restates Paragraph 1-52 of Count II as Paragraphs 1-52 of Count III.

17

53. As further leverage for its demands on Mr. Harris, Fish willfully withheld wages due Mr. Harris in violation of the California Labor Code.

54. Specifically, though Fish was required to pay Mr. Harris wages of $27,234.50 immediately after his forced resignation (California Labor Code Section 201), Fish withheld payment until September 28, 2007.

55. Under California Labor Code Section 203, Fish is therefore required to pay a daily statutory penalty for the late payment.

56. Fish also has not paid Mr. Harris for his accumulated vacation time as required by California Labor Code Section 227.3. Under firm policy, Fish provides its "employees" with 80 hours of vacation time per year. After Fish terminated Mr. Harris, it failed to pay him for his accrued vacation time – over several hundred thousand dollars – plus statutory penalties under California Labor Code Section 203.

## **PRAYER FOR RELIEF**

WHEREFORE, Scott Harris respectfully requests this Court to enter judgment against Fish & Richardson, P.C., granting the following relief:

A   Compensatory damages in an amount in excess of the jurisdictional limit sufficient to redress the harm caused Mr. Harris from Fish's conduct;

B.   Punitive damages;

C.   Costs of suit; and

D.   Any other relief deemed appropriate by the Court.

18

**Jury Demand**

Mr. Harris demands a trial by jury on all issues presented in this Counterclaim.

                                      /s/ Paul K. Vickrey
Raymond P. Niro
Paul K. Vickrey
David J. Sheikh
Richard B. Megley, Jr.
Karen L. Blouin
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0733
Fax: (312) 236-3137

Steven L. Platt
Arnold and Kadjan
19 West Jackson Blvd., Suite 300
Chicago, IL 60604
(312) 236-0415

***Attorneys for Scott C. Harris***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing **SCOTT HARRIS' COUNTERCLAIM AGAINST FISH & RICHARDSON P.C.** was electronically filed with the Clerk of Court using CM/ECF system, which will send notification by electronic mail to the following:

> David J. Bradford
> Eric A. Sacks
> Daniel J. Weiss
> Jenner & Block LLP
> 330 N. Wabash Avenue
> Chicago, IL  60611
> (312) 222-9350
> **Counsel for Fish & Richardson, P.C.**

Additionally, a copy of the foregoing was served on the following by First-Class U.S. Mail:

> Michael S. Kwun
> Google Inc.
> 1600 Amphitheatre Parkway
> Mountain View, CA  94043
> mkwun@google.com
> **Counsel for Google Inc.**

on this 31st day of October, 2007.

> /s/ Paul K. Vickrey
> Attorney for Scott C. Harris