**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **ILLINOIS COMPUTER RESEARCH, LLC,** | ) | |
| *Plaintiff and Counterclaim Defendant,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| **FISH & RICHARDSON P.C.,** | ) | No. 07 C 5081 |
| *Defendant, Counterclaimant and Third-Party Plaintiff,* | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| *v.* | ) | Magistrate Judge Maria Valdez |
| | ) | |
| **SCOTT C. HARRIS,** | ) | |
| *Third-Party Defendant and Counterclaimant,* | ) | JURY TRIAL DEMANDED |
| | ) | |
| *v.* | ) | |
| | ) | |
| **FISH & RICHARDSON P.C.,** | ) | |
| *Defendant, Counterclaimant, Third-Party Plaintiff and Counterclaim Defendant.* | ) | |

**FISH & RICHARDSON P.C.'S REPLY TO**
**SCOTT HARRIS'S COUNTERCLAIM**

Fish & Richardson P.C. ("Fish & Richardson"), by its attorneys Jenner & Block

LLP, hereby replies to the Counterclaim of third-party defendant Scott C. Harris, and

asserts its affirmative defenses thereto as follows:

1.      This counterclaim involves Fish's tortious interference with Scott Harris'
prospective economic advantage through its unwarranted and intentionally false assertion of
contrived ownership and other claims made against him that challenge his lawfully obtained
rights in his inventions and patents.  Mr. Harris also asserts a claim for defamation per se for the
intentionally false statements Fish made to the press after it forced his resignation and for
statements made to professional associates that injured Mr. Harris' reputation and professional
standing.  Mr. Harris also asserts a claim against Fish for the wrongful withholding of wages
under California law.

**RESPONSE:** Fish & Richardson states that paragraph 1 recites Mr. Harris's own characterization of his purported claims and that no answer is therefore required. To the extent an answer is deemed required, Fish & Richardson denies the allegations of paragraph 1.

## THE PARTIES

2.    Scott C. Harris is a resident of Rancho Santa Fe, San Diego County, California, and was an employee at Fish & Richardson from 1994 until his forced resignation on September 14, 2007.

**RESPONSE:** Fish & Richardson admits that Scott C. Harris is a resident of San Diego County, California. Fish & Richardson further admits that Mr. Harris joined Fish & Richardson as a principal in 1994 and resigned on or about September 14, 2007. Fish & Richardson denies all remaining allegations contained in paragraph 2.

3.    Fish is a professional corporation headquartered at 225 Franklin Street, Boston, Massachusetts 02110-2804 but with offices throughout the United States. Fish conducts substantial business in this judicial district, has represented its clients in this judicial district (including clients in lawsuits brought before this Court) and has asserted a claim against Mr. Harris in this Court.

**RESPONSE:** Fish & Richardson admits the allegations contained in the first sentence of paragraph 3. Fish & Richardson further admits that it conducts business in this judicial district, that it has represented clients in this district, and that it has asserted multiple claims against Mr. Harris in this Court. Fish & Richardson denies all remaining allegations contained in paragraph 3.

## JURISDICTION AND VENUE

4.    Jurisdiction exists under 28 U.S.C. §§ 1332 and 1367. The amount in controversy greatly exceeds $75,000.

**RESPONSE:** Fish & Richardson admits that this Court has subject matter jurisdiction over this matter.

5.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

**RESPONSE:** Fish & Richardson admits that venue is appropriate in this judicial district.

## BACKGROUND

6.     Scott Harris was an employee at Fish for approximately 14 years before his forced resignation on September 14, 2007.  Mr. Harris worked for Fish as a patent attorney, predominately in the area of obtaining patents for clients.  Mr. Harris was one of the highest billing Fish attorneys, and had among the highest origination numbers of any Fish attorney.

**RESPONSE:** Fish & Richardson admits that Scott Harris joined Fish & Richardson as a

principal in 1994 and resigned on or about September 14, 2007.  Fish & Richardson admits the

allegations contained in the second sentence of paragraph 6.  Fish & Richardson objects that the

allegations contained in the third sentence of paragraph 6 are vague and ambiguous.  Fish &

Richardson lacks sufficient information to either admit or deny the allegations contained in that

sentence.  Fish & Richardson denies any remaining allegations contained in paragraph 6.

7.     A reason for his success as a patent attorney is that Mr. Harris, like many of his clients, is a prolific inventor in his own right.  Mr. Harris made his first invention at the age of 12, and spent his lifetime in the pursuit of technology innovations.  He first attended Duke University and then George Washington University, where he received a degree in electrical engineering.  Mr. Harris later worked as an electrical engineer in the communications and software fields and thereafter attended George Washington University Law School to pursue his interest in the patent law where he graduated and became a patent attorney.  He is admitted to practice before the United States Patent and Trademark Office ("PTO").

**RESPONSE:**  Fish & Richardson lacks sufficient information to form a belief as to the

truth of the allegations contained in the first, second, third, and fourth sentences of paragraph 7

and therefore denies them.  Fish & Richardson admits the allegations contained in the fifth

sentence of paragraph 7.  Fish & Richardson specifically denies that Mr. Harris ever disclosed to

it the extent of his personal patent activities, his use of firm resources in those activities, or the

other misconduct identified in Fish & Richardson's third-party complaint against Mr. Harris and

denies any inconsistent allegations and any remaining allegations of paragraph 7.

8.     Mr. Harris, at the invitation of respected professionals in the field of intellectual property, has taught various topics in patent law and practice to attorneys and technologists.  He has taught basic patent law and has presented a primer class on software patenting to more than

30 companies.  He has been invited to present a class on patent cost reduction via outsourcing and has taught one-hour class called "Patents for Kids," a program designed to teach young people about intellectual property.  Mr. Harris' patent lectures have taken place throughout the country.  Mr. Harris has also been extensively quoted in national and local publications concerning issues involved with patent law.  Mr. Harris was named the top patent prosecuting attorney in the *IP Law & Business* "Patent Hall of Fame" in 2003.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 8 and therefore denies them.

9.    Until September 12, 2007, Mr. Harris also was a faculty member of Patent Resources Group ("PRG"), a prestigious patent law education organization founded by Professor Irving Kayton of George Washington University Law School in 1969.  PRG explains the quality of its faculty as follows:

> One of the important characteristics of PRG is our exceptional faculty.  Only the best patent attorneys, litigators and strategists are permitted to teach at Patent Resources Group.  In fact, we know of no other patent law training program that has a waiting list of highly accomplished would-be instructors.

Professor Kayton personally invited Mr. Harris to join the PRG faculty and, since 2002, Mr. Harris has played an integral role in its programs.  Until September 12, 2007, Mr. Harris also was identified on PRG's website as a faculty member.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 9 and therefore denies them.

10.    Mr. Harris has invented many new technologies, and has been awarded 27 issued United States Patents and has pending approximately 80 patent applications in diverse fields of technology.  Many of those patents and applications were sold to different companies that license and enforce Mr. Harris' patents.  Most of the sales of Mr. Harris' patents were carried out by Mr. Harris at Fish's insistence.  At all times during his tenure at Fish, Fish attorneys -- including those responsible for firm management -- were aware of Mr. Harris' personal inventorship activities.  Indeed, at or about the time Mr. Harris joined Fish, he informed (now retired) Fish attorney Charles Winchester, then Fish's Ethics Chairman, that (1) he had made inventions, (2) he was currently prosecuting his own patent applications on those inventions before the PTO, and (3) he would continue to invent while associated with Fish.  Mr. Winchester responded that the firm saw no problem with that, and that it was not unusual for patent prosecution attorneys to seek their own patents; indeed, others at Fish had done so before and after Mr. Harris did.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegations contained in the first, second, fifth, and sixth sentences of paragraph 10

and therefore denies them.  Fish & Richardson denies the allegations contained in the third and

fourth sentences of paragraph 10.

11.     Thereafter, Mr. Harris also sought the advice of a Fish administrator, Judy Filamond, who then headed Fish's "Practice Systems" group.  Ms. Filamond likewise advised Mr. Harris that she saw no problems with his personal inventorship activities, and saw no reason why his inventions should be integrated into Fish's patent prosecution docketing system.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the

truth of the allegations contained in paragraph 11 and therefore denies them.

12.     Mr. Harris' inventorship activities were open and well known within Fish.  At no time did Mr. Harris conceal his inventorship activities from Fish.  As an example, a co-inventor on one of his patents (U.S. Patent No. 6,664,896) is the wife of former Fish Managing Partner John Gartman.

**RESPONSE:** Fish & Richardson denies the allegations contained in the first and second

sentences of paragraph 12.  Fish & Richardson lacks sufficient information to form a belief as to

the truth of the allegations contained in the third sentence of paragraph 12 and therefore denies

them.  Fish & Richardson further states that Mr. Gartman was not married to his wife at the time

that U.S. Patent No. 6,664,896 issued.

13.     Mr. Harris also prominently displayed plaques of some of his patents, including U.S. Patent Nos. 5,339,174 and 5,438,436, in his office.  Anyone entering Mr. Harris' office would have seen that he was the sole inventor on the displayed patents and that such activity was taking place while he was associated with Fish.  Many Fish attorneys -- including the Managing Partner of the San Diego office -- came into Mr. Harris' office and saw such plaques on his wall.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the

truth of the allegations contained in paragraph 13 and therefore denies them.

14.     Mr. Harris also provided his U.S. Patent Office PKI (Public Key Infrastructure) certificate to Fish, and allowed Fish to store this certificate in a way that allowed every person in every Fish office to obtain access to this certificate.  This enabled any Fish attorney to check the status of his patent filings.  That certificate was associated with Fish's customer number and also with Mr. Harris' personal customer number, which enabled the user to view all of Mr. Harris' personal filings.  According to the PTO:

> You can log in to the Patent Office's website using your certificate, and get access
> to all the customer numbers and cases, associated with that certificate.  For

example, you can review Pending and Patented Application Information, Prosecution History, Status and Location and other things about the cases.

**RESPONSE:**   As to the first sentence, Fish & Richardson admits that Mr. Harris provided his PKI certificate to Fish & Richardson and denies the remaining allegations.  Fish & Richardson further states, however, that the PKI certificate is password-protected and that passwords are not generally accessible.  Fish & Richardson admits that Harris and anyone to whom Harris gave a protected password could view his patent filings.  Fish & Richardson denies that any Fish & Richardson attorney could check the status of Harris's patent filings.  Fish & Richardson denies that Harris allowed Fish & Richardson to store this certificate in a way that allowed every person in every Fish & Richardson office to obtain access to his PKI password.  Fish & Richardson denies the second sentence.  As to the last sentence, Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegation and therefore denies it.  Fish & Richardson denies that Mr. Harris ever disclosed to it the extent of his personal patent activities, his use of firm resources in those activities, or the other misconduct identified in Fish & Richardson's third-party complaint against Mr. Harris and denies any inconsistent allegations.  Fish & Richardson further denies that the PKI certificate would have revealed those facts and denies any remaining allegations of paragraph 14.

15.    Mr. Harris also used examples of his personal patent prosecution in public presentations to other Fish attorneys.  After one such presentation in 2005, an attorney in Fish's Dallas office, Wes Musselman, specifically asked him about the example Mr. Harris discussed (related to automatic detection of cell phones at gas pumps) because another Fish client was interested in filing a patent application on similar technology.  Mr. Harris confirmed that the cited example was for one of his own patents, and gave Mr. Musselman the patent number (U.S. Patent No. 6,222,458).

**RESPONSE:**   Fish & Richardson lacks sufficient knowledge to admit or deny the allegation made in the first sentence and therefore denies it.  Fish & Richardson states that if Mr. Harris used examples of personal patent prosecutions in public presentations to other Fish

attorneys, it believes that he did not disclose or make clear that the examples were from a

"personal patent prosecution."  Fish & Richardson denies that the referenced presentation was

made in 2005; Fish & Richardson admits that at a different point in time, Mr. Harris made a

presentation on an examiner interview which referenced the identified technology, but alleges

that Mr. Harris did not make clear at that presentation that he was referring to an actual patent

prosecution as opposed to a fictional hypothetical example.  Fish & Richardson admits that Mr.

Musselman and Mr. Harris discussed Mr. Harris's patent, U.S. Patent No. 6,222,458, because

another Fish & Richardson client was interested in filing a patent application on similar

technology and admits that Mr. Musselman gave Mr. Harris the patent number.  Fish &

Richardson further states that Mr. Harris did not disclose or make clear to Mr. Musselman that

this patent was a patent that he developed using any Fish & Richardson resources.  Fish &

Richardson further states that this circumstance should have put Mr. Harris on further notice that

his personal patent prosecutions were causing conflicts with client interests and firm interests.

Mr. Harris effectively acknowledged that he knew that this patent posed an obstacle for a firm

client and to the firm's representation of its client when he stated to Mr. Musselman, "thank you

for being understanding about this."  Fish & Richardson denies any remaining allegations

contained in paragraph 15.

16.     In early 2005, Mr. Harris sought oversight of the PTO's actions by the Court of
Appeals for the Federal Circuit on one of his pending patent applications (In re Scott C. Harris,
Federal Circuit Appeal No. 05-1247), contending that the PTO was applying the wrong legal
standard of patentability in examining business method claims.  Like many intellectual property
firms, Fish closely monitors events in the PTO and Federal Circuit Court of Appeals.  During
that court action, in or around May of 2005, Fish attorney John Dragseth sent an email to many
or all Fish attorneys, discussing that lawsuit and specifically identifying the application as
belonging to Mr. Harris.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the

truth of the allegations contained in the first sentence of paragraph 16 and therefore denies them.

Fish & Richardson admits that some Fish & Richardson lawyers sometimes monitor some but not all events in the PTO and Federal Circuit Court of Appeals.  Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegations contained in the third sentence of paragraph 16 and therefore denies them.  Fish & Richardson specifically denies that Mr. Harris ever disclosed to it the extent of his personal patent activities, his use of firm resources in those activities, or the other misconduct identified in Fish & Richardson's third-party complaint against Mr. Harris and denies any inconsistent allegations and all remaining allegations contained in paragraph 16.

17.    In April of 2006, Mr. Harris also submitted public comments to the PTO's proposed rule changes on continuing applications in which he acknowledged his status as an inventor:

> These comments are responsive to Proposed Rules for Changes to Practice on Continuing Applications, (Federal Register Vol 71, no 1, pp 48-61).  These comments are made by Scott C. Harris, individually, as a registered patent attorney (Reg number 32,030), ***and also as an independent inventor on numerous issued and pending patents.***  These comments are not made on behalf of Fish & Richardson PC, the law firm with which I am associated (emphasis added).

These comments were publicly posted, and still can be viewed on the PTO website at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/harris.pdf.  Mr. Harris said the same thing in his comments on examination of claims (http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_claims/harrisscott.pdf).  These comments are viewed by thousands of patent attorneys, and it is inconceivable that they were overlooked by Fish or all of its attorneys who practice in this area.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to when and what Mr. Harris submitted to the PTO and therefore denies the allegations contained in the first sentence of paragraph 17.  Fish & Richardson admits that the PTO has a website and that information may be viewed on it.  Fish & Richardson further states that the written information on the PTO website speaks for itself, respectfully refers the Court to the website, and denies any inconsistent allegations of paragraph 17.  Fish & Richardson lacks sufficient information to form

a belief as to the number of patent attorneys who view comments on the PTO website and also

lacks sufficient information to form a belief as to the number of patent attorneys who may have

viewed any comments made by Mr. Harris.  Therefore, Fish & Richardson denies the allegations

contained in the first clause of the last sentence of paragraph 17.  Fish & Richardson states that

Mr. Harris's subjective belief of what is "inconceivable" does not require a response, but to the

extent that the Court deems a response is required, Fish & Richardson denies any allegations

contained in the second clause of the last sentence of paragraph 17.  Fish & Richardson denies

any remaining allegations contained in paragraph 17.

18.     At no time did Mr. Harris use any client information in the prosecution of his
patents.  To the contrary, Mr. Harris even assigned at least two of his patents on which he was
only a co-inventor to Fish's clients precisely to avoid any contention that he personally benefited
from client information.

**RESPONSE:** Fish & Richardson admits that Mr. Harris assigned two patents on which

he was a co-inventor to a firm client.  Fish & Richardson lacks sufficient information to form a

belief as to the truth of the allegations contained in the remaining allegations of paragraph 18 and

therefore denies them.

19.     As was the practice at Fish, other attorneys employed at Fish likewise were
inventors on their own patents.  A well-known example is that of Tom Woolston, who
prosecuted his own patents while at Fish[.]  Those very patents were the basis for Woolston's
founding of MercExchange (as in eBay v. MercExchange, 126 S.Ct. 1837 (2006)), a company of
which the Managing Partner of Fish's San Diego office, John Phillips, is a co-owner.

**RESPONSE:** Fish & Richardson admits that some of its attorneys, including Mr.

Woolston, were inventors of patents, but denies that any of those instances were comparable to

Mr. Harris's conduct because to Fish & Richardson's knowledge, no such patents were asserted

against firm clients.  Fish & Richardson lacks sufficient knowledge to form a belief as to the

basis for the founding of the listed company, and therefore denies those allegations.  Fish &

Richardson admits that John Phillips has a minority ownership interest in MercExchange, which

he disclosed to the firm and which the firm has authorized. MercExchange is a client of the firm and has not asserted patent claims against any existing firm clients. Fish & Richardson denies all remaining allegations contained in paragraph 19.

20.    Other attorneys sought and filed their own patents while at Fish, including Tim Pham, who has since left Fish to work for Google.

**RESPONSE:** Fish & Richardson admits that some of its attorneys were inventors of patents, but denies that any of those instances were comparable to Mr. Harris's conduct. Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 20 regarding Mr. Pham's employment and therefore denies them. Fish & Richardson denies all remaining allegations contained in paragraph 20.

21.    Neither the "employment agreement" under which Fish principals are employed, nor any firm policy, written or unwritten, prohibited Mr. Harris or any other firm employee or principal from making inventions and/or obtaining patents on inventions.

**RESPONSE:** Fish & Richardson admits that its policies and agreements with its principals did not prohibit the mere making of an invention or obtaining of a patent, but denies that those policies and agreements permitted the type of misconduct in which Mr. Harris participated or authorized a principal to obtain exclusive and unconditional ownership of the patent. Fish & Richardson denies any remaining allegations contained in paragraph 21.

22.    In March 2007, Dell Computer allegedly complained to Fish that it had been sued for infringement of a patent (U.S. Patent No. 6,704,791) by Mr. Harris and his exclusive licensee, Memory Control Enterprise ("MCE"). Thereafter, on March 19, 2007, Mr. Harris was contacted by John Steele, Fish's Ethics and Conflicts Director and Special Counsel. Mr. Steele told Mr. Harris that Dell was a client of Fish and, for that reason, Mr. Harris could not be a party in any lawsuit against Dell. Mr. Harris later learned that Dell may not, in fact, have been a client of the Fish firm at that time. When Mr. Harris inquired of Mr. Steele by email whether Dell was, in fact, a Fish client, Mr. Steele chose not to respond. Mr. Harris told Mr. Steele about all of his patents and applications. At that time, Mr. Steele indicated (like all others at Fish over the years who Mr. Harris had told about his patents and applications) that this was not a problem, but instructed Mr. Harris to get all his pending patent applications into the Fish conflicts system. Beginning on March 21, 2007, he began doing so to satisfy that demand.

**RESPONSE:** Fish & Richardson admits that representatives of Dell complained to Fish & Richardson about the fact that a Fish & Richardson principal was a plaintiff in the lawsuit filed against it in 2007. Fish & Richardson further admits that Mr. Steele contacted Mr. Harris on or about March 19 and correctly informed him that Dell had been and was an existing client of Fish & Richardson and that it would be a conflict for Mr. Harris to proceed or assist in the action against Dell while a principal of the firm. Fish & Richardson lacks sufficient information to form a belief as to what Mr. Harris "later learned," but states that Dell was in fact a client of Fish & Richardson at the time. Fish & Richardson denies that Mr. Harris told Mr. Steele about "all of his patents and applications," and further states that Mr. Harris made misstatements and omissions that were materially false and misleading in response to Fish & Richardson's inquiry. Fish & Richardson denies Mr. Harris's characterization of what Mr. Steele "indicated" during the inquiry and further denies Mr. Harris's characterization of what "others at Fish over the years" indicated. Fish & Richardson denies all remaining allegations contained in paragraph 22.

23.     On April 10, 2007, Mr. Steele asked Mr. Harris for an update on ownership of the '791 patent. At that time, MCE simply had an exclusive license under the patent and Mr. Harris retained all ownership rights. Mr. Harris told Mr. Steele that he would form a separate company and transfer title to it and also withdraw from the pending litigation personally. Mr. Steele informed Mr. Harris that he had outside counsel look into the issue of whether Mr. Harris had done anything unethical or inappropriate in obtaining the '791 patent and pursuing litigation against Dell. He conceded to Mr. Harris that the investigation cleared Mr. Harris of any wrongdoing.

**RESPONSE:** Fish & Richardson admits the allegations contained in the first sentence of paragraph 23. Fish & Richardson lacks sufficient information to form a belief regarding the "exclusive license" described in the second sentence of paragraph 23 and therefore denies the allegations of that sentence. Fish & Richardson admits that Mr. Harris at some point in April 2007 proposed to transfer one of his patents (the '791 patent) to a separate company that he would own, but that Fish & Richardson told Mr. Harris that proposal was not acceptable. Fish &

Richardson further admits that it investigated Mr. Harris's role in the lawsuit against Dell.  Fish

& Richardson further states that in the course of this inquiry, Mr. Harris made misstatements and

omissions that were materially false and misleading.  Fish & Richardson denies Mr. Harris's

characterization of Fish & Richardson's investigation and its conclusions and denies that it

informed Mr. Harris that "the investigation cleared Mr. Harris of any wrongdoing."  Fish &

Richardson denies all remaining allegations contained in paragraph 23.

24.    On April 22, 2007, Mr. Harris sent an email to Mr. Steele informing him that he
had formed a separate company to own the '791 patent, and that he was going to assign the '791
patent to that company so it could be formally substituted for him as a plaintiff in the lawsuit
against Dell.  Later that day, Mr. Harris received an email from Mr. Steele saying: "Scott, thanks
for hopping on this. Let's talk Monday."  On Monday, April 23, 2007, Mr. Harris again informed
Mr. Steele that he was about to assign the '791 patent to a separate company, but Mr. Steele told
Mr. Harris "to hold off for now."  Mr. Harris complied with his directive.

**RESPONSE:** Fish & Richardson admits that Mr. Harris sent an email to Mr. Steele on or

about April 22, 2007, but denies that Mr. Harris has accurately summarized the email, which

speaks for itself.  Fish & Richardson admits the second sentence of paragraph 24 and asserts that

Mr. Steele's email was induced by Mr. Harris's misstatements and omissions regarding his

misconduct.  Fish & Richardson admits that Mr. Harris and Mr. Steele spoke on or about April

23, 2007 and agreed that Mr. Harris would "hold off for now."  Fish & Richardson further states

that at the time of this meeting, Fish & Richardson was mislead by Mr. Harris's misstatements

and omissions.  Fish & Richardson denies any remaining allegations contained in paragraph 24.

25.    A week later, on May 1, 2007, Mr. Harris received a telephone call from Mr.
Steele and Kathi Lutton, another Fish attorney.  Mr. Steele and Ms. Lutton told Mr. Harris that
he had two choices: (a) drop the lawsuit against Dell or (b) leave Fish.  Ms. Lutton further
ordered Mr. Harris to dismiss the suit against Dell or to sell whatever interest he had in the '791
patent and also to sell any other patents he owned within the next few days.  Mr. Harris told Ms.
Lutton that he had never seen a patent sale happen in such a short amount of time.  Ms. Lutton
agreed, but told Mr. Harris that he had to sell all of his patents anyway.  Ms. Lutton warned Mr.
Harris to "weigh [your] options carefully."

**RESPONSE:** Fish & Richardson admits that Mr. Steele and Ms. Lutton spoke with Mr.

Harris on or about May 1, 2007, and that Ms. Lutton correctly stated in that conversation that

Dell had been and was an existing client and that it would be a conflict for Mr. Harris to proceed

or assist in the action against Dell while a principal of the firm.  Fish & Richardson denies that

Ms. Lutton "ordered" Mr. Harris "to sell any other patents he owned within the next few days"

and further denies that Mr. Harris has accurately and completely summarized the referenced

conversation in the allegations of the second, third, fourth, fifth, or sixth sentences of paragraph

25, and states that at the time of the conversation, Mr. Harris had made misrepresentations and

material omissions with respect to his misconduct.  Fish & Richardson denies any remaining

allegations contained in paragraph 25.

26.     Based upon Fish's demands, Mr. Harris took immediate steps to sell his patents
and pending patent applications to third parties.  The timing of Fish's demand, however, required
that Mr. Harris seek and accept less than optimum terms of sale.  Eventually, Mr. Harris was able
to find purchasers for some of his patents and pending applications, one of which was Illinois
Computer Research LLC ("ICR"), which acquired the '252 patent and U.S. Patents Nos.
7,231,050, 7,194,624 and 7,069,313, as well as U.S. Patent Applications Nos. 09/569,816 and
09/669,959 and any continuations from and reissues or reexaminations of these patents and
applications.  Purchasers of other of Mr. Harris' patents included Bar Tex Research, LLC,
Innovative Biometric Technology LLC, Innovative Patented Technology, LLC, Parker
Innovative Technologies and Virginia Innovative Technology, LLC.  Any prospective purchaser
of patents determine value by identifying a list of users of the relevant technology for each patent
and prospective purchasers did so, including organizations that routinely purchase patents from
inventors.

**RESPONSE:** Fish & Richardson denies the allegations contained in the first sentence of

paragraph 26 and the reference in the second sentence to "Fish's demand."  Fish & Richardson

lacks sufficient information to form a belief as to the truth of the allegations contained in the

remainder of the second, and all of the third, and fourth sentences of paragraph 26, which purport

to characterize transactions to which Fish & Richardson was not a party and therefore denies

them.  Fish & Richardson states that the last sentence of paragraph 26 purports to characterize

how unnamed prospective purchasers determine value and what those unnamed prospective

purchasers did, and therefore Fish & Richardson lacks sufficient information to form a belief as

to the truth of the allegations contained in the last sentence of paragraph 26 and therefore denies

them.  Fish & Richardson denies any remaining allegations contained in paragraph 26.

27.    After the sale of his patents to ICR, ICR sent a letter to Google on August 29, 2003, stating that it was infringing the '252 Patent.  Google is a client of Fish and, on information and belief, Google immediately complained to Fish and sought its help in having the infringement claim withdrawn.

**RESPONSE:** Fish & Richardson admits that Google is a client of Fish & Richardson.

Fish & Richardson further admits that in August or September 2007, someone sent a letter to

Google alleging that Google was infringing the '252 patent, and that, on information and belief,

the letter stated that Mr. Harris (then a principal at Fish & Richardson) was a named inventor of

the '252 patent.  Fish & Richardson further admits that Google complained to Fish & Richardson

after receipt of the letter and the filing of ICR's lawsuit against Google.  Fish & Richardson

denies all remaining allegations contained in paragraph 27.

28.    Even though Fish had demanded that Mr. Harris sell these patents, and Mr. Harris had used his best efforts to comply with that directive, Fish immediately attempted to pressure, punish and intimidate Mr. Harris anyway.  On September 6, 2007, Mr. Steele told Mr. Harris that, if he proceeded with litigation against anyone enforcing his patents, Fish would claim that he copied ideas from firm clients and otherwise violated ethics rules.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 28.

29.    Fish then embarked on a campaign to damage Mr. Harris' professional reputation and cast a cloud over his patent portfolio, all to reassure potential infringers that Fish would assist in undermining the value of that portfolio.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 29.

30.    Specifically, on September 12, 2007, before Fish had even demanded Mr. Harris' resignation, PRG notified him that (1) it had received a call from a Fish official, and (2) it was terminating Mr. Harris from its faculty and removing him from the PRG website.  This, alone, greatly damaged Mr. Harris' professional standing.

**RESPONSE:** Fish & Richardson lacks sufficient information to form a belief as to the

truth of the allegations contained in the first sentence of paragraph 30, which pertain to an

unidentified communication to Mr. Harris, and therefore denies them.  Fish & Richardson denies

the allegations contained in the second sentence of paragraph 30.

31.     Then, later on September 12, 2007, Fish's Managing Partner, Peter Devlin, demanded the resignation of Mr. Harris within 24 hours.  Mr. Harris reluctantly complied with that demand.  Such demand was an effort to punish Mr. Harris for his inventorship activities and to signal that Fish would assist in undermining the value of Mr. Harris' patent portfolio.

**RESPONSE:** Fish & Richardson admits that as a result of its discovery of Mr. Harris's

deception, misconduct, and breaches of his duties, on or after September 6, 2007, Mr. Devlin

asked Mr. Harris for his resignation from Fish & Richardson and Mr. Harris resigned thereafter.

Fish & Richardson denies all remaining allegations contained in paragraph 31.

32.     As part of that effort, on September 13, 2007, Fish, through its "Ethics Director" Steele, telephoned the employment lawyer for Mr. Harris, Ms. Lynne Lasry, and made a number of claims and demands.  In that conversation, Fish claimed that it — and not Mr. Harris — owned Mr. Harris' patents.  Fish asserted that "the patents are being held in constructive trust for the firm."  Fish demanded that Mr. Harris "get these patents back" and insisted on seeing all of Mr. Harris' privileged communications with the Niro law firm, which had represented Mr. Harris.  Fish, through Steele, also stated that, if Mr. Harris pursued patent infringement litigation, Mr. Harris would face inequitable conduct claims and his life could be made "miserable."

**RESPONSE:** Fish & Richardson admits that Mr. Steele of Fish & Richardson had a

telephone conversation with Ms. Lasry regarding Mr. Harris on September 13, 2007 in the

context of settlement discussions governed by Fed. R. Evid. 408.  For all of the following

statements in this paragraph, Fish & Richardson expressly reserves all rights and privileges

associated with Fed. R. Evid. 408 and similar protections for settlement communications.  Fish &

Richardson admits that Mr. Steele and Ms. Lasry had a professional and courteous discussion

about issues relating to Mr. Harris's misconduct, potential resolutions of the issues between Fish

& Richardson and Mr. Harris, and each party's position and desired terms for a possible

resolution.  In the context of discussing those subjects, Fish & Richardson admits that it made

statements to Ms. Lasry, including: (i) that Fish & Richardson asserts an ownership interest in

any patents that Mr. Harris prosecuted while at Fish & Richardson; (ii) that Fish & Richardson

wished to know whether Mr. Harris had remaining asserted rights in the patents or whether the

patents had been purportedly transferred to ICR and others on an irrevocable basis; (iii) that to

protect the interests of other firm clients, Fish & Richardson wished to see Mr. Harris's

communications with Mr. Niro about what other Fish & Richardson clients were the target of

enforcement of the Harris patents; and (iv) that it was not tenable for Mr. Harris to remain a

principal at Fish & Richardson while at the same time his patent was being asserted against a

firm client because, among other reasons, if any claims of inequitable conduct were asserted by

the accused defendant against Mr. Harris as a named inventor, such claims would create yet

another adversity between Mr. Harris and the Fish & Richardson client, which could develop

into a difficult litigation situation that could be a miserable experience.  Fish & Richardson

further states that it did not believe at that time that Mr. Harris and the Niro Firm had an

attorney-client relationship.  Fish & Richardson also admits that Mr. Steele and Ms. Lasry

discussed the difficulties for all parties to any litigation.  Fish & Richardson denies all remaining

allegations contained in paragraph 32.

33.    Then, or about September 21, 2007, Fish gave the media a prepared statement, falsely charging that Mr. Harris' patent activities were "not authorized".  As alleged above and below, Mr. Harris' actions were in fact authorized by the firm.  Indeed, Mr. Harris sold his patents at the express demand of Fish.  On information and belief, in September and early October of 2007, Fish continued to make the same false statements to third parties, all in an effort to undermine the assertion of Mr. Harris' patent portfolio against infringers.  For good measure in early October 2007, Fish publicly made the same declaration to the National Law Journal ("Harris was involved in outside business ventures that were not authorized by the firm....").  This statement (like the others) was false.

**RESPONSE:** Fish & Richardson admits that it made a public statement, but denies that

Mr. Harris has accurately or fully summarized that statement in the first sentence of paragraph

33.  Fish & Richardson denies the allegations contained in the second, third, and fourth sentences

of paragraph 33.  Fish & Richardson admits that the National Law Journal quoted a statement

made by Fish & Richardson, but denies that Mr. Harris has accurately or fully summarized that

statement in the fifth sentence of paragraph 33. Fish & Richardson denies the allegations

contained in the sixth sentence of paragraph 33. Fish & Richardson denies all remaining

allegations contained in paragraph 33.

34. On information and belief, before filing this lawsuit, Fish also improperly told
Google and others that it had ownership rights in Mr. Harris' patents, a fact that encouraged
Google and others not to accept and pay for a license under the Harris patents or to pay far less
than the actual value of a license.

**RESPONSE:** Fish & Richardson admits that it has asserted ownership and other interests

in patents that Mr. Harris prosecuted while he was a principal at Fish & Richardson and denies

that it "improperly told Google and others" of its rights. Fish & Richardson denies all remaining

allegations contained in paragraph 34.

35. Fish's false ownership claims and statements that Mr. Harris had engaged in
unlawful ("not authorized") activities regarding his patents brought the expectancy of licensing
Mr. Harris' patent portfolio on reasonable terms to a screeching halt.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 35.

36. Fish knew that its ownership and other claims were baseless. As alleged above,
from the very beginning, Mr. Harris fully disclosed his personal inventorship activities to Fish,
and Fish expressly and implicitly gave its blessing to those activities. As alleged above, Mr.
Harris was quite open about his inventorship activities, and those activities were publicized and
widely known within the firm. In one case, twelve lawyers at Fish were given power of attorney
to act on Mr. Harris' behalf in connection with the '252 patent. In addition, Fish was clearly on
actual and constructive notice of all Mr. Harris' inventorship activities. Fish personnel had
access to detailed information about each and every one of Mr. Harris' patents via his PKI
certificate. Fish personnel used this access virtually every day, and could have viewed
information about his patents at any time. All Fish attorneys were likely actually on notice of,
Mr. Harris' comments on the rule changes in which indicated that he "was an independent
inventor on numerous issued and pending patents". This alone is enough to show that Fish knew
that Mr. Harris was an inventor and had and was obtaining his own patents while employed by
Fish. Moreover, Mr. Harris had already been cleared of any wrongdoing in Fish's internal ethics
investigation. Finally, Mr. Harris had sold many of his patents and pending applications to third
parties at Fish's insistence. This was also known to Fish.

**RESPONSE:** Fish & Richardson denies the allegations contained in the first, second,

third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth sentences of paragraph 36.

Fish & Richardson lacks sufficient information to form a belief as to the allegations contained in

the fourth sentence of paragraph 36 and therefore denies them. Fish & Richardson states that at the time that Mr. Harris and others were given power of attorney in relation to the '252 patent, Mr. Harris was purportedly representing a firm client, Senatas, in relation to the patent. Fish & Richardson denies that Mr. Harris ever disclosed to it the extent of his personal patent activities, his use of firm resources in those activities, or the other misconduct identified in Fish & Richardson's third-party complaint against Mr. Harris and denies any inconsistent allegations.

37.    Even then, Fish continued to exert pressure on Harris and assert its fabricated claims of ownership, this time through several conversations between Mr. Harris' employment counsel, Ms. Lasry, and Fish's outside counsel, Jenner & Block, in September and early October 2007. During those conversations, Fish: (1) continued to assert that it owns the Harris patents and all of its clients are entitled to "paid-up licenses"; (2) demanded that this lawsuit be dismissed; (3) demanded that Mr. Harris "renegotiate" his Agreement with ICR; (4) refused to discuss the sums due Mr. Harris; and (5) made another reference to inequitable conduct. Fish also improperly cancelled Mr. Harris' health insurance coverage in clear violation of Federal Law, prior to offering him coverage under COBRA. Medical insurance was not reinstituted until almost a month and a half after Mr. Harris' forced termination.

**RESPONSE:** Fish & Richardson denies the first sentence of paragraph 37. Fish & Richardson admits that, through its counsel, Jenner & Block LLP, it had telephone conversations with Mr. Harris's counsel, Ms. Lasry, regarding Mr. Harris. Fish & Richardson states that these conversations were settlement discussions governed by Fed. R. Evid. 408. For all of the following statements in this paragraph, Fish & Richardson expressly reserves all rights and privileges associated with Fed. R. Evid. 408 and similar protections for settlement communications. Fish & Richardson admits that Ms. Lasry and representatives of Jenner & Block engaged in professional and courteous communications regarding the possibility of Fish & Richardson and Mr. Harris amicably resolving the disputes between them. Fish & Richardson admits that, in the course of those settlement communications, Ms. Lasry asked for Fish & Richardson's desired terms for a potential resolution, and, in that context, Fish & Richardson discussed with Ms. Lasry, among other things:  (i) Fish & Richardson's ownership and other

interests in patents prosecuted by Mr. Harris while a principal at Fish & Richardson, and possible options for resolving the disputes over conflicting claims of ownership, including discussions with ICR and a resolution of ICR's suit against Google; and (ii) Fish & Richardson's desire to understand the agreements that Mr. Harris had purported to enter into transferring his alleged interests in the patents and Mr. Harris's unwillingness to provide such information. Fish & Richardson admits that its counsel did decline an invitation to discuss issues concerning Mr. Harris's capital contributions as a principal of Fish & Richardson because such a discussion was premature. Fish & Richardson denies all remaining allegations contained in paragraph 37. Fish & Richardson states that at no time was medical coverage for Mr. Harris interrupted.

38.    Fish falsely represented to Mr. Harris that its "ownership" rights are purportedly based on its contention that Mr. Harris used "firm resources" in obtaining his patents.

**RESPONSE:** Fish & Richardson admits that it has claimed ownership and other interests in patents that Mr. Harris prosecuted while he was a principal at Fish & Richardson because, among other reasons, Mr. Harris misused firm resources. Fish & Richardson denies that those claims were "falsely represented," denies that the use of firm resources is the sole basis for Fish & Richardson's claim, and further denies all remaining allegations contained in paragraph 38.

39.    In actuality, Mr. Harris personally handled his inventorship activities on his own time, and at no time did such activities interfere with his billable work. Indeed, Mr. Harris' billable hours were, for all the years in question, above the goal set by Fish as the required number of hours to be billed per year. He routinely billed 1,900 to 2,000 hours per year. In a firm where many attorneys did not meet their billing goals, this often placed Mr. Harris in the top 25% highest billers at Fish. Moreover, Mr. Harris never used any firm personnel during employment hours to assist him in any way with any of his personal patent filings, with the exception of those filings which were done on behalf of firm clients.

**RESPONSE:** Fish & Richardson denies the allegations contained in the first, second, fourth and fifth sentences of paragraph 39. Fish & Richardson admits the allegations contained in the third sentence of paragraph 39.

40.     In fact, Mr. Harris worked on his personal patent filings, responses and formalities for the most part at home, on his own time, using his own computers and other resources. As alleged above, he had a separate customer number with the PTO for his personal patent filings to avoid confusion between those filings and Fish's filings. That customer number was associated with the same PKI certificate which Fish's customer numbers were associated — evidencing Mr. Harris' practice of making his personal inventorship activities open and well known within Fish. He also had his own separate deposit account, which he personally funded, and which he used to pay fees to the PTO that were due for his personal patent filings. None of his work on personal patent filings in any way interfered with his work as a patent attorney for Fish.

**RESPONSE:** Fish & Richardson states that it is unclear what is meant by "for the most part," asserts that the first sentence of paragraph 40 is vague and that it lacks sufficient information to form a belief as to its truth and therefore denies the allegations of the first sentence. Fish & Richardson admits that Mr. Harris had a "separate customer number" and lacks sufficient information to form a belief as to the remaining allegations related to that separate customer number contained in the second and third sentences of paragraph 40. Fish & Richardson denies that Mr. Harris made his activities "open and well known within Fish." Fish & Richardson lacks sufficient information to form a belief as to the truth of the allegations contained in the fourth sentence of paragraph 40 and therefore denies them. Fish & Richardson denies the allegations contained in the fifth sentence of paragraph 40 and further denies all remaining allegations contained in paragraph 40.

41.     Fish's contention about "firm resources" is directly at odds with its own policies. Fish, like many large firms, is dependent upon its lawyers billing a high number of billable hours. In that regard, and to facilitate the achievement of billable hours goals, Fish recognized that it is inevitable that its attorneys will have to transact business regarding outside commercial ventures, investments, family matters and charitable activities in the course of a normal day at the office. Fish allowed and even encouraged the use of "firm resources" (secretaries, paper, telephones, computers) for such activities as long as it facilitated billable hour production. For example, attorneys routinely would copy and mail personal papers at Fish, such as tax returns. They would pay bills at work using the Fish computer. They would use "firm resources" for other purposes that were in fact wholly personal. Fish allowed this kind of use. In fact, Fish allowed charging certain personal items such as copies and mailings to an attorney's "personal account", which would then be deducted from the attorney's paycheck.

**RESPONSE:** Fish & Richardson denies Mr. Harris's characterizations of Fish &

Richardson's policies and further denies the allegations of what Fish & Richardson attorneys

"routinely" would do. Fish & Richardson admits that its lawyers work hard and bill many hours

per year. Fish & Richardson further admits that it has allowed its attorneys to pay for personal

copies and postage by deducting the appropriate amount from their paycheck, and Fish &

Richardson denies that such a practice is "at odds with" Fish & Richardson's contention that Mr.

Harris's conduct breached his contract and fiduciary duties in multiple ways. Fish & Richardson

denies all remaining allegations contained in paragraph 41.

42.    Fish's contention about "firm resources" also is at odds with its actual practices
and the numerous examples of non-firm commercial dealings by its attorneys. Mr. Steele
conceded to Mr. Harris that many Fish attorneys had what he called "side businesses" on which
they conducted personal work activities from their offices at Fish. Mr. Harris is aware of
numerous examples, including that of Mr. Phillips, the Managing Partner of the San Diego
office, who is co-owner of MercExchange. Other examples include: (1) Steve Stodgill, an
attorney in the Dallas office who purportedly has a number of outside business deals, some with
noted entrepreneur Mark Cuban; (2) John Schnurer, an attorney in the San Diego office, who
purportedly crafted, and personally benefited from, several non-firm real estate deals; and (3)
Charles Heiken, an attorney with significant business relationships with Bose corporation. Fish's
contention is also contradicted by the express language in the "employment agreement" which it
filed in this case. Section 4b of that agreement states the limits placed on outside activities of
employees to be limited only to those activities that "impinge substantially on time or energy
normally required for business of the corporation". Examples given are things like "holding
public office". Nowhere does this or any other section of the employment agreement reference
(much less limit) the employee's rights to file patent applications for their own inventions.
Moreover, Mr. Harris' billing history while at Fish — which was always found satisfactory to
management and was never below the set billing "goal" — clearly demonstrates that his other
activities did not impinge on his time or energy for his Fish work.

**RESPONSE:** Fish & Richardson denies the allegations contained in the first and second

sentences of paragraph 42. Fish & Richardson admits Mr. Harris's billing history was

satisfactory and met goals, but denies the remaining allegations of the last sentence. Fish &

Richardson states that the remaining allegations of paragraph 42 consist largely of legal

arguments, that no answer is required to such allegations, and to the extent an answer is deemed

required, Fish & Richardson denies Mr. Harris's arguments. Fish & Richardson further states

that sentences three through six of paragraph 42 purport to identify "examples" that Mr. Harris

purportedly is "aware of," supporting Mr. Harris's legal arguments.  Fish & Richardson lacks

knowledge as to Mr. Harris's knowledge, but denies that any "examples" support Mr. Harris's

arguments.  Fish & Richardson further states that sentences five through eight of paragraph 42

purport to characterize the terms of a contract, that those terms speak for themselves, and denies

all inconsistent allegations.  Fish & Richardson denies all remaining allegations contained in

paragraph 42.

## COUNT I

## TORTIOUS INERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE AGAINST FISH

1-42.    Mr. Harris restates Paragraphs 1-42 as Paragraphs 1-42 of Count I.

**RESPONSE:** Fish & Richardson restates its responses to paragraphs 1-42 as if fully

stated herein as its response to paragraphs 1-42 of Count I.

43.    Mr. Harris' sale of many of his patents and pending applications to third parties
was at Fish's demand and insistence.  The purpose of such sales was to facilitate the licensing
and enforcement of Mr. Harris' patent portfolio by entities other than Mr. Harris personally.

**RESPONSE:** Fish & Richardson denies the allegations contained in the first sentence of

paragraph 43.  Fish & Richardson lacks knowledge of Mr. Harris's purposes, and therefore

denies the allegations contained in the second sentence of paragraph 43.

44.    Mr. Harris has a valid business expectancy of financially benefiting from the
licensing and enforcement of his patent portfolio.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 44.

45.    Fish has knowledge of that expectancy, indeed, it has so pled in its claim against
Mr. Harris.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 45.

46.    Fish has purposefully, intentionally and wrongfully interfered with Mr. Harris'
legitimate expectancy (without justification) by, among other things, wrongfully asserting

ownership and "unauthorized venture" claims for not just the '252 patent, but for all of his personal inventorship activities, thereby casting a cloud over, and interfering with the ownership of, the entirety of Mr. Harris' patent portfolio.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 46.

47.    Fish made and publicized such claims prior to asserting them in litigation.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 47.

48.    Mr. Harris has been damaged by Fish's actions.  Indeed, potential licensees of Mr. Harris' patents already have pointed to Fish's ownership claims as a purported reason why they do not need a license or why the amount of any payment for a license should be greatly discounted.  Fish's actions have greatly diminished the value of Mr. Harris' patents.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 48.

## COUNT II

## DEFAMATION

1-48.    Mr. Harris restates Paragraphs 1-48 of Count I as Paragraphs 1-48 of Count II.

**RESPONSE:** Fish & Richardson restates its responses to paragraphs 1-48 of Count I as

if fully stated herein as its response to paragraphs 1-48 of Count II.

49.    Fish's statements to the press and other third parties were false, and Fish knew them to be false.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 49.

50.    Fish made the statements with actual malice.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 50.

51.    Fish's statements constitute defamation per se, and Mr. Harris' professional reputation has been damaged.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 51.

52.    If Fish followed through with its stated intention to claim that Mr. Harris copied his inventions from firm clients (to Google, for example), that, too constitutes defamation per se. Mr. Harris does not yet know precisely what Fish told PRG that prompted his termination from the PRG faculty, but such statements also were likely defamatory and false and Mr. Harris already has been damaged thereby.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 52.

**COUNT III**

**VIOLATION OF THE CALIFORNIA LABOR CODE**

1-52.   Mr. Harris restates Paragraph 1-52 of Count II as Paragraphs 1-52 of Count III.

**RESPONSE:** Fish & Richardson restates its responses to paragraphs 1-52 of Count II as if fully stated herein as its response to paragraphs 1-52 of Count III.

53.     As further leverage for its demands on Mr. Harris, Fish willfully withheld wages due Mr. Harris in violation of the California Labor Code.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 53.

54.     Specifically, though Fish was required to pay Mr. Harris wages of $27,234.50 immediately after his forced resignation (California Labor Code Section 201), Fish withheld payment until September 28, 2007.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 54.

55.     Under California Labor Code Section 203, Fish is therefore required to pay a daily statutory penalty for the late payment.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 55.

56.     Fish also has not paid Mr. Harris for his accumulated vacation time as required by California Labor Code Section 227.3.  Under firm policy, Fish provides its "employees" with 80 hours of vacation time per year.  After Fish terminated Mr. Harris, it failed to pay him for his accrued vacation time — over several hundred thousand dollars — plus statutory penalties under California Labor Code Section 203.

**RESPONSE:** Fish & Richardson denies the allegations contained in paragraph 56.

**PRAYER FOR RELIEF**

Fish & Richardson denies that Scott Harris is entitled to any of the relief he seeks.

## JURY DEMAND

Fish & Richardson demands a trial by jury on all claims asserted against it so triable.

## AFFIRMATIVE DEFENSES

For its affirmative defenses against Scott Harris, Fish & Richardson states as follows:

1.    Mr. Harris has failed to state a claim for which relief can be granted.

2.    As a result of Mr. Harris's breach of his contract with Fish & Richardson, his breach of his fiduciary duties, and other misconduct and circumstances alleged in detail in Fish & Richardson's counterclaim against ICR and third-party complaint against Mr. Harris, Fish & Richardson possesses legal ownership, and/or equitable ownership, and/or other interests in the '252 Patent inconsistent with and superior to any interest claimed by ICR or Mr. Harris.

3.    The alleged prospective economic advantage that Mr. Harris has identified is too remote or speculative to be actionable.

4.    Fish & Richardson's conduct at all times was privileged and/or not wrongful or actionable.

5.    Fish & Richardson's alleged statements were privileged and/or immunized.

6.    Fish & Richardson's statements were truthful.

7.    Fish & Richardson's statements were opinion.

8.    Mr. Harris's claims are barred by the doctrine of unclean hands.

WHEREFORE, Fish & Richardson requests that this Court enter judgment on its behalf against Mr. Harris, and order such other relief as the Court may deem equitable, just, and proper.

Dated: November 21, 2007

Respectfully submitted,

FISH & RICHARDSON P.C.

By:     s/ David J. Bradford
            One of Its Attorneys

David J. Bradford
Terrence J. Truax
Eric A. Sacks
Daniel J. Weiss
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, Illinois 60611
Telephone No:  (312) 222-9350
Facsimile No:  (312) 527-0484