# EXHIBIT A

Dockets.Justia.com

--- F.3d ----
--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

H

Estate of Sims v. County of Bureau
C.A.7 (Ill.),2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
ESTATE OF Thetis M. SIMS, by and through its
personal representative, Melissa K. Sims, William
C. Sims, surviving spouse and next of kin, and
Melissa K. Sims, individually, Plaintiffs-Appel-
lants,
v.
COUNTY OF BUREAU, as a necessary party in in-
terest, Greg Johnson, John E. Thompson, in his of-
ficial capacity as Sheriff of the County of Bureau
and Bureau County Sheriff's Department, Defend-
ants-Appellees.
No. 01-2884.

Decided Oct. 19, 2007.<sup>FN1</sup>
Argued Feb. 26, 2003.

**Background:** Estate of journalist, who suffered
fatal heart attack during confrontation with sheriff
regarding article investigating sheriff's alleged cam-
paign fraud, brought action against sheriff in his in-
dividual and official capacity, sheriff's department,
and county alleging that sheriff's actions led to
journalist's death. The United States District Court
for the Central District of Illinois, Joe Billy
McDade, J., dismissed the action. Following settle-
ment with sheriff in his individual capacity,
plaintiff appealed.

**Holdings:** The Court of Appeals, Kanne, Circuit
Judge, held that:

(1) estate failed to allege a policy or custom of the
sheriff's department;

(2) estate failed to allege that sheriff's conduct of
confronting journalist was related to the perform-
ance of his official duties; and

(3) estate failed to allege that sheriff conspired with
another person to conceal information.

Affirmed.

**[1] Federal Courts 170B ⟨⟩412.1**

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(C) Application to Particular Matters
      170Bk412 Contracts; Sales
        170Bk412.1 k. In General. Most Cited
Cases
State law governs a suit to enforce a settlement of a
federal suit.

**[2] Federal Courts 170B ⟨⟩776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most
Cited Cases
The Court of Appeals reviews de novo whether a
complaint states a claim upon which relief can be
granted. Fed.Rules Civ.Proc.Rule 8(a)(2), 28
U.S.C.A.

**[3] Federal Civil Procedure 170A ⟨⟩673**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(B) Complaint
      170AVII(B)1 In General
        170Ak673 k. Claim for Relief in Gen-
eral. Most Cited Cases
A statement in a complaint need only give the de-
fendant fair notice of what the claim is and the
grounds upon which it rests. Fed.Rules
Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[4] Civil Rights 78 ⟨⟩1304**

78 Civil Rights
  78III Federal Remedies in General
    78k1304 k. Nature and Elements of Civil Ac-
tions. Most Cited Cases
In order to state a claim pursuant to § 1983, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs must allege that a government official, acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⚖1394**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1394 k. Complaint in General. Most Cited Cases

In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual pleading requirements. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[6] Civil Rights 78 ⚖1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of Officers and Employees in General; Vicarious Liability and Respondeat Superior in General. Most Cited Cases

A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⚖1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was the moving force behind it. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ⚖1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

The official policy requirement for municipal liability under § 1983 is to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⚖1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of Officers and Employees in General; Vicarious Liability and Respondeat Superior in General. Most Cited Cases

**Civil Rights 78 ⚖1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

**Civil Rights 78 ⚖1354**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1354 k. In General. Most Cited Cases

Under § 1983, misbehaving municipal employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers. 42 U.S.C.A. § 1983.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[10] Civil Rights 78 ⟶1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

A plaintiff may demonstrate an official policy, as required to establish municipal liability under § 1983, through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ⟶1351(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases

Journalist's estate failed to allege a policy or custom of the sheriff's department of frightening journalists to death, as required to support § 1983 action against department alleging that sheriff's actions during confrontation with journalist regarding her investigation into sheriff's alleged campaign fraud led to journalist's fatal heart attack. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 ⟶1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

In § 1983 cases asserting an implicit municipal policy or a gap in express policy, what is needed is evidence that there is a true municipal policy at issue, not a random event. 42 U.S.C.A. § 1983.

**[13] Civil Rights 78 ⟶1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Journalist's estate failed to allege that sheriff's conduct of confronting journalist, who was investigating his alleged campaign fraud, was related to the performance of his official duties, as required to support § 1983 action against sheriff in his official capacity alleging that sheriff's actions during confrontation led to journalist's fatal heart attack. 42 U.S.C.A. § 1983.

**[14] Civil Rights 78 ⟶1326(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(2) k. Officers and Public Employees, in General. Most Cited Cases

Not every action taken by a state official is considered to have occurred under color of state law. 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 ⟶1324**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1324 k. In General. Most Cited Cases

An action is taken under color of state law, for purposes of § 1983 liability, if it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. 42 U.S.C.A. § 1983.

**[16] Civil Rights 78 ⟶1326(8)**

78 Civil Rights

    78III Federal Remedies in General

        78k1323 Color of Law

            78k1326 Particular Cases and Contexts

                78k1326(8) k. Police or Peace Officers; Prisons. Most Cited Cases

Whether a particular action was under color of state law, for purposes of § 1983 liability, depends largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties. 42 U.S.C.A. § 1983.

**[17] United States Magistrates 394 🖝31**

394 United States Magistrates

    394k31 k. Further Review; Direct Appeal. Most Cited Cases

Plaintiff's failure to object to magistrate judge's recommendation that claim be stricken waived his right to challenge the dismissal on appeal.

**[18] Conspiracy 91 🖝18**

91 Conspiracy

    91I Civil Liability

        91I(B) Actions

            91k18 k. Pleading. Most Cited Cases

Journalist's estate failed to allege that sheriff conspired with another person to conceal information or otherwise hamper investigation into journalist's death, as required to support § 1985 action against sheriff, department, and county related to journalist's fatal heart attack during confrontation with sheriff regarding her investigation into sheriff's alleged campaign fraud. 42 U.S.C.A. § 1985.

**[19] Conspiracy 91 🖝18**

91 Conspiracy

    91I Civil Liability

        91I(B) Actions

            91k18 k. Pleading. Most Cited Cases

Even under notice pleading, a § 1985 complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him. 42 U.S.C.A. § 1985.

**[20] Federal Courts 170B 🖝763.1**

170B Federal Courts

    170BVIII Courts of Appeals

        170BVIII(K) Scope, Standards, and Extent

            170BVIII(K)1 In General

                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from

                    170Bk763.1 k. In General. Most Cited Cases

Appellate review of propriety of dismissal of complaint was confined to review of the allegations.

Appeal from the United States District Court for the Central District of Illinois. No. 00 C 1065-Joe Billy McDade, Judge.

Richard L. Steagall, Nicoara & Steagall, Peoria, IL, for Plaintiffs-Appellants.

George J. Casson, Clifford G. Kosoff, O'Halloran, Kosoff, Geitner & Cook, Northbrook, IL, William W. Kurnik, Knight, Hoppe, Kurnik & Knight, Des Plaines, IL, for Defendants-Appellees.

Before EASTERBROOK, Chief Judge, and FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

**\*1** In 1999 Thetis M. Sims suffered a fatal heart attack in her home in Tiskilwa, Illinois. The only person present at the time was Bureau County Sheriff Greg Johnson, whose alleged campaign fraud was the subject of a story Ms. Sims was investigating for the local newspaper. Her estate, her husband, and her daughter brought a federal civil rights suit against Johnson in his individual and official capacities,[FN2] Bureau County, and the Bureau County Sheriff's Department, alleging that Johnson's actions led to Sims's death. The district court granted the defendants' motions to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), and the plaintiffs appeal. Following oral argument in the appeal, the plaintiffs informed us that they had settled their claims against Johnson, but that the remaining defendants were challenging the settlement agreement in Illinois state court. We suspended our proceedings until the Illinois courts could resolve the dis-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pute. In accordance with the state court decisions, we dismiss Johnson in his individual capacity. The plaintiffs have failed to establish their claims against the remaining defendants. Accordingly, we affirm the dismissal of the complaint.

## I. BACKGROUND

Because the district court dismissed the complaint pursuant to Rule 12(b)(6), we assume all well-pleaded allegations in the complaint are true and draw all reasonable inferences in the plaintiffs' favor. *Christensen v. County of Boone, Illinois,* 483 F.3d 454, 457 (7th Cir.2007) (per curiam); *Holman v. Indiana,* 211 F.3d 399, 402 (7th Cir.2000).*See also Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Prior to her death, Sims, a part-time newspaper reporter for the *Kewanee Star Courier,* was conducting an investigation into allegations that Sheriff Johnson engaged in campaign fraud in his election campaign and misused county funds. She had expressed concern to others that Johnson might retaliate against her for writing the story. On the day of her death, in an effort to intimidate Sims from writing the newspaper article about Johnson's misconduct, Johnson deposited for bulk mailing to the residents of the Simses' hometown a letter falsely accusing Sims's husband, William, of past and current felonious criminal conduct. Johnson then telephoned Sims, asked to speak with her, and drove to her home in Tiskilwa. Upon arrival, he showed the defamatory letter to Sims and questioned her regarding the accusations of criminal conduct by her husband. According to the allegations of the complaint, Johnson knew of Sims's heart condition, and knew or had reason to believe that reading a letter containing such extreme, outrageous accusations about her husband would cause her great emotional distress and would increase the likelihood that she would suffer a fatal heart attack.

At approximately 12:30 p.m., Sims did suffer a fatal heart attack. Johnson radioed for an ambulance at 12:47 p.m., but by the time the paramedics arrived at 12:54 p.m., Sims was not breathing and did not have a pulse. One of the paramedics de-

scribed her as "cold" when he arrived. The plaintiffs' expert in emergency medicine averred that Sims died of cardiac arrhythmia provoked by extreme anger or fear and that she could have survived if she had been given CPR immediately. Johnson told the paramedics that he did not complete CPR because his rubber gloves kept breaking. Before calling the ambulance, Johnson used Sims's telephone to call the Princeton Post Office and ask a postal worker about the criminal penalties for sending defamatory letters and whether the bulk-rate mailing of the defamatory letter could be traced. Sims's daughter found the telephone off the hook and out of her mother's reach. Following her death, Johnson dropped his own investigation regarding the defamatory letter. He also failed to investigate Sims's death and refused to cooperate with the police officers seeking to investigate her death.

**\*2** Both Johnson, in his individual capacity, and the County defendants-Bureau County, the Bureau County Sheriff's Department and the Sheriff in his official capacity-filed motions to dismiss for failure to state a claim upon which relief can be granted. Magistrate Judge Evans recommended, in part, that the district court dismiss the following parties and claims: (1) the County of Bureau as a real party in interest; (2) the First, Fourth, Fifth, Eighth, and Ninth Amendment claims in Counts IX and X; (3) the prayer for punitive damages in Counts IX, X, and XI, and (4) Counts XIV, XV, XVI, and XVII against the Sheriff in his official capacity. Neither side filed objections as to these recommendations; therefore, the district court adopted these portions of the Report and Recommendation. The district court, however, rejected the portions of the Report and Recommendation that the Bureau County Sheriff's Department be retained as a party, that the substantive due process violation claims in Counts IX and X be allowed, that the conspiracy claims in Count XI be allowed, and that the supplemental state law claims be allowed. The district court accordingly granted the defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) in their entirety, and dismissed the federal claims with prejudice and the state claims without prejudice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. DISCUSSION

[1] The plaintiffs appealed from the disposition of the motion to dismiss the individual capacity claims against Johnson and the motion to dismiss the claims against Bureau County, the Bureau County Sheriff's Department and the Sheriff in his official capacity. However, after oral argument was heard in this appeal, the plaintiffs entered into a settlement agreement with Johnson. Although the plaintiffs and Johnson settled only the claims against Johnson, the plaintiffs further agreed to dismiss their appeal and to limit their right to collect the settlement solely from Bureau County and its insurers. When they notified this court of the settlement agreement, the plaintiffs informed the court that Bureau County understandably was already challenging the settlement agreement in the state court case and asked the court to stay its proceedings pending resolution of the enforceability of the action in state court, which we did. The Illinois Appellate Court held that the settlement agreement was enforceable with respect to Johnson in his individual capacity, but not enforceable with respect to the Sheriff's Office or the County. *Sims v. Johnson,* No. 3-05-0416 (Ill.App. 3 Dist. July 27, 2006). State law governs a suit to enforce a settlement of a federal suit. *Dillard v. Starcon Int'l, Inc.,* 483 F.3d 502, 506-07 (7th Cir.2007); *Lynch, Inc. v. SamataMason Inc.,* 279 F.3d 487, 490 (7th Cir.2002). At the time he entered into the settlement agreement, Johnson had resigned as Sheriff of Bureau County and was not empowered to act on behalf of the Sheriff's Office. *Cf. Carver v. Sheriff of LaSalle County,* 203 Ill.2d 497, 272 Ill.Dec. 312, 787 N.E.2d 127 (Ill.2003) (holding that an acting sheriff is authorized under the Illinois Tort Immunity Act to enter into settlement agreements that bind the county for the acts of the sheriff in his official capacity). Accordingly, we grant the plaintiffs' motion to dismiss Johnson only in his individual capacity. We reject Johnson's argument that the current Sheriff in his official capacity also be dismissed based on the settlement agreement.

*3 [2][3][4][5] We review *de novo* whether the complaint states a claim upon which relief can be granted. *Christensen,* 483 F.3d at 458.Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."The statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic,* 127 S.Ct. at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).*See also Erickson v. Pardus,* --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). In order to state a claim pursuant 42 U.S.C. § 1983, the plaintiffs must allege that a government official, acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States. *Christensen,* 483 F.3d at 459. In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

[6] Now that the individual capacity claims against Johnson have been settled, only three defendants remain-John E. Thompson, in his official capacity as Sheriff, the Sheriff's Department, and Bureau County. The liability of the Sheriff's Department and of the County is derivative of Thompson's official-capacity liability, and the official-capacity liability is subject to holding in *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."

[7][8][9][10] In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was "the moving force" behind it. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).*See also Arlotta v. Bradley Center,* 349 F.3d 517, 521-22 (7th Cir.2003); *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir.2002). Unless there is an unconstitutional policy, there cannot be official-capacity liability; only individual-capacity li-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

ability is possible. The "official policy" requirement for liability under § 1983 is to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)."Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.' " *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir.2007) (quoting *Fairley v. Fermaint,* 482 F.3d 897, 904 (7th Cir.2007)). A plaintiff may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Lewis,* 496 F.3d at 656.

**\*4** [11][12] The first question, therefore, is whether the complaint alleges a direct causal link between a policy or custom of the Sheriff's Department and the alleged constitutional violations. *City of Canton,* 489 U.S. at 385. The complaint alleges that the Sheriff's Department had no policy or custom at the time of Sims's death for handling emergency medical situations and no protocol or policy manual regarding CPR certification or training. The remaining allegations, however, make clear that the events about which the plaintiffs complain are well beyond a failure to rescue Sims or provide emergency medical services. The complaint contends that Johnson murdered Sims by inducing a heart attack. The plaintiffs do not contend that the Sheriff's Department had a policy of frightening reporters to death, or even of failing to rescue journalists who write critical articles. The plaintiffs have not alleged that such an express policy exists, nor is it possible to infer there is such a policy at work. In cases asserting an implicit policy or a gap in express policy, "what is needed is evidence that there is a true municipal policy at issue, not a random event."*Phelan v. Cook County,* 463 F.3d 773, 790 (7th Cir.2006) (quoting *Calhoun v. Ramsey,* 408 F.3d 375, 380

(7th Cir .2005)). Nor have the plaintiffs asserted that Johnson held final policymaking authority with respect such policies. *Killinger v. Johnson,* 389 F.3d 765, 771-72 (7th Cir.2004). The official in question must be the final policymaker in the particular area or on the particular issue raised in the case.*Kujawski v. Bd. of Comm'rs of Bartholomew, Ind.,* 183 F.3d 734, 738 (7th Cir.1999) (quoting *McMillian v. Monroe County,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)).

[13][14][15][16] Although the plaintiffs baldly assert on appeal that Johnson's actions were "the outrageously reckless, probably criminal, activity of a state actor under of color of his state office," the allegations of the complaint do not show that Johnson's conduct was related to the performance of his official duties. Not every action taken by a state official is considered to have occurred under color of state law. *Honaker v. Smith,* 256 F.3d 477, 484 (7th Cir.2001) (quoting *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989)). An action is taken "under color of state law" if it involves a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."*National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Whether a particular action was under color of state law depends "largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties."*Pickrel v. City of Springfield, Illinois,* 45 F.3d 1115, 1118 (7th Cir.1995).*See also Martinez v. Colon,* 54 F.3d 980, 986-87 (1st Cir.1995). The allegations of the complaint, even viewed in the light most favorable to the plaintiffs, show that Johnson was off on a frolic, trying to protect a personal interest.

**\*5** In an attempt to show his actions were part of an official investigation, the plaintiffs argue that Johnson went to Sims's house to investigate the defamatory letter regarding her husband, but the complaint recognizes that Johnson knew the statements

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the letter were false and that he immediately dropped the "apparent investigation" into the letter after Sims's death. Similarly, the allegations do not support the plaintiffs' argument that Johnson was able to gain entry into the Sims's house only because of his position as Sheriff. *See West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). According to the complaint, Sims was investigating Johnson's campaign misconduct, she asked to speak with him numerous times, he left a message on her answering machine, and she returned the call to arrange his visit to the house. These are not actions of a state actor performed under color of state law but are the private actions of a person who happened to be a county officer. His actions were in furtherance of his personal interests, even if he performed them while on duty. *Pickrel,* 45 F.3d at 1118.

[17] In light of our conclusion that the complaint failed to state an official capacity claim, we only briefly address the plaintiffs' remaining arguments. Plaintiffs argue that neither the magistrate judge nor the district court addressed their claim that Johnson's actions deprived Sims of her First Amendment right to freedom of the press. This argument overlooks the magistrate judge's finding that the plaintiffs failed to make any factual or other required allegations in connection with their First, Fourth, Fifth, Eighth, and Ninth Amendment claims and the judge's corresponding conclusion that these claims should be stricken pursuant to Fed.R.Civ.P. 8(a)(2). Indeed, the complaint does nothing more than list the rights guaranteed under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments and baldly assert that the defendants violated these rights. Plaintiffs failed to object to the magistrate judge's recommendation that these claims be stricken, and accordingly waived their right to challenge the dismissal of the First Amendment claim on appeal. *See* 28 U.S.C. § 636(b)(1); *United States v. Sachsenmaier,* 491 F.3d 680, 683 (7th Cir.2007); *Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032, 1039 (7th Cir.1990).

[18][19] Plaintiffs also challenge the district court's

dismissal of their claim under 42 U.S.C. § 1985 for denial of their right of access to the courts. They alleged that Johnson and "possibly other persons employed by the Bureau County Sheriff's Department" denied them a fair opportunity to vindicate Sims's death through judicial redress by intentionally covering up the circumstances of her death and refusing to cooperate with police officers seeking to investigate the death. The plaintiffs' complaint fails to state a claim of conspiracy to deprive their right of access to the courts because there are no allegations that Johnson conspired with another person to conceal information or otherwise hamper the investigation into Sims's death. *See* 42 U.S.C. § 1985(2); *Wright v. Illinois Dept. of Children & Family Services,* 40 F.3d 1492, 1507 (7th Cir.1994). Even under notice pleading, a complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him. *Walker v. Thompson,* 288 F.3d 1005, 1007 (7th Cir.2002). The plaintiffs' reliance on *Bell v. City of Milwaukee,* 746 F.2d 1205, 1261 (7th Cir.1984), *overruled on other grounds by Russ v. Watts,* 414 F.3d 783 (7th Cir.2005); and *Ryland v. Shapiro,* 708 F.2d 967, 972 (5th Cir.1983), is misplaced and ignores an important factor in *Bell* and *Ryland*-that several defendants conspired together to cover up the deaths. Here, the allegations suggest that Johnson acted alone, and the district court properly concluded that such allegations are insufficient to state a conspiracy claim.

**\*6** We note that after the district court dismissed Bureau County and entered its judgment, we affirmatively held that "a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity." *Carver v. Sheriff of LaSalle County, Illinois,* 324 F.3d 947, 948 (7th Cir.2003). In light of our decision in *Carver,* we agree with the plaintiffs that Bureau County would have been a necessary party to the case if the complaint had stated a claim against the Sheriff in his official capacity.

Finally, we must resolve several other matters that

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))

**(Cite as: --- F.3d ----)**

have arisen in the course of the appeal. The County defendants seek sanctions against plaintiffs' counsel for revealing discussions that were had in the course of participating in proceedings with this court's Settlement Conference Office. Of course, settlement negotiations are confidential for most purposes, *In re Young,* 253 F.3d 926 (7th Cir.2001), and counsel should never reveal such conversations in an attempt to gain a strategic advantage. But it is not clear in this case that counsel engaged in sanctionable conduct with regard to the settlement proceedings, and we deny the appellees' motion for sanctions.

[20] We also deny the motion to strike certain factual statements in the plaintiffs' brief. In reviewing the propriety of the dismissal of the plaintiffs' complaint, we have confined our review to the allegations, liberally construed, as set forth in the plaintiffs' complaint.

### III. CONCLUSION

Because the complaint does not allege a direct, causal link between Sims's death and a policy or custom of the Sheriff and the Sheriff's Department, only individual capacity liability would be possible. The plaintiffs' settlement with appellee Greg Johnson in his individual capacity therefore resolves everything, and we affirm the dismissal of the complaint.

FN1. The decision in this case was withheld pending lengthy settlement proceedings in the Illinois State Courts.

FN2. In accordance with Fed. R.App. P. 43(c)(2), we grant the plaintiffs' unopposed motion to substitute the current Sheriff of Bureau County, John E. Thompson, for Johnson in his official capacity.

C.A.7 (Ill.),2007.

Estate of Sims v. County of Bureau

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Mercury Skyline Yacht Charters v. Dave Matthews
Band, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
MERCURY SKYLINE YACHT CHARTERS, an
Illinois corporation doing business as Chicago's
First Lady Cruises, Plaintiff,
v.
THE DAVE MATTHEWS BAND, INC., a Virginia
corporation, and Stefan A. Wohl, an individual, De-
fendants.
**No. 05 C 1698.**

Nov. 22, 2005.

James S. Montana, Jr., Cindy S. Stuyvesant, and
Ludwig Edward Kolman, Vedder, Price, Kaufman
& Kammholz, P.C., Chicago, IL, for Plaintiff.
Molly Josephine Zillig, Jay R. Starrett, Whyte,
Hirschboeck, Dudek, S.C., Milwaukee, WI; Chris-
topher Noel Skey, Jonathan D. King, Tracy Lee
Bradford, DLA Piper, Rudnick, Gray, Cary US,
LLP, John David Burke, Ice Miller, Chicago, IL,
for Defendants.

*MEMORANDUM OPINION AND ORDER*
FILIP, J.
**\*1** Plaintiff, Mercury Skyline Yacht Charters, Inc.,
d/b/a Chicago's First Lady Cruises ("MSYC" or
"Plaintiff"), filed a complaint in the Circuit Court
of Cook County on February 23, 2005, against
Dave Matthews Band, Inc. ("DMB") and Stefan A.
Wohl ("Wohl") (collectively, "Defendants"). On
March 23, 2005, Defendants filed a Notice of Re-
moval of the case to this Court based upon diversity
jurisdiction. (D.E.1.) FN1

> FN1. The various docket entries in this
> case are designated "D.E. ___."

Plaintiff's Complaint, which is attached to the No-
tice of Removal, brings the following claims
against Defendants: trespass ("Count I"); public

nuisance ("Count II"); tortious interference with
business relationships ("Count III"); gross negli-
gence ("Count IV"); and negligence ("Count
V").(*Id.*) The case is before the Court on DMB's
and Wohl's motions to dismiss (D.E.11, 14) for fail-
ure to state claims upon which relief can be gran-
ted, *see* Fed.R.Civ.P. 12(b)(6), and motions to strike
certain requests for damages. *See* Fed.R.Civ.P.
12(f). For the reasons stated below, Defendants'
motions to dismiss and to strike are granted in part
and denied in part.

FACTS FN2

> FN2. The following facts are taken from
> Plaintiff's Complaint. For present pur-
> poses, the Court accepts the allegations as
> true, as precedent instructs. The Court
> takes no position on whether the allega-
> tions are actually well-founded.

In the summer of 2004, Wohl was an employee of
DMB whose duties included driving one of the
Four Seasons motor coaches leased by DMB for its
summer concert tour. (D.E. 1 ¶ 8.) The Four Sea-
sons motor coach is equipped with, among other
things, an 80 to 100 gallon collection tank for hu-
man waste.(*Id.* ¶ 14.)The tank is emptied by push-
ing a toggle switch located behind the driver's seat.
(*Id.*) The contents of the coach's tank empty
through a drain located underneath the motor
coach, and a full tank can be emptied in 90 seconds
to 2 minutes. (*Id.*) Wohl's responsibilities relating
to the operation of the leased Four Seasons motor
coaches included the disposal of the contents of the
coach collection tank. (*Id.* ¶ 15.)

According to the Complaint, on August 7 and 8,
2004, DMB performed two concerts in East Troy,
Wisconsin, at the Alpine Valley Music Theater. (*Id.*
¶ 11.)DMB's concert tour schedule causes the band
to regularly travel through the state of Illinois, and
DMB stayed at the Peninsula Hotel in downtown
Chicago, Illinois, for its Wisconsin concert dates.
(*Id.* ¶¶ 7, 11, 33.)On August 7 and 8, Four Seasons

Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

motor coaches were used to transport DMB, its crew, and equipment between the Peninsula Hotel and the Wisconsin concert site. (*Id.* ¶ 11.)On Sunday, August 8, at around 1 p.m., Wohl started driving a Four Seasons motor coach from a City of Chicago coach staging area located on Kinzie Street, west of the Chicago River, and traveled east on Kinzie Street. (*Id.* ¶¶ 13, 18.)Wohl was driving the motor coach to the Peninsula Hotel where he was to provide transportation to a member of DMB. (*Id.* ¶ 18.)Wohl's route took him over the Chicago River via the Kinzie Street bridge. (*Id.* ¶¶ 16, 18.)The Kinzie Street bridge has a large, open grated area at its center. (*Id.* ¶ 16.)

*2 On summer weekend days, the downtown section of the Chicago River is used and traveled by a substantial number of commercial and recreational watercraft; this river traffic is readily visible from adjacent Chicago roadways and bridges. (*Id.* ¶ 17.)On Sunday, August 8, the motor vessel *Chicago's Little Lady* ("*Chicago's Little Lady*" ), U.S. Coast Guard No. 1079694, was traveling northbound on the Chicago River. (*Id.* ¶ 19.)*Chicago's Little Lady,* which was operated by MSYC, was carrying approximately 117 passengers, 3 crew members, and a volunteer docent from the Chicago Architectural Foundation. (*Id.*) At 1:18 p.m., the same time as Wohl was driving over the Kinzie Street bridge, *Chicago's Little Lady* passed below the Kinzie Street bridge. (*Id.* ¶ 19.)

As Wohl drove the motor coach over the grated portion of the Kinzie Street bridge, he slowed the vehicle. (*Id.* ¶ 20.)Wohl then intentionally discharged the contents of the motor coach's human waste collection tank through the drain underneath the coach. (*Id.*) The contents of the tank fell from the bottom of the motor coach, through the grates of the Kinzie Street bridge, into the Chicago River and onto *Chicago's Little Lady.*(*Id.* ¶ 22.)

The discharged contents of the tank-a foul-smelling, brownish-yellow liquid-drenched the vessel and dozens of its passengers, getting into passengers' eyes, mouths, and hair and soaking their clothing and personal belongings.(*Id.* ¶ 27.)Many passengers experienced nausea and vomiting from their exposure or proximity to the human waste. (*Id.* ¶ 29.)The waste spill onto *Chicago's Little Lady* and its passengers and crew prompted the ship's captain to turn the vessel around and return the ship to its landing. (*Id.* ¶ 30.)

The Complaint further alleges that in the weeks following the dumping incident, MSYC personnel spent considerable time, energy, and money cleaning up *Chicago's Little Lady.*(*Id.* ¶ 32.)MSYC also addressed passenger refund requests and other passenger needs. (*Id.*) In addition, MSYC responded to the local, national, and international media, and cooperated with law enforcement officials. (*Id.*)

Plaintiff alleges that Defendants' tortious actions "proximately caused MSYC to suffer damages, including but not limited to lost profits from its architectural tour and charter business...."(*Id.* ¶ 38.)For each count, Plaintiff seeks compensatory damages in excess of $50,000 and punitive damages in the amount of $5,000,000 and such other relief as the Court deems just and proper. (*See, e.g., id.* at 9)

Wohl's motion seeks dismissal of (1) Counts I, II, IV and V for failure to state a cause of action because Plaintiff's recovery is barred by the application of the economic loss doctrine of Illinois law, (2) Count III for failure to state a cause of action for tortious interference with business relationships, and (3) Count II for failure to state a claim for public nuisance. (*See* D.E. 14.) DMB's motion requests that the Court: (1) dismiss Count III for failure to allege the elements of tortious interference with business relationships; (2) dismiss Count IV for gross negligence for failing to plead a recognized cause of action; (3) strike or dismiss the claim for punitive damages in each Count against DMB; and (4) strike or dismiss certain damages claims relating to Counts I and II. (*See* D.E. 11.) As explained below, the motions are denied in part and granted in part.

## LEGAL STANDARDS

*3 "A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

state a claim upon which relief may be granted." *Johnson v. Rivera,* 272 F.3d 519, 520-21 (7th Cir.2001). In ruling on a motion to dismiss, the court must assume all facts alleged in the complaint to be true and view the allegations in the light most favorable to plaintiffs. *See, e.g., Singer v. Pierce & Assocs., P.C.,* 383 F.3d 596, 597 (7th Cir.2004); *Marshall-Mosby v. Corp. Receivables, Inc.,* 205 F.3d 323, 326 (7th Cir.2000). Dismissal for failure to state a claim is appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago,* 330 F.3d 456, 459 (7th Cir.2003).

"A federal court exercising diversity jurisdiction must consult the choice-of-law rules of the state in which the court sits to determine which state's substantive law should apply." *Reid by Reid v. Norfolk & W. Ry. Co.,* 157 F.3d 1106, 1110 n. 3 (7th Cir.1998) (citing *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.,* 64 F.3d 1112, 1114 (7th Cir.1995)). Illinois courts apply the law of the state where the tort occurred, unless another state has a more significant relationship to the occurrence or to the parties. *See id.* (citing *Walters v. Maren Eng'g Corp.,* 246 Ill.App.3d 1084, 186 Ill.Dec. 931, 617 N.E.2d 170, 173 (Ill.App.Ct.1993)). The Court will apply Illinois law in this case, because the alleged tort occurred in Illinois, and because Illinois has the most significant relationship to the occurrence and to the parties, based on Illinois being the place of injury, the domicile of the Plaintiff, and the place where the parties' relationship is centered. *See id.; see also Frederick v. Simmons Airlines, Inc.,* 144 F.3d 500, 504 (7th Cir.1998).

## DISCUSSION

### I. Economic Loss Rule

Defendant Wohl moves to dismiss Counts I, II, IV, and V on the basis that Plaintiff has failed to state a basis upon which the requested relief can be granted. Wohl argues that Plaintiff's requested economic damages in the form of lost profits are not recoverable under Illinois law because Plaintiff has not

alleged any property damage. The Court disagrees with Wohl's arguments and finds that Plaintiff has alleged sufficient property damage to support its claim for lost profits.

"At common law [in Illinois], solely economic losses are generally not recoverable in tort actions;" this well-established proposition of Illinois law has come to be known as the economic loss rule. *See In re Chicago Flood Litig.,* 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 274 (Ill.1997) (citing *Ill. Bell Switching Station Litig.,* 161 Ill.2d 233, 204 Ill.Dec. 216, 641 N.E.2d 440, 446 (Ill.1994)). In *Moorman Manuf. Co. v. Nat'l Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (Ill.1982), the Illinois Supreme Court adopted the economic loss rule and held that a products liability plaintiff cannot recover solely economic losses under the tort theories of strict liability, negligence, and innocent misrepresentation. *See id.* at 453. *Moorman* defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits-without any claim of personal injury or damage to other property as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Id.* at 449 (internal citations and quotation marks omitted). The court reasoned that "[t]ort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence ... The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract." *Id.* at 450; *accord, e.g., Ill. Bell Switching Station Litig.,* 204 Ill.Dec. 216, 641 N.E.2d at 444 ("The *Moorman* holding is bottomed upon the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property.").

**\*4** Subsequent Illinois Supreme Court cases applied

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

the economic loss rule outside of the products liability context. In *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (Ill.1982), a person who bought a home from a prior homeowner brought a negligence claim against the original builder, seeking recovery for the costs of repairing and replacing faulty construction of the home. *See id.* at 326.The court applied the economic loss rule and held that the plaintiff/homeowner could not recover the repair and replacement costs, which the court characterized as solely economic losses, "disappointed expectations" and "loss of bargain." *See id.*In *Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (Ill.1986), the Illinois Supreme Court applied the economic loss rule in a services context. *See id.* at 247.In *Anderson Elec., Inc.,* a third party had hired the plaintiff to do electrical contracting and had hired the defendant to inspect and supervise the work. *See id.*The plaintiff brought a negligence claim against the defendant in its supervisory role, and the court held that "a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract."*Id.* at 249.

A recent Illinois Supreme Court case has further defined the scope of the economic loss rule. In that case, *In re Chicago Flood Litig.,* plaintiffs brought multiple claims against the City of Chicago-including claims for private nuisance and negligence-stemming from a flood caused by a city contractor in a city-owned, underground freight tunnel. *See id.,* 223 Ill.Dec. 532, 680 N.E.2d at 268. Plaintiffs, who included numerous individuals and businesses in the area of the flood, as well as an insurer of individuals and area businesses, sought damages from the city for losses caused by the flood, including: injury to property; lost revenues, sales, profits and good will; lost wages, tips and commissions; lost inventory; and expenses incurred in obtaining alternate lodging. *See id.*The court reviewed several certified questions under an interlocutory appeal, one of which was "whether the *Moorman* doctrine bars the claims of those plaintiffs who allege only economic loss."*Id.* at 269.[FN3]The Illinois Supreme

Court affirmed the lower courts' decisions to dismiss the claims of plaintiffs who had not alleged property damage, because those plaintiffs did not satisfy any of the three exceptions to the economic loss rule. *Id.* at 275.The Illinois Supreme Court instructed that the three exceptions are:

> FN3. The Illinois Supreme Court in *In re Chicago Flood Litig.* noted that "[o]ur answers to these certified questions do not affect the applicability of the Tort Immunity Act to these claims."*Id.,* 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 274 (Ill.1997). Because the analysis of defendants' liability proceeded independently from any considerations of municipal immunity, this Court finds that the court's economic loss rule in *In re Chicago Flood Litig.* can be readily applied to the case *sub judice.*

(1) where the plaintiff sustained damage, *i.e.,* personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.,* fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transaction.

**\*5** *Id.* (internal citations omitted). The court in *In re Chicago Flood Litig.* also held that plaintiffs who had alleged unspecified property damage were barred from recovering under the economic loss doctrine. *See id.* at 277.

Turning to the case at hand, the Court concludes that Plaintiff's claims for lost profits are not barred by the economic loss doctrine because Plaintiff's allegations satisfy the first exception to the economic loss rule, as articulated in *In re Chicago Flood Litig. See id.* at 275-76 (stating that the first exception to the economic loss rule "is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage."); *accord, e.g., Trans States Airlines v. Pratt & Whitney Canada,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Case 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 16 of 48    Page 5
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Inc.,* 177 Ill.2d 21, 224 Ill.Dec. 484, 682 N.E.2d 45, 48 (Ill.1997) (" 'The event, by itself, does not constitute an exception to the economic loss rule. Rather, the exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage." ') (quoting *In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 275).

The Court will consider in turn the two elements of the first exception to the economic loss rule. *See, e.g., Mars, Inc. v. Heritage Builders of Effingham,* 327 Ill.App.3d 346, 261 Ill.Dec. 458, 763 N.E.2d 428, 435 (Ill.App.Ct.2002) (describing the inquiry into the first exception to economic loss rule as "necessarily bipartite"). Courts have, somewhat circularly, defined a sudden and dangerous occurrence as "when the sudden occurrence is 'highly dangerous and presents the likelihood of personal injury or injury to other property." ' *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 435 (quoting *Stepan Co. v. Winter Panel Corp.,* 948 F.Supp. 802, 808 (N.D.Ill.1996)). Because Plaintiff's allegations suggest that the dumping of the human waste from the motor coach in the present matter happened quickly (*see, e.g.,* D.E. 1 ¶ 29, 30 (the "spill" of waste "hit" and "drenched" ship and passengers)), and presented a material risk of personal injury or injury to property (*see, e.g., id.* ¶ 29, 30 ("noxious" waste "soaked the vessel and passenger's clothing and personal belongings")), the incident resembles events that courts applying Illinois law have found to be "sudden, dangerous, or calamitous." *See In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 275-76 (underground flood); *MCI Worldcom Network Servs., Inc. v. Big John's Sewer Contractors, Inc.,* No. 03 C 4991, 2003 WL 22532804, at *3 (N.D.Ill. Nov.7, 2003) (Castillo, J.) (excavation in violation of statutes); *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 436 (thunderstorm); *Elecs. Group. Inc. v. Cent. Roofing Co.,* 164 Ill.App.3d 915, 115 Ill.Dec. 844, 518 N.E.2d 369, 371 (Ill.App.Ct.1987) (substantial leaking of water through roof in single day); *United Airlines Inc. v. CEI Indus. of Ill., Inc.,* 148 Ill.App.3d 332, 102 Ill.Dec. 1, 499 N.E.2d 558, 562-63 (Ill.App.Ct.1986) (roof collapse). Precedent teaches that to satisfy the first exception to the eco-

nomic loss rule, "the time period between the calamitous event (the collapsing roof, brake failure, or flood) and the damage to other property (the inventory and equipment, the vehicle, or water damage to a store) is short and sudden, almost contemporaneous." *Nabisco v. Am. United Logistics,* No. 99 C 0763, 2000 WL 748131, at *6 (N.D.Ill., June 1, 2000) (Ashman, M.J.) (collecting cases to illustrate what is and "what is not a sudden or calamitous occurrence."). The contemporaneousness of the dumping and the damage to *Chicago's Little Lady* distinguishes the case at hand from cases where courts have not found a sudden or calamitous event. *See, e.g., id.* at *6 (gradual and prolonged seeping of chemicals through packaging of food products was not sudden or calamitous); *NBD Bank v. Krueger Ringier, Inc.,* 292 Ill.App.3d 691, 226 Ill.Dec. 921, 686 N.E.2d 704, 708 (Ill.App.Ct.1997) (collecting cases and holding that petroleum gradually leaking through ruptured underground storage tanks and into soil was not a sudden or calamitous occurrence).

**\*6** Turning to the element of property damage, Plaintiff alleges that *Chicago's Little Lady* was "contaminat[ed]" and that cleaning up the ship required "considerable time, energy and expense...." (D.E. 1 ¶¶ 32, 40). The allegations relating to the ship's condition after the spill are incorporated by reference in all the subsequent counts. (*See, e.g., id.* ¶ 34, 226 Ill.Dec. 921, 686 N.E.2d 704.) The Court views Plaintiff's property damage allegations as falling within the range of property damage that courts have found sufficient, when coupled with a sudden or calamitous event, to apply the first exception to the economic loss rule. *See, e.g., In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 276 (lost perishable inventory); *MCI Worldcom Network Servs., Inc.,* 2003 WL 22532804, at *3 (severed fiber optic cable); *In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d 828, 842-43 (N.D.Ill.2002) (Moran, J.) (contaminated corn crop); *United Airlines, Inc.,* 102 Ill.Dec. 1, 499 N.E.2d at 562 (water damage to "walls, furniture, furnishings").

Wohl contends that *Palatine Nat'l Bank v. Charles*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Greengard Assocs. Inc.,* 119 Ill.App.3d 376, 74 Ill.Dec. 914, 456 N.E.2d 635 (Ill.App.Ct.1983), is on point and establishes the proposition that clean up costs are to be treated as separate from property damage. (*See* D.E. 14 at 4.) The Court respectfully disagrees. In *Palatine Nat'l Bank,* property developers brought a tort action against an engineering firm, alleging that the firm had designed an inadequate storm and surface water drainage system. *See id.,* 74 Ill.Dec. 914, 456 N.E.2d at 637. The court found that "[t]he only possible allegation of property damage ... the clean up and restoration of the premises due to the flood" was insufficient to meet the standard for the first exception to the economic loss doctrine, because "the damage relates to the natural accumulation of water on the premises and not to the 'type of sudden and dangerous occurrence best served by the policy of tort law." ' *Id.* at 638-39 (quoting *Moorman Manuf. Co.,* 61 Ill.Dec. 746, 435 N.E.2d at 450). Plaintiff's allegations of "human waste dumping" (*see, e.g.,* D.E. 1 ¶ 32) differ significantly from the "natural accumulation of water" in *Palatine Nat'l Bank, (id.,* 74 Ill.Dec. 914, 456 N.E.2d at 639), and as was discussed previously, fall into the category of a sudden or dangerous occurrence. In addition, because the damages in *Palatine Nat'l Bank* sprang from the allegedly negligent performance of contracted-for services, the damages could also have been categorized as disappointed commercial expectations (*see id.* at 638), which precedent teaches are barred by the economic loss rule. *See, e.g., id.* at 638-39;*Redarowicz,* 65 Ill.Dec. 411, 441 N.E.2d at 326.

In summary, Plaintiff's allegations of a "sudden, dangerous or calamitous event," *i.e.,* the alleged dumping, coupled with the allegations of the contamination of *Chicago's Little Lady,* are sufficient to permit Plaintiff to state a claim for recovering lost profits under the first exception to the economic loss rule.[FN4] Accordingly, the Court finds that Plaintiff's claims are not barred by the economic loss doctrine and denies Wohl's motion to dismiss Counts I, II, IV, and V.

> FN4. Although Wohl's motion to dismiss Counts I, II, IV, and V on the basis of the

application of the economic loss doctrine is denied, the Court notes that it respectfully disagrees with Plaintiff's arguments that *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.,* 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503 (Ill.1994), would permit recovery in the present matter in the absence of allegations of property damage. (Plaintiff's Response to Wohl's Motion to Dismiss at 4.) *Congregation of the Passion, Holy Cross Province* is one in a line of Illinois professional malpractice cases, where courts evaluated whether the defendants' duty arose under the contract for professional services or whether the professional owed an extracontractual duty to the plaintiff that would permit an action in tort. *See id.,* 201 Ill.Dec. 71, 636 N.E.2d at 514 ("The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client."); *see id.* at 515 (holding that the duty an accountant owes to his client is extracontractual and so the economic loss doctrine does not bar recovery for solely economic losses); *see also 2314 Lincoln Park W. Condominium Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.,* 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346, 353 (Ill.1990) (conducting similar analysis and holding that economic loss doctrine barred plaintiff's recovery in tort against architect for solely economic damages because architect's responsibility originated in contract). Because the parties in the present matter have no contractual relationship for professional services, the narrow exception to the economic loss rule explored in cases such as *Congregation of the Passion, Holy Cross Province* is inapplicable.

II. Tortious Interference with Business Relationships

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**\*7** Both DMB and Wohl have moved to dismiss Count III for tortious interference with business relationships on the grounds that Plaintiff has failed to state a claim upon which relief can be granted. Defendants argue that the Complaint falls short of making out a claim for either tortious interference with contract or tortious interference with prospective business relationships. The Court agrees.

The Complaint contains allegations that suggest that Plaintiff is claiming both interference with existing contracts ("ticketed passengers"), as well as interference with prospective business relationships ("prospective passengers"). (D.E. 1 ¶¶ 44, 48.) Although Count III is somewhat vague, it appears to attempt to allege both of the standard tortious interference commercial torts-tortious interference with an existing contract and tortious interference with a prospective business relationship. The Court will assume that Plaintiff is attempting to invoke both torts, and will analyze both of them. For the reasons explained below, the Court finds that neither tort has been sufficiently pleaded on the facts as alleged.

The elements of a claim for tortious interference with an existing contract are: " '(1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of that contract, (3) the defendant's intentional and unjustifiable inducement of a breach of the contract, (4) a subsequent breach by the other, caused by defendant's wrongful conduct, and (5) damages." ' *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.,* 192 F.3d 724, 731 (7th Cir.1999) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (Ill.1989)). Where the plaintiff's economic expectancy has not yet solidified into a contractual relationship, he can still recover in tort by showing: " '(1) [a] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference." ' *Int'l*

*Mktg., Ltd.,* 192 F.3d at 731 (quoting *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d 358, 370 (Ill.1998)).

Plaintiff's allegations fail with respect to multiple elements of the tort of intentional interference with contract. First, Plaintiff has not sufficiently alleged that Defendants were aware of Plaintiff's contracts with ticketed passengers. Plaintiff's sole allegation that could potentially relate to knowledge of existing contracts is its statement that Defendants "knew or should have known that this portion of the Chicago River, including the area near Kinzie Street bridge, is highly traveled by commercial and recreational watercraft."(D.E. 1 ¶ 24.) Precedent teaches that allegations of actual awareness of existing contracts are required. *See, e.g., Kraft Chem. Co. v. Ill. Bell Tel. Co.,* 240 Ill.App.3d 192, 181 Ill.Dec. 170, 608 N.E.2d 243, 247 (Ill.App.Ct.1992) (finding that plaintiffs failed to show that defendant landscapers, who severed an underground fiber optic cable and interrupted communications service, had specific knowledge of existing contracts for phone service between the proposed customer class and telephone company); *accord, e.g., HPI Health Care Servs., Inc.,* 137 Ill.Dec. 19, 545 N.E.2d at 676. Plaintiff's allegation of Defendants' knowledge about Chicago River watercraft activity falls short of alleging that Defendants was actually aware of Plaintiff's contracts with ticketed passengers.

**\*8** Plaintiff implicitly concedes that it has not pleaded a basis to satisfy this element of the tort, as Plaintiff states in a response brief that the Defendants had "constructive knowledge" of the Plaintiff's business relationships and expectancies. (Plaintiff's Response to DMB's Motion to Dismiss at 2.) Plaintiff offers no authority in support of its "constructive knowledge" position, nor for its related assertion that "actual or constructive knowledge of the operation of commercial tour boats necessarily includes awareness of commercial expectancies of the commercial tour boat operators with their passengers."(*Id.* at 8, 137 Ill.Dec. 19, 545 N.E.2d 672.) More specifically, Plaintiff offers no authority to suggest that an "awareness of commercial expectancies" is sufficient knowledge of a con-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

tract. The one case that Plaintiff cites for this point, *NEG Micon USA, Inc. v. N. Alternative Energy,* No. 03 C 5851, 2004 WL 609373 (N.D.Ill. Mar.23, 2004) (Guzman, J.), involved a defendant corporate entity charged with tortiously interfering with a contract; the defendant corporation was formed by individuals who had been officers of the corporation that was a party to the disputed contract at the time the contract was formed. *See id.* at *2. Under that factual scenario, the court understandably found the element of knowledge to be sufficiently alleged. *See id.* at *4 ("NEG Micon alleges Navitas was aware of the Agreement between NEG Micon and NAE.").

Second, Plaintiff has not alleged that Defendants intentionally and unjustifiably induced a breach of contract. *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 298 (7th Cir.1981) ("Illinois courts have consistently held that the plaintiff must allege ... facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies.") (collecting cases). As a practical matter, it seems to the Court to be difficult for a defendant intentionally to interfere with a contract of which it is unaware, and, perhaps tacitly acknowledging this issue, Plaintiff has omitted such an allegation from its complaint. Plaintiff alleges that Defendants intentionally discharged the waste while traveling on the bridge (D.E. 1 ¶ 46), but Plaintiff does not allege that the nonaccidental discharge was in any way intended to induce a breach of contract. *See HPI Health Care Servs., Inc.,* 137 Ill.Dec. 19, 545 N.E.2d at 676 (discussing the "generally recognized" "elements of this tort" in Illinois, which include " 'the defendant's intentional and unjustified inducement of a breach of the contract' ") (quoting *Prudential Ins. Co. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 511 N.E.2d 740, 744 (Ill.App.Ct.1987) (further internal quotation and citation omitted).

Plaintiff also cites the Restatement (Second) of Torts, § 767 cmt d., which says that a "plaintiff must show that the interference was 'either desired by the actor or known by him to be a substantially certain result of his conduct.' ' (Plaintiff's Re-

sponse to DMB's Motion to Dismiss at 9 (quoting Restatement).) This statement would appear to hurt Plaintiff's cause, not assist it. Plaintiff does not allege that the Defendants intended or desired to interfere with its contracts or business expectancies; instead, the Complaint alleges that the Defendants intended to discharge the waste on the bridge. (*See id.*(citing D.E. 1 ¶ 46).) Neither the Complaint nor common experience suggest that it is "substantially certain" that something dropped off of the Kinzie Street bridge, even for 90 to 120 seconds, will strike any boat. And while the Court need not verge outside the corners of the Complaint to resolve the motion to dismiss, when one thinks of the Plaintiff's proffered "substantial certainty" criterion, it is hard to ignore the practical, commonsense reality that there are geometrically more pleasure craft that travel that section of the Chicago River than ticketed tour boats. In any event, and simply put, the Complaint, at least as presently framed, does not outline any basis to conclude that the Defendants intentionally induced the passengers of Plaintiff to breach their contracts or intended to interfere with Plaintiff's putative commercial relationships.

**\*9** When analyzed as a potential claim for tortious interference with prospective business advantage, Count III also fails. First, Plaintiff's claim is defective with respect to intentional interference, as explained immediately above.

Second, Plaintiff alleges a "reasonable expectation of continuing to have business relationships with architectural tour and charter customers."(D.E. 1 ¶ 45.) However, Plaintiff does not allege that Defendants had knowledge of that expectation-such an omission is fatal to a claim for tortious interference with prospective business advantage. *See, e.g., Futurevision, Inc. v. Dahl,* 139 Ill.App.3d 61, 93 Ill.Dec. 683, 487 N.E.2d 127, 131 (Ill.App.Ct.1985) (dismissing claim and stating "[a] necessary element to state a cause of action for interference with a prospective business advantage is defendant's knowledge of a reasonable business expectancy and defendant's intentional interference which prevents the expectancy from ripening into a valid business relationship.") (collecting cases).

Case 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 20 of 48   Page 9
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Third, Plaintiff fails to allege that Defendants directed any misdeeds towards future clients of the Plaintiff, as is required under Illinois law. Plaintiff alleges that Defendants "recklessly, wantonly and maliciously interfered with MSYC's prospective business relationships with tour and charter passengers by subjecting it to unwanted and negative media attention that deterred prospective passengers from doing business with it."(D.E. 1 ¶ 48.) However, while Plaintiff alleges Defendants' intentional interference with its prospective business relationships, the action alleged, *i.e.,* the dumping of waste, was directed at Plaintiff rather than at prospective passengers. As explained by then District Judge Rovner in *Westland v. Sero of New Haven, Inc.,* 601 F.Supp. 163 (N.D.Ill.1985), "an allegation of conduct directed by defendant toward a third party through which the defendant purposely causes that third party not to enter into or continue with a prospective contractual relationship with the plaintiff is essential to stating a cause of action for the tort of intentional interference with a prospective business opportunity."*Id.* at 166 (collecting cases); *accord, e.g., Schuler v. Abbott Labs.,* 265 Ill.App.3d 991, 203 Ill.Dec. 105, 639 N.E.2d 144, 147 (Ill.App.Ct.1993) ( "Plaintiff must also allege action by the interfering party directed towards the party with whom the plaintiff expects to do business."); *Cohabco Cigar Co. v. U.S. Tobacco Co.,* No. 98 C 1580, 1999 WL 988805, at *13 (N.D.Ill. Oct.22, 1999) (Kocoras, J.) (similar); *McIntosh v. Magna Sys., Inc.,* 539 F.Supp. 1185, 1193 (N.D.Ill.1982) (Aspen, J.) (collecting cases and holding that "the tort of intentional interference with a prospective business opportunity requires that plaintiff allege some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff.").[FN5] Because Plaintiff solely alleges acts of intentional interference that were directed at Plaintiff itself rather than at prospective passengers, it does not state a required element of the claim for tortious interference with prospective business relationships.

> FN5. The Court notes that Plaintiff does

not allege that the intentional discharge of waste onto the passengers deterred current passengers from buying a ticket from MSYC for another river trip.

**\*10** For all of these reasons, the Court holds that Plaintiff has failed to state a claim for either tortious interference with contract or with prospective business relationships and so dismisses Count III without prejudice.

### III. Gross Negligence

DMB moves to dismiss Count IV on the basis that Illinois law does not recognize gross negligence as a cause of action. (*See* D.E. 13 at 10.) The Court agrees with DMB that Count IV should be dismissed. Regarding distinctions between different degrees of negligence, longstanding Illinois Supreme Court precedent instructs that "the authorities establish the proposition that the rights of the parties are not affected by any question of the degree of ... negligence."*Chicago, R.I. & P. Ry. Co. v. Hamler,* 215 Ill. 525, 74 N.E. 705, 708 (Ill.1905). Courts generally have interpreted *Chicago, R.I. & P. Ry. Co.* as eliminating the cause of action for gross negligence in Illinois. In this regard, most notably, in *Merit Ins. Co. v. Colao,* 603 F.2d 654, 659 (7th Cir.1979), the Seventh Circuit cited *Chicago, R.I. & P. Ry. Co.* and taught that "Illinois does not recognize gross negligence as an independent ground for recovery."*Accord, e.g., Instituto Nacional de Comercializacion Agricola v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago,* 530 F.Supp. 279, 283 (N.D.Ill.1982) (Shadur, J.) (treating claim for gross negligence as a simple negligence action because "Illinois does not recognize an action for gross negligence."). Under this caselaw, including the Seventh Circuit's teaching, the Court accepts DMB's argument that Illinois does not recognize gross negligence as an independent cause of action.[FN6]Accordingly, the Court grants DMB's motion to dismiss Count IV.

> FN6. The Court acknowledges Plaintiff's citation of *Mathias v. Accor Econ. Lodge,* No. 01 C 6329, 2002 WL 221523, at *4

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 21 of 48
Not Reported in F.Supp.2d                                                           Page 10
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

(N.D.Ill. Feb.13, 2002), which denied a motion to dismiss a claim for gross negligence and defined gross negligence as "an action that is committed with actual or deliberate intention to harm or with an utter indifference or conscious disregard for the safety of others."Because *Mathias* appears to conflict with the weight of authority, including the teaching of the Seventh Circuit, the Court respectfully declines Plaintiff's invitation to rely on it.

Plaintiff apparently acknowledges the tenuousness of the claim of gross negligence and suggests that Count IV properly could be reframed as a claim for willful and wanton conduct. (*See* Plaintiff's Response to DMB's Motion to Dismiss at 11.) However, precedent also instructs that Illinois does not recognize an independent cause of action for willful and wanton conduct. *See Ziarko v. Soo Line R.R.,* 161 Ill.2d 267, 204 Ill.Dec. 178, 641 N.E.2d 402, 406 (Ill.1994) (collecting Illinois appellate cases and holding that "[t]here is no separate and independent tort for 'willful and wanton' misconduct."); *accord, e.g., Sorkin v. Blackman, Kallick & Co.,* 184 Ill.App.3d 873, 133 Ill.Dec. 133, 540 N.E.2d 999, 1003 (Ill.App.Ct.1989) ("[w]illful and wanton misconduct affects the amount of damages and is not a separate tort."). Instead, willful and wanton conduct typically is alleged in conjunction with both intentional torts and negligence to support a claim for punitive damages.[FN7] *See Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 359 (Ill.1979) ("[i]t has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others.") (citing *Consol. Coal Co. v. Haenni,* 146 Ill. 614, 35 N.E. 162, 165 (Ill.1893)); *accord, e.g., Giles v. General Motors,* 344 Ill.App.3d 1191, 280 Ill.Dec. 607, 802 N.E.2d 858, 865-66 (Ill.App.Ct.2003) (denying motion to dismiss claim for punitive damages where plaintiff pleaded willful and wanton conduct in conjunction with allegations of negligence); *Doe v. Chand,* 335

Ill.App.3d 809, 269 Ill.Dec. 543, 781 N.E.2d 340, 349 (Ill.App.Ct.2002) (stating that "[p]unitive damages are warranted where an otherwise negligent act is accompanied by outrageous conduct or acts committed with malice or reckless indifference to the rights of others.")

> FN7. Willful and wanton misconduct may properly be alleged as a basis for liability where the cause of action is against one of various governmental entities, officials, or employees in cases where an immunity statute establishes a standard of "willful and wanton misconduct" as a basis for assessing liability. *See, e.g., Am. Nat'l Bank & Trust Co. v. City of Chicago,* 192 Ill.2d 274, 248 Ill.Dec. 900, 735 N.E.2d 551, 555 (Ill.2000) (finding that allegations supported claims that paramedics and city engaged in willful and wanton misconduct, precluding a dismissal based on immunity under Illinois Emergency Medical Services Act); *Munizza v. City of Chicago,* 222 Ill.App.3d 50, 164 Ill.Dec. 645, 583 N.E.2d 561, 565-66 (Ill.App.Ct.1991) (holding that plaintiffs had alleged insufficient facts to plead willful and wanton misconduct so as to overcome the tort immunity of city, public agency and public employees). However, for the case at hand, there is no applicable immunity statute that would necessitate Plaintiff bringing a separate cause of action for willful and wanton misconduct.

**\*11** For the foregoing reasons, the Court grants DMB's motion to dismiss Count IV for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). The Court also gives Plaintiff leave to amend its complaint and replead its remaining causes of action if it determines that such amendment is necessary to sufficiently allege willful and wanton conduct so as to support any particular damages theory. *See* Fed.R.Civ.P. 15(a); *see, e.g., Brunt v. Serv. Employees Int'l Union,* 284 F.3d 715, 720 (7th Cir.2002) ("Rule 15(a) provides that leave to amend a pleading shall be freely given

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

when justice so requires.").

### IV. Public Nuisance

Wohl moves to dismiss Count II for public nuisance on the grounds that Plaintiff has failed to state a claim upon which relief can be granted. The Court finds that Plaintiff has adequately stated a claim for public nuisance and therefore denies Wohl's motion.

The Illinois Supreme Court has defined public nuisance as "an unreasonable interference with a right common to the general public."*See City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1111 (Ill.2004) (internal quotation marks and citation omitted). Illinois law further establishes that a public nuisance is "the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public. *Id.* at 1114 (collecting authorities, including *Vill. of Wilsonville v. SCA Servs., Inc.,* 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824, 837 (Ill.1981)); *accord City of Chicago v. Am. Cyanamid Co.,* 355 Ill.App.3d 209, 291 Ill.Dec. 116, 823 N.E.2d 126, 131 (Ill.App.Ct.2005). To state a cause of action for public nuisance, a basis must be alleged in support of (1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause; and (4) injury. *See Beretta,* 290 Ill.Dec. 525, 821 N.E.2d at 1113. "Thus, the first element that must be alleged to state a claim for public nuisance is the existence of a right common to the public."*Id.* at 1114.Precedent instructs that the concept includes, for example, "the right of public health, public safety, public peace, public comfort, and public convenience."*Id.* (citation omitted). For public nuisance actions, a private individual may recover damages only if he has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the public that was the subject of interference."*Young v. Bryco Arms,* 213 Ill.2d 433, 290 Ill.Dec. 504, 821 N.E.2d 1078, 1083 (Ill.2004) (noting that "special damage" require-

ment is "well-established law in Illinois.") (internal quotation marks and citation omitted); *see also In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 ("The harm must be of a different type, not merely a difference in severity or imposing a disproportionate share of the burden on plaintiffs.").

As for the pleading standards for public nuisance, precedent teaches that they "are not exacting because the 'concept of common law public nuisance eludes precise definition." ' *Beretta* at 1110 (quoting *City of Chicago v. Festival Theatre Corp.,* 91 Ill.2d 295, 63 Ill.Dec. 421, 438 N.E.2d 159, 164 (Ill.1982)); *Am. Cyanamid Co.,* 291 Ill.Dec. 116, 823 N.E.2d at 129. Federal district courts (reviewing pleadings under the more lenient standards of *Fed.R.Civ.P.* 12(b)(6)) have similarly commented. *See, e.g., In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 (denying a motion to dismiss public nuisance claim and noting the "limited depth of review courts typically undertake on a motion to dismiss a public nuisance claim.").

**\*12** Wohl argues that Plaintiff has not alleged a violation of a public right and instead has "merely asserted an alleged violation of an individual right that has resulted in harm to individual members of the general public."(D.E. 14 at 7.) In support of his argument, Wohl points to the standard for a public right articulated in *Am. Cyanamid:* a public right is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured."*Id.,* 291 Ill.Dec. 116, 823 N.E.2d at 131 (internal quotation marks and citation omitted). The Court respectfully disagrees with Wohl's characterization of Plaintiff's allegations. Although the Complaint does not explicitly name the public rights at issue, the Court can infer that Plaintiff is alleging a violation of the public's right to health, welfare and comfort based on having large amounts of human waste discharged into a public waterway. [FN8] (*See* D.E. 1 ¶¶ 20, 26, 27); *see, e.g., In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 (alleged public right of "health, safety, comfort and convenience" relating to the alleged contamination of corn and food supply "certainly satisfied" permissive pleading stand-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ard for public nuisance); *City of Chicago v. Latronica Asphalt & Grading, Inc.,* 346 Ill.App.3d 264, 281 Ill.Dec. 913, 805 N.E.2d 281, 290 (Ill.App.Ct.2004) (illegal disposal of construction debris resulted in violation of public right because "waste disposed of on the Site became airborne and scattered onto the public way and nearby properties.") (internal quotation marks omitted). Thus, the Court believes that Plaintiff has alleged a sufficient violation of a public right.

> FN8. At the stage of a motion to dismiss, the court must accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Bressner v. Ambroziak,* 379 F.3d 478, 480 (7th Cir.2004).

Moreover, Plaintiff's claim falls within the well-established category of nuisance cases that invoke the public right to be free from "odors, fumes, dust, and other sources of pollution."*See Beretta,* 290 Ill.Dec. 525, 821 N.E.2d at 1114 (collecting Illinois public nuisance cases where the "[p]ublic comfort has been affected by odors, fumes, dust, and other sources of pollution."). Plaintiff's allegation of a violation of a public right relating to the Chicago River also resembles many other public nuisance claims because the allegations deal with the contamination of "an indivisible resource shared by the public at large, like air, water, or public rights of way."*Am. Cyanamid,* 291 Ill.Dec. 116, 823 N.E.2d at 131;*see also id.*(offering as illustrations of violations of public rights "prevent[ing] the use of public bathing beach" or a "kill[ing] the fish in a navigable stream"); *accord, e.g., Latronica Asphalt,* 281 Ill.Dec. 913, 805 N.E.2d at 287 (stating that public nuisance includes the causing or allowing of "any offal [or] filth ... to be collected, deposited or to remain in any place, to the prejudice of others.") (internal quotation marks and citation omitted); *Tamalunis v. City of Georgetown,* 185 Ill.App.3d 173, 134 Ill.Dec. 223, 542 N.E.2d 402, 410 (Ill.Ct.App.1989) ("The Illinois Supreme Court has determined the discharge of untreated sewage and the illegal dumping of refuse to be abatable nuisances.") (collecting cases); *Cook v. City of Du*

*Quoin,* 256 Ill.App. 452, 1930 WL 3039, at *2 (Ill.App.Ct.1930) (city's discharge of sewage into creek was a public nuisance).

**\*13** Bearing in mind the "permissive standard" for pleading a public right, the Court concludes that Plaintiff has alleged sufficiently a violation of the public's right to health, welfare and comfort relating to the indivisible resource of the Chicago River. *See In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848. Accordingly, the Court denies Wohl's motion to dismiss the claim for public nuisance.

V. Public Nuisance and Trespass Damages

DMB requested that the Court dismiss or strike Plaintiff's prayer for relief for public nuisance to the extent that Plaintiff seeks recovery of "prospective or future damages," or damages other than for its "personal inconvenience, annoyance and discomfort." (D.E. 13 at 11.) To the extent that Plaintiff requests damages based on Defendants' future conduct, the Court agrees with DMB that future or prospective damages are unavailable for Plaintiff's public nuisance action. *See Beretta,* 290 Ill.Dec. 525, 821 N.E.2d at 1138 ("An award for damages in an action for nuisance is retroactive, applying to past conduct ....") (internal quotation marks and citation omitted). However, the Court disagrees with DMB that Plaintiff's potential recovery is limited to damages for personal inconvenience, annoyance and discomfort.

As an initial matter, recent Illinois Supreme Court precedent dealing with private nuisance [FN9] instructs that "[a] plaintiff in a private nuisance action may recover *all consequential damages* flowing from the injury to the use and enjoyment of his or her person or property. However, recovery of damages for solely economic loss is not permitted."*In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 278 (citing *Schatz v. Abbott Labs., Inc.,* 51 Ill.2d 143, 281 N.E.2d 323 (Ill.1972) (other citations omitted) (emphasis added).[FN10] Although Plaintiff's claim is for public nuisance rather than for private nuisance, Defendants offer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 13

no basis to conclude that the rule should be different, and the Court finds that Plaintiff should be able to claim consequential damages.

> FN9. Although the cause of action of public nuisance "eludes precise definition" (*City of Chicago v. Am. Cyanamid Co.,* 355 Ill.App.3d 209, 291 Ill.Dec. 116, 823 N.E.2d 126, 129 (Ill.App.Ct.2005)), Illinois courts have defined it sufficiently to recognize it as a separate action from private nuisance. *See City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1110 (Ill.2004) (noting that public nuisance is often " 'negatively defined' by distinguishing it from other tort actions") (quoting *City of Chicago v. Festival Theatre Corp.,* 91 Ill.2d 295, 63 Ill.Dec. 421, 438 N.E.2d 159, 164 (Ill.1982)). In this regard, Illinois law defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land"*In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d 828, 844-45 (N.D.Ill.2002) (internal quotation marks and citation omitted). Illinois law defines a public nuisance as "an unreasonable interference with a right common to the general public."*Id.* at 848 (internal quotation marks and citation omitted).

> FN10. As the parties discuss, Illinois law distinguishes between two types of damages for private nuisance-damages caused by permanent nuisances and those caused by temporary nuisances. *See Statler v. Catalano,* 167 Ill.App.3d 397, 118 Ill.Dec. 283, 521 N.E.2d 565, 571 (Ill.App.Ct.1988)."A permanent nuisance is one characterized as continuing indefinitely and the structure constituting the nuisance is a lawful one, or one which the person or entity has a legal right to maintain.... A temporary nuisance is one which is occasional, intermittent, or recurrent and is remediable, removable or

*Tamalunis v. City of Georgetown,* 185 Ill.App.3d 173, 134 Ill.Dec. 223, 542 N.E.2d 402, 404 (Ill.App.Ct.1989). Precedent instructs that "the proper measure of damages for a permanent nuisance is the market value of the land, while the proper measure of damages for a temporary nuisance is the discomfort and deprivation of the use and enjoyment of a person's home."*Statler,* 118 Ill.Dec. 283, 521 N.E.2d at 571;*see also Tamalunis,* 134 Ill.Dec. 223, 542 N.E.2d at 410 ("Generally, the measure of damages for a temporary nuisance is the personal inconvenience, annoyance, and discomfort suffered on account of the nuisance.") (collecting cases). However, contrary to DMB's assertion, precedent also teaches that the amount recoverable for temporary nuisance "cannot be gauged by any definite rule," and may include, under appropriate circumstances, lost profits, where they can be determined with reasonable certainty. *Schatz v. Abbott Labs., Inc.,* 51 Ill.2d 143, 281 N.E.2d 323, 325-26 (Ill.1972); *see id.* at 326 ("Where, as here, plaintiffs' damages flow from a loss of business, the amount of compensation should be the same whether the cause be a breach of contract, negligence or nuisance.") (citation omitted). Moreover, the nuisance at issue in *In re Chicago Flood Litig.* would seem to be characterized as temporary, and in light of the Illinois Supreme Court permitting "all consequential damages" for that nuisance, the Court disagrees with DMB that recovery for private nuisance actions is restricted to damages for personal inconvenience, annoyance, and discomfort. *See id.,* 223 Ill.Dec. 532, 680 N.E.2d at 279. The Court provides this context on the damages available for private nuisance actions because of the close relationship between public and private nuisance and because parties refer to private nuisance cases in their briefs.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

For public nuisance actions, a private individual may recover damages only if he has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the public that was the subject of interference." *Young,* 290 Ill.Dec. 504, 821 N.E.2d at 1083 (internal quotation marks and citation omitted). The types of special damage that private plaintiffs bringing public nuisance actions may allege include, for example, "physical harm to chattels." *In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848.

In the instant case, Plaintiff alleges physical harm to chattels, by stating, for example, that *Chicago's Little Lady* was "contaminat[ed]." (D.E. 1 ¶ 40.) Plaintiff's allegations of harm are of a different type than the harm allegedly done to the public's rights of health and comfort. Therefore, Plaintiff has alleged sufficient special harm to state a claim for private damages and should be able to recover for those damages. *See In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 (farmers were able to state a claim for private action for public nuisance by alleging both contamination of the public's food supply (public harm) and damages to their fields, grain supply, and their crop sales (private harm)).

**\*14** DMB suggests in passing that Plaintiff's damages for Count I, its claim of trespass, should be "similarly limited," because " 'the same rules of damages apply whether the action be in trespass or for a nuisance." ' (D.E. 21 at 14-15 (quoting *Kugel v. Vill. of Brookfield,* 322 Ill.App. 349, 54 N.E.2d 92, 95 (Ill.App.Ct.1944).) *But see Ariola v. Nigro,* 16 Ill.2d 46, 156 N.E.2d 536, 543 (Ill.1959) ("With reference to the issue of damages, the rule is well-established that one who trespasses or assumes control over the property of another without authority is responsible for all the consequences.") (citation omitted). Assuming that DMB states a still-correct proposition of law, the Court's analysis permitting recovery of consequential damages for the public nuisance claim should apply for the trespass claim. Thus, the Court concludes that Plaintiff's recovery for Count I is not limited to damages for personal inconvenience, annoyance and discomfort.

Accordingly, the Court grants DMB's motion to strike Plaintiff's claims for damages for Counts I and II to the extent that Plaintiff seeks future or prospective damages. The Court denies DMB's motion to dismiss or strike Plaintiff's claims for damages outside of the category of personal inconvenience, annoyance, and discomfort.

## VI. Punitive Damages Analysis

DMB moves to strike or to dismiss Plaintiff's request for punitive damages for Counts I-IV, arguing that Plaintiff has failed to allege a basis for an award of punitive damages against DMB. (D.E. 11 at 1-2.) The Court agrees with DMB's argument.

DMB suggests, and the Complaint reflects, that *respondeat superior* is the theory of Plaintiff's case against DMB-*i.e.,* DMB is liable as Wohl's employer. (D.E. 13 at 3-4; *see, e.g.,* D.E. 1 ¶ 23 ("At all times relevant to this complaint, Wohl acted under the supervision of the Band and within the scope of his employment duties."); *id.* ¶ 10 ("The Band was and is Wohl's principal and Wohl is the Band's agent. The Band was and is, therefore, responsible for any conduct by Wohl in furtherance of his duties on behalf of the Band."); *see also id.* ¶¶ 8, 9.)FN11 Precedent teaches that when liability of a corporate defendant is predicated on *respondeat superior,* "the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished." *Mattyasovszky v. W. Towns Bus Co.,* 61 Ill.2d 31, 330 N.E.2d 509, 512 (Ill.1975). Imposition of punitive damages in situations of vicarious liability is "narrowly circumscribed." *Kennan v. Checker Taxi Co., Inc.,* 250 Ill.App.3d 155, 189 Ill.Dec. 891, 620 N.E.2d 1208, 1212 (Ill.App.Ct.1993). The Illinois Supreme Court in *Mattyasovszky* delineated four situations where there was adequate "corporate complicity" for punitive damages to lie against a principal for the act of an agent: "(a) the principal authorized the doing and the manner of the act; (b) the agent was unfit and the principal was reckless in employing him; (c) the agent was employed in a managerial capacity and was acting in the scope of his employment; or (d) the principal or a managerial agent of the

Not Reported in F.Supp.2d
Case 1:07-cv-05081   Document 50-2   Filed 11/21/2007   Page 26 of 48 Page 15
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

principal ratified or approved the act."*Id.,* 330 N.E.2d at 512 (internal quotation marks and citation omitted); *Jannotta v. Subway Sandwich Shops, Inc.,* 125 F.3d 503, 513-14 (7th Cir.1997) (same); *Smith v. Am. Gen. Life & Accident Ins. Co.,* No. 99 C 3743, 2002 WL 215527, at *9 (N.D.Ill. Feb.11, 2002)* (Lefkow, J.) (same). To establish the requisite corporate complicity for an award of punitive damages, the plaintiff must offer a basis to find that there has been *"deliberate corporate participation." Kennan,* 189 Ill.Dec. 891, 620 N.E.2d at 1212 (emphasis in *Kennan;* citing *Tolle v. Interstate Sys. Truck Lines, Inc.,* 42 Ill.App.3d 771, 1 Ill.Dec. 437, 356 N.E.2d 625, 627 (Ill.App.Ct.1976)).

> FN11. Plaintiff argues that the use of the plural "Defendants," and references to "Wohl and the Band" in the Complaint serve to "expressly allege ... the Band's complicity" in the wrongful conduct. (Plaintiff's Response to DMB's Motion to Dismiss at 4.) However, the Complaint states that "Wohl intentionally, illegally and purposefully caused the contents of the motor coach's human waste collection tank to empty through the drain underneath the motor coach into the river."(D.E. 1 ¶ 20.) Because the Complaint indicates that Wohl singlehandedly committed the tortious act at issue, the Court reads boilerplate plural references such as "Defendants' deliberate and reckless discharge ..." as merely serving to allege DMB's vicarious liability as opposed to alleging any direct liability. (*Id.* ¶ 33,223 Ill.Dec. 532, 680 N.E.2d 265.)

**\*15** In the present matter, Plaintiff has not made allegations that would equate to "deliberate corporate participation" on the part of DMB, which is a prerequisite to the imposition of such sanctions under Illinois law in this context. *See, e.g., Kennan,* 189 Ill.Dec. 891, 620 N.E.2d at 1212 (internal quotation marks, citation, and emphasis omitted). The only actions allegedly taken by DMB relating to this lawsuit were employing Wohl and withholding in-

come taxes, Social Security and Medicare taxes from his paycheck. (*See* D.E. 1 ¶¶ 8, 9.) Because of that employment relationship, Plaintiff alleges that DMB had the right to control and direct how Wohl performed his duties and that DMB is therefore responsible for Wohl's conduct in the furtherance of his duties on behalf of DMB. (*See id.* ¶ 10, 189 Ill.Dec. 891, 620 N.E.2d 1208.) These allegations are sufficient to state a claim for vicarious liability against DMB. However, as a basis for an award of punitive damages against DMB, the Court does not regard these allegations, at least as pleaded, as "the sort of deliberate action ... which would bring [them] within the complicity rule."*Brummerstedt v. Am. Airlines, Inc.,* 845 F.Supp. 532, 534 (N.D.Ill.1993) (Aspen, J.) (dismissing claim for punitive damages where plaintiff did not indicate that the corporation participated in or condoned the employee's alleged misconduct, or that the employee was a manager acting within the scope of employment); *see also Bahl v. D.A. Express, Inc.,* No. 90 C 20014, 1990 WL 304278, at *1 (N.D.Ill. June 14, 1990)* (Roszkowski, J.) (striking punitive damages portion of complaint given that plaintiff did not allege that corporate defendant "approved, authorized or ratified" the employee's alleged misconduct).

Plaintiff cites to *Arlington Fin. Corp. v. Ben Franklin Bank of Ill.,* No. 98 C 7068, 1999 WL 89567 (N.D.Ill. Feb.16, 1999) (Conlon, J.), for the proposition that "where a complaint states claims which may allow a finding of culpable conduct by the defendant depending on facts developed through discovery, it would be 'inappropriate to foreclose prematurely the possibility of recovery of punitive damages." ' (Plaintiff's Response to DMB's Motion to Dismiss at 4 (quoting *Arlington Fin. Corp.,* 1999 WL 89567, at *7*).) However, the present matter is distinguishable from *Arlington. Arlington* was testing the claim for punitive damages for the sufficiency of its allegations of willful misconduct, as opposed to the sufficiency of allegations of deliberate corporate participation. *See Arlington,* 1999 WL 89567, at *6*. Judge Conlon's opinion in *Arlington* cannot fairly be read to abrogate the principle of Illinois law that, in this *respondeat superior* setting,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

the punitive and admonitory justifications for awarding punitive damages are relatively weak, such that precedent requires allegations of some corporate participation in the misconduct. *See, e.g., Brummerstedt,* 845 F.Supp. at 534 ("Where the employer itself has committed no intentional wrong, then, Illinois courts will not impose the harsh sanction of punitive damages.") (collecting cases); *Twardy v. Northwest Airlines, Inc.,* No. 00 C 6493, 2001 WL 199567, at *5 (N.D.Ill. Feb.28, 2001) (Plunkett, J.). Nor can *Arlington* be fairly read to eliminate a plaintiff's burden to at least outline or adumbrate a basis for seeking punitive damages-which burden Plaintiff has failed to meet. Because the Complaint lacks any allegations of corporate participation by DMB, the Court finds that Plaintiff has not sufficiently stated a claim for punitive damages.

**\*16** The Court also rejects Plaintiff's argument that "the factual predicates demonstrating the Band's participation or corporate complicity in Wohl's illegal conduct are substantially similar to those alleged by the plaintiff in *Deal v. Byford."*(Plaintiff's Response to DMB's Motion to Dismiss at 5.) In *Deal v. Byford,* 127 Ill.2d 192, 130 Ill.Dec. 200, 537 N.E.2d 267 (Ill.1989), the Illinois Supreme Court ruled that there was a sufficient basis to impose punitive damages against a principal under a theory of *respondeat superior. See id.* at 273.In that case, it was undisputed that the employee who committed the misconduct was the "resident manager" of the apartment complex and was "acting within the scope of his employment."*Id.* The court determined that these admissions met the standard of the fourth corporate complicity situation of *Mattyasovszky.See id.*(permitting "the imposition of punitive damages against a principal when the agent is employed in a managerial capacity and is acting within the scope of his employment."). Because the Plaintiff does not seriously even allege that Wohl was playing a managerial role (indeed, Wohl is alleged to be a bus driver) while operating one of DMB's tour buses, the outcome in *Deal* does not aid Plaintiff's request for punitive damages.

The Court concludes that Plaintiff's demand for

punitive damages against DMB should be stricken without prejudice. Plaintiff is given leave to amend its complaint and replead its claims for punitive damages against DMB. *See*Fed.R.Civ.P. 15(a); *see, e.g., Brunt,* 284 F.3d at 720.[FN12]

> **FN12.** However, in repleading, Plaintiff should be wary of making conclusory allegations that merely parrot the corporate complicity standard for punitive damages. *See, e.g., Twardy v. Northwest Airlines, Inc.,* No. 00 C 6493, 2001 WL 199567, at *5 (N.D.Ill. Feb.28, 2001) (Plunkett, J.) (stating that allegations such as "[d]efendant authorized the act the way in which it was done" were insufficient to state a claim for punitive damages in *respondeat superior* setting).

CONCLUSION

For the reasons stated above, the Court respectfully denies in part and grants in part the various motions to dismiss and motion to strike. (D.E.11, 14.) The Court dismisses Counts III and IV without prejudice, strikes Plaintiff's claims for future or prospective damages for Counts I and II, and strikes Plaintiff's requests for punitive damages against DMB for Counts I-V without prejudice.

So ordered.

N.D.Ill.,2005.
Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.
Not Reported in F.Supp.2d, 2005 WL 3159680 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

---

Essex Real Estate Group, Ltd. v. River Works, L.L.C.

N.D.Ill.,2002.

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

THE ESSEX REAL ESTATE GROUP., LTD. and James E. Lefkowitz Plaintiffs

v.

RIVER WORKS, L.L.C.; the Drew Group; J. Michael Drew; Daniel J. Drew; J. Michael Drew 1998 Childrens' Trusts; Lance Mayster; Dwinn, Shaffer & Co. and Column Financial, Inc. Defendants

**No. 01 C 5285.**

Aug. 7, 2002.

MEMORANDUM OPINION AND ORDER

HIBBLER, District Court J.

**\*1** The Essex Real Estate Group, Ltd. and James E. Lefkowitz ("Plaintiffs") bring forth allegations against River Works, L.L.C., The Drew Group, J. Michael Drew, Daniel R. Drew, J. Michael Drew 1998 Childrens' Trust, Daniel R. Drew 1998 Childrens' Trust, Lance Mayster, Dwinn, Shaffer & Company, and Column Financial, Inc. ("Defendants") in a four-count complaint stemming from a $150,000 finder's fee Plaintiffs allege they are entitled to as a result of securing financing for a development project.

The Court has before it Defendants' partial motion to dismiss. For the following reasons, Defendants' motion is GRANTED.

Background

Defendant River Works, a real estate development company, renovated commercial space in Chicago, Illinois, and eventually leased the space to Sara Lee Corporation ("Project"). River Works is owned by two trusts, Defendants J. Michael Drew 1998 Childrens' Trust and Daniel R. Drew 1998 Childrens' Trust. Defendant Drew Group is an Illinois corporation established by J. Michael Drew and Daniel R.

Drew that manages River Works.

In the summer of 2000, the Project required permanent mortgage financing. As part of that process, Plaintiff Essex Real Estate Group, Ltd. through Plaintiff Lefkowitz, a mortgage broker, searched for a lender for the Project. The parties reduced the Plaintiffs' efforts to secure financing for the Project to a written document ("Agreement") on October 27, 2000. The Agreement is a one-page letter with the relevant portion providing for a $150,000 finder's fee payable to Plaintiffs.

Plaintiffs maintain they produced a suitable lender, UBS Principal Financial, L.L.C. ("UBS") that materially met the requested mortgage terms. Defendant J. Michael Drew signed a mortgage application with UBS ("River Works-UBS Agreement") for financing of the Project. The relevant portion of the River Works-UBS Agreement precluded River Works from "shopping" the transaction (i.e. River Works must deal only with UBS as a lender and no one else) while completing the process of securing financing through UBS. Sometime after Plaintiff introduced UBS to River Works, Defendant River Works contends UBS and River Works were unable to reach an agreement with acceptable terms for mortgage financing. Subsequently, River Works maintains Defendant Lance Mayster, a mortgage broker employed by Defendant Dwinn, Shaffer & Company ("Defendant Dwinn"), obtained suitable financing for the Project from a different lender, Defendant Column Financial, Inc. ("Defendant Column"). Plaintiffs maintain not only that UBS terms were suitable, but also that Defendants Mayster, Dwinn, and Column tortiously interfered with Plaintiffs' contractual and business relationships.

More specifically, in Count I Plaintiffs bring a breach of contract claim against Defendants River Works, Drew Group, J. Michael Drew, Daniel R. Drew, J. Michael Drew 1998 Childrens' Trust, and Daniel R. Drew 1998 Childrens' Trust ("Developer Defendants") for breach of the Agreement. In

Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Count II, Plaintiffs assert a third party beneficiary claim against Developer Defendants for breach of the River Works-UBS Agreement. In Count III, Plaintiffs allege Defendants Mayster, Dwinn, and Column tortiously interfered with Plaintiffs' contractual and business relations when they alternatively secured financing for the Project. In Count IV, Plaintiffs request this Court grant relief based on a quantum meruit (also known as quasi-contract) theory.

### Standard of Review

**\*2** The function of a Rule 12(b)(6) motion is to test the sufficiency of the complaint, not to determine the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Authority,* 892 F.2d 583, 586 (7th Cir.1989). In evaluating the sufficiency of a complaint, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520-1521 (7th Cir.1990). This Court must sustain a complaint unless it determines beyond a doubt the plaintiff can prove no set of facts in support of the claims that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). However, a complaint "must allege sufficient facts to outline a cause of action." *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). Therefore, merely asserting conclusions does not make the allegations in a complaint sufficient to survive a motion to dismiss. *Jones v. Lampe,* 845 F.2d 755, 758 (7th Cir.1988).

### Analysis

#### Count I: Breach of Contract

In response to Plaintiffs' breach of contract claim, Defendants J. Michael Drew, Daniel R. Drew, J. Michael Drew 1998 Childrens' Trust, and Daniel R. Drew 1998 Childrens' Trust ("Individual Drew Defendants") bring a motion to dismiss them from Count I and to dismiss Plaintiff Lefkowitz as a party to this litigation.

In order for a breach of contract claim to survive a Rule 12(b)(6) motion, the plaintiff must allege that:

(1) a contract existed; (2) plaintiff sufficiently performed its contractual obligations; (3) defendant breached its contractual obligations; and (4) as a result of defendant's breach the plaintiff suffered damages. *McClellan v. Banc Midwest, McLean County,* 517 N.E.2d 762, 764 (Ill.App.Ct.1997); *see also Carl v. Galuska,* 785 F.Supp. 1283, 1289 (N.D.Ill.1992). In the present motion to dismiss, the Individual Drew Defendants take issue with element one, i.e., they contend a contract never existed between the Individual Drew Defendants and Plaintiffs.

It is undisputed the Individual Drew Defendants and Plaintiff Lefkowitz are not signatories or named parties to the Agreement. Although Defendant J. Michael Drew's signature appears on the Agreement, he signed only in his official capacity as President of the Drew Group, which manages River Works, and thus not in his individual capacity.[FN1] (Compl.Ex. A.) Likewise, Plaintiff Lefkowitz signed the Agreement in his official capacity as President of Essex Real Estate Group, Ltd. and not in his individual capacity.[FN2] (Compl.Ex. A.)

> FN1. Immediately above the Defendants' signature line, the Agreement lists Riverworks, L.L.C. and then below that indicates "By: the Drew Group, Inc., Its Manager."Furthermore, below Defendant Michael Drew's signature is "J. Michael Drew, President."

> FN2. Immediately above the Plaintiffs' signature line, the Agreement indicates "Essex Real Estate Group" and below Plaintiff Lefkowitz signature is "James E. Lefkowitz, President."

Furthermore, no language in the content of the Agreement suggests the Individual Drew Defendants are liable to Plaintiffs or that Plaintiff Lefkowitz is entitled to payment individually. If the Individual Drew Defendants are a party to the agreement, their acceptance would be a prerequisite to the formation of a valid contract and should be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case: 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 31 of 48    Page 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

evidenced by their signatures. *Smith v. Clark Equipment Co.,* 136 Ill.App.3d 800, 804 (Ill.App.Ct.1985). Therefore, Plaintiffs' allegations must shift to another basis for liability because under a standard contract analysis, neither Plaintiff Lefkowitz nor the Individual Drew Defendants are signatories or named parties to the Agreement. *Id.* (finding plaintiff is not a party to the agreement because plaintiff is not a signatory to the agreement and proceeded to consider the claim under a third party beneficiary theory). [FN3]

> [FN3]. This Court analyzes Plaintiffs' third party beneficiary claims separately in Count II.

**\*3** In terms of Plaintiff Lefkowitz, the failure to be a signatory or a named party in his individual capacity requires the Court dismiss him as a party. In *Continental Illinois National Bank & Trust Co. of Chicago v. Stanley,* Continental brought suit against Stanley to recover on Stanley's personal guaranty of loans made to companies controlled by Stanley. 585 F.Supp. 1385 (N.D.Ill.1984). In Stanley's various common-law counterclaims, he argued the same factual situation that gave rise to a cause of action for the corporation can also give rise to separate causes of action on his behalf. *Id.* at 1388. The court found Stanley's allegations were the result of injuries suffered by the company and not based on any independent contractual relationship he had with plaintiff Continental. *Id.* Following the well-established rule that an alleged injury to a corporation accrues a cause of action to the corporation and not the individual stockholders, the court granted the plaintiff's motion to dismiss when it determined Stanley had no standing in his individual capacity. *Id.*

Similarly, the cause of action for the alleged breach of contract in the present case accrues only to Plaintiff Essex not to Plaintiff Lefkowitz in his individual capacity. Plaintiff Lefkowitz attempts to rely on the same factual allegations giving rise to Plaintiff Essex's presumed injury and likewise presents no evidence of an independent contractual relationship with any of the Defendants named in

the complaint. Therefore, the Court must dismiss Plaintiff Lefkowitz as a party to this lawsuit. [FN4]

> [FN4]. Because Plaintiff Lefkowitz is not entitled to relief in his individual capacity, this Court when referencing the Plaintiff from this point forward in the opinion will only be referring to Plaintiff Essex unless otherwise indicated.

The Individual Drew Defendants, however, are not so easily dismissed from the present lawsuit. A corporation is a separate and distinct legal entity from its shareholders, directors, and officers, and generally from other corporations with which it may be affiliated. *Van Dorn Co. v. Future Chem. & Oil Corp.,* 753 F.2d 565, 569 (7th Cir.1985). Although exceptions exist, the courts disfavor piercing the corporate veil and stringently apply its requirements. *Bright v. Roadway Servs., Inc.,* 846 F.Supp. 693, 700 (N.D.Ill.1994). Here, Plaintiff must pierce the corporate veil to state a claim against the Individual Drew Defendants. To pierce the corporate veil, Plaintiff must plead: (1) such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) the circumstances are such that adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice. *Sea-Land Servs. v. Pepper Source,* 941 F.2d 519, 520 (7th Cir.1991).

In determining whether a corporation is so controlled by another to justify disregarding their separate identities, the Court considers: (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another corporation as its own. *Sea-Land Servs.,* 941 F.2d at 521.

**\*4** In *Laborers' Pension Fund v. Paragon Pool Construction Inc.,* the plaintiff attempted to hold the defendant personally liable and alleged the defendant acted as the chief operating officer of the company and owned and operated the company for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 32 of 48
Not Reported in F.Supp.2d    Page 4
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

his exclusive benefit. No. 00 C 2408, 2001 WL 218642, at *2, (N.D.Ill. Jan. 16, 2001). The court noted "these statements could probably be made about most single-owner corporations ... as the closely-held corporation is run very much like an individual proprietorship. But the law nonetheless recognizes the separate corporate entity."*Id.* Determining the allegations were conclusionary and insufficient, the court granted defendant's motion to dismiss him from the proceedings. *Id.* at *3.

In *Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange,* No. 97 C 1256, 1997 WL 767290 (N.D.Ill.Dec. 3, 1997), counter-plaintiff Illinois Insurance Exchange ("Exchange") alleged Defendant Lobo Claims Management, Inc. ("Lobo") was liable for failing to indemnify them and in turn, Lobo moved to dismiss on the grounds that it was not a party to the agreements forming the basis of the Exchange's counterclaim. 1997 WL 767290, at *2-3. Since Lobo was a not a signatory to the agreements, the court considered whether an alter ego theory would apply, and thus allow the claim to survive. *Id.* at *5. The court granted Lobo's motion to dismiss and determined: (1) Exchange's pleadings were conclusionary; (2) they failed to allege Lobo was a mere instrumentality of the other corporations; and (3) they failed to show how the recognition of Lobo as a separate entity would sanction a fraud or promote injustice. *Id.*

In *Bright,* the court considered whether a former employee's parent corporation is liable for discrimination alleged to have occurred while the former employee was employed by its subsidiary. *Bright,* 846 F.Supp. at 695. The former employee argued the corporate veil should be pierced and the parent corporation held liable because it "owns and operates" its subsidiary and it "ratified and affirmed" all acts listed in the complaint. *Id.* The *Bright* court determined the plaintiff's conclusionary allegations were insufficient as a matter of law and therefore dismissed the parent corporation from the lawsuit. *Id.* at 701.

In *Hornsby v. Hornsby's Stores, Inc.,* the court contemplated whether the defendant Stores was the al-

ter ego of two other corporations, thereby justifying the piercing of the corporate veil and making the other two corporations liable to the plaintiffs for the Store's breach of a lease agreement. 734 F.Supp. 302, 306-07 (N.D.Ill.1990). Specifically, the plaintiffs alleged the Store and the other two companies shared the same office space, the same office staff, and the same telephone number. *Id.* at 306.The court held these allegations were insufficient to state a cause of action because Plaintiffs failed to allege any facts suggesting the Store was a mere instrumentality of the other companies. *Id.* at 308.

**\*5** In the case at bar, Plaintiff asserts only two relevant allegations: (1) "[t]he Individual Drew Defendants... are owners of the Drew Group and exercise such control over the Drew Group, River Works and the Trusts as to be and constitute alter egos, without actual separate corporate identity" (Compl.¶ 7) and (2) "the Individual Drew Defendants were the managers of the property receiving substantial compensation; and acted as the developer of the property receiving substantial compensation and in all other facts acted as if they were running the property for their own benefit."(Pls.' Reply Br. at 3.) Plaintiff's conclusionary allegations do not suggest any of the four factors are present to establish River Works or the Drew Group are mere instrumentalities of the Individual Drew Defendants. Moreover, Plaintiff's allegations are significantly less defined than those outlined in *Hornsby* and even then the court found those allegations insufficient as matter of law and subsequently granted the motion to dismiss. Therefore, Plaintiff fails to meet his pleading requirement with regard to element one.

Plaintiff similarly fails to establish how upholding River Works as a separate corporate entity will sanction a fraud or promote injustice. *See Sea-Land Servs.,* 941 F.2d at 522-24 (after extensively analyzing relevant Illinois case law, the court found the inability to collect a debt is not sufficient to pierce the corporate veil; rather, a "wrong" beyond intentional asset and liability-shifting is required).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff alleges no facts in the complaint to suggest sustaining River Works as a corporate entity would create a fraud, injustice or wrong. In the reply brief, Plaintiff alludes to intentional asset-shifting when he alleges "River Works ... and the ... Childrens' Trusts were formed to ... shield and hide the assets of the Individual Drew Defendants for an existing obligation to the U.S. Department of Treasury for unpaid ... taxes."(Pls.' Reply Br. at 3.) [FN5] Plaintiff fails to demonstrate how suggestions of asset-shifting to avoid paying unpaid corporate taxes merits piercing the corporate veil and assigning individual liability with regard to the finder's fee in the Agreement at issue in the present litigation. Further, Plaintiff does not allege River Works cannot pay the requested remedy in the event the court determined Plaintiff was entitled to such relief. Although such an allegation is not by itself sufficient to justify breaching corporate protections, an argument of a judgment proof defendant would at least show Plaintiff sought to establish fraud or injustice and may have provided some link to the asserted asset-shifting theory. Rather, Plaintiff's allegations are insufficient because they merely involve intentional asset-shifting. *See* Sea-Land Servcs., 941 F.2d at 522-24.

> FN5. It is not necessary for this Court to determine whether it is appropriate to make these allegations in the reply brief because Plaintiff's allegations are nevertheless insufficient as a matter of law.

Accordingly, the Individual Drew Defendants are not signatories or named parties to the Agreement and Plaintiff fails to sufficiently state a case for piercing the corporate veil; therefore, Count I against the Individual Drew Defendants must be dismissed with prejudice. Additionally, Plaintiff Lefkowitz is dismissed as a party to these proceedings because he is not a signatory or a named party in his individual capacity to the Agreement.

*Count II: Breach of Third Party Beneficiary Agreement*

**\*6** In Count II, Plaintiffs Essex and Lefkowitz as-

sert they are third-party beneficiaries of the River Works-UBS Agreement, thereby entitling Plaintiffs relief as a result of Developer Defendants alleged contractual breach of the River Works-UBS Agreement. Developer Defendants, without conceding as such, do not presently take issue with whether a breach actually occurred; rather, they argue Plaintiffs are not third party beneficiaries in any event.

It remains undisputed that on the face of the River Works-UBS Agreement there is no express mention of Plaintiffs. Accordingly, the Court's analysis must shift to whether in the absence of express language, Plaintiffs are nevertheless third party beneficiaries. For a third party to have a right to sue, the contract must be for the plaintiff's direct benefit and the contract must affirmatively make this clear. *E.B. Harper & Co. v. Nortek, Inc.,* 104 F.3d 913, 920 n. 4 (7th Cir.1997)(noting a broker could not be considered a third party beneficiary of a Stock Purchase Agreement between two businesses where the broker was only mentioned in the contract incidentally and the sale of the business was not for the broker's direct benefit). If the intent is not express on the face of the contract, then "its implication at least must be so strong as to be practically an express declaration."*Id.*"[B]rokers are generally not third-party beneficiaries of sales agreements to which they are not a party."*Id.; see also* Banco del Estado v. Navistar Int'l Trans. Corp., 954 F.Supp. 1275 (N.D.Ill.1997). In the present case, Plaintiff is not referenced in the River Works-UBS Agreement from which it seeks recovery as third-party beneficiaries and Plaintiffs' benefit would have been relatively incidental. *Id.* (the court found the plaintiff should alternatively rely on the duties created by his own agreement and could not avail himself as a third party beneficiary of the other parties' agreement).

The River Works-UBS Agreement cannot be interpreted as explicitly or implicitly suggesting it was undertaken for Plaintiffs' benefit; rather, the separate and distinct agreement benefitted River Works to secure financing and UBS to be their chosen lender. Although the River Works-UBS Agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

contains a paragraph representing that Defendants will work solely with UBS as their lender, the damages for breach of that agreement expressly provide for enforcement by UBS only. The right to enforce the River Works-UBS Agreement belongs to UBS alone; Plaintiffs' remedy would lie only under its own Agreement with Defendant River Works. Accordingly, the Court dismisses Count II in its entirety with prejudice.

*Count III: Tortious Interference*

Plaintiff alleges tortious interference claims against Defendants Mayster, Dwinn, and Column.[FN6] In response to Plaintiff's allegations, Defendant Mayster argues this Court should dismiss Count III against him in his individual capacity because (1) he was acting within the scope of his employment with Dwinn, Shaffer & Company and (2) Plaintiff has failed to state a claim.

> FN6. This Court has granted the motion to dismiss Plaintiff Lefkowitz, as discussed in Count I, and therefore for the same reasons he is unable to recover under Count III.

**\*7** "A qualified privilege bars liability for tortious interference." *MGD, Inc. v. Dalen Trading Co.,* 230 Ill.App.3d 916, 920 (Ill.App.Ct.1992). Generally, privilege exists when the defendant acted in good faith to protect an interest or uphold a duty. *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 171 (7th Cir.1993). Further, the defendant's conduct must be limited in scope to that purpose, on a proper occasion, in a proper manner, and to the proper parties only. *Id.*

In the present case, an affidavit confirms Defendant Mayster is a broker employed by Defendant Dwinn (Def. Mayster's Aff.) and as such he owed a duty, as an employee, to Dwinn. Plaintiff pleads no facts to suggest otherwise.[FN7] A component of Defendant Mayster's employment as a mortgage broker is introducing Developer Defendants to Defendant Column and he was therefore acting within the proper scope of that duty. Likewise, Developer Defendants were proper parties on the proper occasion because they were commercial real estate de-

velopers searching for a lender for the Project. Plaintiff presents no facts indicating Defendant Mayster acted in an improper manner while exercising his duty. Therefore, this Court determines Defendant Mayster's conduct is privileged.

> FN7. Plaintiff's tortious interference allegations consist of the following:
> Broker Defendants and Column, directly and by their respective agents, jointly and severally, have knowingly and tortiously interfered with Plaintiffs' contractual and advantageous business relationships, both those directly with Defendant Developers and, indirectly between UBS-Defendant Developers, whence Plaintiffs are third-party beneficiaries, and Broker Defendants and Column have, jointly and severally, thus purposefully caused injury to Plaintiffs, under circumstances where they might reasonably have expected that their conduct would cause economic injury to Plaintiffs, damaging the Plaintiffs in the amount of One Hundred Fifty Thousand Dollars ($150,000). (Compl.¶ 33.)

A closely analogous qualified privilege exists to protect corporate officers from liability for decisions made on behalf of the company. *3COM Corp. v. Elec. Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 938 (N.D.Ill.2000). To surmount the qualified privilege, a plaintiff must show the corporate officer's action was done without justification or with actual malice. *MGD Inc.,* 230 Ill.App.3d at 920. To plead malice in the context of tortious interference with contractual relations, Plaintiff must establish Defendant Mayster intentionally injured Plaintiff and his desire to harm was unrelated to the interests of corporation. *Id.* Here, Plaintiff pleads no facts to suggest Defendant Mayster acted without justification, with actual malice, and contrary to the interests of Defendant Dwinn; therefore, Plaintiff fails to overcome the qualified privilege. Accordingly, this Court dismisses Defendant Mayster in his individual capacity from these proceedings.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

In addition, Plaintiff fails to state a claim for tortious interference under either a contractual or business relations theory. The Court notes Plaintiff's complaint alleges both interference with contract and interference with business relations. (Pls.' Compl. at 6.) "Interference with contract and interference with business relations (sometimes called prospective economic advantage) are related torts." *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.,* 192 F.3d 724, 731 (7th Cir.1999).

To state a claim for tortious interference with contract, Plaintiff must plead: (1) a valid and enforceable contract existed between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a breach by the third party, caused by the defendant's wrongful conduct; and (5) damages as a result of the breach by the third party. *Id.*

**\*8** Plaintiff fails to allege Defendant Mayster's conduct of introducing Defendant Column to Defendant River Works caused River Works to breach the Agreement.[FN8] Plaintiff merely asserts Broker Defendants engaged the Developer Defendants to "shop" the loan. (Compl.¶ 21.) However, that paragraph refers to the River Works-UBS Agreement and not Plaintiff's Agreement to which Plaintiff applies the tortious interference with contract claim. Plaintiff also fails to allege Defendant Mayster's conduct was unjustified.

> FN8. As discussed above, Plaintiff is not a third-party beneficiary to the River Works-UBS Agreement and therefore any tortious interference claims regarding the River Works-UBS Agreement do not entitle Plaintiff to relief. For purposes of Count III, the remaining allegations involve the Agreement only.

When the plaintiff's economic expectancy has not been reduced to a contract yet, one can still recover under the theory of tortious interference with business relations. *Int'l Mktg., Ltd.,* 192 F.3d at 731. Under this theory, Plaintiff must plead: (1) his reas-

onable expectation of entering into a valid business relationship; (2) the defendant's knowledge of plaintiff's expectancy; (3) purposeful interference by the defendant which prevents the legitimate expectancy from solidifying into a valid business relationship; and (4) damages to plaintiff as a result of defendant's interference. *Id.*

Competition is a complete defense against tortious interference with business relations claims. *Id.* "Competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort." *Id.* A competitor is ineligible for the competition defense only if its conduct is motivated solely by spite or ill will. *Id.*

In the present case, Defendant Mayster asserts the defense of competition. (Defs.' Mot. Dismiss at 12.) Plaintiff fails to make any allegations that Defendant Mayster was motivated by spite or ill will and thus, he fails to counteract the defense. *Id.* at 732 (dismissing a claim of tortious interference with business relations based on the defense of competition when plaintiff did not counteract defense by pleading allegations of ill will or spite).

Accordingly, Plaintiff has failed to state a claim for tortious interference against Defendant Mayster in his individual capacity under either a contractual or business relations theory.

*Count IV: Quantum Meruit*

In Count IV, Plaintiff requests relief under a quantum meruit theory. Plaintiff's only factual assertion to support this claim is "Plaintiff Lefkowitz did not sign the Agreement."(Pls.' Reply Br. at 8.) In response, Defendants' argue Count IV should be dismissed because a contract dictates the terms of the parties' deal.

Illinois law does not authorize recovery on a theory of quasi-contract when a real contract governs the parties' dealings. *Murray v. ABT Assoc.,* 18 F.3d 1376, 1379 (7th Cir.1994). The Agreement is the real contract that applies to the present case. Al-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

though the parties may dispute whether a breach of the Agreement factually occurred, what the terms of the Agreement are, or which parties are bound to the Agreement, it is nevertheless a real contract. Liability or non-liability flows from the Agreement at issue. FN9 On this point alone, Plaintiff's quantum meruit claim fails as a matter of law.

> FN9. As an initial matter this Court determined Plaintiff Lefkowitz and the Individual Drew Defendants are not parties to the Agreement and therefore no relief flows to Plaintiff Lefkowitz and no liability attaches to the Individual Drew Defendants.

**\*9** Further, Illinois law does not allow quasi-contract recovery when a plaintiff seeks such recovery just because a specific subject matter is not covered in the express contract. *Borowski v. DePuy, Inc.,* 850 F.2d 297, 301 (7th Cir.1988). In the present case, Plaintiff cannot recover under a quantum meruit theory because Plaintiff does so only to redress an area not discussed in the Agreement: breach of the Agreement by "shopping" the terms of the loan and the damages resulting from such a breach. Accordingly, the Court dismisses Count IV in its entirety with prejudice.

### Conclusion

For the above stated reasons, the Court GRANTS Defendants' motion to dismiss in the following areas: (1) the Individual Drew Defendants are dismissed from Count I; (2) Count II is dismissed with prejudice; (3) the tortious interference claims in Count III are dismissed with respect to Defendant Mayster; (4) Count IV is dismissed with prejudice; and (5) Plaintiff Lefkowitz is dismissed as a party to these proceedings.

IT IS SO ORDERED.

N.D.Ill.,2002.
Essex Real Estate Group, Ltd. v. River Works, L.L.C.
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)

END OF DOCUMENT

# EXHIBIT D

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Steffes v. Stepan Co.
N.D.Ill.,1997.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Joan M. STEFFES, Plaintiff,
v.
STEPAN COMPANY; Charles Worden; Seyfarth,
Shaw, Fairweather & Geraldson; Carl Johnson; and
Sari Alamuddin, Defendants.
**No. 96 C 8225.**

May 30, 1997.

*MEMORANDUM OPINION AND ORDER*
JAMES F. HOLDERMAN, District Judge.
**\*1** Defendants have moved to dismiss plaintiff's
complaint for retaliation and intentional interfer-
ence with prospective economic advantage. This
case stems from the investigation and discovery
surrounding case No. 95 C 2630, an action by
plaintiff in this court against her former employer
Stepan Company (Stepan). The complaint in 95 C
2630 alleges that Stepan failed to accommodate
plaintiff's disability-her allergies to certain chemic-
als-because Stepan could have made positions
available which did not overly expose plaintiff to
these allergens. In this case, plaintiff alleges that
the defendants-Stepan, Stepan human resources
manager Charles Worden, and Stepan's counsel
(Seyfarth)-intentionally injured plaintiff when
Worden told plaintiff's current employer of her dis-
crimination suit as well her allergies. For the fol-
lowing reasons, defendants' motion to dismiss is
granted.

*BACKGROUND*

According to plaintiff's complaint, plaintiff was
employed by Stepan from 1978 until June 1996,
working mostly in Stepan's maintenance ware-
house. Stepan placed plaintiff on paid medical
leave in December 1993 and never reinstated her.
On May 6, 1994, plaintiff filed a charge with the
Equal Opportunity Employment Commission al-

leging that Stepan had violated the Americans with
Disabilities Act by discriminating against plaintiff
because of her allergies and breathing difficulties.
A lawsuit based on these charges is currently
pending as case 95 C 2630. One of Stepan's re-
sponses to the law suit has been that there was not
any available position in the company which would
have allowed Stepan to reasonably accommodate
plaintiff's medical restriction to avoid certain chem-
icals.

In July 1996, plaintiff began working in a mainten-
ance warehouse for Dow Chemical (Dow) through
a placement agency, First Choice Temporary Ser-
vice, Inc. (First Choice). On October 1, 1996, in her
answers to Seyfarth's interrogatories for the under-
lying case, plaintiff told Seyfarth that she was cur-
rently working for First Choice and was contracted
through them to Dow. The next day, Seyfarth direc-
ted Worden to call Dow and ask Dow if plaintiff
worked there. Following Seyfarth's instruction,
Worden called Dow on October 2, 1996, and dis-
covered that plaintiff worked there. Worden then
informed Dow that plaintiff had sued Stepan for
discrimination and that she had a weight restriction
and could not work around chemicals [FN1]. Due to
Worden's call, Dow directed First Choice to inform
plaintiff not to return to work with Dow until Dow
was informed as to plaintiff's medical restrictions.
Plaintiff did not work for Dow from October 3,
1996 until October 16, 1996, when Dow received a
letter from plaintiff's doctor.

> FN1. In counts IV, V, and VI, plaintiff al-
> leges that Seyfarth directed Worden to find
> out if Dow was aware of plaintiff's medical
> restrictions.

On December 16, 1996, plaintiff filed her com-
plaint in this matter. She alleges that as a direct res-
ult of Worden's actions, she was temporarily de-
prived of her job with Dow and will never be hired
by Dow as other than a contractual employee
through First Choice. Plaintiff's complaint contains
six counts: count I alleges that Stepan retaliated

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 2

against plaintiff's discrimination charge with Worden's phone call; count II alleges that Worden retaliated for the discrimination charge; count III alleges that Worden intentionally interfered with plaintiff's prospective economic advantage; and counts IV through VI allege that Stepan's counsel are liable for intentional interference with prospective economic advantage due to Worden's phone call. Defendants have moved to dismiss all six counts.

### I. Counts III, IV, V, and VI do not State a Cause of Action for Intentional Interference with Prospective Economic Advantage

**\*2** In counts III through VI, plaintiff claims that various defendants intentionally interfered with her employment at Dow though their responsibility for the Worden phone call. Dismissal under Rule 12(b)(6) is appropriate only if no relief could be granted under any set of facts that could be proved consistent with the allegations. *Panares v. Liquid Carbonic Industries Corp.,* 74 F.3d 786, 791 (7th Cir.1996). This court accepts as true all well-pleaded allegations and the inferences that may be reasonably drawn from those allegations. *Id.* While federal notice pleading allows for a generous reading of a complaint, it must at least set out facts sufficient to outline the basis of the claim. *Id.* at 792. The pleader will not be allowed to evade this requirement by attaching a bare legal conclusion to the facts that he narrates. *Id.* A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6). *Id.*

To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional, unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference. *Anderson v. Vanden Dorpel,* 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296, 1299 (Ill.1996). In addition,

while these requirements do not explicitly address the relevance of truthfulness by the interferer, permitting recovery for tortious interference based on truthful statements would seem to raise significant First Amendment problems. *Delloma v. Consolidated Coal Co.,* 996 F.2d 168, 172 (7th Cir.1993).

First, the court finds that counts III to VI fail to allege the first requirement that plaintiff had a reasonable expectancy of future employment with Dow. The complaint alleges that due to Worden's phone call, plaintiff "will never be hired by Dow Chemical as other than a contractual employee through First Choice Temporary Service Inc." Comp. at ¶ 20. This allegation is inadequate under *Anderson,* where the Illinois Supreme Court recently held, "The hope of receiving a job offer is not a sufficient expectancy." 217 Ill.Dec. 720, 667 N.E.2d at 1299. *Anderson* dismissed an interference claim by a candidate for a position who was scheduled for further interviews. The instant case is even weaker than *Anderson,* as plaintiff had not yet begun the process of becoming a Dow employee. Plaintiff does not dispute the preceding authority but instead argues that she is alleging an adverse employment decision by First Choice. Plaintiff's complaint, though, does not allege that First Choice has ever taken any employment action against plaintiff. Moreover, paragraphs 19 and 20 of the complaint indicate that plaintiff was reassigned to Dow as an employee with First Choice within two weeks of Worden's call. Because the complaint fails to allege any factual assertions which would allow for a reasonable expectancy of entering into a valid business relationship, counts III, IV, V, and VI fail to state a claim upon which relief may be granted.

**\*3** In addition, counts III through VI fail to state a claim because there is no allegation that Worden said anything untrue in his call to Dow. The Restatement of Torts states:
There is of course no liability for interference with contract or with prospective contractual relation on the part of one who merely gives truthful information to another. The interference in this instance is clearly not improper. This is true even though ... the person to whom the information is given immedi-

ately recognizes [the information] as reason for breaking his contract or refusing to deal with another. It is also true whether or not the information is requested.

Rest. (2d) Torts § 772 Comment (b). The Illinois Appellate Court recently cited the Restatement to conclude, "There is no liability for interference with a prospective contractual relation on the part of one who merely gives truthful information to another." *Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill.App.3d 606, 215 Ill.Dec. 251, 663 N.E.2d 1, 10 (Ill.App. 1st Dist.1995). Plaintiff attempts to distinguish *Soderlund* on the basis that her underlying claim is retaliation and not defamation, but her allegations in counts III through VI are identical to *Sunderland* in their theory of liability-statements that caused injury by interfering with a prospective economic relationship. No Illinois case has ever held that true statements may be the basis for an action for tortious interference with a prospective contractual relation. *Delloma,* 996 F.2d at 172. Thus, this court will follow the Restatement and *Soderlund* to hold that counts III through VI fail to state claims because they do not allege that any of Worden's statement's were untrue.

II. *Counts I and II for Retaliation Must be Dismissed Because Worden's Statements are Absolutely Privileged as Legal Communication Relevant to the Litigation*

A. *Warden Acted as Seyfarth's Agent while Talking to Dow*

Worden and Stepan claim that any privilege their counsel would have held in communicating with Dow should be extended to Worden because he was acting as Seyfarth's agent when he called Dow. The court agrees. The agency relationship is a consensual, fiduciary one between two legal entities, where the principal has the right to control the conduct of the agent and the agent has the power to affect the legal relations of the principal. *Taylor v. Kohll,* 162 Ill.2d 91, 204 Ill.Dec. 766, 642 N.E.2d 467, 468 (Ill.1994). Ordinarily, the key consideration in determining whether an agency relationship exists is

whether the principle had the right to control the activities of the agent. *Knapp v. Hill,* 276 Ill.App.3d 376, 212 Ill.Dec. 723, 657 N.E.2d 1068, 1071 (Ill.App. 1st Dist.1995); *Taylor,* 204 Ill.Dec. 766, 642 N.E.2d at 468-69. Because plaintiff's complaint alleges that Seyfarth was directing Worden's activities, Worden was under the control of Seyfarth and, thus, was its agent. Cases from other jurisdictions have consistently found that investigators acting on behalf of attorneys should be accorded the same privilege as the attorneys themselves. See *Leavitt v. Bickerton,* 855 F.Supp. 455 (D.Mass.1994); *Buckhannon v. U.S. West Communications Inc.,* 928 P.2d 1331, 1996 WL 123186 (Col.App.); *Hawkins v. Harris,* 141 N.J. 207, 661 A.2d 284 (N.J.1995). While plaintiff argues that Worden's status as a Stepan employee precludes him from serving as Seyfarth's agent, nothing prevents agents from serving in dual capacities. *Illinois Association of Remittance Agents v. Powell,* 122 Ill.App.2d 322, 258 N.E.2d 827, 829 (Ill.App. 4th Dist.1970).

B. *Worden's Inquiry into Plaintiff's Forthrightness with Dow was Communication within the Absolute Litigation Privilege*

**\*4** Illinois law recognizes an absolute litigation privilege which protects anything said or written in the course of a legal proceeding. *In re American Continental/Lincoln Savings & Loan Securities Litigation,* 884 F.Supp. 1388, 1396 (D.Ariz.1995) (examining Illinois law), *aff'd,*102 F.3d 1524,*cert. granted,*1997 WL 134379; *Skopp v. First Federal Savings of Wilmette,* 189 Ill.App.3d 440, 136 Ill.Dec. 832, 545 N.E.2d 356, 360 (Ill.App. 1st Dist.1989). The only qualification to this privilege is that the communication pertain to the litigation. *American,* 884 F.Supp. at 1396; *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361. This requirement is not applied strictly, and the communication need not be confined to the specific issues involved in the litigation. *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361. The communication need not occur in court to be protected by the privilege (*Libco Corp. v. Adams,* 100 Ill.App.3d 314, 55 Ill.Dec. 805, 426 N.E.2d 1130, 1132 (Ill.App. 1st Dist.1981)), and the priv-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Case 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 41 of 48    Page 4

ilege applies to any communications pertinent to pending litigation. *McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 425 N.E.2d 1130, 1133 (Ill.App. 1st Dist.1981). The rationale for the privilege is to secure for attorneys as officers of the court the utmost freedom in representing clients. *Libco,* 55 Ill.Dec. 805, 426 N.E.2d at 1132. The absolute privilege is afforded even when malice is assumed to have motivated the attorney. *Scheib v. Grant,* 22 F.3d 149, 156 (7th Cir.), *cert. denied,* 513 U.S. 929, 115 S.Ct. 320, 130 L.Ed.2d 280 (1994). All doubts are to be resolved in favor of finding that the privilege applies. *American,* 884 F.Supp. at 1396; *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361.

Plaintiff claims that Worden's talk with Dow was irrelevant to the litigation because Dow had no legitimate interest in plaintiff's medical restrictions. The important issue is not Dow's interest, though, but the needs of the litigants. One of plaintiff's argument in the underlying case is that her successful employment with Dow reveals pretext by contradicting Stepan's claim that plaintiff could not work in its chemical company because of her physical condition FN2. Whether plaintiff had informed Dow of her allergies could be very relevant to combat this contention. Plaintiff may have been having the same health problems with Dow as she had with Stepan, but perhaps plaintiff temporarily neglected to inform or complain to Dow in order to gain an advantage in her lawsuit with Stepan. In addition, plaintiff could have been working at Dow exclusively with chemicals that do not cause her difficulties, but this theory could be proved only by telling Dow about plaintiff's allergies and comparing the chemicals at plaintiff's Dow workplace. When Illinois and federal courts have examined actions alleging liability from communications relevant and necessary to an underlying claim, as the communications were in this case, these courts have consistently held that the absolute privilege applies. See *American,* 884 F.Supp. at 1396 (no tortious interference from letter to FDIC lawyer); *Scheib,* 22 F.3d at 156 (7th Cir.1994) (no violation of Illinois Eavesdropping Act); *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361 (no tortious interference form statements made to attorneys and other offi-

cials at meeting); *Libco,* 55 Ill.Dec. 805, 426 N.E.2d at 1132 (letter from one attorney to another); *McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 425 N.E.2d 1130, 1133 (Ill.App. 1st Dist.1981) (testimony to Board of Education about alleged battery was pertinent to pending litigation).

> FN2. To further support their claim of relevance, defendants have filed a joint motion to take judicial notice of plaintiffs pleadings in Case No. 95 C 2630. The court has not needed to rely on plaintiff's pleadings because plaintiff's response memo in this matter has adequately informed the court about arguments in the complaint filed in that case, as plaintiff admits the relevance of "Evaluating Stepan's defense that Plaintiff cannot work in a chemical company due to her physical condition, because, obviously, if Plaintiff is working for Dow, a chemical company, Stepan's claim is significantly weakened." Pl.Resp.Memo to Stepan and Worden Mot. to Dis. at 8.

**\*5** Plaintiff relies on *Auriemma v. Montgomery,* 860 F.2d 273 (7th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989), but that case is inapposite. The *Auriemma* court denied the absolute privilege to government attorneys who sought, acquired, and used the plaintiffs' credit reports to intimidate them. Unlike the instant case, *Auriemma* neither involved communications nor was based on conduct which had any relevance to the pending litigation. The *Auriemma* court expressly approved "extending absolute immunity to actions taken by advocates within the broad confines of the civil discovery procedures available in both state and federal courts." *Id.* at 278. The court finds that questioning a potential witness about matters pertinent to the litigation falls within the broad confines of the discovery privilege envisioned by the Seventh Circuit. As the Seventh Circuit stated in *Scheib:* "We believe that the Illinois [Supreme] Court would conclude that the truth-seeking process of a judicial proceeding will be most securely advanced if attorneys do not fear

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

civil or criminal liability as the consequence of mis-judging the legality of disclosing particular inform-ation." *Scheib,* 22 F.3d at 156. Worden disclosed information only in making communications relev-ant and necessary to his case. Therefore, this court finds Worden's communications with Dow are ab-solutely privileged. Accordingly, counts I and II al-leging retaliation from Worden's communications must be dismissed.

### CONCLUSION

For the above stated reasons, the defendants' mo-tion to dismiss is GRANTED. This case is dis-missed in its entirety. All pending motions are moot. Each side is to bear its own costs.

N.D.Ill.,1997.
Steffes v. Stepan Co.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Not Reported in F.Supp.                                                                           Page 1
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

⊞
Young v. Connecticut Mut. Life Ins. Co.
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Richard J. YOUNG, Plaintiff,
v.
CONNECTICUT MUTUAL LIFE INSURANCE
COMPANY, et al., Defendants.
**No. 90 C 254.**

Aug. 17, 1990.

*MEMORANDUM OPINION AND ORDER*
MAROVICH, District Judge.
**\*1** Plaintiff Richard J. Young, an insurance agent,
brought this action against defendants for allegedly
preventing him from selling an innovative insur-
ance product. Count I is a breach of contract claim
against Connecticut Mutual Life Insurance Com-
pany ("CML"), for which Young acted as an agent,
for not allowing him to sell the product in question.
Count II is against CML and three individual de-
fendants, Bruce Knox, Robert Kroner, and Philip
Davis, and alleges tortious interference with pro-
spective economic advantage. Before the court is
defendant Davis' motion to dismiss Count II of the
complaint for lack of personal jurisdiction. Also be-
fore the court are CML's motion to dismiss Counts I
and II for failure to state a claim upon which relief
can be granted, and the individual defendants' mo-
tion to dismiss Count II, also for failure to state a
claim. For the following reasons, defendant Davis'
motion to dismiss for lack of personal jurisdiction
is denied, but the motions to dismiss for failure to
state a claim are granted.

*I. BACKGROUND*

In ruling on defendants' motions to dismiss, this
court must take the allegations in plaintiff's com-
plaint to be true and view them, along with the
reasonable inferences to be drawn therefrom, in the
light most favorable to plaintiff. *See Ellsworth v.*

*City of Racine,* 774 F.2d 182, 184 (7th Cir.1985),
*cert. denied,*475 U.S. 1047 (1986). Young is an in-
surance agent specializing in designing and selling
compensation packages to law firms, accounting
firms, and other professional groups. Paragraph 1 of
plaintiff's complaint. CML is a mutual life insur-
ance company.

On January 16, 1980, a "Career Contract" was
entered into by Young; the Hunken Agency, which
was a general agent of CML; and CML (¶ 6). This
contract established Young as an agent of CML and
gave him the right to sell CML's products. *Id.* Sec-
tion One of the Career Contract governed Young's
authority. Part A of Section One provides that:

The Agent may solicit and procure applications for
life insurance, disability insurance, annuity con-
tracts and other products now or hereafter offered
by the Company at such time and in such manner as
he may determine, subject to the provisions of this
Contract and any Supplement and/or Amendment
hereto, and to his being properly licensed in the jur-
isdiction where such applications are solicited and
procured, and, if necessary, registered with the
proper authorities.

Exhibit A to Plaintiff's Complaint at 1. Young was
the top selling Chicago agent of CML for 1986,
1987 and 1988 (¶ 12). As a result of his perform-
ance, Young was appointed as a full-time agent su-
pervisor by CML in January of 1989 (¶ 13).

Sometime prior to September of 1987, CML
entered into an agreement with Knox, Kroner, and
Davis (collectively referred to as "CCPI defend-
ants"), who did business as Corporate Compensa-
tion Plans, Inc. Under the agreement, all of the de-
fendants acted together to develop a new universal
group life insurance product called Consortium
Group Flexible Premium Adjustable Life Insurance
Policy ("Consortium") (¶ 14). The market for Con-
sortium is limited to large groups of fifty or more
partners or executives. *Id.* In September of 1987,
CML authorized the marketing and sale of Consor-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

tium by the CCPI defendants, but the product was not disclosed to Young until March of 1989 (¶¶ 15, 16). From September of 1987 through March of 1989, the CCPI defendants entered the Chicago marketplace and solicited law and accounting firms for the sale of Consortium (¶ 17). The CCPI defendants solicited several Chicago law firms and sold Consortium to at least three firms (¶ 20).

**\*2** On January 16, 1990, Young filed his complaint. Count I is a breach of contract claim; Young alleges that CML had an obligation under the "Career Contract" to make Consortium available to Young along with its other agents. Count II is an interference with prospective economic advantage claim against all defendants for their agreement to develop and market Consortium without Young.

Defendant Davis has moved to dismiss Count II for lack of personal jurisdiction. CML has moved to dismiss Count I on the grounds that nothing in the contract supports Young's allegation that CML had a duty to permit Young to sell all of its products. CML also seeks a dismissal of Count II on the grounds that Young cannot state a claim for interference with prospective economic advantage. The CCPI defendants have brought a similar motion directed at Count II. We find that we have personal jurisdiction over defendant Davis, but that plaintiff cannot state a claim against any of the defendants. Counts I and II are thus both dismissed with prejudice.

## II. *DISCUSSION*

### A. Davis' Motion To Dismiss For Lack of Personal Jurisdiction

Defendant Davis contends that Count II should be dismissed for lack of personal jurisdiction. None of the other CCPI defendants have contested personal jurisdiction. Young has the burden of establishing a *prima facie* case of personal jurisdiction. *Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir.1987). In ruling on this issue, however, all the allegations in the complaint are to be taken as true unless controverted by Davis' affidavits, and any conflicts in the affidavits must be resolved in Young's favor. *Id.* Dav-

is originally submitted an affidavit stating that he was an officer of "Corporate Compensation Plans, Inc.," a Delaware corporation, and that any actions that he had taken in Illinois were taken in his capacity as an officer of that corporation. May 11, 1990 Affidavit of Philip T. Davis. Davis, however, later realized that his affidavit was in error because there is no such corporation as "Corporate Compensation Plans, Inc." registered in Delaware. Davis then submitted a supplemental affidavit stating that he was not an officer of CCPI, Inc., but rather was an officer of "Corporate Compensation Plans of North America, Inc." June 15, 1990 Supplemental Affidavit of Philip T. Davis. In this supplemental affidavit, Davis also concedes that he was in Illinois approximately seven times in connection with the marketing of Consortium, beginning in October of 1988, but he asserts that all his appearances were on behalf of Corporate Compensation Plans of North America, Inc.

Davis relies exclusively on the fiduciary shield doctrine, which provides that where a person's activities in a state are all conducted in his capacity as the representative of a corporation, these activities cannot be relied upon to exercise individual personal jurisdiction over that person. *See Ameritech Mobile Communications, Inc. v. Cellular Communications Corp.,* 664 F.Supp. 1175, 1180 n. 4 (N.D.Ill.1987). The doctrine, however, is equitable in nature and thus is applied in the court's discretion. *Washburn v. Becker,* 186 Ill.App.3d 629, 633, 542 N.E.2d 764 (1st Dist.1989). The fiduciary shield doctrine should not be applied in this case because of the uncertainty surrounding the proper identity of the corporate defendant. Davis has demonstrated in his affidavit that he appeared in Illinois as a representative of Corporate Compensation Plans of North America, Inc., but he has not demonstrated that people with whom he dealt knew that he was acting as a representative of this corporation. In fact, the only evidence on this latter point is that the individual defendants purportedly appeared as representatives of Corporate Compensation Plans, Inc., which never existed, or of "Corporate Compensation Plans," which did not purport to be a corporation. Exhibits A and B to Plaintiff's Response to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Davis' Motion to Dismiss.

**\*3** It would be inequitable to apply the fiduciary shield doctrine here. Even if Davis appeared as a representative of Corporate Compensation Plans of North America, Inc., this fact was not made known to the people with whom he dealt. The fiduciary shield doctrine exists because it is thought unfair to subject persons to suit in their individual capacity where they acted solely as representatives of a corporation. A defendant should not be protected, however, where persons with whom he dealt thought they were dealing with an individual or with the representative of a different corporation.

Having rejected Davis' fiduciary shield argument, we find that we have personal jurisdiction over him because he transacted business in Illinois. Section 2-209 of the Illinois Code of Civil Procedure provides in pertinent part:

(a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits ... to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this State....

Ill.Rev.Stat. ch. 110, ¶ 2-209(a). The transaction of business standard "does not require that the nonresident defendant conduct business within Illinois regularly or systematically; a single act may be sufficient, as long as the cause of action arises from that act." *Snyder v. Smith,* 736 F.2d 409, 416 (7th Cir.1984). Davis admits that he entered Illinois and marketed Consortium here, and Young's cause of action directly arises from this conduct. Under the Illinois long arm statute we find that Davis transacted business in Illinois and we thus have personal jurisdiction over him.

### B. Breach of Contract

CML argues that Count I does not state a claim for breach of contract because the language of the contract between the parties does not support a requirement that CML disclose all of its products to its agents. In seeking to establish a duty on the part of CML to allow Young to sell all of its products, Young relies on Section 1A of the Career Contract. This portion of the contract, however, merely sets out the agent's general authority and does not impose any duty on CML. Nothing in the language of the contract could even remotely be construed as prohibiting CML from denying Young access to its products.

Young repeatedly points out that there is no language in the contract which allows CML to deny him access to CML's products. His argument relies on a backwards interpretation of the law. To establish a breach of contract, a plaintiff must show that the contract creates a duty or specifically prohibits certain conduct, not that it fails to specifically allow something. *See North Broadway Motors, Inc. v. Fiat Motors of North America, Inc.,* 622 F.Supp. 466, 468 (N.D.Ill.1984). Young further claims that CML's interpretation of the contract merely creates an ambiguity as to the meaning of the contract provision, and that the contract must be construed against CML, which prepared it. *See Smith v. Connecticut General Life Ins. Co.,* 122 Ill.App.3d 725, 728, 462 N.E.2d 604 (1st Dist.1984). The contract language, however, is clear and it does not support Young's interpretation. The above principle thus does not apply here. Count I is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

### C. Interference with Prospective Economic Advantage

**\*4** CML and the CCPI defendants have moved separately to dismiss Count II, which asserts a claim of tortious interference with prospective economic advantage against all defendants. The essential elements of an action for interference with prospective economic advantage are:

[1] The plaintiff's reasonable expectancy of entering into a valid business relationship;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05081    Document 50-2    Filed 11/21/2007    Page 47 of 48    Page 4

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

[2] The defendant's knowledge of this expectancy;

[3] An intentional interference by the defendant which prevents the expectancy from ripening into a valid business relationship; and

[4] Damages to the plaintiff from such interference.

*Crinkley v. Dow Jones & Co.,* 67 Ill.App.3d 869, 878, 385 N.E.2d 714 (1st Dist.1979). CML claims that Young has not properly pled facts to support the first and third elements of this tort. We will not rule on these arguments, which are directed toward matters of pleading, because we find that Young's claim must fail for a more fundamental reason.

CML contends that Young cannot state a claim against it in Count II because a party cannot be liable for interfering with its own contract or business relationship. *DP Service, Inc. v. AM International,* 508 F.Supp. 162, 168 (N.D.Ill.1981). The tort in question requires some wrongful action toward a third party which disrupts a prospective economic relationship between the plaintiff and the third party. *See Id.* at 167. Young cannot meet this requirement and thus cannot state a claim against CML for interference with prospective economic advantage.

Young alleges in his complaint that he was an agent of CML. He also contends that he had an expectancy of selling CML products to certain customers, but all of these expected sales would have been made as an agent of CML. The business relationship which CML is alleged to have interfered with would have been between the third-party customers, Young, *and* CML, which would issue the policies. CML cannot be liable for interfering with its own relationship.

In addition, even if the business relationship of Young with the prospective customers can be considered to exist apart from CML, Young cannot state a claim for interference with prospective economic advantage. The tort requires that the defendant have taken some action toward a third party which caused the third party not to do business with the plaintiff. *DP Service,* 508 F.Supp. at 167. The

action toward the third party must be some sort of direct interference with the relationship between the plaintiff and the third party, such as disparagement or other wrongful conduct. *See Downers Grove Volkswagen v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 527-28, 540 N.E.2d 33 (2d Dist.1989). We do not believe that a defendant's mere selling of a product to a third party, so that the plaintiff could not sell to them, is an actionable type of wrongful interference. Of course the situation might be different if CML had some duty not to sell to these third parties without notifying Young, but we have previously found that no such duty existed under the parties' contract. Young has not alleged any other basis for such a duty. Young has failed to state a claim against CML in Count II.

**\*5** The CCPI defendants have also moved to dismiss Count II for failure to state a claim. These defendants contend that Young has failed to properly plead that they had knowledge of his expectancy of selling to the customers in question. Again, we will not consider this type of argument, because there is a more fundamental reason that Young cannot state a claim against these defendants. As noted above, a person cannot be liable for interference with prospective economic advantage unless he has taken some wrongful action, directed at a third party, to induce the third party not to do business with the plaintiff. Like CML, the CCPI defendants did not take any such action because they merely sold Consortium to third parties, and did not directly attempt to induce these parties not to do business with Young.

Moreover, as competitors of Young, the CCPI defendants have an even stronger case for dismissal than CML because selling Consortium in competition with Young is privileged conduct. *See Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 553, 413 N.E.2d 98 (1st Dist.1980). Young points out that competition is not privileged if it is unlawful, *City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill.App.3d 359, 363, 300 N.E.2d 331 (3d Dist.1973), but Young has not alleged any unfair competition on the part of the CCPI defendants. All the complaint alleges is that the CCPI defendants

entered into an agreement with CML to sell Consortium. There is absolutely nothing in the complaint to suggest that the defendants engaged in any type of unfair competition. *See Downers Grove Volkswagen,* 190 Ill.App.3d at 528.

Young claims that the CCPI defendants' privilege claim must be raised as an affirmative defense and can not be considered on a motion to dismiss, citing *Haupt v. International Harvester Co.,* 582 F.Supp. 545, 550 (N.D.Ill.1984). The Illinois Appellate Court, however, has subsequently stated that privilege is not an affirmative defense, but that, rather the plaintiff must demonstrate lack of privilege. *King v. Levin,* 184 Ill.App.3d 557, 561, 540 N.E.2d 492 (1st Dist.1989). Young has failed to state a claim for interference with prospective economic advantage against either CML or the CCPI defendants, so Count II of the complaint must be dismissed.

### III. *CONCLUSION*

For the above reasons, defendant Davis' motion to dismiss for lack of personal jurisdiction is denied. Counts I and II are dismissed with prejudice against all defendants.

N.D.Ill.,1990.
Young v. Connecticut Mut. Life Ins. Co.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.