# EXHIBIT A

Dockets.Justia.com

Westlaw.

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

**H**

Estate of Sims v. County of Bureau
C.A.7 (Ill.),2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
ESTATE OF Thetis M. SIMS, by and through its
personal representative, Melissa K. Sims, William
C. Sims, surviving spouse and next of kin, and
Melissa K. Sims, individually, Plaintiffs-Appel-
lants,
v.
COUNTY OF BUREAU, as a necessary party in in-
terest, Greg Johnson, John E. Thompson, in his of-
ficial capacity as Sheriff of the County of Bureau
and Bureau County Sheriff's Department, Defend-
ants-Appellees.
No. 01-2884.

Decided Oct. 19, 2007.[FN1]
Argued Feb. 26, 2003.

**Background:** Estate of journalist, who suffered
fatal heart attack during confrontation with sheriff
regarding article investigating sheriff's alleged cam-
paign fraud, brought action against sheriff in his in-
dividual and official capacity, sheriff's department,
and county alleging that sheriff's actions led to
journalist's death. The United States District Court
for the Central District of Illinois, Joe Billy
McDade, J., dismissed the action. Following settle-
ment with sheriff in his individual capacity,
plaintiff appealed.

**Holdings:** The Court of Appeals, Kanne, Circuit
Judge, held that:

(1) estate failed to allege a policy or custom of the
sheriff's department;

(2) estate failed to allege that sheriff's conduct of
confronting journalist was related to the perform-
ance of his official duties; and

(3) estate failed to allege that sheriff conspired with
another person to conceal information.

Affirmed.

**[1] Federal Courts 170B ⊂⇒412.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk412 Contracts; Sales
                170Bk412.1 k. In General. Most Cited
Cases
State law governs a suit to enforce a settlement of a
federal suit.

**[2] Federal Courts 170B ⊂⇒776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
The Court of Appeals reviews de novo whether a
complaint states a claim upon which relief can be
granted. Fed.Rules Civ.Proc.Rule 8(a)(2), 28
U.S.C.A.

**[3] Federal Civil Procedure 170A ⊂⇒673**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak673 k. Claim for Relief in Gen-
eral. Most Cited Cases
A statement in a complaint need only give the de-
fendant fair notice of what the claim is and the
grounds upon which it rests. Fed.Rules
Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[4] Civil Rights 78 ⊂⇒1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and Elements of Civil Ac-
tions. Most Cited Cases
In order to state a claim pursuant to § 1983, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs must allege that a government official, acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞1394**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1394 k. Complaint in General. Most Cited Cases
In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual pleading requirements. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[6] Civil Rights 78 ☞1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of Officers and Employees in General; Vicarious Liability and Respondeat Superior in General. Most Cited Cases
A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In General. Most Cited Cases
In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was the moving force behind it. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In General. Most Cited Cases
The official policy requirement for municipal liability under § 1983 is to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ☞1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of Officers and Employees in General; Vicarious Liability and Respondeat Superior in General. Most Cited Cases

**Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In General. Most Cited Cases

**Civil Rights 78 ☞1354**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
        78k1354 k. In General. Most Cited Cases
Under § 1983, misbehaving municipal employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers. 42 U.S.C.A. § 1983.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[10] Civil Rights 78 ⟲1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

A plaintiff may demonstrate an official policy, as required to establish municipal liability under § 1983, through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ⟲1351(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases

Journalist's estate failed to allege a policy or custom of the sheriff's department of frightening journalists to death, as required to support § 1983 action against department alleging that sheriff's actions during confrontation with journalist regarding her investigation into sheriff's alleged campaign fraud led to journalist's fatal heart attack. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 ⟲1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases

In § 1983 cases asserting an implicit municipal policy or a gap in express policy, what is needed is evidence that there is a true municipal policy at issue, not a random event. 42 U.S.C.A. § 1983.

**[13] Civil Rights 78 ⟲1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Journalist's estate failed to allege that sheriff's conduct of confronting journalist, who was investigating his alleged campaign fraud, was related to the performance of his official duties, as required to support § 1983 action against sheriff in his official capacity alleging that sheriff's actions during confrontation led to journalist's fatal heart attack. 42 U.S.C.A. § 1983.

**[14] Civil Rights 78 ⟲1326(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(2) k. Officers and Public Employees, in General. Most Cited Cases

Not every action taken by a state official is considered to have occurred under color of state law. 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 ⟲1324**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1324 k. In General. Most Cited Cases

An action is taken under color of state law, for purposes of § 1983 liability, if it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. 42 U.S.C.A. § 1983.

**[16] Civil Rights 78 ⟲1326(8)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))

**(Cite as: --- F.3d ----)**

78 Civil Rights
   78III Federal Remedies in General
     78k1323 Color of Law
      78k1326 Particular Cases and Contexts
        78k1326(8) k. Police or Peace Officers; Prisons. Most Cited Cases

Whether a particular action was under color of state law, for purposes of § 1983 liability, depends largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties. 42 U.S.C.A. § 1983.

**[17] United States Magistrates 394 ☞31**

394 United States Magistrates
   394k31 k. Further Review; Direct Appeal. Most Cited Cases

Plaintiff's failure to object to magistrate judge's recommendation that claim be stricken waived his right to challenge the dismissal on appeal.

**[18] Conspiracy 91 ☞18**

91 Conspiracy
   91I Civil Liability
     91I(B) Actions
      91k18 k. Pleading. Most Cited Cases

Journalist's estate failed to allege that sheriff conspired with another person to conceal information or otherwise hamper investigation into journalist's death, as required to support § 1985 action against sheriff, department, and county related to journalist's fatal heart attack during confrontation with sheriff regarding her investigation into sheriff's alleged campaign fraud. 42 U.S.C.A. § 1985.

**[19] Conspiracy 91 ☞18**

91 Conspiracy
   91I Civil Liability
     91I(B) Actions
      91k18 k. Pleading. Most Cited Cases

Even under notice pleading, a § 1985 complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him. 42 U.S.C.A. § 1985.

**[20] Federal Courts 170B ☞763.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
         170Bk763.1 k. In General. Most Cited Cases

Appellate review of propriety of dismissal of complaint was confined to review of the allegations.

Appeal from the United States District Court for the Central District of Illinois. No. 00 C 1065-Joe Billy McDade, Judge.

Richard L. Steagall, Nicoara & Steagall, Peoria, IL, for Plaintiffs-Appellants.

George J. Casson, Clifford G. Kosoff, O'Halloran, Kosoff, Geitner & Cook, Northbrook, IL, William W. Kurnik, Knight, Hoppe, Kurnik & Knight, Des Plaines, IL, for Defendants-Appellees.

Before EASTERBROOK, Chief Judge, and FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

**\*1** In 1999 Thetis M. Sims suffered a fatal heart attack in her home in Tiskilwa, Illinois. The only person present at the time was Bureau County Sheriff Greg Johnson, whose alleged campaign fraud was the subject of a story Ms. Sims was investigating for the local newspaper. Her estate, her husband, and her daughter brought a federal civil rights suit against Johnson in his individual and official capacities,[FN2] Bureau County, and the Bureau County Sheriff's Department, alleging that Johnson's actions led to Sims's death. The district court granted the defendants' motions to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), and the plaintiffs appeal. Following oral argument in the appeal, the plaintiffs informed us that they had settled their claims against Johnson, but that the remaining defendants were challenging the settlement agreement in Illinois state court. We suspended our proceedings until the Illinois courts could resolve the dis-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pute. In accordance with the state court decisions, we dismiss Johnson in his individual capacity. The plaintiffs have failed to establish their claims against the remaining defendants. Accordingly, we affirm the dismissal of the complaint.

## I. BACKGROUND

Because the district court dismissed the complaint pursuant to Rule 12(b)(6), we assume all well-pleaded allegations in the complaint are true and draw all reasonable inferences in the plaintiffs' favor. *Christensen v. County of Boone, Illinois,* 483 F.3d 454, 457 (7th Cir.2007) (per curiam); *Holman v. Indiana,* 211 F.3d 399, 402 (7th Cir.2000).*See also Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Prior to her death, Sims, a part-time newspaper reporter for the *Kewanee Star Courier,* was conducting an investigation into allegations that Sheriff Johnson engaged in campaign fraud in his election campaign and misused county funds. She had expressed concern to others that Johnson might retaliate against her for writing the story. On the day of her death, in an effort to intimidate Sims from writing the newspaper article about Johnson's misconduct, Johnson deposited for bulk mailing to the residents of the Simses' hometown a letter falsely accusing Sims's husband, William, of past and current felonious criminal conduct. Johnson then telephoned Sims, asked to speak with her, and drove to her home in Tiskilwa. Upon arrival, he showed the defamatory letter to Sims and questioned her regarding the accusations of criminal conduct by her husband. According to the allegations of the complaint, Johnson knew of Sims's heart condition, and knew or had reason to believe that reading a letter containing such extreme, outrageous accusations about her husband would cause her great emotional distress and would increase the likelihood that she would suffer a fatal heart attack.

At approximately 12:30 p.m., Sims did suffer a fatal heart attack. Johnson radioed for an ambulance at 12:47 p.m., but by the time the paramedics arrived at 12:54 p.m., Sims was not breathing and did not have a pulse. One of the paramedics de-

scribed her as "cold" when he arrived. The plaintiffs' expert in emergency medicine averred that Sims died of cardiac arrhythmia provoked by extreme anger or fear and that she could have survived if she had been given CPR immediately. Johnson told the paramedics that he did not complete CPR because his rubber gloves kept breaking. Before calling the ambulance, Johnson used Sims's telephone to call the Princeton Post Office and ask a postal worker about the criminal penalties for sending defamatory letters and whether the bulk-rate mailing of the defamatory letter could be traced. Sims's daughter found the telephone off the hook and out of her mother's reach. Following her death, Johnson dropped his own investigation regarding the defamatory letter. He also failed to investigate Sims's death and refused to cooperate with the police officers seeking to investigate her death.

**\*2** Both Johnson, in his individual capacity, and the County defendants-Bureau County, the Bureau County Sheriff's Department and the Sheriff in his official capacity-filed motions to dismiss for failure to state a claim upon which relief can be granted. Magistrate Judge Evans recommended, in part, that the district court dismiss the following parties and claims: (1) the County of Bureau as a real party in interest; (2) the First, Fourth, Fifth, Eighth, and Ninth Amendment claims in Counts IX and X; (3) the prayer for punitive damages in Counts IX, X, and XI, and (4) Counts XIV, XV, XVI, and XVII against the Sheriff in his official capacity. Neither side filed objections as to these recommendations; therefore, the district court adopted these portions of the Report and Recommendation. The district court, however, rejected the portions of the Report and Recommendation that the Bureau County Sheriff's Department be retained as a party, that the substantive due process violation claims in Counts IX and X be allowed, that the conspiracy claims in Count XI be allowed, and that the supplemental state law claims be allowed. The district court accordingly granted the defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) in their entirety, and dismissed the federal claims with prejudice and the state claims without prejudice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. DISCUSSION

[1] The plaintiffs appealed from the disposition of the motion to dismiss the individual capacity claims against Johnson and the motion to dismiss the claims against Bureau County, the Bureau County Sheriff's Department and the Sheriff in his official capacity. However, after oral argument was heard in this appeal, the plaintiffs entered into a settlement agreement with Johnson. Although the plaintiffs and Johnson settled only the claims against Johnson, the plaintiffs further agreed to dismiss their appeal and to limit their right to collect the settlement solely from Bureau County and its insurers. When they notified this court of the settlement agreement, the plaintiffs informed the court that Bureau County understandably was already challenging the settlement agreement in the state court case and asked the court to stay its proceedings pending resolution of the enforceability of the action in state court, which we did. The Illinois Appellate Court held that the settlement agreement was enforceable with respect to Johnson in his individual capacity, but not enforceable with respect to the Sheriff's Office or the County. *Sims v. Johnson,* No. 3-05-0416 (Ill.App. 3 Dist. July 27, 2006). State law governs a suit to enforce a settlement of a federal suit. *Dillard v. Starcon Int'l, Inc.,* 483 F.3d 502, 506-07 (7th Cir.2007); *Lynch, Inc. v. SamataMason Inc.,* 279 F.3d 487, 490 (7th Cir.2002). At the time he entered into the settlement agreement, Johnson had resigned as Sheriff of Bureau County and was not empowered to act on behalf of the Sheriff's Office. *Cf. Carver v. Sheriff of LaSalle County,* 203 Ill.2d 497, 272 Ill.Dec. 312, 787 N.E.2d 127 (Ill.2003) (holding that an acting sheriff is authorized under the Illinois Tort Immunity Act to enter into settlement agreements that bind the county for the acts of the sheriff in his official capacity). Accordingly, we grant the plaintiffs' motion to dismiss Johnson only in his individual capacity. We reject Johnson's argument that the current Sheriff in his official capacity also be dismissed based on the settlement agreement.

*3 [2][3][4][5] We review *de novo* whether the complaint states a claim upon which relief can be granted. *Christensen,* 483 F.3d at 458.Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."The statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic,* 127 S.Ct. at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).*See also Erickson v. Pardus,* --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). In order to state a claim pursuant 42 U.S.C. § 1983, the plaintiffs must allege that a government official, acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States. *Christensen,* 483 F.3d at 459. In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

[6] Now that the individual capacity claims against Johnson have been settled, only three defendants remain-John E. Thompson, in his official capacity as Sheriff, the Sheriff's Department, and Bureau County. The liability of the Sheriff's Department and of the County is derivative of Thompson's official-capacity liability, and the official-capacity liability is subject to holding in *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."

[7][8][9][10] In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was "the moving force" behind it. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).*See also Arlotta v. Bradley Center,* 349 F.3d 517, 521-22 (7th Cir.2003); *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir.2002). Unless there is an unconstitutional policy, there cannot be official-capacity liability; only individual-capacity li-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

ability is possible. The "official policy" requirement for liability under § 1983 is to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)."Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.' " *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir.2007) (quoting *Fairley v. Fermaint,* 482 F.3d 897, 904 (7th Cir.2007)). A plaintiff may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Lewis,* 496 F.3d at 656.

**\*4** [11][12] The first question, therefore, is whether the complaint alleges a direct causal link between a policy or custom of the Sheriff's Department and the alleged constitutional violations. *City of Canton,* 489 U.S. at 385. The complaint alleges that the Sheriff's Department had no policy or custom at the time of Sims's death for handling emergency medical situations and no protocol or policy manual regarding CPR certification or training. The remaining allegations, however, make clear that the events about which the plaintiffs complain are well beyond a failure to rescue Sims or provide emergency medical services. The complaint contends that Johnson murdered Sims by inducing a heart attack. The plaintiffs do not contend that the Sheriff's Department had a policy of frightening reporters to death, or even of failing to rescue journalists who write critical articles. The plaintiffs have not alleged that such an express policy exists, nor is it possible to infer there is such a policy at work. In cases asserting an implicit policy or a gap in express policy, "what is needed is evidence that there is a true municipal policy at issue, not a random event."*Phelan v. Cook County,* 463 F.3d 773, 790 (7th Cir.2006) (quoting *Calhoun v. Ramsey,* 408 F.3d 375, 380

(7th Cir.2005)). Nor have the plaintiffs asserted that Johnson held final policymaking authority with respect such policies. *Killinger v. Johnson,* 389 F.3d 765, 771-72 (7th Cir.2004). The official in question must be the final policymaker in the particular area or on the particular issue raised in the case.*Kujawski v. Bd. of Comm'rs of Bartholomew, Ind.,* 183 F.3d 734, 738 (7th Cir.1999) (quoting *McMillian v. Monroe County,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)).

[13][14][15][16] Although the plaintiffs baldly assert on appeal that Johnson's actions were "the outrageously reckless, probably criminal, activity of a state actor under of color of his state office," the allegations of the complaint do not show that Johnson's conduct was related to the performance of his official duties. Not every action taken by a state official is considered to have occurred under color of state law. *Honaker v. Smith,* 256 F.3d 477, 484 (7th Cir.2001) (quoting *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989)). An action is taken "under color of state law" if it involves a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."*National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Whether a particular action was under color of state law depends "largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties."*Pickrel v. City of Springfield, Illinois,* 45 F.3d 1115, 1118 (7th Cir.1995).*See also Martinez v. Colon,* 54 F.3d 980, 986-87 (1st Cir.1995). The allegations of the complaint, even viewed in the light most favorable to the plaintiffs, show that Johnson was off on a frolic, trying to protect a personal interest.

**\*5** In an attempt to show his actions were part of an official investigation, the plaintiffs argue that Johnson went to Sims's house to investigate the defamatory letter regarding her husband, but the complaint recognizes that Johnson knew the statements

in the letter were false and that he immediately dropped the "apparent investigation" into the letter after Sims's death. Similarly, the allegations do not support the plaintiffs' argument that Johnson was able to gain entry into the Sims's house only because of his position as Sheriff. *See West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).* According to the complaint, Sims was investigating Johnson's campaign misconduct, she asked to speak with him numerous times, he left a message on her answering machine, and she returned the call to arrange his visit to the house. These are not actions of a state actor performed under color of state law but are the private actions of a person who happened to be a county officer. His actions were in furtherance of his personal interests, even if he performed them while on duty. *Pickrel, 45 F.3d at 1118.*

[17] In light of our conclusion that the complaint failed to state an official capacity claim, we only briefly address the plaintiffs' remaining arguments. Plaintiffs argue that neither the magistrate judge nor the district court addressed their claim that Johnson's actions deprived Sims of her First Amendment right to freedom of the press. This argument overlooks the magistrate judge's finding that the plaintiffs failed to make any factual or other required allegations in connection with their First, Fourth, Fifth, Eighth, and Ninth Amendment claims and the judge's corresponding conclusion that these claims should be stricken pursuant to Fed.R.Civ.P. 8(a)(2). Indeed, the complaint does nothing more than list the rights guaranteed under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments and baldly assert that the defendants violated these rights. Plaintiffs failed to object to the magistrate judge's recommendation that these claims be stricken, and accordingly waived their right to challenge the dismissal of the First Amendment claim on appeal. *See 28 U.S.C. § 636(b)(1); United States v. Sachsenmaier, 491 F.3d 680, 683 (7th Cir.2007); Egert v. Connecticut General Life Ins. Co., 900 F.2d 1032, 1039 (7th Cir.1990).*

[18][19] Plaintiffs also challenge the district court's

dismissal of their claim under 42 U.S.C. § 1985 for denial of their right of access to the courts. They alleged that Johnson and "possibly other persons employed by the Bureau County Sheriff's Department" denied them a fair opportunity to vindicate Sims's death through judicial redress by intentionally covering up the circumstances of her death and refusing to cooperate with police officers seeking to investigate the death. The plaintiffs' complaint fails to state a claim of conspiracy to deprive their right of access to the courts because there are no allegations that Johnson conspired with another person to conceal information or otherwise hamper the investigation into Sims's death. *See 42 U.S.C. § 1985(2); Wright v. Illinois Dept. of Children & Family Services, 40 F.3d 1492, 1507 (7th Cir.1994).* Even under notice pleading, a complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him. *Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir.2002).* The plaintiffs' reliance on *Bell v. City of Milwaukee, 746 F.2d 1205, 1261 (7th Cir.1984), overruled on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir.2005);* and *Ryland v. Shapiro, 708 F.2d 967, 972 (5th Cir.1983),* is misplaced and ignores an important factor in *Bell* and *Ryland*-that several defendants conspired together to cover up the deaths. Here, the allegations suggest that Johnson acted alone, and the district court properly concluded that such allegations are insufficient to state a conspiracy claim.

**\*6** We note that after the district court dismissed Bureau County and entered its judgment, we affirmatively held that "a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity." *Carver v. Sheriff of LaSalle County, Illinois, 324 F.3d 947, 948 (7th Cir.2003).* In light of our decision in *Carver,* we agree with the plaintiffs that Bureau County would have been a necessary party to the case if the complaint had stated a claim against the Sheriff in his official capacity.

Finally, we must resolve several other matters that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have arisen in the course of the appeal. The County defendants seek sanctions against plaintiffs' counsel for revealing discussions that were had in the course of participating in proceedings with this court's Settlement Conference Office. Of course, settlement negotiations are confidential for most purposes, *In re Young,* 253 F.3d 926 (7th Cir.2001), and counsel should never reveal such conversations in an attempt to gain a strategic advantage. But it is not clear in this case that counsel engaged in sanctionable conduct with regard to the settlement proceedings, and we deny the appellees' motion for sanctions.

[20] We also deny the motion to strike certain factual statements in the plaintiffs' brief. In reviewing the propriety of the dismissal of the plaintiffs' complaint, we have confined our review to the allegations, liberally construed, as set forth in the plaintiffs' complaint.

### III. CONCLUSION

Because the complaint does not allege a direct, causal link between Sims's death and a policy or custom of the Sheriff and the Sheriff's Department, only individual capacity liability would be possible. The plaintiffs' settlement with appellee Greg Johnson in his individual capacity therefore resolves everything, and we affirm the dismissal of the complaint.

FN1. The decision in this case was withheld pending lengthy settlement proceedings in the Illinois State Courts.

FN2. In accordance with Fed. R.App. P. 43(c)(2), we grant the plaintiffs' unopposed motion to substitute the current Sheriff of Bureau County, John E. Thompson, for Johnson in his official capacity.

C.A.7 (Ill.),2007.

Estate of Sims v. County of Bureau

--- F.3d ----, 2007 WL 3036752 (C.A.7 (Ill.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 1

Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

Cooper v. Durham School Services

N.D.Ill.,2003.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern
Division.

Cynthia COOPER and Rapid Test Products, Inc.,
Plaintiffs,

v.

DURHAM SCHOOL SERVICES a/k/a Robinson
Bus Services, Inc., Defendant.

**No. 03 C 2431.**

Sept. 22, 2003.

Ted A. Donner, Donner & Company Law Offices
LLC, Chicago, IL, for plaintiffs.

Lawrence Charles Rubin, Elizabeth J. Boddy, Shef-
sky & Froelich, Ltd., Chicago, IL, for defendant.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.

**\*1** Plaintiffs Rapid Test Products, Inc. (RTP) and
Cynthia Cooper, RTP's majority owner, brought
this action against defendant Robinson Bus Ser-
vices, Inc., a/k/a Durham School Services
(Durham), seeking a declaratory judgment declar-
ing the right of RTP to participate as a subcontract-
or for the Chicago Public Schools (Schools). In the
alternative, plaintiffs allege breach of contract
(Count II), unjust enrichment (Count III), common
law fraud (Count IV), tortious interference with
prospective business advantage (Count V), injunct-
ive relief (Count VI), and violation of 42 U.S.C. §
1981 (Count VII). Defendant filed a motion to dis-
miss pursuant to Federal Rule of Civil Procedure
12(b)(6), for failure to state a claim upon which re-
lief may be granted. For the following reasons, de-
fendant's motion is granted in part and denied in
part.

*BACKGROUND*

Plaintiff Cynthia Cooper, an African-American wo-
man, claims that RTP qualifies as both a minority-
owned and woman-owned business enterprise, al-

lowing its participation as a disadvantaged business
entity (DBE) in publicly-funded contracts.

In late 2001 and early 2002, RTP and Durham ne-
gotiated an agreement in which RTP would serve as
a subcontractor to Durham for work to be done for
the Chicago Public Schools under contract no.
02-250030, which extends to August 31, 2005. Pur-
suant to the agreement between RTP and Durham,
Ms. Cooper executed a signed letter of intent as-
serting RTP's status as a DBE. The letter of intent
further stated that RTP would provide drug testing
for Durham employees involved in the contract.

On or about March 22, 2002, Durham provided the
Schools with an affidavit in support of its applica-
tion for work under the contract. The affidavit con-
firmed its compliance with the Schools' DBE re-
quirements and informed the Schools that RTP
would receive 2% of the contract's value-a total of
$434,547.50. Durham also submitted RTP's letter of
intent.

After securing the Schools contract, Durham did
not employ RTP to provide drug testing of its em-
ployees. In an effort to determine the status of
RTP's agreement with Durham, Ms. Cooper in-
quired about the timetable for work under the
Schools contract. On August 8, 2002, Ms. Cooper
sent Durham a written request to "know where
things stand" regarding their agreement. In re-
sponse, Durham requested that RTP arrange for the
fingerprinting of Durham's drivers and the prepara-
tion of forms to be used for future work. RTP per-
formed these tasks and received payment for them.
However, in October 2002, after Durham had
provided no additional work to RTP, Ms. Cooper
once again wrote to Durham requesting that
Durham comply with its obligations. In January
2003 (the letter is misdated January 30, 2002), the
Director of the Office of Business Diversity of the
Chicago Public Schools wrote to Durham regarding
its commitment to subcontract work to RTP. The
director informed Durham that it was required to
honor its commitment as a condition of being awar-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05081    Document 53-2    Filed 11/21/2007    Page 13 of 72    *Page 2*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

ded the contract with the Schools, reminding Durham that two-and-a-half years still remained under the contract. The director requested that Durham inform the Schools as to its intentions. Durham has not used any further services of RTP since these communications.

*DISCUSSION*

**\*2** A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). In deciding a motion to dismiss, the court must assume the truth of all well-pleaded allegations, making all inferences in the plaintiff's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Before discussing plaintiffs' individual counts, defendant challenges plaintiff Cynthia Cooper's standing to sue on all claims. To have standing an individual must have a personal stake in the controversy which arises from a "distinct and palpable injury"-an injury in fact, not a conjectural harm. *SeeDuke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Gillespie v. City of Indianapolis,* 185 F.3d 693, 701 (7th Cir.1999). Defendant argues that Cooper lacks an actual and substantial interest in the subject matter of the action because she has not sustained any distinct injury in fact. We agree that Cooper does not have standing.

The plaintiffs base their claims on an alleged contract between RTP and Durham, and RTP's status as a third party beneficiary of a contract between Durham and the Schools. Cooper is not a named party to either of these alleged contracts, yet she asserts standing based on her status as majority owner of RTP. Cooper emphasizes RTP's role not just as a subcontractor involved in the contracts, but as a

disadvantaged business entity. Cooper argues that since the Schools' DBE program seeks to increase the participation of minority- and women-owned businesses, she gained a personal stake in this case as a minority woman business owner. Cooper asserts that RTP's certification of DBE status clarifies her stake, for it certifies that a minority woman was going to take part in the Schools contract.

Cooper cites *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667 (7th Cir.1987) and *U.S. ex rel King v. F.E. Moran, Inc.,* 2002 WL 2003219 (N.D.Ill.2002), in support of her arguments. However, as the defendant points out all of these cases focus on the benefits of DBE programs to minority-owned businesses, not to the business owners. None of these cases grants standing to an owner, individually, for the lost contracting opportunity of the business.

The court in *Perez v. Abbott Laboratories,* 1995 WL 86716 (N.D.Ill.1995), directly addressed a minority business owner's standing to sue for the denial of contracting rights when his business is the contracting party. In *Perez,* plaintiffs supported their 42 U.S.C. § 1981 claim with two decisions from the District Court of Colorado, which held that a president/sole shareholder of a corporation had standing to assert a race discrimination claim when his corporation was denied a contract due to race. *Id.* at 4. The Colorado courts reasoned that the corporation had been stamped with the "minority racial identity" of the owner and, therefore, the owner's claim merged with that of the corporation. *Id.citingGreat American Tool and Mfg. Co. v. Adolph Coors Co.,* 780 F.Supp. 1354 (D.Colo.1992) and *Rosales v. AT & T Information Systems, Inc.,* 702 F.Supp. 1489 (D.Colo.1988). However, the court in *Perez* declined to follow the decisions of the District Court of Colorado. 1995 WL 86716 at *5. As the court explained, a shareholder, even a sole shareholder, is distinct from the corporation and cannot sue unless he or she suffers direct injury. *Id.* Cooper has not alleged that she suffered any direct personal injury that would call for relief under 42 U.S.C. § 1981.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

*3 Cooper brings all of her other claims: declaratory relief, unjust enrichment, common law fraud, tortious interference with business expectancy and injunctive relief, in the name of her business as well. Thus, she cannot establish that she suffered "an invasion of a legally protected interest."*SeeBoudrea ex rel. Boudreau v.. Ryan,* 2002 WL 314794, *4 (N.D.Ill.2002). Since Cooper lacks requisite standing, all of her claims are dismissed.

Despite this ruling no count of plaintiffs' complaint is wholly dismissed, for RTP asserted all the same claims as Cooper. Defendant has not challenged RTP's standing to assert the claims in the complaint. As the named party to the alleged contract, RTP has the requisite standing. Therefore, we will now address the motion to dismiss each claim individually. Of the seven claims brought by RTP, only one provides the basis for federal jurisdiction, the claim for relief under 42 U.S.C.1981.[FN1] Since the court would lack jurisdiction over the remaining claims if this federal claim is dismissed, our analysis will begin with Count VII of the complaint.

> FN1. Though the claim for declaratory relief derives from 28 U.S.C. § 2201, the Declaratory Judgment Act standing alone does not provide a basis for federal jurisdiction. *Ream v. Handley,* 359 F.2d 728, 732 (7th Cir.1966).

*Count VII-42 U.S.C. § 1981*

In Count VII, RTP asserts that Durham violated its rights under 42 U.S.C. § 1981. Section 1981 provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws ... as is enjoyed by white citizens...."42 U.S.C. § 1981(a). Defendant argues that RTP's claim under § 1981 must be dismissed due to plaintiff's failure to sufficiently allege the existence of a contract between RTP and Durham. Durham's motion to dismiss this claim is denied.

In support of its argument to dismiss the § 1981

claim, as well as the breach of contract and declaratory relief claims discussed below, defendant argues that RTP insufficiently plead the existence of a contract. Defendant contends all plaintiffs' references to a contract are conclusory allegations. However, the inclusion of conclusory allegations in a complaint does not justify the dismissal of a claim. *SeeHiggs v. Carter,* 286 F.3d 437, 439 (7th Cir.2002)("A complaint that complies with the federal rules of civil procedure cannot be dismissed on the ground that it is conclusory or fails to allege facts. The federal rules require (with irrelevant exceptions) only that the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid.") The Seventh Circuit has made clear that, except for claims of fraud, "a complaint is not required to allege all, *or any,* of the facts logically entailed by the claim...."*Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1988). A complaint is only the starting point of litigation. *Id.* at 518.Despite its deficiencies, a complaint is sufficient if it gives the defendant notice of the claim(s) for relief. *Id.* As the court in *Bennett* explained, a plaintiff's claim of racial discrimination in employment would survive a Rule 12(b)(6) motion even if her complaint merely stated, "I was turned down for a job because of my race."*Id.*

*4 Despite the fact that the defendant did not need to plead facts to survive a motion to dismiss, RTP did provide facts supporting the existence of a contract. RTP stated that from late 2001 until early 2002 it negotiated with Durham before reaching an agreement regarding RTP's subcontracting work. Following this agreement, RTP wrote a letter of intent which affirmed that it would provide drug testing for certain Durham employees working under the Schools contract. Durham provided this letter of intent along with its own affidavit to the Schools. Durham's affidavit asserted that RTP would participate in its service contract with the Schools to the extent of 2% of its value. Thus, RTP alleged the existence of a contract between RTP and Durham under which RTP would test Durham employees for drugs and Durham would pay RTP $434,547.50. These allegations more than satisfy the pleading

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

standard described by the Seventh Circuit in *Carter* and *Bennett*.

Defendants rely on *Blumenthal v. Murray,* 995 F.Supp. 831 (N.D.Ill.1998), to support their contention that RTP failed to state a claim under § 1981 because it insufficiently plead the existence of a contract. In *Blumenthal,* the court dismissed a § 1981 claim due to the plaintiff's failure to specifically allege a contractual relationship. *Id.* at 835.However, *Blumenthal* is not persuasive, for it is both out of tune with the Seventh Circuit's more recent elaborations on pleading standards and easily distinguishable from this case. In *Blumenthal,* the plaintiff's complaint made only one reference to a "contract agreement" and provided no other facts regarding the possible existence of a contractual relationship. *Id.* As noted, RTP's complaint contains several allegations regarding the existence of a contract, not just one fleeting reference.

Since RTP's § 1981 claim survives the motion to dismiss on the basis of its alleged contract with Durham, we need not address whether the complaint sufficiently alleged RTP's third party beneficiary status to the contract between Durham and the Schools. Given plaintiff's success in pleading a claim under § 1981, we now turn to its declaratory relief and state law claims.

*Count II-Breach of Contract*

Count II in RTP's complaint is for breach of contract. Plaintiff alleges that Durham failed to meet its obligations to RTP under its contract, as well as under a contract between Durham and the Schools, to which RTP was a third party beneficiary. Durham argues that this claim should be dismissed due to RTP's failure to plead (1) a valid and enforceable contract; (2) facts establishing a breach; (3) its own performance; and (4) its third party beneficiary status. The motion to dismiss this claim is denied. RTP has sufficiently plead breach of contract.

To state a claim for breach of contract in Illinois, the plaintiff must allege the following elements: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of

contract by the defendant; and (4) resultant injury to the plaintiff." *Elson v. State Farm Fire and Cas. Co.,* 295 Ill.App.3d 1, 6, 229 Ill.Dec. 334, 691 N.E.2d 807, 811 (1st Dist.1998) *citingNielsen v. United Services Auto., Ass'n,* 244 Ill.App.3d 658, 662, 183 Ill.Dec. 874, 612 N.E.2d 526, 529 (2d Dist.1993). While "Illinois, a fact-pleading state, also requires a plaintiff to allege facts sufficient to indicate the terms of the contract claimed to be breached," the Federal Rules of Civil Procedure "do not require particular facts to be alleged in the complaint."*Arifin v. Schude,* 1999 WL 342395, *5 (N.D.Ill.1999). All of defendant's case law indicating otherwise, predates the Seventh Circuit's recent explanation of the pleading standard in *Bennett v. Schmidt,* 153 F.3d 516 (7th Cir.1998), *McCormick v. City of Chicago,* 230 F.3d 319 (7th Cir.2000), and *Higgs v. Carter,* 286 F.3d 437 (7th Cir.2002).

**\*5** As stated above, RTP alleges an agreement under which it would serve as a subcontractor to Durham, providing drug testing services in exchange for payment of $434,547.50. RTP asserts that it has been "ready, willing, and able to perform its obligations under the relevant agreements and has done each and everything required of it by Durham...." Despite this, Durham has refused to use RTP for the work agreed upon, causing damage to RTP. Contrary to Durham's contentions that these pleadings allege neither a valid contract nor RTP's performance, the complaint sufficiently addresses each element of a breach of contract claim.

Durham also argues that even if the pleadings establish a valid contract, they fail to establish a breach because they do not allege a specific term of duration for the contract. Under Illinois law, an executory contract lacking an express term of duration is terminable at the will of either party. Thus, Durham contends the alleged contract was terminable at-will. However, the question before the court is not whether RTP must prove a term of duration in order to win its case, but whether it must plead this detail in order to survive a motion to dismiss. *Ryan v. Wersi Electronics GmbH and Co. .,* 3 F.3d 174 (7th Cir.1993), on which Durham relies, does not address this question-it involves the Seventh

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Circuit's review of a summary judgment decision. Here RTP alleges that it agreed to provide drug testing for a stated amount, presumably the drug testing required by Durham's contract with Schools, a contract running until August 31, 2005. RTP's assertions regarding the parties' obligations and Durham's breach suffice to state a claim.

Since RTP has stated a claim for breach of contract under its alleged contract with Durham, we need not address Durham's final argument that RTP fails to plead third party beneficiary status to the contract between Durham and the Schools.

*Count I-Declaratory Relief*

In Count I, RTP seeks declaratory relief declaring its rights to participate in the Schools contract. In its motion to dismiss Durham once again argues that the claim is precluded because RTP failed to sufficiently allege an enforceable contract from which a controversy can arise. Though RTP has sufficiently alleged an enforceable contract, the declaratory judgment claim is dismissed.

Under the Declaratory Judgment Act a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."*28 U.S.C. § 2201*. The long-recognized purpose of the Act "is to avoid the accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication, without waiting until his adversary should see fit to begin suit, after damage has accrued."*M Credit, Inc. v. Cadlerock, L.L.C., 2003 WL 21800017, *2 (N.D.Ill.2003)citing Nucor Corp. v. Aceros v Maquilas de Occidente. S.A. de C.V., 28 F.3d 572, 577* (7th Cir.1994). Given this purpose, the courts have identified two related but distinct fact situations in which declaratory judgments are appropriate: "(1) The controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e. a suit for damages or an injunction) but has not done so; and (2) Although the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a de-

cision."*Tempco Elec. Heater Corp. v. Omega Engineering, Inc., 819 F.2d 746, 749* (7th Cir.1987); *see also Ell's Chicago Finest, Inc. v. Cheesecake Factory, Inc., 23 F.Supp.2d 906, 907-08 (N.D.Ill.1998)*.

**\*6** Neither of these two situations apply to this case. The first fact pattern does not apply because RTP has sought damages and injunctive relief through its multi-count complaint. The second fact pattern does not apply because the controversy has ripened, allowing RTP to seek resolution through substantive claims. Furthermore, both situations in which declaratory judgments are appropriate involve claimants who anticipate being sued by another party. In this case, plaintiff RTP has not brought its declaratory judgment action in anticipation of litigation by Durham, but rather as part of its own substantive suit against Durham. The courts have held that where a controversy has ripened and a substantive suit would resolve the issues raised by the declaratory judgment action, "the declaratory judgment action 'serves no useful purpose." ' *Amari v. Radio Spirits, Inc., 219 F.Supp.2d 942, 944 (N.D.Ill.2002)citing Tempco Elec. Heater Corp. v. Omega Engineering, Inc., 819 F.2d 746, 749* (7th Cir.1987); *see also F.T.C. v. Bay Area Business Council, Inc., 2003 WL 21003711, *4-*5 (N.D.Ill.2003)*.

In *Edward E. Gillen Co. v. Elgin Riverboat Resort, 1995 WL 153389 (N.D.Ill.1995)*, plaintiff brought a declaratory judgment action to declare its rights to payments under a contract with defendant. In dismissing the action, the court emphasized that plaintiff, not defendant, had the right to a coercive remedy, rendering a declaratory judgment unnecessary. *Id.* at 3. The court noted that Gillen could sue for breach of contract-a significantly better means to adjudicate it rights. *Id.* Likewise, in this case, accepting the complaint as true, RTP has the right to seek a coercive remedy, rendering declaratory relief superfluous.

*Count III-Unjust Enrichment*

In Count III, RTP brings a claim for unjust enrich-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ment against Durham. Durham moves to dismiss the claim, arguing that RTP is not entitled to restitution for unjust enrichment, if (as RTP alleges) an express contract governs their relationship. Durham further asserts that even if no contract exists, RTP fails to plead the required elements for unjust enrichment, a benefit conferred to Durham and a detriment suffered by RTP. RTP's claim for unjust enrichment is dismissed due to the complaint's allegations of a governing contract.

In its motion to dismiss, defendant states that an unjust enrichment claim is not an independent cause of action but, rather, a remedy for some other wrongdoing. However, the Illinois Supreme Court has recognized a cause of action for unjust enrichment. See *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672, 678-79 (1989). To state a cause of action under Illinois law, a plaintiff must allege that the defendant unjustly retained a benefit to plaintiff's detriment and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Id* . at 679.

**\*7** Unjust enrichment is a contract substitute and therefore does not succeed where a contract exists. See *Svitanak v. Elexon, Ltd.,* 1998 WL 703331, \*17 (N.D.Ill.1998); *F.H. Prince & Co., Inc. v. Towers Financial Corp.,* 275 Ill.App.3d 792, 804, 211 Ill.Dec. 950, 656 N.E.2d 142, 151, (1st Dist.1995). Of course, the Federal Rules of Civil Procedure allow parties to plead in the alternative. See *Fed.R.Civ.P. 8(e)(2).* Thus, they may allege both breach of contract and unjust enrichment, despite any inconsistency between them. See *Vanguard Fin. Serv. Corp. v. RW Prof'l Leasing Servs. Corp.,* 1998 WL 774984 (N.D.Ill.1998). Nonetheless, a party may not include specific references to a governing contract in a count for unjust enrichment. See *Team Impressions, Inc. v. Chromas Technologies,* 2003 WL 355647, \*4 (N.D.Ill.2003). RTP's unjust enrichment claim does contain allegations that it entered into a contract with Durham which governed its obligations. Thus, by its own pleadings, RTP established that an unjust enrichment ac-

tion is inappropriate.

*Count IV-Common Law Fraud*

In Count IV plaintiff alleges that Durham fraudulently induced RTP. Durham moves to dismiss the claim, arguing that RTP's allegation that Durham promised to perform a future act with no intention to do so fails to establish fraud. Although we conclude that RTP may well state a legal claim for promissory fraud, it has failed to plead the claim with particularity. Therefore, the claim is dismissed without prejudice.

To state a claim for fraud in Illinois a plaintiff must allege (1) defendant's intentional false statement of material fact for the purpose of inducing the plaintiff's reliance; (2) the plaintiff's actual and reasonable reliance on the statement; and (3) a resulting injury to the plaintiff. *Bradley Real Estate Trust v. Dolan Assocs. Ltd.,* 266 Ill.App.3d 709, 713, 203 Ill.Dec. 582, 640 N.E.2d 9, 12 (1st Dist.1994). Generally, the defendant's false statement must regard present or pre-existing facts, not statements of future intent or conduct. *Id.,citing HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672, 678-79 (1989). This requirement safeguards against every breach of contract claim becoming a fraud claim as well. *Hollymatic Corp. v. Holly Systems, Inc.,* 620 F.Supp. 1366, 1369 (N.D.Ill.1985). However, promissory fraud is actionable "where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud." *Bower v. Jones,* 978 F.2d 1004, 1011 (7th Cir.1992) *quoting Steinberg v. Chicago Med. Sch. .,* 69 Ill.2d 320, 334, 13 Ill.Dec. 699, 371 N.E.2d 634, 641 (1977). In other words, a plaintiff can make a claim for promissory fraud when "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Bower,* 978 F.2d at 1011 *quoting Concord Industries, Inc. v. Harvel Industries Corp.,* 122 Ill.App.3d 845, 849, 78 Ill.Dec. 898, 462 N.E.2d 1252, 1255 (1984).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*8** Durham ignores the availability of a promissory fraud action when it broadly asserts in its motion to dismiss that "statements of future intent ... are not actionable as fraud."Durham relies on *North American Plywood Corp. v. Oshkosh Trunk & Luggage Co.,* 263 F.2d 543 (7th Cir.1959), to support its argument. This 44-year old case does not reflect the current state of the Illinois common law, which provides an exception to the general rule limiting fraud to misrepresentations of present or pre-existing facts. *Id.* at 545.More recent case law clearly recognizes promissory fraud actions. *SeeBower v. Jones,* 978 F.2d 1004, 1011 (7th Cir.1992); *Davis Cos., Inc. v. Emerald Casino, Inc.,* 2003 WL 22113414, *7 (N.D.Ill.2003); *Concord Industries, Inc. v. Marvel Industries Corp.,* 122 Ill.App.3d 845, 849, 78 Ill.Dec. 898, 462 N.E.2d 1252,1255 (1984).

Durham also argues that RTP's allegations of fraudulent intent and injury are too speculative and vague to state a claim. RTP alleges that Durham represented it would employ RTP in connection with the Schools contract, despite having no intention to use RTP's services. RTP maintains that Durham made these representations to induce RTP to prepare materials which Durham used to secure the Schools contract. RTP further states that as a result of this inducement it prepared the needed materials and made arrangements for an influx of work from Durham, resulting in costs and a changed business position for RTP. These allegations sufficiently allege Durham's fraudulent intent to induce RTP and RTP's resulting injury. *SeeBensdorf & Johnson, Inc. v. Northern Telecom Ltd.,* 58 F.Supp.2d 874, 881 (N.D.Ill.1999)(motion to dismiss claim for promissory fraud denied where plaintiff alleged that defendant misrepresented intent to enter into business relationship in order to take advantage of plaintiff's business contacts, and that plaintiff relied on defendant's inducements to its detriment).

Despite the availability of an action for promissory fraud, this claim is dismissed for failure to comply with *Fed.R.Civ.P.9(b).*Rule 9(b) requires a complaint to state fraud claims with particularity. In contrast to the pleading requirements for other claims, fraud claims must include specific facts to support the claim. These facts are "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."*Uni\*Quality, Inc. v. Infotrox, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). Thus, the plaintiff must plead the who, what, where, and when of the alleged fraud, forcing him "to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate."*Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999).

RTP's pleadings fail to provide any detail about the who, what, where, or when of the alleged fraud. They do not state who at Durham made representations, nor what the representations were. They do not describe the representations' form or content. The pleadings do not explain where the representations were made, nor when they were made, other than to early say negotiations took place from late 2001 to early 2002. Thus, this count fails to meet the pleading requirements of *Rule 9(b)* and is dismissed without prejudice.

*Count V-Tortious Interference with Prospective Economic Advantage*

**\*9** In Count V, RTP asserts that Durham tortiously interfered with its prospective economic advantage. Durham moves to dismiss this claim on the grounds that the complaint fails to allege any of the required elements of the tort. The claim is dismissed.

In *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991), the Illinois Supreme Court enumerated the required elements of the tort of intentional interference with prospective economic advantage. To state a case the plaintiff must plead "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy

from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference."*Id.* at 512, 154 Ill.Dec. 649, 568 N.E.2d 870. Furthermore, the alleged prospective business relationship must be with a third party, not with the defendant, because "a party cannot be liable in tort for interfering with its own business relationship."*Perez v.. Abbott Laboratories,* 1995 WL 86176, *13 (N.D.Ill.1995)*citing*F.E.L. Publ'ns, Ltd. v. Catholic Bishop of Chicago,* 754 F.2d 216, 221 (7th Cir.1985).

RTP does not allege a reasonable expectation of entering into a valid business relationship with a third party. A reasonable expectation of a business relationship is more than a "mere hope" of developing or continuing a relationship. *See*Williams v. Weaver,* 145 Ill.App.3d 562, 569, 99 Ill.Dec. 412, 495 N.E.2d 1147, 1152 (1st Dist.1986)(dismissing claim for tortious interference with prospective economic advantage where plaintiff "entertained a hope" that his employment contract would be renewed, but did not demonstrate a "reasonable expectancy" of a future business relationship). The complaint alleges an expectation of future business with the Chicago Public Schools. However, the expectation is not reasonable. RTP states that Durham interfered with plaintiff's "ability to realize the benefits of prospective business for [the Schools], including the business which was the subject matter of the aforesaid contract and such additional business opportunities as to which RTP's participation would have naturally led."However, RTP's business opportunity under the "aforesaid contract" was to provide Durham with employee drug testing. RTP secured this business by negotiating an alleged contract with Durham. As Durham cannot be liable for tortiously interfering with its own business relationship, this fails to support RTP's claim. RTP's reference to additional business opportunities with the Schools, which would have naturally followed its work with Durham, constitutes a mere hope of a future business relationship rather than a reasonable expectation.

Even if RTP had alleged a reasonable expectancy of a business relationship with the Schools, its claim

would still be dismissed for failure to allege two other required elements. First, plaintiff's complaint does not state that Durham had knowledge of RTP's reasonable expectation of a future business relationship with the Schools. Second, RTP fails to allege that Durham purposely interfered with its legitimate expectancy of a valid business relationship with the Schools. RTP's assertion that Durham refused to allow plaintiff to perform the work agreed upon supports the contention that Durham purposely interfered with its own current business relationship with RTP, but it does not support the claim that Durham interfered with RTP's relationship with a third party.

### Count VI-Injunctive Relief

**\*10** In Count VI, RTP asserts that it is entitled to injunctive relief because its remedy at law is inadequate. Durham moves to dismiss this claim arguing that money damages would compensate any alleged injury and that plaintiff made no showing of a need for injunctive relief. The court agrees that injunctive relief is unwarranted in this case.

When seeking injunctive relief, a party must establish "a lawful right needing protection; an inadequate remedy at law; and that irreparable harm will be suffered without the protection sought."*Northrop Corp. v. AIL Systems, Inc.,* 218 Ill.App.3d 951, 954, 161 Ill.Dec. 562, 578 N.E.2d 1208, 1210 (1st Dist.1991). RTP fails to establish an inadequate remedy at law. "A legal remedy is adequate when it is clear, complete and is as practical and efficient in achieving the prompt administration of justice as is the equitable remedy."*Id.* Illinois courts have repeatedly held that money damages are the appropriate remedy for breach of contract cases. *See*Lake in the Hills Aviation Group, Inc. v. Village of Lake in the Hills,* 298 Ill.App.3d 175,185, 698 N.E.2d 163, 169 (2d Dist.1998); *Northrop Corp.,* 218 Ill.App.3d at 954-55, 161 Ill.Dec. 562, 578 N.E.2d at 1210.

Despite Illinois case law, RTP acknowledges that it is seeking injunctive relief for breach of contract. Count VI states, "Durham's conduct prior hereto

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

constituted a breach of Durham's obligations as aforesaid and that Durham should therefore be required, by force of a mandatory injunction under Rule 65, to allow and provide for [RTP's] participation in the aforesaid agreement...." In the same sentence, RTP undermines its argument for injunctive relief by recognizing a clear legal remedy. Count VI goes on to request payment "in an amount sufficient to recompense RTP for such damages as the trier of fact deems due and owing."Throughout the complaint RTP states that the value of its contract with Durham is $434,547.50.

In *Northrop Corp.v. AIL Systems, Inc.,* the Illinois Appellate Court affirmed the district court's dismissal of a subcontractor's claim for injunctive relief for breach of contract where monetary damages were available. 161 Ill.Dec. 562, 578 N.E.2d at 1210. The appellate court cautioned, "Injunctive relief is an extraordinary remedy which should be used sparingly, with due restraint, and only when the circumstances clearly require it."*Id.* The court found that monetary relief was "clear, complete and more practical and efficient than injunctive relief."*Id.* Likewise, in this case, RTP's legal remedy is clear and therefore injunctive relief is unwarranted.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss all counts brought by plaintiff Cynthia Cooper for lack of standing is granted. Defendant's motion to dismiss plaintiff RTP's Counts I, III, V and VI is granted; Count IV is dismissed without prejudice; and the motion to dismiss Counts II and VII (42 U.S.C. § 1981) is denied.

N.D.Ill.,2003.
Cooper v. Durham School Services
Not Reported in F.Supp.2d, 2003 WL 22232833 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

McGehee v. Coe Newnes/McGehee ULC
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Ronald W. MCGEHEE, and McGehee Develop-
ment, LLC, Plaintiffs,
v.
COE NEWNES/MCGEHEE ULC, the Coe Manu-
facturing Compnay, and Brian Esher Defendants.
**No. C 03-5145 MJJ.**

Nov. 4, 2004.

Howard A. Slavitt, Frederick S. Fields, J. Timothy
Nardell, Coblentz Patch Duffy & Bass LLP, San
Francisco, CA, for Plaintiffs.
W. Chelsea Chen, J. William Koegel, Jr., Steptoe &
Johnson LLP, Washington, DC, Douglas E. Dexter,
Robert H. Sloss, Farella Braun & Martel LLP, San
Francisco, CA, for Defendants.

ORDER *GRANTING* IN PART AND *DENYING* IN
PART DEFENDANTS' 12(b)(6) MOTION TO
DISMISS; *DENYING* DEFENDANT ESHER'S
12(b)(2) MOTION TO DISMISS
JENKINS, J.

INTRODUCTION

**\*1** Before the Court is a motion to dismiss pursuant
to Federal Rules of Civil Procedure 12(b)(6) filed
by Coe Newnes/McGehee ULC ("Coe Newnes"),
the Coe Manufacturing Company, and Brian Esher
("Defendants"). Defendants seek to dismiss two
causes of action from the First Amended Complaint
("Amended Complaint"): 1) breach of fiduciary
duty; and 2) intentional interference with prospect-
ive economic advantage. Additionally, Defendant
Esher moves to dismiss the Third, Fourth, and Fifth
causes of action against him on the ground that the
Court lacks personal jurisdiction over him under
Federal Rule of Civil Procedure 12(b)(2). For the
following reasons, the Court DENIES Defendants'
12(b)(6) Motion to Dismiss the breach of fiduciary
duty claim with respect to Coe Newnes, and

GRANTS the motion with leave to amend with re-
spect to Coe Manufacturing and Esher. The Court
GRANTS Defendants' 12(b)(6) Motion to Dismiss
the intentional interference with prospective eco-
nomic advantage claim with leave to amend. The
Court DENIES Esher's 12(b)(2) Motion to Dismiss.

FACTUAL BACKGROUND

On June 29, 2001, Ronald McGehee and McGehee
Development Company LLC ("Plaintiffs") entered
into a written agreement ("the Agreement") with
CAE McGahee, Inc.FN1 Pursuant to the Agree-
ment, Plaintiffs provided Coe Newnes with product
designs for Forest Industry Products and Equipment
("New Products"). Plaintiff Ronald McGahee was
to personally perform the services for McGahee
Co., except where the nature of the services to be
performed did not require his knowledge or expert-
ise. Plaintiffs agreed to assign all of their rights and
interests in the intellectual property and patents
arising from their work to Coe Newnes. In return,
Coe Newnes agreed to compensate McGehee in two
ways: 1) it was required to pay McGahee $375,000
per annum; and (b) it was required to pay McGahee
a royalty based on the net sales of the New
Products.

> FN1. Defendant Coe Newnes assumed all
> of CAE McGahee's rights and obligations
> under the Agreement as part of a corporate
> acquisition in 2002. That entity will be re-
> ferred to as Coe Newnes.

Pursuant to the Agreement, Plaintiffs allege they
conceived of and designed the "McGahee Optimiz-
ing Planer," which optimizes the planing of rough-
cut lumber into finished lumber. Plaintiffs allege
that Defendant Brian Esher informed them to dis-
continue developing the planer because Coe
Newnes's sister company, Coe Manufacturing, was
already in the process of developing a similar
product. Plaintiffs allege that contrary to Esher's
representation, Coe Manufacturing had not de-
signed or undertaken any development work on a

Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

product similar to Plaintiffs' planar. Plaintiffs assert that all of their inquiries to Defendants regarding the decision to cancel development of the planar were ignored. On or about May 20, 2003, Defendant Esher wrote to McGahee and gave notice of Coe Newnes' termination of the Agreement with Plaintiffs.

Plaintiffs commenced this action in state court on October 26, 2003, by filing a complaint requesting declaratory relief and asking the court to adjudicate the rights and obligations of Plaintiffs and Coe Newnes under the Agreement. Defendants subsequently removed the case to federal court. On September 8, 2004, Plaintiffs amended their Complaint to add four new claims: 1) breach of contract; 2) breach of fiduciary duty; 3) tortious interference with contract; and 4) tortious interference with prospective economic advantage. Plaintiffs also added two new Defendants, Coe Manufacturing and Brian Esher.

## LEGAL STANDARD

**\*2** A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *See Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337 (9th Cir.1996). Dismissal of an action pursuant to Rule 12(b)(6) is appropriate only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1482 (9th Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In reviewing such a motion, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star v. Arizona Corp. Comm.,* 720 F.2d 578, 580 (9th Cir.1983). The Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987).

In the context of a motion to dismiss, review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989).

Rule 12(b)(2) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint for lack of personal jurisdiction. The plaintiff has the burden of proving that the Court has personal jurisdiction over the defendant. *American Telephone & Telegraph Co. v. Compagne Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996). If the Court rules without holding an evidentiary hearing, dismissal for lack of personal jurisdiction is appropriate only if the plaintiff has not made a prima facie showing of personal jurisdiction. *Id.* In determining whether the plaintiff has met this burden, the uncontroverted allegations in the complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Id.* at 588-89.

There are two limitations on the Court's power to exercise personal jurisdiction over a nonresident defendant: the applicable state or federal personal jurisdiction statute and constitutional principles of due process. *Sher v. Johnson,* 911 F.2d 1357, 1360 (9th Cir.1990). Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state in which the district sits applies. *See Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1484 (9th Cir.1993). As California's long-arm statute allows courts to exercise personal jurisdiction to the extent permitted by the Due Process Clause of the United States Constitution, the Court need only determine whether personal jurisdiction in this case would meet the requirements of due process. *Id.; see* Cal.Code Civ. Proc. § 410.10.

**\*3** Federal due process requires that a nonresident defendant have minimum contacts with the forum state such that the exercise of personal jurisdiction does not offend traditional notions of fair play and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

substantial justice.*Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 838 (9th Cir.1986) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The defendant's conduct and connection with the forum must be such that the defendant should reasonably anticipate being haled into court there. *Sher,* 911 F.2d at 1361 (citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

The constitutional test may be satisfied in either of two ways: through general jurisdiction or specific jurisdiction. General jurisdiction exists if the non-resident's contacts with the forum are continuous and systematic and the exercise of jurisdiction satisfies traditional notions of fair play and substantial justice. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995) (quoting *Reebok Int'l Ltd. v. McLaughlin,* 49 F.3d 1387, 1391 (9th Cir.1995)). If general jurisdiction exists, the Court has jurisdiction over the defendant even if the cause of action is unrelated to the defendant's forum activities. *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 270 (9th Cir.1995).

If general jurisdiction does not exist, the Court still may be able to assert specific jurisdiction over the defendant for a cause of action that arises out of the defendant's forum-related activities. *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 588 (9th Cir.1993). The Court applies a three-part test in determining whether it may assert specific jurisdiction over the defendant: (1) the defendant must perform an act or consummate a transaction within the forum, purposefully availing himself of the privilege of conducting activities in the forum and invoking the benefits and protections of its laws; (2) the claim must arise out of or result from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Id.*

## ANALYSIS

### I. Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants seek to dismiss two causes of action from the Amended Complaint: 1) breach of fidu-

ciary duty; and 2) intentional interference with prospective economic advantage. The Court will discuss each issue separately.

### A. Breach of Fiduciary Duty

California courts have defined a fiduciary relationship as follows:

A fiduciary relationship has been defined as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent.

**\*4** *Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp,* 115 Cal.App.4th 1145, 1146-47, 10 Cal.Rptr.3d 582 (2004) (citation, internal quotation marks, and alterations omitted).

It is well-settled that parties to a contract do not by necessary implication become fiduciaries. *See Wolf v. Superior Court,* 107 Cal.App.4th 25, 31, 130 Cal.Rptr.2d 860 (2003) (stating that "every contract requires one party to repose an element of trust and confidence in the other to perform"). In the commercial context, typical examples of fiduciary relationships include "trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventures, and agent/principle."*Id.* at 30, 130 Cal.Rptr.2d 860. "Inherent in each these relationships is the duty of undivided loyalty the fiduciary owes to its beneficiary, imposing on the fiduciary obligations far more stringent than those required of ordinary contractors. *Id.*

Plaintiffs allege that Coe Newnes owed a fiduciary duty to Plaintiffs because it promised in good faith, to evaluate, develop, market, and promote products presented to it for consideration. Plaintiffs contend that this promise was broken when Defendants conspired to halt the development of the McGahee Op-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

timizing Planer.

Defendants argue that the breach of fiduciary duty claim against Coe Newnes fails as a matter of law because the allegations asserted in the Amended Complaint give rise only to a breach of contract claim. Furthermore, Defendants contend that Plaintiffs' claim against Coe Manufacturing and Esher for conspiracy to breach a fiduciary duty is not legally cognizable because neither Defendant owed an independent fiduciary duty to Plaintiffs.

After reviewing the Amended Complaint, the Court finds that Plaintiffs have adequately alleged that the Agreement created a fiduciary relationship between Plaintiffs and Coe Newnes. In *City of Hope Nat. Medical Center v. Genentech,* 20 Cal.Rptr.3d 234, 2004 WL 2361763 (Cal.App. 2 Dist.), the court re-affirmed the general notion that the relationship between inventors and those they entrust their secrets to is "confidential or fiduciary in nature." 20 Cal.Rptr.3d 234, 2004 WL 2361763, at *25;*see also Stevens v. Marco,* 147 Cal.App.2d 357, 305 P.2d 669 (1956). The court stated that "there is every reason to afford the utmost protection to inventors who entrust their secrets to others for developing, patenting, manufacturing, and licensing the secrets in exchange for royalties.... To encourage inventors to disclose their ideas to third parties who can bring the ideas to the market place, those third parties should be held to the standards of a fiduciary." *Id.* at *27, 305 P.2d 669. Although Defendants have argued that the Agreement did not create a fiduciary relationship because Defendants retained discretion to develop all or none of Plaintiffs' inventions, *City of Hope* clearly dismissed this line of argument . FN2 The court stated as follows:

> FN2. Plaintiffs' reliance upon *Wolf* is misplaced. *Wolf* did not involve the entrustment of secret ideas for patenting purposes, but rather involved the assignment of literary rights. 107 Cal.App.4th at 228, 133 Cal.Rptr.2d 149. According to *City of Hope,* "[t]his distinction is dispositive." 20 Cal.Rptr.3d 234, 2004 WL 2361763 at *28.

For policy reasons, there should be no distinction between when a third party agrees to develop, patent and exploit an inventor's secret and when a third party is given that option and takes it. The inventor is still in the same position of trusting the third party regarding information and accountings. As well, the policy of encouraging public disclosure of inventions is better served by protecting both types of agreements. In reaching this conclusion, we remain mindful of [plaintiff's] trust, [defendant's] superior position, and the importance of encouraging public disclosure of life saving inventions in today's world.

**\*5** 20 Cal.Rptr.3d 234, 2004 WL 2361763, at *29.

In light of *City of Hope,* there can be little doubt that Plaintiffs have adequately plead a breach of fiduciary duty against Coe Newness in the Amended Complaint. However, Coe Manufacturing and Esher cannot be liable for conspiring with Coe Newnes to breach fiduciary duties it owed Plaintiffs because they did not each owe independent duties to Plaintiffs. *See 1-800 Contacts, Inc. v. Steinberg,* 107 Cal.App.4th 568, 590, 132 Cal.Rptr.2d 789 (2003). Furthermore, while Plaintiffs' argue that Coe Manufacturing and Esher "aided and abetting a breach of fiduciary duty," Plaintiffs' Amended Complaint did not properly allege such activity. Therefore, the Court grants the motion to dismiss the breach of fiduciary duty claim against Coe Manufacturing and Esher. However, based upon the arguments of Plaintiffs' counsel, the Court finds that it is appropriate to grant Plaintiffs' leave to amend the claim. *See Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995).

B. Interference with Prospective Economic Relations (Against Coe Manufacturing and Esher)

Under California law, the following five elements must be established to support a cause of action for interference with prospective economic relations: "(1) the existence of a specific economic relationship between [plaintiff] and third parties that may economically benefit [plaintiff]; (2) knowledge by the [defendants] of this relationship; (3) intentional acts by the [defendants] designed to disrupt the re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lationship; (4) actual disruption of the relationship; and (5) damages to the [plaintiff]."*Silicon Knights, Inc. v. Crystal Dynamics, Inc., 983 F.Supp. 1303, 1311 (N.D.Cal.1997)* (citation omitted). In addition, a plaintiff must allege conduct that is "wrongful by some measure beyond the fact of the interference itself."*Della Penna v. Toyota Motor Sales U.S.A ., Inc., 11 Cal.4th 376, 393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995)* (internal quotation marks and citation omitted).

Defendants' argue that Plaintiffs' claim for intentional interference with prospective economic relations should be dismissed for two reasons. First, Defendants' contend that Plaintiffs have not alleged "wrongful conduct" as defined in *Della Penna.*Second, Defendants' contend that Plaintiffs have failed to allege the existence of any specific business relationships with the probability of future economic benefit that were affected by Defendants' actions.

Plaintiffs argue that "wrongful conduct" was properly plead in the Amended Complaint in the form of "interference with contract" and "aiding and abetting a breach of fiduciary duty."Plaintiffs also contend that they had multiple relationships with third parties with the probability of economic benefit to Plaintiffs.

Initially, the Court finds that Plaintiffs' have not adequately alleged "wrongful conduct." Plaintiffs' allegation of "interference with contract" does not constitute wrongful conduct "by some measure beyond the fact of the interference itself" within the meaning of *Della Penna.*Furthermore, while Plaintiffs' allegation of "aiding and abetting a breach of fiduciary duty" is legally cognizable, *see Neilson v. Union Bank of California, 290 F.Supp.2d 1101 (C.D.Cal.2003),* Plaintiffs have not properly plead the claim against Esher or Coe Manufacturing in the Amended Complaint.

**\*6** In addition, the Court further finds that Plaintiffs have failed to properly plead "intentional interference with prospective economic relations" because Plaintiffs' allegations of future economic harm are

too speculative. The Amended Complaint states that Plaintiffs prospective economic relationships were with:

a) Coe Newnes; and

b) Various probable customers for the McGahee Optimizing Planer, including but not limited to probable customers in California, probable customers to whom McGahee has sold forestry products and equipment in the past, and probable customers with whom McGahee has maintained business contacts and/or relationships and/or who are aware of and rely on McGehee's reputation in the market for creating and developing forest products and equipment.

With respect to the business relationships Plaintiffs had with "probable customers," the Court finds the pleading is severely lacking in detail. *See Brown v. Allstate Ins. Co., 17 F.Supp.2d 1134, 1139 (S.D.Cal.1998)* ( "Plaintiff must establish an actual economic relationship or a protected expectancy with a third person, not merely a hope of future transactions.").

With respect to Plaintiffs' business relationship with "Coe Newnes," the Court finds that Plaintiffs' intentional interference with prospective economic relations claim fails because Coe Manufacturing and Esher were not "third-party stranger[s]" to that relationship. *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc., 271 F.3d 825, 832 (9th Cir.2001).* It is well settled "that the core of intentional interference business torts is interference with an economic relationship by a third party stranger to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by the pursuit of its interests."*Id.* Here, Coe Manufacturing and Esher cannot be characterized as "strangers" to the business relationship between Coe Newnes and Plaintiffs. The Court need not look further than the Amended Complaint to draw this conclusion. In the Amended Complaint, Plaintiffs allege that Esher "has been the Chief Executive Officer and/or Chairman of the Board of Directors of each Coe Newnes and Coe Mfg." Plaintiffs also allege their belief that "Coe Newnes and Coe Mfg. have a common (or

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

closely allied) controlling owner or owners...." And perhaps most telling, Plaintiffs allege that Coe Manufacturing, Esher, and Coe Newnes engaged in a conspiracy to interfere with McGehee's contract rights. Given the totality of these allegations, Plaintiffs' contention that Coe Manufacturing and Esher were "strangers" to the business contract between Coe Newnes and Plaintiffs is, at best, disingenuous.

Therefore, for the reasons set forth above, the Court grants Defendants' motion to dismiss the intentional interference with prospective economic relations claim against Coe Manufacturing and Esher. However, based on the moving papers and the arguments of Plaintiffs' counsel, the Court finds that leave to amend is in order. *See Doe,* 58 F.3d at 497.

II. Motion to Dismiss Pursuant to Rule 12(b)(2)

**\*7** Defendant Esher seeks to dismiss the action against him arguing that he did not have the required "minimum contacts" with the state of California.[FN3] Esher states that he has never resided or owned property in California. He also states that he has never traveled to California for business relating to Coe Newnes or Coe Manufacturing. He admits that he has spoken with McGahee on the phone, but those conversations were initiated almost entirely by McGahee. In any event, Esher argues that he was merely a "secondary participant" in the alleged wrongdoing and Coe Newnes was the "primary participant."

> FN3. Plaintiffs maintain that the Court should exercise jurisdiction over Esher on the application of specific, rather than general, jurisdiction.

Plaintiffs contend that Esher's conduct was sufficient to satisfy the "minimum contacts" test. First, Plaintiffs argue that Esher committed several intentional torts against McGahee, and the effect of those torts were felt by McGahee in California. Second, Plaintiffs assert that Esher knew that McGahee was a resident of California. Third, Plaintiffs argue that Esher expressly aimed his intentional conduct at California.

As an initial matter, the Court finds Esher's argument that he was simply a "secondary participant" in the alleged wrongdoing against Plaintiffs to be unpersuasive. The Ninth Circuit has recognized that "[c]ases which found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct ... or the 'central figure' in the challenged corporate activity." *Davis v. Metro Productions, Inc.,* 885 F.2d 515, 524 (9th Cir.1989). In such a scenario, "[e]ach defendant's contacts with the forum state must be assessed individually." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 787, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

Here, Plaintiffs' allegations regarding Esher's individual wrongdoing are unequivocal. Plaintiffs allege that Esher was the CEO and/or Chairman of the Board of both Coe Newnes and Coe Manufacturing. (Comp.¶ 7.) Plaintiffs allege that Esher was in attendance during the March 19, 2000 meeting at which the McGahee Optimizing Planer was first introduced. (Comp.¶ 27.) Plaintiffs allege that Esher originally showed great enthusiasm for the project. However, only two weeks after the presentation, Esher directed Ray Stevens to send an email to Plaintiffs ordering that all work on the McGahee Optimizing Planer be stopped. (Comp.¶ 28.) Esher allegedly told McGahee that Coe Manufacturing had been working on a similar project for sometime and that the project was already being developed. And perhaps most importantly, Esher sent a letter to Plaintiffs giving notice of Coe Newnes' termination of the contract. (Comp.¶ 33.) In sum, Plaintiffs allegations label Esher as not only the CEO of Coe Newnes and Coe Manufacturing, but also as the "guiding spirit" behind the termination of the Plaintiffs' employment contract. Accordingly, the Court is not restricted in its ability to exercise jurisdiction over Esher as an individual.

**\*8** Next, the Court must apply *Rano'* s three-step test and determine whether the Court has specific jurisdiction over Esher. To determine whether Esher "purposefully availed" himself to the laws of California, the Court must examine "if the defend-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

ant intentionally directed his activities into the forum state."*Brainerd v. Governors of Alberta,* 873 F.2d 1257, 1259 (9th Cir.1989). To meet this test, "the defendant must have 1) committed an intentional act, which was 2) expressly aimed at the forum state, and 3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state."*Bancroft & Masters, Inc. v. Augusta National, Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000).

In *Brainerd,* the court stated that the defendant's "communications were directed to Arizona .... [the defendant] knew the injury and harm stemming from his communications would occur in Arizona, where [the plaintiff] planned to live and work."*Id.* Similarly, in *Metropolitan Life Insurance Co. v. Neaves,* 912, F.2d 1062 (9th Cir.1990), the court held that an Alabama resident could be haled into a California court on the basis of a letter she sent to an insurance company representing that she was entitled to an insurance payment that actually belonged to a California resident. The critical factor in the court's holding was the defendant "was purposefully defrauding [plaintiff] in California" by sending the letter. *Id.* at 1065.

In this case, Plaintiffs have adequately alleged that Esher knew that Plaintiffs' resided in California. It is also adequately alleged that Esher was responsible for at least three communications to Plaintiffs in California. Plaintiffs also allege that these communications, culminating in the termination of the Agreement, constituted tortious conduct, including, but not limited to, intentional interference with contractual relations. At this stage of the litigation, the Court must accept Plaintiffs' allegations as truth. Accordingly, the Court finds that Esher engaged in allegedly wrongful conduct targeted at Plaintiffs, and that Esher knew Plaintiffs were residents of California.

Furthermore, there is no doubt that Plaintiffs' claims arise out of Defendants' forum related activities. Plaintiffs' contract claims directly arise from Esher's communications, sent to Plaintiffs in California, that eventually resulted in the termination of

the Agreement. Accordingly, the second prong of the *Rano* test is satisfied.

Finally, the Court must determine whether asserting personal jurisdiction over Esher is reasonable. The Ninth Circuit applies a seven factor test to determine the reasonableness of the exercise of personal jurisdiction: 1) the extent of the defendant's purposeful interjection into the state forum; 2) the burden on the defendant of defending in the chosen forum; 3) the extent of conflict with the sovereignty of defendant's state; 4) the forum state's interest in adjudicating the dispute; 5) the most efficient forum for judicial resolution of the dispute; 6) the importance of the forum to plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum.*Core-Vent Corp. v. Nobel Industries A.B.,* 11 F.3d 1482, 1487 (9th Cir.1993).

**\*9** Since Esher purposefully directed his activities into California, personal jurisdiction over him is presumed to be reasonable. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Esher must present a compelling case that jurisdiction would be unreasonable.*Id.*

The *Core-Vent* factors do not seem to heavily favor either party. Under the first factor, while the extent of Esher's "purposeful interjection" was not overwhelming, it was also not minimal. Esher's email, phone call, and letter were all directed to Plaintiffs in California and were incidents that gave rise to Plaintiffs' claims. This factor weighs in favor of Plaintiffs.

Second, while Esher will bear a burden in litigating this case in California, the Ninth Circuit has recognizing that "modern means of communication and transportation have tended to diminish the burden of defense of a lawsuit in a distant forum."*Insurance Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1271 (9th Cir.1981). Moreover, Esher's burden "will not be deemed unreasonable unless it constitutes a deprivation of due process."*Yahoo! Inc. v. La Lige Contre Le Racisme Et L'Antisemitisme,* 379 F.3d 1120, 1136 (9th

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Cir.2004). Esher has alleged no such facts. Therefore, this factor weighs slightly in Esher's favor.

Third, there appears to be no conflict between the laws of California and Georgia, thus this factor appear to be neutral.

Fourth, a state always maintains a strong interest in providing an effective means of redress for its residents who are tortiously injured. *Brainerd,* 873 F.3d at 1260. Thus, this factor weighs in favor of Plaintiffs.

Fifth, "the efficient-resolution factor considers the availability of evidence and witnesses and the forum which is more familiar with the facts and history of the case." *Yahoo!,* 379 F.3d at 1137. Plaintiff's business records and most of their witnesses are located in California. Esher has not stated where the majority of his witnesses and evidence would be located. Accordingly, this factor is neutral or favors Plaintiff.

Sixth, there can be little question that California is the more convenient and effective forum from Plaintiffs' perspective. However, courts have noted that this factor is "not of paramount importance." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1129 (9th Cir.2003). This factor is either neutral or favor Plaintiffs.

Finally, Georgia is a possible alternative forum. There is no question that a federal court in Georgia would properly have personal jurisdiction over Esher. Thus, this factor favors Esher.

In sum, the majority of the *Core-Vent* factors either favor Plaintiffs or are neutral. As previously stated, Esher carries the burden to present a compelling case that the exercise of jurisdiction is unreasonable. He has not carried this burden. Accordingly, the Court concludes that it is reasonable to exercise jurisdiction over Esher.

CONCLUSION

**\*10** For the foregoing reasons, Defendants' 12(b)(6) Motion to Dismiss the breach of fiduciary duty claim is DENIED with respect to Coe Newnes, and GRANTED with leave to amend with respect to Coe Manufacturing and Esher. Defendants' 12(b)(6) Motion to Dismiss the intentional interference with prospective economic advantage claim is GRANTED with leave to amend. Defendant Esher's 12(b)(2) Motion to Dismiss is DENIED.

IT IS SO ORDERED.

N.D.Cal.,2004.
McGehee v. Coe Newnes/McGehee ULC
Not Reported in F.Supp.2d, 2004 WL 2496127 (N.D.Cal.)

END OF DOCUMENT

# EXHIBIT D

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Essex Real Estate Group, Ltd. v. River Works, L.L.C.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
THE ESSEX REAL ESTATE GROUP., LTD. and James E. Lefkowitz Plaintiffs
v.
RIVER WORKS, L.L.C.; the Drew Group; J. Michael Drew; Daniel J. Drew; J. Michael Drew 1998 Childrens' Trusts; Lance Mayster; Dwinn, Shaffer & Co. and Column Financial, Inc. Defendants
**No. 01 C 5285.**

Aug. 7, 2002.

MEMORANDUM OPINION AND ORDER
HIBBLER, District Court J.
**\*1** The Essex Real Estate Group, Ltd. and James E. Lefkowitz ("Plaintiffs") bring forth allegations against River Works, L.L.C., The Drew Group, J. Michael Drew, Daniel R. Drew, J. Michael Drew 1998 Childrens' Trust, Daniel R. Drew 1998 Childrens' Trust, Lance Mayster, Dwinn, Shaffer & Company, and Column Financial, Inc. ("Defendants") in a four-count complaint stemming from a $150,000 finder's fee Plaintiffs allege they are entitled to as a result of securing financing for a development project.

The Court has before it Defendants' partial motion to dismiss. For the following reasons, Defendants' motion is GRANTED.

Background

Defendant River Works, a real estate development company, renovated commercial space in Chicago, Illinois, and eventually leased the space to Sara Lee Corporation ("Project"). River Works is owned by two trusts, Defendants J. Michael Drew 1998 Childrens' Trust and Daniel R. Drew 1998 Childrens' Trust. Defendant Drew Group is an Illinois corporation established by J. Michael Drew and Daniel R.

Drew that manages River Works.

In the summer of 2000, the Project required permanent mortgage financing. As part of that process, Plaintiff Essex Real Estate Group, Ltd. through Plaintiff Lefkowitz, a mortgage broker, searched for a lender for the Project. The parties reduced the Plaintiffs' efforts to secure financing for the Project to a written document ("Agreement") on October 27, 2000. The Agreement is a one-page letter with the relevant portion providing for a $150,000 finder's fee payable to Plaintiffs.

Plaintiffs maintain they produced a suitable lender, UBS Principal Financial, L.L.C. ("UBS") that materially met the requested mortgage terms. Defendant J. Michael Drew signed a mortgage application with UBS ("River Works-UBS Agreement") for financing of the Project. The relevant portion of the River Works-UBS Agreement precluded River Works from "shopping" the transaction (i.e. River Works must deal only with UBS as a lender and no one else) while completing the process of securing financing through UBS. Sometime after Plaintiff introduced UBS to River Works, Defendant River Works contends UBS and River Works were unable to reach an agreement with acceptable terms for mortgage financing. Subsequently, River Works maintains Defendant Lance Mayster, a mortgage broker employed by Defendant Dwinn, Shaffer & Company ("Defendant Dwinn"), obtained suitable financing for the Project from a different lender, Defendant Column Financial, Inc. ("Defendant Column"). Plaintiffs maintain not only that UBS terms were suitable, but also that Defendants Mayster, Dwinn, and Column tortiously interfered with Plaintiffs' contractual and business relationships.

More specifically, in Count I Plaintiffs bring a breach of contract claim against Defendants River Works, Drew Group, J. Michael Drew, Daniel R. Drew, J. Michael Drew 1998 Childrens' Trust, and Daniel R. Drew 1998 Childrens' Trust ("Developer Defendants") for breach of the Agreement. In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Count II, Plaintiffs assert a third party beneficiary claim against Developer Defendants for breach of the River Works-UBS Agreement. In Count III, Plaintiffs allege Defendants Mayster, Dwinn, and Column tortiously interfered with Plaintiffs' contractual and business relations when they alternatively secured financing for the Project. In Count IV, Plaintiffs request this Court grant relief based on a quantum meruit (also known as quasi-contract) theory.

### Standard of Review

**\*2** The function of a Rule 12(b)(6) motion is to test the sufficiency of the complaint, not to determine the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Authority,* 892 F.2d 583, 586 (7th Cir.1989). In evaluating the sufficiency of a complaint, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520-1521 (7th Cir.1990). This Court must sustain a complaint unless it determines beyond a doubt the plaintiff can prove no set of facts in support of the claims that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). However, a complaint "must allege sufficient facts to outline a cause of action."*Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). Therefore, merely asserting conclusions does not make the allegations in a complaint sufficient to survive a motion to dismiss. *Jones v. Lampe,* 845 F.2d 755, 758 (7th Cir.1988).

### Analysis

#### Count I: Breach of Contract

In response to Plaintiffs' breach of contract claim, Defendants J. Michael Drew, Daniel R. Drew, J. Michael Drew 1998 Childrens' Trust, and Daniel R. Drew 1998 Childrens' Trust ("Individual Drew Defendants") bring a motion to dismiss them from Count I and to dismiss Plaintiff Lefkowitz as a party to this litigation.

In order for a breach of contract claim to survive a Rule 12(b)(6) motion, the plaintiff must allege that:

(1) a contract existed; (2) plaintiff sufficiently performed its contractual obligations; (3) defendant breached its contractual obligations; and (4) as a result of defendant's breach the plaintiff suffered damages. *McClellan v. Banc Midwest, McLean County,* 517 N.E.2d 762, 764 (Ill.App.Ct.1997); *see also Carl v. Galuska,* 785 F.Supp. 1283, 1289 (N.D.Ill.1992). In the present motion to dismiss, the Individual Drew Defendants take issue with element one, i.e., they contend a contract never existed between the Individual Drew Defendants and Plaintiffs.

It is undisputed the Individual Drew Defendants and Plaintiff Lefkowitz are not signatories or named parties to the Agreement. Although Defendant J. Michael Drew's signature appears on the Agreement, he signed only in his official capacity as President of the Drew Group, which manages River Works, and thus not in his individual capacity.[FN1] (Compl.Ex. A.) Likewise, Plaintiff Lefkowitz signed the Agreement in his official capacity as President of Essex Real Estate Group, Ltd. and not in his individual capacity.[FN2] (Compl.Ex. A.)

> FN1. Immediately above the Defendants' signature line, the Agreement lists Riverworks, L.L.C. and then below that indicates "By: the Drew Group, Inc., Its Manager."Furthermore, below Defendant Michael Drew's signature is "J. Michael Drew, President."

> FN2. Immediately above the Plaintiffs' signature line, the Agreement indicates "Essex Real Estate Group" and below Plaintiff Lefkowitz signature is "James E. Lefkowitz, President."

Furthermore, no language in the content of the Agreement suggests the Individual Drew Defendants are liable to Plaintiffs or that Plaintiff Lefkowitz is entitled to payment individually. If the Individual Drew Defendants are a party to the agreement, their acceptance would be a prerequisite to the formation of a valid contract and should be

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

evidenced by their signatures. *Smith v. Clark Equipment Co.,* 136 Ill.App.3d 800, 804 (Ill.App.Ct.1985). Therefore, Plaintiffs' allegations must shift to another basis for liability because under a standard contract analysis, neither Plaintiff Lefkowitz nor the Individual Drew Defendants are signatories or named parties to the Agreement. *Id.* (finding plaintiff is not a party to the agreement because plaintiff is not a signatory to the agreement and proceeded to consider the claim under a third party beneficiary theory). [FN3]

> **FN3.** This Court analyzes Plaintiffs' third party beneficiary claims separately in Count II.

**\*3** In terms of Plaintiff Lefkowitz, the failure to be a signatory or a named party in his individual capacity requires the Court dismiss him as a party. In *Continental Illinois National Bank & Trust Co. of Chicago v. Stanley,* Continental brought suit against Stanley to recover on Stanley's personal guaranty of loans made to companies controlled by Stanley. 585 F.Supp. 1385 (N.D.Ill.1984). In Stanley's various common-law counterclaims, he argued the same factual situation that gave rise to a cause of action for the corporation can also give rise to separate causes of action on his behalf. *Id.* at 1388. The court found Stanley's allegations were the result of injuries suffered by the company and not based on any independent contractual relationship he had with plaintiff Continental. *Id.* Following the well-established rule that an alleged injury to a corporation accrues a cause of action to the corporation and not the individual stockholders, the court granted the plaintiff's motion to dismiss when it determined Stanley had no standing in his individual capacity. *Id.*

Similarly, the cause of action for the alleged breach of contract in the present case accrues only to Plaintiff Essex not to Plaintiff Lefkowitz in his individual capacity. Plaintiff Lefkowitz attempts to rely on the same factual allegations giving rise to Plaintiff Essex's presumed injury and likewise presents no evidence of an independent contractual relationship with any of the Defendants named in the complaint. Therefore, the Court must dismiss Plaintiff Lefkowitz as a party to this lawsuit. [FN4]

> **FN4.** Because Plaintiff Lefkowitz is not entitled to relief in his individual capacity, this Court when referencing the Plaintiff from this point forward in the opinion will only be referring to Plaintiff Essex unless otherwise indicated.

The Individual Drew Defendants, however, are not so easily dismissed from the present lawsuit. A corporation is a separate and distinct legal entity from its shareholders, directors, and officers, and generally from other corporations with which it may be affiliated. *Van Dorn Co. v. Future Chem. & Oil Corp.,* 753 F.2d 565, 569 (7th Cir.1985). Although exceptions exist, the courts disfavor piercing the corporate veil and stringently apply its requirements. *Bright v. Roadway Servs., Inc.,* 846 F.Supp. 693, 700 (N.D.Ill.1994). Here, Plaintiff must pierce the corporate veil to state a claim against the Individual Drew Defendants. To pierce the corporate veil, Plaintiff must plead: (1) such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) the circumstances are such that adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice. *Sea-Land Servs. v. Pepper Source,* 941 F.2d 519, 520 (7th Cir.1991).

In determining whether a corporation is so controlled by another to justify disregarding their separate identities, the Court considers: (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another corporation as its own. *Sea-Land Servs.,* 941 F.2d at 521.

**\*4** In *Laborers' Pension Fund v. Paragon Pool Construction Inc.,* the plaintiff attempted to hold the defendant personally liable and alleged the defendant acted as the chief operating officer of the company and owned and operated the company for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

his exclusive benefit. No. 00 C 2408, 2001 WL 218642, at *2, (N.D.Ill. Jan. 16, 2001). The court noted "these statements could probably be made about most single-owner corporations ... as the closely-held corporation is run very much like an individual proprietorship. But the law nonetheless recognizes the separate corporate entity."*Id.* Determining the allegations were conclusionary and insufficient, the court granted defendant's motion to dismiss him from the proceedings. *Id.* at *3.

In *Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange,* No. 97 C 1256, 1997 WL 767290 (N.D.Ill.Dec. 3, 1997), counter-plaintiff Illinois Insurance Exchange ("Exchange") alleged Defendant Lobo Claims Management, Inc. ("Lobo") was liable for failing to indemnify them and in turn, Lobo moved to dismiss on the grounds that it was not a party to the agreements forming the basis of the Exchange's counterclaim. 1997 WL 767290, at *2-3. Since Lobo was a not a signatory to the agreements, the court considered whether an alter ego theory would apply, and thus allow the claim to survive. *Id.* at *5. The court granted Lobo's motion to dismiss and determined: (1) Exchange's pleadings were conclusionary; (2) they failed to allege Lobo was a mere instrumentality of the other corporations; and (3) they failed to show how the recognition of Lobo as a separate entity would sanction a fraud or promote injustice. *Id.*

In *Bright,* the court considered whether a former employee's parent corporation is liable for discrimination alleged to have occurred while the former employee was employed by its subsidiary. *Bright,* 846 F.Supp. at 695. The former employee argued the corporate veil should be pierced and the parent corporation held liable because it "owns and operates" its subsidiary and it "ratified and affirmed" all acts listed in the complaint. *Id.* The *Bright* court determined the plaintiff's conclusionary allegations were insufficient as a matter of law and therefore dismissed the parent corporation from the lawsuit. *Id.* at 701.

In *Hornsby v. Hornsby's Stores, Inc.,* the court contemplated whether the defendant Stores was the al-

ter ego of two other corporations, thereby justifying the piercing of the corporate veil and making the other two corporations liable to the plaintiffs for the Store's breach of a lease agreement. 734 F.Supp. 302, 306-07 (N.D.Ill.1990). Specifically, the plaintiffs alleged the Store and the other two companies shared the same office space, the same office staff, and the same telephone number. *Id.* at 306.The court held these allegations were insufficient to state a cause of action because Plaintiffs failed to allege any facts suggesting the Store was a mere instrumentality of the other companies. *Id.* at 308.

**\*5** In the case at bar, Plaintiff asserts only two relevant allegations: (1) "[t]he Individual Drew Defendants... are owners of the Drew Group and exercise such control over the Drew Group, River Works and the Trusts as to be and constitute alter egos, without actual separate corporate identity" (Compl.¶ 7) and (2) "the Individual Drew Defendants were the managers of the property receiving substantial compensation; and acted as the developer of the property receiving substantial compensation and in all other facts acted as if they were running the property for their own benefit."(Pls.' Reply Br. at 3.) Plaintiff's conclusionary allegations do not suggest any of the four factors are present to establish River Works or the Drew Group are mere instrumentalities of the Individual Drew Defendants. Moreover, Plaintiff's allegations are significantly less defined than those outlined in *Hornsby* and even then the court found those allegations insufficient as matter of law and subsequently granted the motion to dismiss. Therefore, Plaintiff fails to meet his pleading requirement with regard to element one.

Plaintiff similarly fails to establish how upholding River Works as a separate corporate entity will sanction a fraud or promote injustice. *See Sea-Land Servs.,* 941 F.2d at 522-24 (after extensively analyzing relevant Illinois case law, the court found the inability to collect a debt is not sufficient to pierce the corporate veil; rather, a "wrong" beyond intentional asset and liability-shifting is required).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

Plaintiff alleges no facts in the complaint to suggest sustaining River Works as a corporate entity would create a fraud, injustice or wrong. In the reply brief, Plaintiff alludes to intentional asset-shifting when he alleges "River Works ... and the ... Childrens' Trusts were formed to ... shield and hide the assets of the Individual Drew Defendants for an existing obligation to the U.S. Department of Treasury for unpaid ... taxes."(Pls.' Reply Br. at 3.) FN5 Plaintiff fails to demonstrate how suggestions of asset-shifting to avoid paying unpaid corporate taxes merits piercing the corporate veil and assigning individual liability with regard to the finder's fee in the Agreement at issue in the present litigation. Further, Plaintiff does not allege River Works cannot pay the requested remedy in the event the court determined Plaintiff was entitled to such relief. Although such an allegation is not by itself sufficient to justify breaching corporate protections, an argument of a judgment proof defendant would at least show Plaintiff sought to establish fraud or injustice and may have provided some link to the asserted asset-shifting theory. Rather, Plaintiff's allegations are insufficient because they merely involve intentional asset-shifting. *See Sea-Land Servcs., 941 F.2d at 522-24.*

> FN5. It is not necessary for this Court to determine whether it is appropriate to make these allegations in the reply brief because Plaintiff's allegations are nevertheless insufficient as a matter of law.

Accordingly, the Individual Drew Defendants are not signatories or named parties to the Agreement and Plaintiff fails to sufficiently state a case for piercing the corporate veil; therefore, Count I against the Individual Drew Defendants must be dismissed with prejudice. Additionally, Plaintiff Lefkowitz is dismissed as a party to these proceedings because he is not a signatory or a named party in his individual capacity to the Agreement.

*Count II: Breach of Third Party Beneficiary Agreement*

**\*6** In Count II, Plaintiffs Essex and Lefkowitz as-

sert they are third-party beneficiaries of the River Works-UBS Agreement, thereby entitling Plaintiffs relief as a result of Developer Defendants alleged contractual breach of the River Works-UBS Agreement. Developer Defendants, without conceding as such, do not presently take issue with whether a breach actually occurred; rather, they argue Plaintiffs are not third party beneficiaries in any event.

It remains undisputed that on the face of the River Works-UBS Agreement there is no express mention of Plaintiffs. Accordingly, the Court's analysis must shift to whether in the absence of express language, Plaintiffs are nevertheless third party beneficiaries. For a third party to have a right to sue, the contract must be for the plaintiff's direct benefit and the contract must affirmatively make this clear. *E.B. Harper & Co. v. Nortek, Inc.,* 104 F.3d 913, 920 n. 4 (7th Cir.1997)(noting a broker could not be considered a third party beneficiary of a Stock Purchase Agreement between two businesses where the broker was only mentioned in the contract incidentally and the sale of the business was not for the broker's direct benefit). If the intent is not express on the face of the contract, then "its implication at least must be so strong as to be practically an express declaration."*Id.*"[B]rokers are generally not third-party beneficiaries of sales agreements to which they are not a party."*Id.; see also Banco del Estado v. Navistar Int'l Trans. Corp.,* 954 F.Supp. 1275 (N.D.Ill.1997). In the present case, Plaintiff is not referenced in the River Works-UBS Agreement from which it seeks recovery as third-party beneficiaries and Plaintiffs' benefit would have been relatively incidental. *Id.* (the court found the plaintiff should alternatively rely on the duties created by his own agreement and could not avail himself as a third party beneficiary of the other parties' agreement).

The River Works-UBS Agreement cannot be interpreted as explicitly or implicitly suggesting it was undertaken for Plaintiffs' benefit; rather, the separate and distinct agreement benefitted River Works to secure financing and UBS to be their chosen lender. Although the River Works-UBS Agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

contains a paragraph representing that Defendants will work solely with UBS as their lender, the damages for breach of that agreement expressly provide for enforcement by UBS only. The right to enforce the River Works-UBS Agreement belongs to UBS alone; Plaintiffs' remedy would lie only under its own Agreement with Defendant River Works. Accordingly, the Court dismisses Count II in its entirety with prejudice.

*Count III: Tortious Interference*

Plaintiff alleges tortious interference claims against Defendants Mayster, Dwinn, and Column.[FN6] In response to Plaintiff's allegations, Defendant Mayster argues this Court should dismiss Count III against him in his individual capacity because (1) he was acting within the scope of his employment with Dwinn, Shaffer & Company and (2) Plaintiff has failed to state a claim.

> FN6. This Court has granted the motion to dismiss Plaintiff Lefkowitz, as discussed in Count I, and therefore for the same reasons he is unable to recover under Count III.

**\*7** "A qualified privilege bars liability for tortious interference." *MGD, Inc. v. Dalen Trading Co.,* 230 Ill.App.3d 916, 920 (Ill.App.Ct.1992). Generally, privilege exists when the defendant acted in good faith to protect an interest or uphold a duty. *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 171 (7th Cir.1993). Further, the defendant's conduct must be limited in scope to that purpose, on a proper occasion, in a proper manner, and to the proper parties only. *Id.*

In the present case, an affidavit confirms Defendant Mayster is a broker employed by Defendant Dwinn (Def. Mayster's Aff.) and as such he owed a duty, as an employee, to Dwinn. Plaintiff pleads no facts to suggest otherwise.[FN7] A component of Defendant Mayster's employment as a mortgage broker is introducing Developer Defendants to Defendant Column and he was therefore acting within the proper scope of that duty. Likewise, Developer Defendants were proper parties on the proper occasion because they were commercial real estate de-

velopers searching for a lender for the Project. Plaintiff presents no facts indicating Defendant Mayster acted in an improper manner while exercising his duty. Therefore, this Court determines Defendant Mayster's conduct is privileged.

> FN7. Plaintiff's tortious interference allegations consist of the following:
> Broker Defendants and Column, directly and by their respective agents, jointly and severally, have knowingly and tortiously interfered with Plaintiffs' contractual and advantageous business relationships, both those directly with Defendant Developers and, indirectly between UBS-Defendant Developers, whence Plaintiffs are third-party beneficiaries, and Broker Defendants and Column have, jointly and severally, thus purposefully caused injury to Plaintiffs, under circumstances where they might reasonably have expected that their conduct would cause economic injury to Plaintiffs, damaging the Plaintiffs in the amount of One Hundred Fifty Thousand Dollars ($150,000). (Compl.¶ 33.)

A closely analogous qualified privilege exists to protect corporate officers from liability for decisions made on behalf of the company. *3COM Corp. v. Elec. Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 938 (N.D.Ill.2000). To surmount the qualified privilege, a plaintiff must show the corporate officer's action was done without justification or with actual malice. *MGD Inc.,* 230 Ill.App.3d at 920. To plead malice in the context of tortious interference with contractual relations, Plaintiff must establish Defendant Mayster intentionally injured Plaintiff and his desire to harm was unrelated to the interests of corporation. *Id.* Here, Plaintiff pleads no facts to suggest Defendant Mayster acted without justification, with actual malice, and contrary to the interests of Defendant Dwinn; therefore, Plaintiff fails to overcome the qualified privilege. Accordingly, this Court dismisses Defendant Mayster in his individual capacity from these proceedings.

Case 1:07-cv-05081   Document 53-2   Filed 11/21/2007   Page 37 of 72   *Page 7*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

In addition, Plaintiff fails to state a claim for tortious interference under either a contractual or business relations theory. The Court notes Plaintiff's complaint alleges both interference with contract and interference with business relations. (Pls.' Compl. at 6.) "Interference with contract and interference with business relations (sometimes called prospective economic advantage) are related torts." *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.,* 192 F.3d 724, 731 (7th Cir.1999).

To state a claim for tortious interference with contract, Plaintiff must plead: (1) a valid and enforceable contract existed between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a breach by the third party, caused by the defendant's wrongful conduct; and (5) damages as a result of the breach by the third party. *Id.*

**\*8** Plaintiff fails to allege Defendant Mayster's conduct of introducing Defendant Column to Defendant River Works caused River Works to breach the Agreement.[FN8] Plaintiff merely asserts Broker Defendants engaged the Developer Defendants to "shop" the loan. (Compl.¶ 21.) However, that paragraph refers to the River Works-UBS Agreement and not Plaintiff's Agreement to which Plaintiff applies the tortious interference with contract claim. Plaintiff also fails to allege Defendant Mayster's conduct was unjustified.

> FN8. As discussed above, Plaintiff is not a third-party beneficiary to the River Works-UBS Agreement and therefore any tortious interference claims regarding the River Works-UBS Agreement do not entitle Plaintiff to relief. For purposes of Count III, the remaining allegations involve the Agreement only.

When the plaintiff's economic expectancy has not been reduced to a contract yet, one can still recover under the theory of tortious interference with business relations. *Int'l Mktg., Ltd.,* 192 F.3d at 731. Under this theory, Plaintiff must plead: (1) his reas-

onable expectation of entering into a valid business relationship; (2) the defendant's knowledge of plaintiff's expectancy; (3) purposeful interference by the defendant which prevents the legitimate expectancy from solidifying into a valid business relationship; and (4) damages to plaintiff as a result of defendant's interference. *Id.*

Competition is a complete defense against tortious interference with business relations claims. *Id.* "Competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort." *Id.* A competitor is ineligible for the competition defense only if its conduct is motivated solely by spite or ill will. *Id.*

In the present case, Defendant Mayster asserts the defense of competition. (Defs.' Mot. Dismiss at 12.) Plaintiff fails to make any allegations that Defendant Mayster was motivated by spite or ill will and thus, he fails to counteract the defense. *Id.* at 732 (dismissing a claim of tortious interference with business relations based on the defense of competition when plaintiff did not counteract defense by pleading allegations of ill will or spite).

Accordingly, Plaintiff has failed to state a claim for tortious interference against Defendant Mayster in his individual capacity under either a contractual or business relations theory.

### *Count IV: Quantum Meruit*

In Count IV, Plaintiff requests relief under a quantum meruit theory. Plaintiff's only factual assertion to support this claim is "Plaintiff Lefkowitz did not sign the Agreement."(Pls.' Reply Br. at 8.) In response, Defendants' argue Count IV should be dismissed because a contract dictates the terms of the parties' deal.

Illinois law does not authorize recovery on a theory of quasi-contract when a real contract governs the parties' dealings. *Murray v. ABT Assoc.,* 18 F.3d 1376, 1379 (7th Cir.1994). The Agreement is the real contract that applies to the present case. Al-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

though the parties may dispute whether a breach of the Agreement factually occurred, what the terms of the Agreement are, or which parties are bound to the Agreement, it is nevertheless a real contract. Liability or non-liability flows from the Agreement at issue. FN9 On this point alone, Plaintiff's quantum meruit claim fails as a matter of law.

> FN9. As an initial matter this Court determined Plaintiff Lefkowitz and the Individual Drew Defendants are not parties to the Agreement and therefore no relief flows to Plaintiff Lefkowitz and no liability attaches to the Individual Drew Defendants.

**\*9** Further, Illinois law does not allow quasi-contract recovery when a plaintiff seeks such recovery just because a specific subject matter is not covered in the express contract. *Borowski v. DePuy, Inc.,* 850 F.2d 297, 301 (7th Cir.1988). In the present case, Plaintiff cannot recover under a quantum meruit theory because Plaintiff does so only to redress an area not discussed in the Agreement: breach of the Agreement by "shopping" the terms of the loan and the damages resulting from such a breach. Accordingly, the Court dismisses Count IV in its entirety with prejudice.

### Conclusion

For the above stated reasons, the Court GRANTS Defendants' motion to dismiss in the following areas: (1) the Individual Drew Defendants are dismissed from Count I; (2) Count II is dismissed with prejudice; (3) the tortious interference claims in Count III are dismissed with respect to Defendant Mayster; (4) Count IV is dismissed with prejudice; and (5) Plaintiff Lefkowitz is dismissed as a party to these proceedings.

IT IS SO ORDERED.

N.D.Ill.,2002.
Essex Real Estate Group, Ltd. v. River Works, L.L.C.
Not Reported in F.Supp.2d, 2002 WL 1822913 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Steffes v. Stepan Co.
N.D.Ill.,1997.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Joan M. STEFFES, Plaintiff,
v.
STEPAN COMPANY; Charles Worden; Seyfarth,
Shaw, Fairweather & Geraldson; Carl Johnson; and
Sari Alamuddin, Defendants.
**No. 96 C 8225.**

May 30, 1997.

*MEMORANDUM OPINION AND ORDER*
JAMES F. HOLDERMAN, District Judge.
**\*1** Defendants have moved to dismiss plaintiff's
complaint for retaliation and intentional interfer-
ence with prospective economic advantage. This
case stems from the investigation and discovery
surrounding case No. 95 C 2630, an action by
plaintiff in this court against her former employer
Stepan Company (Stepan). The complaint in 95 C
2630 alleges that Stepan failed to accommodate
plaintiff's disability-her allergies to certain chemic-
als-because Stepan could have made positions
available which did not overly expose plaintiff to
these allergens. In this case, plaintiff alleges that
the defendants-Stepan, Stepan human resources
manager Charles Worden, and Stepan's counsel
(Seyfarth)-intentionally injured plaintiff when
Worden told plaintiff's current employer of her dis-
crimination suit as well her allergies. For the fol-
lowing reasons, defendants' motion to dismiss is
granted.

*BACKGROUND*

According to plaintiff's complaint, plaintiff was
employed by Stepan from 1978 until June 1996,
working mostly in Stepan's maintenance ware-
house. Stepan placed plaintiff on paid medical
leave in December 1993 and never reinstated her.
On May 6, 1994, plaintiff filed a charge with the
Equal Opportunity Employment Commission al-

leging that Stepan had violated the Americans with
Disabilities Act by discriminating against plaintiff
because of her allergies and breathing difficulties.
A lawsuit based on these charges is currently
pending as case 95 C 2630. One of Stepan's re-
sponses to the law suit has been that there was not
any available position in the company which would
have allowed Stepan to reasonably accommodate
plaintiff's medical restriction to avoid certain chem-
icals.

In July 1996, plaintiff began working in a mainten-
ance warehouse for Dow Chemical (Dow) through
a placement agency, First Choice Temporary Ser-
vice, Inc. (First Choice). On October 1, 1996, in her
answers to Seyfarth's interrogatories for the under-
lying case, plaintiff told Seyfarth that she was cur-
rently working for First Choice and was contracted
through them to Dow. The next day, Seyfarth direc-
ted Worden to call Dow and ask Dow if plaintiff
worked there. Following Seyfarth's instruction,
Worden called Dow on October 2, 1996, and dis-
covered that plaintiff worked there. Worden then
informed Dow that plaintiff had sued Stepan for
discrimination and that she had a weight restriction
and could not work around chemicals [FN1]. Due to
Worden's call, Dow directed First Choice to inform
plaintiff not to return to work with Dow until Dow
was informed as to plaintiff's medical restrictions.
Plaintiff did not work for Dow from October 3,
1996 until October 16, 1996, when Dow received a
letter from plaintiff's doctor.

> FN1. In counts IV, V, and VI, plaintiff al-
> leges that Seyfarth directed Worden to find
> out if Dow was aware of plaintiff's medical
> restrictions.

On December 16, 1996, plaintiff filed her com-
plaint in this matter. She alleges that as a direct res-
ult of Worden's actions, she was temporarily de-
prived of her job with Dow and will never be hired
by Dow as other than a contractual employee
through First Choice. Plaintiff's complaint contains
six counts: count I alleges that Stepan retaliated

against plaintiff's discrimination charge with Worden's phone call; count II alleges that Worden retaliated for the discrimination charge; count III alleges that Worden intentionally interfered with plaintiff's prospective economic advantage; and counts IV through VI allege that Stepan's counsel are liable for intentional interference with prospective economic advantage due to Worden's phone call. Defendants have moved to dismiss all six counts.

*I. Counts III, IV, V, and VI do not State a Cause of Action for Intentional Interference with Prospective Economic Advantage*

**\*2** In counts III through VI, plaintiff claims that various defendants intentionally interfered with her employment at Dow though their responsibility for the Worden phone call. Dismissal under Rule 12(b)(6) is appropriate only if no relief could be granted under any set of facts that could be proved consistent with the allegations. *Panares v. Liquid Carbonic Industries Corp.,* 74 F.3d 786, 791 (7th Cir.1996). This court accepts as true all well-pleaded allegations and the inferences that may be reasonably drawn from those allegations. *Id.* While federal notice pleading allows for a generous reading of a complaint, it must at least set out facts sufficient to outline the basis of the claim. *Id.* at 792. The pleader will not be allowed to evade this requirement by attaching a bare legal conclusion to the facts that he narrates. *Id.* A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6). *Id.*

To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional, unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference. *Anderson v. Vanden Dorpel,* 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296, 1299 (Ill.1996). In addition,

while these requirements do not explicitly address the relevance of truthfulness by the interferer, permitting recovery for tortious interference based on truthful statements would seem to raise significant First Amendment problems. *Delloma v. Consolidated Coal Co.,* 996 F.2d 168, 172 (7th Cir.1993).

First, the court finds that counts III to VI fail to allege the first requirement that plaintiff had a reasonable expectancy of future employment with Dow. The complaint alleges that due to Worden's phone call, plaintiff "will never be hired by Dow Chemical as other than a contractual employee through First Choice Temporary Service Inc." Comp. at ¶ 20. This allegation is inadequate under *Anderson,* where the Illinois Supreme Court recently held, "The hope of receiving a job offer is not a sufficient expectancy." 217 Ill.Dec. 720, 667 N.E.2d at 1299. *Anderson* dismissed an interference claim by a candidate for a position who was scheduled for further interviews. The instant case is even weaker than *Anderson,* as plaintiff had not yet begun the process of becoming a Dow employee. Plaintiff does not dispute the preceding authority but instead argues that she is alleging an adverse employment decision by First Choice. Plaintiff's complaint, though, does not allege that First Choice has ever taken any employment action against plaintiff. Moreover, paragraphs 19 and 20 of the complaint indicate that plaintiff was reassigned to Dow as an employee with First Choice within two weeks of Worden's call. Because the complaint fails to allege any factual assertions which would allow for a reasonable expectancy of entering into a valid business relationship, counts III, IV, V, and VI fail to state a claim upon which relief may be granted.

**\*3** In addition, counts III through VI fail to state a claim because there is no allegation that Worden said anything untrue in his call to Dow. The Restatement of Torts states:
There is of course no liability for interference with contract or with prospective contractual relation on the part of one who merely gives truthful information to another. The interference in this instance is clearly not improper. This is true even though ... the person to whom the information is given immedi-

Not Reported in F.Supp.
Case 1:07-cv-05081    Document 53-2    Filed 11/21/2007    Page 42 of 72   Page 3
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

ately recognizes [the information] as reason for breaking his contract or refusing to deal with another. It is also true whether or not the information is requested.

*Rest. (2d) Torts § 772* Comment (b). The Illinois Appellate Court recently cited the Restatement to conclude, "There is no liability for interference with a prospective contractual relation on the part of one who merely gives truthful information to another." *Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill.App.3d 606, 215 Ill.Dec. 251, 663 N.E.2d 1, 10 (Ill.App. 1st Dist.1995). Plaintiff attempts to distinguish *Soderlund* on the basis that her underlying claim is retaliation and not defamation, but her allegations in counts III through VI are identical to *Sunderland* in their theory of liability-statements that caused injury by interfering with a prospective economic relationship. No Illinois case has ever held that true statements may be the basis for an action for tortious interference with a prospective contractual relation. *Delloma,* 996 F.2d at 172. Thus, this court will follow the Restatement and *Soderlund* to hold that counts III through VI fail to state claims because they do not allege that any of Worden's statement's were untrue.

## II. *Counts I and II for Retaliation Must be Dismissed Because Worden's Statements are Absolutely Privileged as Legal Communication Relevant to the Litigation*

### A. *Warden Acted as Seyfarth's Agent while Talking to Dow*

Worden and Stepan claim that any privilege their counsel would have held in communicating with Dow should be extended to Worden because he was acting as Seyfarth's agent when he called Dow. The court agrees. The agency relationship is a consensual, fiduciary one between two legal entities, where the principal has the right to control the conduct of the agent and the agent has the power to affect the legal relations of the principal. *Taylor v. Kohll,* 162 Ill.2d 91, 204 Ill.Dec. 766, 642 N.E.2d 467, 468 (Ill.1994). Ordinarily, the key consideration in determining whether an agency relationship exists is

whether the principle had the right to control the activities of the agent. *Knapp v. Hill,* 276 Ill.App.3d 376, 212 Ill.Dec. 723, 657 N.E.2d 1068, 1071 (Ill.App. 1st Dist.1995); *Taylor,* 204 Ill.Dec. 766, 642 N.E.2d at 468-69. Because plaintiff's complaint alleges that Seyfarth was directing Worden's activities, Worden was under the control of Seyfarth and, thus, was its agent. Cases from other jurisdictions have consistently found that investigators acting on behalf of attorneys should be accorded the same privilege as the attorneys themselves. See *Leavitt v. Bickerton,* 855 F.Supp. 455 (D.Mass.1994); *Buckhannon v. U.S. West Communications Inc.,* 928 P.2d 1331, 1996 WL 123186 (Col.App.); *Hawkins v. Harris,* 141 N.J. 207, 661 A.2d 284 (N.J.1995). While plaintiff argues that Worden's status as a Stepan employee precludes him from serving as Seyfarth's agent, nothing prevents agents from serving in dual capacities. *Illinois Association of Remittance Agents v. Powell,* 122 Ill.App.2d 322, 258 N.E.2d 827, 829 (Ill.App. 4th Dist.1970).

### B. *Worden's Inquiry into Plaintiff's Forthrightness with Dow was Communication within the Absolute Litigation Privilege*

**\*4** Illinois law recognizes an absolute litigation privilege which protects anything said or written in the course of a legal proceeding. *In re American Continental/Lincoln Savings & Loan Securities Litigation,* 884 F.Supp. 1388, 1396 (D.Ariz.1995) (examining Illinois law), *aff'd,*102 F.3d 1524,*cert. granted,*1997 WL 134379; *Skopp v. First Federal Savings of Wilmette,* 189 Ill.App.3d 440, 136 Ill.Dec. 832, 545 N.E.2d 356, 360 (Ill.App. 1st Dist.1989). The only qualification to this privilege is that the communication pertain to the litigation. *American,* 884 F.Supp. at 1396; *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361. This requirement is not applied strictly, and the communication need not be confined to the specific issues involved in the litigation. *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361. The communication need not occur in court to be protected by the privilege (*Libco Corp. v. Adams,* 100 Ill.App.3d 314, 55 Ill.Dec. 805, 426 N.E.2d 1130, 1132 (Ill.App. 1st Dist.1981)), and the priv-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

ilege applies to any communications pertinent to pending litigation. *McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 425 N.E.2d 1130, 1133 (Ill.App. 1st Dist.1981). The rationale for the privilege is to secure for attorneys as officers of the court the utmost freedom in representing clients. *Libco,* 55 Ill.Dec. 805, 426 N.E.2d at 1132. The absolute privilege is afforded even when malice is assumed to have motivated the attorney. *Scheib v. Grant,* 22 F.3d 149, 156 (7th Cir.), *cert. denied,* 513 U.S. 929, 115 S.Ct. 320, 130 L.Ed.2d 280 (1994). All doubts are to be resolved in favor of finding that the privilege applies. *American,* 884 F.Supp. at 1396; *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361.

Plaintiff claims that Worden's talk with Dow was irrelevant to the litigation because Dow had no legitimate interest in plaintiff's medical restrictions. The important issue is not Dow's interest, though, but the needs of the litigants. One of plaintiff's argument in the underlying case is that her successful employment with Dow reveals pretext by contradicting Stepan's claim that plaintiff could not work in its chemical company because of her physical condition [FN2] Whether plaintiff had informed Dow of her allergies could be very relevant to combat this contention. Plaintiff may have been having the same health problems with Dow as she had with Stepan, but perhaps plaintiff temporarily neglected to inform or complain to Dow in order to gain an advantage in her lawsuit with Stepan. In addition, plaintiff could have been working at Dow exclusively with chemicals that do not cause her difficulties, but this theory could be proved only by telling Dow about plaintiff's allergies and comparing the chemicals at plaintiff's Dow workplace. When Illinois and federal courts have examined actions alleging liability from communications relevant and necessary to an underlying claim, as the communications were in this case, these courts have consistently held that the absolute privilege applies. See *American,* 884 F.Supp. at 1396 (no tortious interference from letter to FDIC lawyer); *Scheib,* 22 F.3d at 156 (7th Cir.1994) (no violation of Illinois Eavesdropping Act); *Skopp,* 136 Ill.Dec. 832, 545 N.E.2d at 361 (no tortious interference form statements made to attorneys and other offi-

cials at meeting); *Libco,* 55 Ill.Dec. 805, 426 N.E.2d at 1132 (letter from one attorney to another); *McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 425 N.E.2d 1130, 1133 (Ill.App. 1st Dist.1981) (testimony to Board of Education about alleged battery was pertinent to pending litigation).

> FN2. To further support their claim of relevance, defendants have filed a joint motion to take judicial notice of plaintiffs pleadings in Case No. 95 C 2630. The court has not needed to rely on plaintiff's pleadings because plaintiff's response memo in this matter has adequately informed the court about arguments in the complaint filed in that case, as plaintiff admits the relevance of "Evaluating Stepan's defense that Plaintiff cannot work in a chemical company due to her physical condition, because, obviously, if Plaintiff is working for Dow, a chemical company, Stepan's claim is significantly weakened." Pl.Resp.Memo to Stepan and Worden Mot. to Dis. at 8.

*5 Plaintiff relies on *Auriemma v. Montgomery,* 860 F.2d 273 (7th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989), but that case is inapposite. The *Auriemma* court denied the absolute privilege to government attorneys who sought, acquired, and used the plaintiffs' credit reports to intimidate them. Unlike the instant case, *Auriemma* neither involved communications nor was based on conduct which had any relevance to the pending litigation. The *Auriemma* court expressly approved "extending absolute immunity to actions taken by advocates within the broad confines of the civil discovery procedures available in both state and federal courts." *Id.* at 278. The court finds that questioning a potential witness about matters pertinent to the litigation falls within the broad confines of the discovery privilege envisioned by the Seventh Circuit. As the Seventh Circuit stated in *Scheib:* "We believe that the Illinois [Supreme] Court would conclude that the truth-seeking process of a judicial proceeding will be most securely advanced if attorneys do not fear

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

civil or criminal liability as the consequence of mis-judging the legality of disclosing particular information." *Scheib,* 22 F.3d at 156. Worden disclosed information only in making communications relevant and necessary to his case. Therefore, this court finds Worden's communications with Dow are absolutely privileged. Accordingly, counts I and II alleging retaliation from Worden's communications must be dismissed.

### CONCLUSION

For the above stated reasons, the defendants' motion to dismiss is GRANTED. This case is dismissed in its entirety. All pending motions are moot. Each side is to bear its own costs.

N.D.Ill.,1997.
Steffes v. Stepan Co.
Not Reported in F.Supp., 1997 WL 305306 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Young v. Connecticut Mut. Life Ins. Co.
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Richard J. YOUNG, Plaintiff,
v.
CONNECTICUT MUTUAL LIFE INSURANCE
COMPANY, et al., Defendants.
**No. 90 C 254.**

Aug. 17, 1990.

*MEMORANDUM OPINION AND ORDER*
MAROVICH, District Judge.
**\*1** Plaintiff Richard J. Young, an insurance agent,
brought this action against defendants for allegedly
preventing him from selling a innovative insur-
ance product. Count I is a breach of contract claim
against Connecticut Mutual Life Insurance Com-
pany ("CML"), for which Young acted as an agent,
for not allowing him to sell the product in question.
Count II is against CML and three individual de-
fendants, Bruce Knox, Robert Kroner, and Philip
Davis, and alleges tortious interference with pro-
spective economic advantage. Before the court is
defendant Davis' motion to dismiss Count II of the
complaint for lack of personal jurisdiction. Also be-
fore the court are CML's motion to dismiss Counts
I and II for failure to state a claim upon which relief
can be granted, and the individual defendants' mo-
tion to dismiss Count II, also for failure to state a
claim. For the following reasons, defendant Davis'
motion to dismiss for lack of personal jurisdiction
is denied, but the motions to dismiss for failure to
state a claim are granted.

*I. BACKGROUND*

In ruling on defendants' motions to dismiss, this
court must take the allegations in plaintiff's com-
plaint to be true and view them, along with the
reasonable inferences to be drawn therefrom, in the
light most favorable to plaintiff. *See Ellsworth v.*

*City of Racine,* 774 F.2d 182, 184 (7th Cir.1985),
*cert. denied,* 475 U.S. 1047 (1986). Young is an in-
surance agent specializing in designing and selling
compensation packages to law firms, accounting
firms, and other professional groups. Paragraph 1 of
plaintiff's complaint. CML is a mutual life insur-
ance company.

On January 16, 1980, a "Career Contract" was
entered into by Young; the Hunken Agency, which
was a general agent of CML; and CML (¶ 6). This
contract established Young as an agent of CML and
gave him the right to sell CML's products. *Id.* Sec-
tion One of the Career Contract governed Young's
authority. Part A of Section One provides that:

The Agent may solicit and procure applications for
life insurance, disability insurance, annuity con-
tracts and other products now or hereafter offered
by the Company at such time and in such manner as
he may determine, subject to the provisions of this
Contract and any Supplement and/or Amendment
hereto, and to his being properly licensed in the jur-
isdiction where such applications are solicited and
procured, and, if necessary, registered with the
proper authorities.

Exhibit A to Plaintiff's Complaint at 1. Young was
the top selling Chicago agent of CML for 1986,
1987 and 1988 (¶ 12). As a result of his perform-
ance, Young was appointed as a full-time agent su-
pervisor by CML in January of 1989 (¶ 13).

Sometime prior to September of 1987, CML
entered into an agreement with Knox, Kroner, and
Davis (collectively referred to as "CCPI defend-
ants"), who did business as Corporate Compensa-
tion Plans, Inc. Under the agreement, all of the de-
fendants acted together to develop a new universal
group life insurance product called Consortium
Group Flexible Premium Adjustable Life Insurance
Policy ("Consortium") (¶ 14). The market for Con-
sortium is limited to large groups of fifty or more
partners or executives. *Id.* In September of 1987,
CML authorized the marketing and sale of Consor-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

tium by the CCPI defendants, but the product was not disclosed to Young until March of 1989 (¶¶ 15, 16). From September of 1987 through March of 1989, the CCPI defendants entered the Chicago marketplace and solicited law and accounting firms for the sale of Consortium (¶ 17). The CCPI defendants solicited several Chicago law firms and sold Consortium to at least three firms (¶ 20).

**\*2** On January 16, 1990, Young filed his complaint. Count I is a breach of contract claim; Young alleges that CML had an obligation under the "Career Contract" to make Consortium available to Young along with its other agents. Count II is an interference with prospective economic advantage claim against all defendants for their agreement to develop and market Consortium without Young.

Defendant Davis has moved to dismiss Count II for lack of personal jurisdiction. CML has moved to dismiss Count I on the grounds that nothing in the contract supports Young's allegation that CML had a duty to permit Young to sell all of its products. CML also seeks a dismissal of Count II on the grounds that Young cannot state a claim for interference with prospective economic advantage. The CCPI defendants have brought a similar motion directed at Count II. We find that we have personal jurisdiction over defendant Davis, but that plaintiff cannot state a claim against any of the defendants. Counts I and II are thus both dismissed with prejudice.

## II. *DISCUSSION*

### A. Davis' Motion To Dismiss For Lack of Personal Jurisdiction

Defendant Davis contends that Count II should be dismissed for lack of personal jurisdiction. None of the other CCPI defendants have contested personal jurisdiction. Young has the burden of establishing a *prima facie* case of personal jurisdiction. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987). In ruling on this issue, however, all the allegations in the complaint are to be taken as true unless controverted by Davis' affidavits, and any conflicts in the affidavits must be resolved in Young's favor. *Id.* Dav-

is originally submitted an affidavit stating that he was an officer of "Corporate Compensation Plans, Inc.," a Delaware corporation, and that any actions that he had taken in Illinois were taken in his capacity as an officer of that corporation. May 11, 1990 Affidavit of Philip T. Davis. Davis, however, later realized that his affidavit was in error because there is no such corporation as "Corporate Compensation Plans, Inc." registered in Delaware. Davis then submitted a supplemental affidavit stating that he was not an officer of CCPI, Inc., but rather was an officer of "Corporate Compensation Plans of North America, Inc." June 15, 1990 Supplemental Affidavit of Philip T. Davis. In this supplemental affidavit, Davis also concedes that he was in Illinois approximately seven times in connection with the marketing of Consortium, beginning in October of 1988, but he asserts that all his appearances were on behalf of Corporate Compensation Plans of North America, Inc.

Davis relies exclusively on the fiduciary shield doctrine, which provides that where a person's activities in a state are all conducted in his capacity as the representative of a corporation, these activities cannot be relied upon to exercise individual personal jurisdiction over that person. *See Ameritech Mobile Communications, Inc. v. Cellular Communications Corp.*, 664 F.Supp. 1175, 1180 n. 4 (N.D.Ill.1987). The doctrine, however, is equitable in nature and thus is applied in the court's discretion. *Washburn v. Becker*, 186 Ill.App.3d 629, 633, 542 N.E.2d 764 (1st Dist.1989). The fiduciary shield doctrine should not be applied in this case because of the uncertainty surrounding the proper identity of the corporate defendant. Davis has demonstrated in his affidavit that he appeared in Illinois as a representative of Corporate Compensation Plans of North America, Inc., but he has not demonstrated that people with whom he dealt knew that he was acting as a representative of this corporation. In fact, the only evidence on this latter point is that the individual defendants purportedly appeared as representatives of Corporate Compensation Plans, Inc., which never existed, or of "Corporate Compensation Plans," which did not purport to be a corporation. Exhibits A and B to Plaintiff's Response to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Davis' Motion to Dismiss.

**\*3** It would be inequitable to apply the fiduciary shield doctrine here. Even if Davis appeared as a representative of Corporate Compensation Plans of North America, Inc., this fact was not made known to the people with whom he dealt. The fiduciary shield doctrine exists because it is thought unfair to subject persons to suit in their individual capacity where they acted solely as representatives of a corporation. A defendant should not be protected, however, where persons with whom he dealt thought they were dealing with an individual or with the representative of a different corporation.

Having rejected Davis' fiduciary shield argument, we find that we have personal jurisdiction over him because he transacted business in Illinois. Section 2-209 of the Illinois Code of Civil Procedure provides in pertinent part:

(a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits ... to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this State....

Ill.Rev.Stat. ch. 110, ¶ 2-209(a). The transaction of business standard "does not require that the nonresident defendant conduct business within Illinois regularly or systematically; a single act may be sufficient, as long as the cause of action arises from that act." *Snyder v. Smith*, 736 F.2d 409, 416 (7th Cir.1984). Davis admits that he entered Illinois and marketed Consortium here, and Young's cause of action directly arises from this conduct. Under the Illinois long arm statute we find that Davis transacted business in Illinois and we thus have personal jurisdiction over him.

### B. Breach of Contract

CML argues that Count I does not state a claim for breach of contract because the language of the contract between the parties does not support a requirement that CML disclose all of its products to its agents. In seeking to establish a duty on the part of CML to allow Young to sell all of its products, Young relies on Section 1A of the Career Contract. This portion of the contract, however, merely sets out the agent's general authority and does not impose any duty on CML. Nothing in the language of the contract could even remotely be construed as prohibiting CML from denying Young access to its products.

Young repeatedly points out that there is no language in the contract which allows CML to deny him access to CML's products. His argument relies on a backwards interpretation of the law. To establish a breach of contract, a plaintiff must show that the contract creates a duty or specifically prohibits certain conduct, not that it fails to specifically allow something. *See North Broadway Motors, Inc. v. Fiat Motors of North America, Inc.,* 622 F.Supp. 466, 468 (N.D.Ill.1984). Young further claims that CML's interpretation of the contract merely creates an ambiguity as to the meaning of the contract provision, and that the contract must be construed against CML, which prepared it. *See Smith v. Connecticut General Life Ins. Co.,* 122 Ill.App.3d 725, 728, 462 N.E.2d 604 (1st Dist.1984). The contract language, however, is clear and it does not support Young's interpretation. The above principle thus does not apply here. Count I is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

### C. Interference with Prospective Economic Advantage

**\*4** CML and the CCPI defendants have moved separately to dismiss Count II, which asserts a claim of tortious interference with prospective economic advantage against all defendants. The essential elements of an action for interference with prospective economic advantage are:

[1] The plaintiff's reasonable expectancy of entering into a valid business relationship;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

[2] The defendant's knowledge of this expectancy;

[3] An intentional interference by the defendant which prevents the expectancy from ripening into a valid business relationship; and

[4] Damages to the plaintiff from such interference.

*Crinkley v. Dow Jones & Co.,* 67 Ill.App.3d 869, 878, 385 N.E.2d 714 (1st Dist.1979). CML claims that Young has not properly pled facts to support the first and third elements of this tort. We will not rule on these arguments, which are directed toward matters of pleading, because we find that Young's claim must fail for a more fundamental reason.

CML contends that Young cannot state a claim against it in Count II because a party cannot be liable for interfering with its own contract or business relationship. *DP Service, Inc. v. AM International,* 508 F.Supp. 162, 168 (N.D.Ill.1981). The tort in question requires some wrongful action toward a third party which disrupts a prospective economic relationship between the plaintiff and the third party. *See Id.* at 167. Young cannot meet this requirement and thus cannot state a claim against CML for interference with prospective economic advantage.

Young alleges in his complaint that he was an agent of CML. He also contends that he had an expectancy of selling CML products to certain customers, but all of these expected sales would have been made as an agent of CML. The business relationship which CML is alleged to have interfered with would have been between the third-party customers, Young, *and* CML, which would issue the policies. CML cannot be liable for interfering with its own relationship.

In addition, even if the business relationship of Young with the prospective customers can be considered to exist apart from CML, Young cannot state a claim for interference with prospective economic advantage. The tort requires that the defendant have taken some action toward a third party which caused the third party not to do business with the plaintiff. *DP Service,* 508 F.Supp. at 167. The

action toward the third party must be some sort of direct interference with the relationship between the plaintiff and the third party, such as disparagement or other wrongful conduct. *See Downers Grove Volkswagen v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 527-28, 540 N.E.2d 33 (2d Dist.1989). We do not believe that a defendant's mere selling of a product to a third party, so that the plaintiff could not sell to them, is an actionable type of wrongful interference. Of course the situation might be different if CML had some duty not to sell to these third parties without notifying Young, but we have previously found that no such duty existed under the parties' contract. Young has not alleged any other basis for such a duty. Young has failed to state a claim against CML in Count II.

**\*5** The CCPI defendants have also moved to dismiss Count II for failure to state a claim. These defendants contend that Young has failed to properly plead that they had knowledge of his expectancy of selling to the customers in question. Again, we will not consider this type of argument, because there is a more fundamental reason that Young cannot state a claim against these defendants. As noted above, a person cannot be liable for interference with prospective economic advantage unless he has taken some wrongful action, directed at a third party, to induce the third party not to do business with the plaintiff. Like CML, the CCPI defendants did not take any such action because they merely sold Consortium to third parties, and did not directly attempt to induce these parties not to do business with Young.

Moreover, as competitors of Young, the CCPI defendants have an even stronger case for dismissal than CML because selling Consortium in competition with Young is privileged conduct. *See Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 553, 413 N.E.2d 98 (1st Dist.1980). Young points out that competition is not privileged if it is unlawful, *City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill.App.3d 359, 363, 300 N.E.2d 331 (3d Dist.1973), but Young has not alleged any unfair competition on the part of the CCPI defendants. All the complaint alleges is that the CCPI defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

entered into an agreement with CML to sell Consortium. There is absolutely nothing in the complaint to suggest that the defendants engaged in any type of unfair competition. *See Downers Grove Volkswagen,* 190 Ill.App.3d at 528.

Young claims that the CCPI defendants' privilege claim must be raised as an affirmative defense and can not be considered on a motion to dismiss, citing *Haupt v. International Harvester Co.,* 582 F.Supp. 545, 550 (N.D.Ill.1984). The Illinois Appellate Court, however, has subsequently stated that privilege is not an affirmative defense, but that, rather the plaintiff must demonstrate lack of privilege. *King v. Levin,* 184 Ill.App.3d 557, 561, 540 N.E.2d 492 (1st Dist.1989). Young has failed to state a claim for interference with prospective economic advantage against either CML or the CCPI defendants, so Count II of the complaint must be dismissed.

### III. *CONCLUSION*

For the above reasons, defendant Davis' motion to dismiss for lack of personal jurisdiction is denied. Counts I and II are dismissed with prejudice against all defendants.

N.D.Ill.,1990.
Young v. Connecticut Mut. Life Ins. Co.
Not Reported in F.Supp., 1990 WL 125496 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

LEXSEE 1991 US DIST LEXIS 3102


**STEVEN E. LERNER, Ph.D., Inc., a California corporation dba LERNER & ASSOCIATES, Plaintiff, v. CAPITAL CITIES/ABC, INC., a New York corporation, and ROBERT W. KARR, Defendants**

**No. C 90-2303**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1991 U.S. Dist. LEXIS 3102*


**March 11, 1991, Decided
March 11, 1991, Filed**

**CASE SUMMARY:**


**PROCEDURAL POSTURE:** Defendant attorney filed a *Fed. R. Civ. P. 12(b)(2)* motion to dismiss for lack of personal jurisdiction and a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss for failure to state a claim in plaintiff witness brokerage's defamation action against the attorney and defendant broadcaster.

**OVERVIEW:** The attorney, an Illinois resident, spoke about his experience using the services of the witness brokerage, a California corporation, on a television program that was nationally televised. The court denied the motion to dismiss for lack of personal jurisdiction because, regardless of whether he had reason to know the interview would be broadcast in California, the attorney's intentional conduct, aimed at a California resident with foreseeable and intended effects in California, satisfied the due process requirements for assertion of jurisdiction. The court granted the motion to dismiss for failure to state a slander claim because the statements either failed to express or imply the defamatory content attributed to them or amounted to a subjective characterization not susceptible of truth or falsehood. The witness brokerage did not explain how a false statement that the attorney and the witness brokerage had a contract could injure the witness brokerage. The statements did not imply that people who contracted with the witness brokerage could not anticipate what fees would be charged. The characterization of the advance payment as exorbitant was not a statement of fact.

**OUTCOME:** The court denied the attorneys motion to dismiss for lack of personal jurisdiction, but granted his motion to dismiss for failure to state a claim.

**LexisNexis(R) Headnotes**


*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] A motion to dismiss will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a *Fed. R. Civ. P. 12(b)(6)* motion. Where the court has such attachments before it in a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of jurisdictional facts in order to avoid dismissal.


*Civil Procedure > Jurisdiction > Jurisdictional Sources*

1991 U.S. Dist. LEXIS 3102, *

> *General Overview*
*Constitutional Law > The Judiciary > Jurisdiction >*
*General Overview*
*Constitutional Law > Bill of Rights > Fundamental*
*Rights > Procedural Due Process > General Overview*
[HN2] When a federal court sits in diversity, the plaintiff must show first that the state statute of the forum confers personal jurisdiction over the non-resident defendant, and second that the exercise of jurisdiction accords with federal constitutional principles of due process. However, because California's "long-arm" statute permits the exercise of jurisdiction on any basis not inconsistent with the Constitution of the United States, *Cal. Civ. Proc. Code § 410.10*, the state and federal limits are coextensive. Thus, this court need only decide whether the exercise of jurisdiction complies with due process. The *due process clause of the fourteenth amendment* requires that the defendant have minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Civil Procedure > Jurisdiction > Personal Jurisdiction*
*& In Rem Actions > In Personam Actions > General*
*Overview*
*Civil Procedure > Jurisdiction > Subject Matter*
*Jurisdiction > Jurisdiction Over Actions > General*
*Overview*
[HN3] The exercise of general jurisdiction over a non-resident defendant requires that the defendant have "substantial" or "continuous and systematic" contacts with the state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction*
*& In Rem Actions > In Personam Actions > Minimum*
*Contacts*
*Civil Procedure > Jurisdiction > Subject Matter*
*Jurisdiction > Jurisdiction Over Actions > Limited*
*Jurisdiction*
[HN4] Where the defendant's activities are not sufficiently pervasive to subject him to the court's general jurisdiction, specific jurisdiction nevertheless may be asserted for a cause of action that arises out of the defendant's forum-related activities. The Ninth Circuit adopts a three-part test for determining whether such limited jurisdiction may be exercised: 1) The nonresident defendant must either (a) purposefully perform some act or consummate some transaction with the forum or resident thereof or (b) perform some act by which he

purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. 2) The claim must arise out of or result from the defendant's forum-related activities. 3) Exercise of jurisdiction must be reasonable. The plaintiff bears the burden of proving the existence of jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction*
*& In Rem Actions > In Personam Actions > Minimum*
*Contacts*
[HN5] The "purposeful availment" prong of the three-part test for determining whether specific jurisdiction may be exercised does not require that the defendant actually conduct activity in the forum. Jurisdiction also may be exercised over a defendant whose only contact with the forum is the purposeful direction of a foreign act having effect in the forum state. Jurisdiction is proper where the reporter commits intentional and allegedly tortious actions expressly aimed at California by writing and editing an article that he knows will have a potentially devastating impact upon the plaintiff, and knows that the injury will be felt by the plaintiff in the state in which she lives and works and in which the reporter's employer has its largest circulation. The decisive factor is the reporter's knowledge that his article will have a devastating impact upon a California resident and that the injury will be felt in the state of her residence and business.

*Civil Procedure > Jurisdiction > Personal Jurisdiction*
*& In Rem Actions > In Personam Actions > General*
*Overview*
*Civil Procedure > Jurisdiction > Subject Matter*
*Jurisdiction > Jurisdiction Over Actions > Limited*
*Jurisdiction*
[HN6] A defendant who purposely directs his actions at a resident of the forum has fair warning that he may be haled into court there. The courts will assert limited jurisdiction over nonresident defendants who make tortious statements to other nonresidents about a California company because the defendants are acting intentionally to affect the nonresidents' opinion of the plaintiff's product and the 'manipulation of third persons who thereby refrain from consummating a contemplated transaction in California constitutes a forum-related activity by the defendants. The fact that defendants direct their conduct through third parties does not insulate them from jurisdiction when it is the defendants' own activity that creates the injury in the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Limited Jurisdiction*

[HN7] The second prong of the Ninth Circuit's analysis for determining whether limited jurisdiction may be exercised requires that the claim "arise out of" the defendant's forum-related activities. The circuit adopts a "but for" test for the satisfaction of this requirement.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Limited Jurisdiction*

[HN8] The following factors are considered in determining whether the exercise of limited jurisdiction over a defendant would be reasonable: 1) extent of purposeful interjection; 2) burden on the defendant; 3) conflict with sovereignty of defendant's state; 4) forum state's interest in adjudicating the dispute; 5) efficient judicial resolution; 6) convenience and effectiveness of relief for plaintiff; and 7) existence of an alternative forum. The extent of purposeful interjection factor is closely tied to the issue of targeted conduct. This factor is not given separate consideration once it is shown that the defendant purposefully directed its activities toward the forum state. Under the second factor the court is required to examine the burden on the defendant in light of the corresponding burden on the plaintiff. Regarding the fourth factor, California has a strong interest in protecting its citizens against the tortious acts of others.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*

[HN9] *Fed. R. Civ. P. 12(b)(6)* permits a motion to dismiss for failure to state a claim upon which relief can be granted.

*Torts > Business Torts > General Overview*

*Torts > Damages > Compensatory Damages > General Overview*

*Torts > Intentional Torts > Defamation > Defamation Per Se*

[HN10] *Cal. Civ. Code § 46* defines slander as a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: 1. Charges any person with crime, or having been indicted, convicted, or punished for crime; 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; 4. Imputes to him impotence or a want of chastity; or 5. Which, by natural consequence, causes actual damage. The first four classes of statement are slanderous per se and presumed injurious; to recover for any other utterances, actual damages must be pleaded and proved.

*Civil Procedure > Remedies > Damages > Special Damages*

*Torts > Intentional Torts > Defamation > Defamation Per Se*

[HN11] Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof, and unless the plaintiff establishes the defamatory character of the statement by explanation of the surrounding circumstances.

*Torts > Intentional Torts > Defamation > Elements > Slander*

[HN12] Statements that cannot reasonably be interpreted as stating actual facts about an individual are not actionable.

**JUDGES:** [*1]  Marilyn Hall Patel, United States District Judge.

**OPINION BY:** PATEL

**OPINION**

*MEMORANDUM AND ORDER*

Plaintiff Steven E. Lerner, Ph.D., Inc., a California corporation doing business as Lerner & Associates

("Lerner"), brings this action seeking damages for alleged defamatory statements made by defendant Robert W. Karr ("Karr") and nationally televised on August 13, 1989, by defendant Capital Cities/ABC, Inc. ("ABC"). Karr is a resident of Chicago, Illinois. Capital Cities/ABC, Inc. is a corporation organized and existing under the laws of the state of New York and has its principal place of business in New York. The suit was brought in this court pursuant to its diversity jurisdiction under *28 U.S.C. § 1332*.

The parties are now before the court on defendant Karr's motion to dismiss for lack of personal jurisdiction under *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, and a motion to dismiss for failure to state a claim under *Rule 12(b)(6)* of the Federal Rules. Having considered the submissions and arguments of the parties, for the following reasons, the court DENIES the motion to dismiss for lack of personal jurisdiction. However, the court GRANTS defendant's motion to dismiss for failure [*2] to state a claim.

BACKGROUND

Plaintiff Steven Lerner's business is providing medical expert witnesses for attorneys trying medical malpractice suits. In May 1986, Lerner and Chicago attorney John Guy ("Guy") entered into a written agreement that Lerner would provide Guy with an expert to review the medical records in one of Guy's cases, *Zeigler v. Adelson.* Lerner received and forwarded the records to Dr. James Grendell.

Defendant Robert Karr is also an attorney practicing in Chicago. In late May 1986, Karr was substituted as attorney in *Zeigler*, replacing Guy. In October 1986, Karr took Dr. Grendell's deposition in San Francisco. A statement of charges for the deposition was sent to Guy in October 1986 [1]; Karr sent Lerner a check to cover the charges in November 1986. Pl. Opp., Ex. D.

> 1   Plaintiff alleges that although Guy informed Dr. Grendell that Karr had been substituted as attorney in *Zeigler*, plaintiff was not similarly informed.

Two and a half years later, in May 1989, Karr telephoned Lerner's [*3] office in San Francisco requesting that Dr. Grendell appear in Chicago to testify in *Zeigler*. Lerner was at his office in Hawaii at the time of this call. After being contacted in Hawaii by his San Francisco office, Lerner called Karr and requested that Karr sign the retainer agreement and deposit fees of $ 8,750 as required by the agreement to secure Grendell's appearance. At that point, Karr decided not to use Lerner's services.

In August 1989, Karr agreed to be interviewed by the ABC television program "The Health Show" for a segment on the subject of expert witness brokering. The program was broadcast nationally on August 13, 1989. However, Karr states that he was unaware that the program was produced by ABC and that he had no information that the interview would be broadcast in California.

In the segment at issue, the "voice-over" stated that Karr had been about to go to trial and had an agreement with a witness brokerage for the testimony of Dr. Grendell when the broker, plaintiff Lerner, called. ABC then aired a portion of the interview with Karr in which he made the following statement:

> And I am told that they want a check immediately for $ 8,750 or Dr. Grendell would [*4] not appear in court. Well, Dr. Grendell is my case. I know enough about contract law to know that I can't read, in the four corners of this two page document, anything that would indicate what I consider to be an exorbitant payment like that.

> Compl., Ex. A at 2.

Lerner brings this defamation action against Karr and ABC, alleging that they knew or should have known that statements about the relationship between Lerner and Karr were false; that they knew or should have known that damage to plaintiff's reputation, business and feelings would result from the false statements; and that such damage has in fact occurred. Plaintiff Lerner further contends that Karr maliciously misrepresented his relationship with Lerner to ABC in order to retaliate against plaintiff. Finally, Lerner contends that ABC negligently failed to determine the falsehood of Karr's claims.

Defendant Karr brings this motion to dismiss for lack of personal jurisdiction. He argues that he has not had the continuous and systematic contacts with California sufficient for this court to assert general jurisdiction. He further argues that the court may not assert specific jurisdiction over him, since he has not purposely [*5]

availed himself of the privilege of conducting activities in California nor directed any action towards California.

In the alternative, Karr moves to dismiss for failure to state a claim upon which relief can be granted. He argues that the alleged false statements are either 1) not slander per se and therefore require that the plaintiff plead innuendo or inducement, which he has failed to do; or 2) rhetorical hyperbole or statements of opinion not actionable as defamation.

LEGAL STANDARD

[HN1] A motion to dismiss will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*; *Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco, 792 F.2d 1432, 1435 (9th Cir. 1986)*, cert. denied, *479 U.S. 1064 (1987)*. All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986)*. Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents [*6] are deemed part of the complaint and may be considered in evaluating the merits of a *Rule 12(b)(6)* motion. *Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.)*, cert. denied sub. nom. *Wyoming Community Dev. Auth. v. Durning, 484 U.S. 944 (1987)*. Where the court has such attachments before it in a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of jurisdictional facts in order to avoid dismissal. *Lake v. Lake, 817 F.2d 1416, 1420 (9th Cir. 1987)*.

DISCUSSION

I. PERSONAL JURISDICTION

[HN2] When a federal court sits in diversity, the plaintiff must show first that the state statute of the forum confers personal jurisdiction over the non-resident defendant, and second that the exercise of jurisdiction accords with federal constitutional principles of due process. However, because California's "long-arm" statute permits the exercise of jurisdiction "on any basis not inconsistent with the Constitution . . . of the United States," *Cal. Civ. Pr. Code § 410.10*, the state and federal limits are coextensive. *Haisten v. Grass Valley Medical Reimbursement, 784 F.2d 1392, 1396 (9th Cir. 1986)*. Thus, this court need [*7] only decide whether the exercise of jurisdiction complies with due process.

The *due process clause of the fourteenth amendment* requires that the defendant have minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)*; *Sinatra v. National Enquirer, Inc., 854 F.2d 1191, 1194 (9th Cir. 1988)*.

A. General Jurisdiction

[HN3] The exercise of general jurisdiction over a non-resident defendant requires that the defendant have "substantial" or "continuous and systematic" contacts with California. *Sinatra, 854 F.2d at 1194-95* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 & n.9 (1984)*).

The court finds unpersuasive plaintiff's argument for the assertion of general jurisdiction over Karr. Lerner does not dispute that Karr made only one telephone call to California, in connection with the Zeigler litigation; traveled only once to San Francisco in order to take the deposition of Dr. Grendell in preparation for that litigation; and mailed a single check to Lerner in payment for services connected [*8] with that deposition. Lerner makes no allegations of other business activity in or contacts with California on the part of Karr. These facts clearly fall short of the "continuous and systematic" contacts required by International Shoe.

B. Specific Jurisdiction

[HN4] Where the defendant's activities are not sufficiently pervasive to subject him to the court's general jurisdiction, specific jurisdiction nevertheless may be asserted for a cause of action that arises out of the defendant's forum-related activities. *Haisten, 784 F.2d at 1397*. The Ninth Circuit has adopted a three-part test for determining whether such limited jurisdiction may be exercised:

1) The nonresident defendant must either (a) purposefully perform some act or consummate some transaction with the forum or resident thereof or (b) perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of

its laws.

2) The claim must arise out of or result from the defendant's forum-related activities.

3) Exercise of jurisdiction must be reasonable. See, e.g., Brainerd v. Governors of the/e *University of Alberta, 873 F.2d* [*9] *1257, 1259 (9th Cir. 1989).* The plaintiff bears the burden of proving the existence of jurisdiction. *Haisten, 784 F.2d at 1397* (citations omitted).

The court will consider each of these requirements in turn.

1. Purposeful Availment. The Supreme Court has held that [HN5] the "purposeful availment" prong does not require that the defendant actually conduct activity in the forum. *Calder v. Jones, 465 U.S. 783, 790-791 (1984).* Jurisdiction also may be exercised over a defendant "whose only 'contact' with the forum is the 'purposeful direction' of a foreign act having effect in the forum state." *Haisten, 784 F.2d at 1397* (citing *Calder, 465 U.S. at 789*) (emphasis in original).

Lerner alleges that Karr has purposely availed himself of the privilege of conducting activities in California by assumption of a contract between Lerner and Guy; by traveling to California to take Dr. Grendell's deposition; and by subsequently telephoning Lerner's office in California to request Dr. Grendell's services at trial.

More importantly, the alleged slander, including broadcast of Karr's comments, concerned the conduct and allegedly affected the reputation and business fortunes of [*10] a California resident. In this respect, the facts are closely analogous to Calder v. Jones, in which the Court found jurisdiction proper over a reporter and an editor for the National Enquirer who were both residents of Florida. The Court refused to judge the employees' contacts with California by their employer's activities there. Instead, it held that the employees themselves had committed intentional and allegedly tortious actions "expressly aimed at California" by writing and editing an article that they knew would have a potentially devastating impact upon the plaintiff, and knowing that the injury would be felt by the plaintiff in the state in which she lived and worked and in which the Enquirer had its largest circulation. This was so despite the fact that the defendants had no control over, nor any direct economic stake in, their employer's sales in the forum state. *Calder,*

*465 U.S. at 791.*

In the case before this court, the claimed tortious conduct was the broadcast of portions of an interview with Karr, in which he made statements about his dealings with the plaintiff. Karr purportedly knew or should have known that his statements would damage the reputation [*11] of Lerner, a California resident, and knew that the injury would be felt in California, where Lerner lived and worked.

Karr states in his declaration that he did not know that the "Health Show" interviewer was with ABC, nor that the interview would be broadcast nationwide. Karr Decl. paras. 6, 7. Plaintiff does not offer any evidence to the contrary, although he opines that it is implausible that an attorney would grant an interview to a television reporter without learning that the program was produced by a national network.

Karr's statements are not dispositive of the issue of whether his conduct was aimed at California. The Calder court found the decisive factor to be the defendants' knowledge that their article would have a devastating impact upon a California resident and that the injury would be felt in the state of her residence and business. *465 U.S. at 789-90*. Here, defendant had in his hands at the time of the interview a copy of the 1986 retainer agreement between Lerner and Guy, indicating that Lerner's office was in Larkspur, California. In addition, after Karr took Dr. Grendell's deposition, he mailed a check for Lerner's services to the Larkspur address, and in [*12] May 1989, Karr called the Larkspur office to request Dr. Grendell's services for trial. The court finds that Karr knew or should have known that Lerner was a California resident, and finds that his remarks about Lerner in the interview with ABC were knowingly "aimed at" a California resident and concerned his California activities.

However, knowledge of the impact and injury in Calder depended in turn upon defendants' knowledge that their employer, the National Enquirer, had its largest circulation in California. Id. The court finds it a close question whether the defendant should have known that his remarks would be nationally broadcast and therefore that they would have impact and inflict injury in California. Karr's remarks would be "aimed at California" not merely because he should have known that the show would be nationally broadcast and therefore also broadcast in California, but because he should have

known that the show would be nationally broadcast, and that broadcast in California would likely injure a California resident doing business in California. See Calder, 465 U.S. at 489. However, even if defendant neither knew nor should have known that the interview [*13] would be nationally broadcast, his knowledge that it would be locally broadcast in the Chicago area is arguably sufficient for conduct intended to injure Lerner in California. Since Lerner had Chicago clients, including former counsel in Karr's case, even a broadcast in the Chicago area could damage Lerner's reputation and business by discouraging Chicago counsel from doing business with him. This injury, as well as the alleged emotional injuries to Lerner, would be felt where the plaintiff resides and does business, i.e., in California.

Thus, although the court finds it a close question whether Karr's conducted was targeted at California, viewing all of these facts in the light most favorable to the nonmoving party and given the broad language of Calder, the court concludes that Karr knew or should have known that his conduct would have effects on a California resident in California.

Karr further argues that even if the court finds he should have known of likely injury to a California resident in California, the Ninth Circuit has held that jurisdiction may only be asserted where the defendant seeks or receives some economic benefit from his forum-directed activity. Although the [*14] defendant cites Sinatra for this proposition, in fact the court in Sinatra held only that "we must consider the economic reality of the defendant's activities that form the basis for the assertion of jurisdiction" and that business solicitation directed at the forum is a factor indicating purposeful direction. Sinatra, 854 F.2d at 1196-97 (finding defendant's commercial activity and targeted marketing in the forum state sufficient for jurisdiction).

Despite the absence of a showing that Karr had any economic interest in his California-directed activity, the facts of this case are sufficiently similar to Calder to find that jurisdiction over Karr is appropriate. [HN6] A defendant who purposely directs his actions at a resident of the forum has fair warning that he may be haled into court there. Keeton v. Hustler Magazine, 465 U.S. 770, 774. In California Software Inc. v. Reliability Research, the court asserted limited jurisdiction over nonresident defendants who made tortious statements to other nonresidents about a California software company. 631

F. Supp. 1356, 1361-62. The court reasoned that the defendants acted intentionally to affect the nonresidents' [*15] opinion of the plaintiff's product, and that the

'manipulation' of third persons who thereby refrain from consummating a contemplated transaction in California constitutes a forum-related activity by the defendants . . . The fact that defendants directed their conduct through third parties does not insulate them from jurisdiction when it is the defendants' own activity that creates the injury in the forum state.

Id. at 1396.

The court concludes that defendant Karr's conduct was knowingly targeted at a California resident and was intended to have effects in California, regardless of whether he specifically knew or had reason to know that the interview would be broadcast in California. Defendant therefore satisfies the first prong of the Ninth Circuit test for the assertion of personal jurisdiction.

2. Claim Arising Out of Forum-Related Activity. [HN7] The second prong of the Ninth Circuit's jurisdictional analysis requires that the claim "arise out of" the defendant's forum-related activities. The circuit has recently adopted a "but for" test for the satisfaction of this requirement. Gray & Company v. Firstenberg Machinery Company, Inc., 913 F.2d 758, 759 (9th Cir. 1990) [*16] (citing Shute v. Carnival Cruise Lines, 897 F.2d 377, 385-86 (9th Cir.), cert. granted, U.S. , 111 S. Ct. 39 (1990)). Since the alleged defamation consisted of Karr's comments about Lerner in the interview with ABC, this element is satisfied.

3. Reasonableness. The Ninth Circuit has enumerated [HN8] the following factors to be considered in determining whether the exercise of jurisdiction over Karr would be reasonable: 1) extent of purposeful interjection; 2) burden on the defendant; 3) conflict with sovereignty of defendant's state; 4) forum state's interest in adjudicating the dispute; 5) efficient judicial resolution; 6) convenience and effectiveness of relief for plaintiff; 7) existence of an alternative forum. Shute v. Carnival Cruise Lines, 897 F.2d at 386-87.

(1) Extent of Purposeful Interjection. This factor is closely tied to the issue of targeted conduct analyzed above. Recent cases indicate that this factor is not given separate consideration once it is shown that the defendant purposefully directed its activities toward the forum state.

*Id. at 386* (citing *Corporate Inv. Business Brokers v. Melcher, 824 F.2d 786, 790 (9th Cir. 1987))*.

(2) Burden [*17] on the Defendant. Although the defendant would clearly prefer to defend this suit in Illinois rather than in California, under this factor the court is required to "examine the burden on the defendant in light of the corresponding burden on the plaintiff." *Id. at 386*. The court finds that any inconvenience suffered by Karr would not be so great as to constitute a deprivation of due process. See, e.g., *Sinatra, 854 F.2d at 1199* (burden of defending suit in California on Swiss defendant corporation having only one representative in U.S. does not constitute due process violation). This factor does not weigh in favor of dismissal.

(3) Conflict with Sovereignty of Defendant's State. Karr does not contend that California jurisdiction would conflict with the sovereignty of Illinois.

(4) Forum State's Interest in the Dispute. California has a strong interest in protecting its citizens against the tortious acts of others. *Shute, 897 F.2d at 387*. Because the court has found that defendant Karr directed his conduct at a California resident with foreseeable effect in California, this factor weighs against dismissal.

(5) Efficient Judicial Resolution. As between Illinois [*18] and California, the two states capable of exercising jurisdiction, this factor does not appear to favor strongly either state.

(6) Convenience and Effectiveness of Relief for Plaintiff. Plaintiff has provided no evidence of the costs in terms of convenience and effectiveness of pursuing this suit in Illinois. As Illinois courts are presumably competent to award relief comparable to that which plaintiff seeks in California, this factor does not appear to favor strongly either state.

(7) The Existence of an Alternative Forum. An alternative forum exists in either Illinois state court or United States District Court. This factor favors defendant's position.

Reviewing all of the above factors, the court finds that defendant Karr has not met his burden of presenting a compelling case that the exercise of jurisdiction would be unreasonable. The court therefore concludes that defendant Karr's intentional conduct, aimed at a California resident with foreseeable and intended effects

in California, satisfies the due process requirements for the assertion of personal jurisdiction. The court will now turn to defendant's motion to dismiss for failure to state a claim.

## II. FAILURE TO STATE A CLAIM

[*19] [HN9] *Rule 12(b)(6) of the Federal Rules of Civil Procedure* permits a motion to dismiss for failure to state a claim upon which relief can be granted. Defendant Karr argues that with respect to plaintiff's first claim for relief, Karr's alleged slander is not defamatory on its face. Hence, the plaintiff is required to allege innuendo or inducement as an element, which Lerner has failed to do and, defendant argues, could not conceivably do.

Secondly, Karr argues that with respect to plaintiff's second claim for relief based on Karr's suggestion that the contract was ambiguous and Karr's characterization of the requested deposit as "exorbitant," the statements are not actionable because they are either rhetorical hyperbole or expressions of opinion protected by the *first amendment*.

The court agrees with defendant that, even taking the facts in the light most favorable to the plaintiff, the complaint does not state a claim for slander under California law.

[HN10] *Section 46 of the California Civil Code* defines slander as follows:

Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:

1. Charges any person [*20] with crime, or having been indicted, convicted, or punished for crime;

2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;

3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

4. Imputes to him impotence or a want of chastity; or

5. Which, by natural consequence, causes actual

damage.

The first four classes of statement are slanderous per se and presumed injurious; to recover for any other utterances, actual damages must be pleaded and proved. 5 Witkin on Torts § 489 at 577 (1988).

Karr contends and Lerner concedes that the only subsections arguably applicable to this case are subsections 3 and 5.

A. Existence of Contract Between Lerner and Karr

In his Second Cause of Action, Lerner alleges only that Karr falsely represented to ABC that he had a contract with Lerner for the production of an expert witness for a malpractice trial and that defendants [*21] falsely represented the relationship between Karr and Lerner in the televised broadcast.

Even assuming arguendo that Karr made this representation, and that it was false, such a statement is not defamatory on its face nor slander per se. California courts have held that [HN11] defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof, and unless the plaintiff establishes the defamatory character of the statement by explanation of the surrounding circumstances (innuendo). 5 Witkin on Torts 481, at 565; *Barnes-Hind, Inc. v. Superior Court, 181 Cal. App. 3d 377, 381 (1986)*.

Plaintiff Lerner offers no such proof of special damages, nor does his complaint provide any account of surrounding circumstances that would explain how a false statement that Karr and Lerner had a contract could directly injure Lerner in his profession or business. In his opposition brief, Lerner argues that by falsely suggesting that there was a contract, Karr and ABC created the false impression that Lerner had a contract duty to supply Karr with an expert witness and to "perform at Karr's demands" and that [*22] Lerner breached that contract. Pl. Opp. to MTD for Failure to State a Claim at 3-5.

Even assuming arguendo (and contrary to the court's finding below) that Karr falsely stated or implied that Lerner breached a contract, the court finds that such a statement is not defamatory on its face nor slander per se. To hold that it is slander per se would be to hold that any plaintiff who loses a breach of contract suit on the merits is ipso facto liable for slander, an absurd and untenable result.

Upon review of the transcript of the ABC broadcast, the court agrees with Karr that he did not state that he had a contract with Lerner under which Lerner was to provide an expert witness and did not state that Lerner breached the contract. Although Karr implies that he and Lerner had an agreement, there is no implication that Lerner was under a duty to "perform at Karr's demands," and that he breached that duty. Compl., Ex. A at 2. In the interview, Karr does state that he was told by Lerner that Dr. Grendell would not appear in court unless Karr immediately mailed to Lerner a check for $ 8,750, but plaintiff does not dispute the truth of that statement.

B. Ambiguous Contracts, Exorbitant [*23] Fees

Lerner also alleges that Karr falsely represented in the interview that the alleged contract was so ambiguous that Karr "could not determine from the contract the amount to be charged for witness fees." Compl. para. 16. He argues that this is defamatory because it suggests that "people who contract with [Lerner] cannot anticipate what fees will be charged and that when the fees are ultimately revealed by Lerner, that they are exorbitant." Pl. Opp. to MTD for Failure to State a Claim at 5.

In fact, Karr's statement neither states nor implies that people who contract with Lerner cannot anticipate what fees will be charged. After describing Lerner's telephone call to Karr requesting immediate payment of $ 8,750 to guarantee Dr. Grendell's appearance, Karr says only that he could not find in the two page agreement any provision for "what I consider to be an exorbitant payment like that." Compl., Ex. A at 2. The clear implication is that the agreement does not specify such payment in advance of the expert witness's appearance, nor the amount of such payment. Plaintiff does not dispute the truth of this implication; indeed, the agreement itself substantiates the truth of this implication. [*24] Pl. Opp. to MTD for Lack of Personal Jurisdiction, Ex. A. Karr makes no general characterization of Lerner's professional competence or business practices or moral character, and what verifiable content his statement did contain, viz., that Lerner's requirement of a $ 8,750 pre-payment was not specified in the contract, is not disputed by Lerner.

With respect to Karr's characterization of the required advance payment as "exorbitant," the court agrees with Karr's argument that the characterization is

1991 U.S. Dist. LEXIS 3102, *24

an opinion or rhetorical hyperbole, not a statement of fact, and therefore that it is not actionable.

The Supreme Court recently reaffirmed that [HN12] statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual are not actionable. *Milkovitch v. Lorain,    U.S.   , 110 S. Ct. 2695, 2706 (1990)* (quoting *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988))*. In Milkovitch, the Court found that an accusation that the plaintiff had lied was a statement of fact not protected from an action for libel. Milkovitch is the only case relied upon by plaintiff for the proposition that the statements here are defamatory. However Milkovitch clearly [*25] is distinguishable. The Supreme Court emphasized that the statements in issue suggested that the plaintiff had committed perjury and were not merely "loose, figurative or hyperbole." *Id. at 2707*. The statements here are neither as serious nor as clear and precise as the offending ones in Milkovitch.

Furthermore, characterizing Lerner's pre-payment requirements as "exorbitant" is not "an articulation of an objectively verifiable event." Milkovich,    U.S. at   , 110 S. Ct. at 2707 (quoting *Scott v. News-Herald, 25 Ohio St. 3d 243, 252 (1986))*. The court concludes that no reasonable jury could find that Karr's use of the word "exorbitant" expresses a verifiable statement susceptible of truth or falsehood for the purposes of a defamation action.

CONCLUSION

Having found that Karr's statements were targeted at a California resident and that there has been no compelling showing that the assertion of jurisdiction over him would be unreasonable, the court DENIES defendant Karr's motion to dismiss for lack of personal jurisdiction. However, having found that defendant's statements either 1) fail to express or imply the defamatory content attributed to them by defendant, [*26] or 2) amount to a subjective characterization not susceptible of truth or falsehood, the court GRANTS defendant's motion to dismiss for failure to state a claim.

IT IS SO ORDERED.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

H

Chabra v. Southern Monterey County Memorial
Hosp., Inc.
N.D.Cal.,1994.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Jagdish CHABRA, Plaintiff,
v.
SOUTHERN MONTEREY COUNTY MEMORI-
AL HOSPITAL, INC., et al. Defendants.
**Civ. No. C 94-20335 EAI.**

Oct. 3, 1994.

Stephen R. Pappas, Palo Alto, CA, for plaintiff.
John S. Simonson, David J. Miclean, Kimberly A.
Donovan, Ropers, Majeski, Kohn, Bentley, Wagner
& Kane, Redwood City, CA, for defendants.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DIS-
MISS, ETC.
INFANTE, United States Magistrate Judge.

### I. *Introduction and Background*

**\*1** Plaintiff Jagdish Chabra, M.D. ("Dr. Chabra") is
a radiologist formerly affiliated with defendant
Southern Monterey County Memorial Hospital, Inc.
dba Mee Memorial Hospital ("Mee Hospital") in
King City, California. He and his wife, Karin
Chabra, have sued Mee Hospital and various of its
trustees, administrators, and staff regarding the ter-
mination of his affiliation with Mee Hospital. De-
fendants have presently moved to dismiss the Com-
plaint in its entirety for failure to state a claim upon
which relief may be granted. Fed.R.Civ.P. 12(b)(6).
Alternatively, defendants seek a more definite
statement of each cause of action. *Id.,*Rule 12(e).
Finally, defendants move to strike plaintiffs' prayer
for punitive damages and the references in the
Complaint to "marital communities". *Id.,*Rule 12(f).

Plaintiffs have requested leave to amend the Com-
plaint and have submitted a proposed first amended
complaint together with their papers in opposition

to defendants' motion. The proposed first amended
complaint drops Karin Chabra as a plaintiff, along
with the first, third and thirteenth causes of action
of the Complaint, adds three new causes of action,
and supplements the allegations in support of the
remaining causes of action. Defendants do not op-
pose the request for leave to amend, and in any
event this Court's leave is not required.FN1 Ac-
cordingly, the Court evaluates defendants' motion
to dismiss as if directed to the First Amended Com-
plaint.

### II. *Allegations of First Amended Complaint*

The First Amended Complaint alleges that in July
1987, Dr. Chabra entered into a contract with Mee
Hospital in which he was given the exclusive right
to perform radiological services at the hospital, ex-
cept in emergencies.FN2 Pursuant to the agreement,
Dr. Chabra billed patients separately for his ser-
vices.FN3 The agreement did not specify the num-
ber of days or hours Dr. Chabra was to perform ra-
diological services at Mee Hospital; it was instead
"anticipated" that these would be "dictated by the
demand" therefor.FN4 The agreement provided "a
specific, limited set of conditions" under which
Mee Hospital could terminate the agreement. Dr.
Chabra could be removed: if he lost his medical
staff privileges because of ethical misconduct, pur-
suant to procedures and remedies under the hospit-
al's bylaws; if he lost his licences to practice medi-
cine; if he was found to be an habitual abuser of
drugs or intoxicants; or if he was found to have a
mental or physical impairment which might ad-
versely affect his work performance.FN5

Dr. Chabra became chief of the department of dia-
gnostic radiology at Mee Hospital and presided
over a significant expansion of the department's
available services and a concommitant growth in
revenues generated. He received "numerous
awards" from Mee Hospital and the King City com-
munity for these contributions.FN6

Periodically, and without objection from Mee Hos-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

pital, Dr. Chabra contracted with other hospitals to perform radiology services.FN7 In September 1992, Steven Harrison, M.D., the chief of staff of Mee Hospital and a member of its board of trustees and medical executive committee, requested that Dr. Chabra designate office hours, which the two agreed would be Mondays, Wednesdays and Fridays between 9 a.m. and 3 p.m.FN8 On November 16, 1992, in reliance on his agreement with Dr. Harrison, Dr. Chabra contracted with the Kaiser Hospital in Vallejo, California to provide radiological services on Tuesdays and Thursdays.FN9 However, a few days later on November 20, Dr. Harrison requested, as a "convenience" to other medical staff, that Dr. Chabra change his schedule to four days per week, on Mondays, Tuesdays, Thursdays and Fridays. Dr. Chabra declined "because of his commitment to Kaiser".FN10 He offered to be available on Tuesdays and Thursdays to read radiological tests by means of "teleradiology" equipment, which permits transmission of radiological test data over telephone lines.FN11 Dr. Harrison's medical executive committee was "dissatisfied" with Dr. Chabra's refusal to redesign his schedule and thereupon "conspired and agreed and [ ] commence[d] a campaign designed to harrass and intimidate and otherwise drive Dr. Chabra away from [Mee] Hospital, which ultimately succeeded in its objective".FN12

**\*2** Dr. Chabra alleges on information and belief that, in December 1992 and January 1993, Linda Stireman, Mee Hospital's chief executive officer, directed hospital staff to schedule non-emergency patients for radiology examinations during times when Dr. Chabra was not scheduled to be available while simultaneously leaving free time during Dr. Chabra's regularly scheduled hours "for the sole purpose of making it appear that Dr. Chabra's schedule was inadequate to service patient needs".FN13 Dr. Chabra also alleges on information and belief that on January 2, 1993 Dr. Harrison began "secret" negotiations with another radiologist, a Dr. Curran, to replace him.FN14

On January 29, 1993, Dr. Harrison called an "emergency" meeting of the medical executive committee to review several of Dr. Chabra's ultrasound diagnoses which conflicted with clinical or pathological findings. The meeting was called without notice to Dr. Chabra and as a pretext for replacing Dr. Chabra with Dr. Curran. At the meeting, Dr. Harrison and another committee member, Robert Hosteter, M.D., made "false statements" to the effect that Dr. Chabra's ultrasound readings "fell below the standard of care", and the committee voted unanimously that Dr. Chabra be "proctored" or monitored by Dr. Curran, at Dr. Chabra's personal expense, "with an eye toward replacing [Dr. Chabra] at [Mee] Hospital".FN15

On February 10, 1993, another "emergency" meeting of the medical executive committee was held in which Dr. Chabra's ultrasound readings were re-reviewed with the benefit of "blind" control readings from a certain Dr. Saenz of the Community Hospital of Monterey Peninsula. Although the two radiologists' readings were 85 percent consistent, the medical executive committee members conspired to omit reference of this fact from the minutes of the meetings.FN16 The committee passed a motion, "with malice and in bad faith for the sole purpose of harrassing Dr. Chabra into leaving [Mee] Hospital", requiring that Dr. Chabra undergo "peer review" for a period of three months-"a severe remedy giving rise to a right to appeal under the bylaws".FN17 On February 23, Dr. Chabra made a written request for an appeal, which request CEO Stireman denied in contravention of the Mee Hospital bylaws.FN18

Dr. Chabra alleges on information and belief that beginning on March 15, 1993, Dr. Harrison and Dante Pepito, M.D., another medical executive committee member, ordered the "transmission" of non-emergency radiological studies to Dr. Curran, in violation of Dr. Chabra's agreement with Mee Hospital. Thomas McGuire, the chief technician of the radiology department, transmitted the films, which Dr. Curran read under an arrangement with Mee Hospital in which the hospital received an "unlawful kickback" for the cost of transcription services, resulting in "double-billing" of patients and loss of income to Dr. Chabra.FN19

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

In April 1993, Dr. Chabra alleges on information and belief, Stireman and Marty Feliciano, the Mee Hospital medical staff secretary, surreptitiously entered Dr. Chabra's office and pilfered confidential correspondence from Dr. Chabra's attorney, which was later shown to the medical executive committee.[FN20] On April 20, Dr. Harrison threatened that Dr. Chabra's hospital staff privileges would be suspended unless he implemented a "peer review plan" by June 1, 1993 despite the fact that Dr. Chabra already had such a program in place and despite the fact that state and federal law prohibited the suspension of a physician's hospital staff privileges in the absence of imminent danger to a patient.[FN21] On June 1, Dr. Harrison made good on his threat by suspending Dr. Chabra's staff privileges. On June 14, Chabra's staff privileges were reinstated on advice of Mee Hospital's attorney that there was no legal basis for the suspension.[FN22]

**\*3** On July 14, 1993, the Mee Hospital board of trustees sent Dr. Chabra a letter informing him that the hospital was terminating its agreement with him, notwithstanding that none of the conditions precedent for termination were satisfied.[FN23] Following this letter, radiology services for Mee Hospital were performed through "open staffing" by the first available radiologist. Because Dr. Chabra still held staff privileges, he continued to perform services when available, but his work, at Stireman's direction, was billed as work performed by Dr. Curran.[FN24] The hospital began boycotting Dr. Chabra's services, referring radiological examinations only to Dr. Curran and, eventually, in February 1994, McGuire, the chief radiology technician, refused to work for Dr. Chabra. On February 23, 1994, Stireman directed Dr. Chabra to schedule all of his work through his competitor, Dr. Curran. Finally, in March 1994, Dr. Harrison advised Dr. Chabra that his staff privileges would be terminated altogether at the end of the month.[FN25]

The First Amended Complaint asserts sixteen causes of action, in order: (1) and (2) violation of the Sherman Antitrust Act; (3) violation of common law due process rights; (4) interference with the right to practice one's profession; (5) and (6) breach of contract; (7) and (8) intentional interference with contractual relations; (9) unfair competition; (10) unfair business practices; (11) contract in restraint of trade; (12) combination in restraint of trade; (13) defamation; (14) promissory estoppel; (15) fraud; and (16) civil conspiracy. Dr. Chabra seeks punitive damages on the third, fourth, seventh, eighth, thirteenth, fifteenth and sixteenth causes of action.

III. *Discussion*

A. *Motion to Dismiss*

1. *Standard*

In reviewing a motion to dismiss a complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted, the Court considers the allegations of material fact in such pleading to be true, construes them in the light most favorable to the nonmoving party, and inquires whether it appears beyond doubt therefrom that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Buckey v. County of Los Angeles,* 968 F.2d 791, 794 (9th Cir.)cert. denied, *City of Manhattan v. Buckey,* 506 U.S. 999, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992).

2. *Former Plaintiff Karin Chabra*

Defendants sought to dismiss the initial Complaint insofar as brought by Dr. Chabra's wife, Karin Chabra, because the Complaint did not allege that she was in any way involved in the transactions and occurrences complained about. Since she has withdrawn her claims against the defendants in the superceding First Amended Complaint, the motion to dismiss Mrs. Chabra's claims is denied as moot.[FN26]

3. *Sherman Antitrust Act Causes of Action*

The first and second causes of action of the First Amended Complaint assert claims under the federal Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 against each of the defendants.[FN27]

**\*4** The elements of a claim under Section 1 of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05081    Document 53-2    Filed 11/21/2007    Page 66 of 72 Page 4

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

Sherman Act are: (1) a contract, combination or conspiracy; (2) which unreasonably restrains trade; and (3) which effects interstate commerce. *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1410 (9th Cir.), *cert. denied,* 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). The elements of a claim under Section 2 of the Sherman Act are: (1) possession of monopoly power in the relevant geographic and product markets; (2) willful acquisition and maintenance of such power; and (3) injury resulting from the exercise of monopoly power. *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1425 (9th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994); *Foremost Pro Color v. Eastman Kodak Co.,* 703 F.2d 534, 543 (9th Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).

In this case, the First Amended Complaint alleges that defendants are engaged in interstate commerce in that: (1) a significant number of radiology patients at Mee Hospital are covered by federal Medicare and state Medicaid programs, (2) defendants receive millions of dollars annually from insurance companies located outside of California to pay for radiological services, and (3) reports concerning peer review proceedings are "routinely" distributed across state lines and affect physicians' employment opportunities nationwide.[FN28] The First Amended Complaint alleges that defendants "possess monopoly power in the Salinas River Valley, south of Salinas and north of San Luis Obispo, over [the] provision of medical, hospital and radiological facilities and services", which they willfully acquired and maintained, and that they have conspired to exercise this power to boycott Dr. Chabra's radiological services in favor of "establishing a monopoly in [sic] Dr. Curran for the provision of radiological services to [Mee] Hospital".[FN29]

Defendants had argued that the initial Complaint failed to allege the necessary elements of either a Section 1 or Section 2 claim under the Sherman Act. The amended allegations appear to touch upon each of the necessary elements. Defendants assert, however, with regard to the Section 2 claim, that "[Dr.] Chabra still fails to allege a relevant market

consisting of both a geographic and product market in the proposed first amended complaint".[FN30] The Court disagrees. Dr. Chabra has identified the product market as radiological services and the geographic market as the Salinas Valley between Salinas and San Luis Obispo. These markets are identified with sufficient specificity to give defendants notice of Dr. Chabra's claim, and defendants do not say why the markets, thus defined, should not be considered "relevant" within the meaning of the antitrust laws. The motion to dismiss the Sherman Act claims is denied.

### 4. Interference with Right to Practice

The fourth cause of action of the First Amended Complaint asserts that defendants unlawfully interfered without substantial justification with his right to practice his profession as a radiologist at Mee Hospital.[FN31]

**\*5** Defendants' argue that Dr. Chabra cannot assert a legally enforceable claim for violation of his purported right to practice his profession because the decision on which he relies, *Willis v. Santa Ana Community Hospital Ass'n,* 58 Cal.2d 806, 26 Cal.Rptr. 640, 376 P.2d 568 (1962), was overruled in *Cianci v. Superior Court,* 40 Cal.3d 905, 221 Cal.Rptr. 574, 710 P.2d 375 (1985). Defendants misread the caselaw.

In *Willis, supra,* plaintiff, a licensed osteopathic physician and surgeon, sued to recover damages from defendant Santa Ana Community Hospital Association ("Santa Ana Hospital") under state statutory antitrust law (the Cartwright Act, Cal.Bus. & Prof.Code § 16700 et seq.) as well as common law theories, asserting that Santa Ana Hospital had conspired to "dominate", in restraint of trade, the practice of medicine by licensed osteopathic physicians and surgeons within Orange County. 26 Cal.Rptr. at 641. The trial court dismissed the complaint for failure to state a claim and the California Supreme Court reversed, holding that although the Cartwright Act "was not intended to apply to the professions", a cause of action is stated under the common law "where, as here, it is alleged that a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

physician of the highest qualifications is denied access to necessary hospital facilities as the result of a conspiracy designed to restrain competition and deprive him of his practice in order to benefit competing members of the conspiracy." *Id., at 642.*
"There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. Whether there is justification is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities interfered with on the one hand and permitting the interference on the other."

*Id.* (citations omitted). The *Cianci* decision overruled *Willis* in determining that the Cartwright Act applies to the medical profession. 221 Cal.Rptr. at 575, 582-585, 585 ("[t]he reasoning in *Willis,* we conclude, is unsound and its holding must be rejected"), and 587. The *Cianci* court is entirely silent, however, on the question of interest in our case whether the statutory Cartwright Act claim preempts the pre-existing common law theory, and indeed *Willis* hints that the Cartwright Act would *not* do so. *Willis, supra,* 26 Cal.Rptr. at 642 ("[n]othing in the act discloses an intent to supersede the common law with respect to matters *not* covered in the legislation, and an indication to the contrary is found in the provision that the act is '*cumulative* ' of 'any other provision of law relating to the same subject in effect May 22, 1907' ") [quoting Cartwright Act; emphasis added].

**\*6** Accordingly, defendants' motion to dismiss Dr. Chabra's claim of interference with the practice of his profession is denied.

### 5. *Breach of Contract Causes of Action*

The fifth and sixth causes of action of the First Amended Complaint assert claims for breach of separate contracts, the affiliation agreement between Dr. Chabra and Mee Hospital and a

"contractual relationship" between the same parties arising out of the hospital's bylaws.[FN32]

Defendants had sought to dismiss the (single) breach of contract cause of action asserted in the original Complaint for lack of an allegation that any party other than Mee Hospital was a party to the affiliation agreement. Dr. Chabra has since withdrawn the breach of contract allegations against the other defendants and, accordingly, the motion to dismiss insofar as it relates to these allegations is denied as moot.

### 6. *Intentional Interference w/Contract*

The seventh and eighth causes of action assert claims for intentional interference with contractual relations against each of the defendants except Mee Hospital.[FN33] The seventh claim alleges interference with the Dr. Chabra's affiliation agreement with Mee Hospital, while the eighth claim alleges interference with Dr. Chabra's alleged contractual relationship emanating from the hospital's bylaws.

Defendant Mee Hospital had sought to dismiss the single intentional interference with contractual relations in the original Complaint, arguing that it could not have interfered with its own contract with Dr. Chabra. See *Applied Equipment Corp. v. Litton Saudi, Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454,*rehearing denied,* (1994). However, the intentional interference with contractual relations claims have been withdrawn as to Mee Hospital, and as such this aspect of the motion to dismiss is also denied as moot.

### 7. *Unfair Competition Cause of Action*

The ninth cause of action of the First Amended Complaint asserts a claim for unfair competition under §§ 17200 et seq. of the California Business & Professions Code.[FN34] A plaintiff alleging unfair competition under Cal.Bus. & Prof.Code § 17200 must state with reasonable particularity the facts supporting the statutory elements of the violation. *Khoury v. Maly's of California, Inc.,* 14 Cal.App.4th 612, 17 Cal.Rptr.2d 708, 712 (1993).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Here, the First Amended Complaint alleges that defendants' actions were "undertaken for the purpose and had the result of depriving Dr. Chabra of his radiology practice at [Mee] Hospital and transferring that practice to Dr. Curran".FN35 Further, the transferred practice has purportedly harmed consumers because Dr. Curran "uses teleradiology excessively to transmit non-emergency radiological films to his office away from [Mee] Hospital, resulting in poorer film quality and poorer correlation between [ ] radiological stud [ies] and pathological results", because consumers are charged extra for the transmission, and because consumers are "double-billed" for transcriptions services.FN36

**\*7** Defendants argue that these allegations would be "better plead if plaintiff incorporated the allegations contained within his opposition brief".FN37 However, the pleader need only outline the claim with "reasonable particularity". *Khoury, supra,* 17 Cal.Rptr. at 712; *see also*Fed.R.Civ.P. 8(a)(2) (requiring merely "a short and plain statement of the claim showing that the pleader is entitled to relief"). Dr. Chabra has met this standard. Defendants' motion, insofar as it seeks to dismiss the unfair competition claim, is denied.

### 8. *Unfair Business Practices Cause of Action*

The tenth cause of action of the First Amended Complaint asserts that Dr. Curran's double billing of patients (a portion of which is "kickbacked" to Mee Hospital) for transcription services constitutes an unfair business practices under Cal.Bus. & Prof.Code § 17045, which provides:
"The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchaser special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."FN38

Defendants do not identify any deficiencies in the amended pleading and as such their motion to dismiss the unfair business practices claim is denied.

### 9. *Defamation Cause of Action*

The thirteenth cause of action of the First Amended Complaint alleges, on information and belief, that defendants defamed Dr. Chabra by publishing false, deprecatory statements to personnel at other hospitals where Dr. Chabra has sought new contractual arrangements, thereby injuring his professional reputation and his ability to practice his profession.FN39

The words constituting a libel or slander must be specifically identified, if not pled verbatim. *Kahn v. Bower,* 232 Cal.App.3d 15 99, 284 Cal.Rptr. 244, 252 n. 5,*rehearing denied,review denied,* (1991). Dr. Chabra has not satisfied this rule. Accordingly, defendants' motion to dismiss the defamation claim is granted without prejudice and with leave to amend within sixty (60) days.FN40

### 10. *Promissory Estoppel Cause of Action*

The fourteenth cause of action of the First Amended Complaint asserts a claim for promissory estoppel.FN41 Defendants argue that "[e]stoppel is an affirmative defense ... [and] not a legally cognizable cause of action".FN42 This contention is frivolous.FN43 Both state and federal courts have interpreted the doctrine of promissory estoppel, as defined under Section 90 of the *Restatement (2d) of Contracts,* as an independent cause of action. See, *Smith v. City and County of San Francisco,* 225 Cal.App.3d 38, 275 Cal.Rptr. 17, 23 (1990) ("[w]hile labelling this cause of action 'Breach of Contract', appellants in fact attempt to state a *cause of action* for promissory estoppel") [emphasis added]; *Kinzli v. City of Santa Cruz,* 539 F.Supp. 887, 901-902 (N.D.Cal.1982) (Patel, J.) ("[h]ere the same disputed questions of fact that preclude summary judgment as to the contract claim operate to preclude it as to the [promissory] estoppel *claim* ") [emphasis added];FN44 *see also, Jablon v. United States,* 657 F.2d 1064, 1070 (9th Cir.1981) ("[w]e [ ] conclude that the government has not waived its sovereign immunity with respect to a promissory estoppel *cause of action* ") [emphasis added];FN45 *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

F.2d 69, 73 (2d Cir.1989) ("summary judgment was not appropriate [ ] on appellants' promissory estoppel claim") [applying New York law]. Defendants' motion to dismiss, insofar as relates to the promissory estoppel claim, is denied.

### 11. *Fraud Cause of Action*

**\*8** The fifteenth cause of action of the First Amended Complaint avers that several of the defendants made misrepresentations of fact which upon which he relied.[FN46]

"Fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance, and (5) resulting damage." *Cicone v. URS Corp.,* 183 Cal.App.3d 194, 227 Cal.Rptr. 887, 890 (1986). Here, the fraud claim does not specifically identify the alleged misrepresentations nor the persons who made or received them, nor the justification for Dr. Chabra's supposed reliance. Instead, the two-paragraph cause of action merely realleges by reference all of the preceding allegations. Allegations of fraud must be stated with particularity. Fed.R.Civ.P. 9(b). Defendants' motion to dismiss, with respect the fraud cause of action, is therefore granted without prejudice to Dr. Chabra amending his allegations within sixty (60) days.

### 12. *Civil Conspiracy Cause of Action*

Finally, the sixteenth cause of action of the First Amended Complaint alleges the existence of a "civil conspiracy" among defendants "to achieve an unlawful end (the cessation of Dr. Chabra's staff privileges and exclusive contract [with Mee Hospital] without cause)".[FN47] Defendants correctly assert that there is no separate cause of action for civil conspiracy.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participating in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors. [¶] Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort.... 'Therefore, it is the acts done and not the conspiracy to do them which should be regarded as the essence of the civil action.' "

*Applied Equipment Corp., supra,* 28 Cal.Rptr.2d at 478 (citations omitted). Defendants' potential liability for conspiring among themselves to commit the tortious acts complained of is adequately and properly alleged within the auspices of the various tort claims. There is no legal basis for an independent conspiracy cause of action. Accordingly, defendants' motion to dismiss the civil conspiracy claim is granted with prejudice.

### B. *Motion for More Definite Statement*

"If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired." Fed.R.Civ.P. 12(e).

**\*9** Defendants had charged that the original Complaint was insufficiently definite in setting forth the various causes of action. The First Amended Complaint, however, cures these defects as to the remaining claims which have not been dismissed herein. Therefore, the motion for a more definite statement is denied.

### C. *Motion to Strike*

"[T]he court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f).

Defendants seek to strike Dr. Chabra's punitive damages claims, arguing that "[a] complaint which seek [sic] punitive damages must plead specific facts justifying an award of such damages and cannot recite mere conclusions". They argue that Dr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

Chabra has not adequately alleged the elements of malice, fraud or oppression which must ultimately be proved by clear and convincing evidence for Dr. Chabra to recover punitive damages.[FN48] Dr. Chabra counters that "defendants attempt to apply technical California pleading standards to these allegations, when in fact [federal] notice pleading standards ... apply".[FN49]

Dr. Chabra has the better view. Although Cal.Civ.Code § 3294 establishes the elements which entitle a litigant to punitive damages on California state law torts, "the determinations regarding the adequacy of pleadings are governed by the Federal Rules of Civil Procedure". *Pease & Curren Refining, Inc. v. Spectrolab, Inc.,* 744 F.Supp. 945, 948 (C.D.Cal.1990). Most pertinently, " '(m)alice ... and other conditions of mind of a person may be averred generally' ". *Id., at* 949, quoting Fed.R.Civ.P. 9(b). Therefore, defendants' motion to strike the prayer for punitive damages is denied.

## IV. *Order*

Accordingly, IT IS HEREBY ORDERED:

(1) Defendants' motion to dismiss the fraud and defamation claims asserted in the superseding First Amended Complaint is GRANTED WITHOUT PREJUDICE and plaintiff shall have sixty (60) days to amend;

(2) Defendants' motion to dismiss the claim for civil conspiracy asserted in the First Amended Complaint is GRANTED WITH PREJUDICE;

(3) Defendants' motion to dismiss all other claims asserted in the First Amended Complaint is DENIED;

(4) Defendants' motion for a more definite statement is DENIED;

(5) That Defendants' motion to strike the prayer for punitive damages is DENIED;[FN50] and

(6) Plaintiff shall file and serve his proposed First Amended Complaint forthwith.

SO ORDERED.

FN1. "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ..."Fed.R.Civ.P. 15(a). A motion to dismiss is not a "responsive pleading" within the meaning of Rule 15, and as such a complaint may be amended notwithstanding the filing of a motion to dismiss as a matter of course-i.e., without leave of court. *Mayes v. Leipziger,* 729 F.2d 605, 607, 608 (9th Cir.1984); *Worldwide Church of God, Inc. v. State of California,* 623 F.2d 613, 616 (9th Cir.1980); *Nolen v. Fitzharris,* 450 F.2d 958 (9th Cir.1971).

FN2. First Amended Complaint, ¶¶ 20-21. Chabra also entered into a separate agreement for a ten-year lease of space at Mee Hospital. *Id.,* ¶ 26.

FN3. *Id.,* ¶ 24.

FN4. *Id.*

FN5. *Id.,* ¶ 22.

FN6. *Id.,* ¶ 28.

FN7. *Id.,* ¶ 30.

FN8. *Id.,* ¶ 31. Dr. Harrison confirmed the hours in writing on October 2, 1992. *Id.*

FN9. *Id.,* ¶ 32.

FN10. *Id.,* ¶ 33.

FN11. *Id.* Mee Hospital lacked teleradiology equipment at the time, but Dr. Chabra alleges that a desire to purchase such equipment had been previously expressed to him. *Id.*

FN12. *Id.,* ¶ 34.

FN13. *Id.,* ¶ 34(a).

FN14. *Id.,* ¶ 34(b). Dr. Chabra was be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

lately and falsely told that Dr. Curran was being considered to provide teleradiology services in emergency situations. *Id.*

FN15. *Id.,* ¶ 34(c).

FN16. *Id.,* ¶ 34(d).

FN17. *Id.,* ¶ 34(e). Dr. Chabra was notified by Dr. Harrison of this decision on February 16, 1993. *Id.*

FN18. *Id.,* ¶ 34(f). Dr. Saenz declined an offer to conduct the peer review of Dr. Chabra, citing a restrictive covenant in his contract with the Monterey hospital, but the Mee Hospital medical executive committee blamed Dr. Chabra for this because Dr. Harrison falsely told the committee that Dr. Chabra had threatened to sue Dr. Saenz. *Id.,* ¶ 34(h).

FN19. *Id.,* ¶ 34(g).

FN20. *Id.,* ¶ 34(i).

FN21. *Id.,* ¶ 34(k).

FN22. *Id.,* ¶ 34(m).

FN23. *Id.,* ¶ 34(q).

FN24. *Id.,* ¶¶ 34(r) and 34(s).

FN25. *Id.,* ¶¶ 34(t)-34(w).

FN26. For the same reasons, the motion to strike references to marital communities is also denied as moot.

FN27. First Amended Complaint, ¶¶ 37-41 (first cause of action) and 42-43 (second cause of action).

FN28. *Id.,* ¶¶ 37-38.

FN29. *Id.,* ¶¶ 39-40.

FN30. Defendants' Reply Brief, at p. 5 n. 1.

FN31. First Amended Complaint, ¶¶ 48-51 (fourth cause of action).

FN32. First Amended Complaint, ¶¶ 52-55 (fifth cause of action) and 56-60 (sixth cause of action).

FN33. *Id.,* ¶¶ 61-65 (seventh cause of action); 66-70 (eighth cause of action).

FN34. *Id.,* ¶¶ 71-75 (ninth cause of action).

FN35. *Id.,* ¶ 72.

FN36. *Id.,* ¶ 73.

FN37. Defendants' Reply Brief, at p. 4. For instance, Dr. Chabra argues that the double billing of transcription services is a practice "likely to deceive the public", citing *Payne v. United California Bank,* 23 Cal.App.3d 850, 100 Cal.Rptr. 672 (1972). Plaintiff's Opposition Brief, at p. 4.

FN38. First Amended Complaint, ¶¶ 76-77 (tenth cause of action).

FN39. *Id.,* ¶¶ 84-87 (thirteenth cause of action).

FN40. Dr. Chabra has pled this cause of action on information and belief, which explains his inability to satisfy the pleading standards. Discovery, in particular the depositions of various individual defendants and third-party hospital personnel, may enable to him to ultimately salvage this cause of action. The parties should be aware that the Court will allow plaintiff's counsel some latitude to inquire about potentially defamatory statements during discovery, notwithstanding that Dr. Chabra's defamation claim has been dismissed.

FN41. First Amended Complaint, ¶¶ 88-89.

FN42. Defendants' Brief, at p. 15, citing *State Credit Corp. v. Ranger,* 101 Cal.App.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310 (1929).

FN43. Dr. Chabra's counsel suggests that "[d]efendants should be ashamed of their reliance on a 1929 case to deny the existence of a long-standing doctrine of California law". Plaintiffs' Opposition Brief, at p. 5. Shameful is perhaps an overly harsh characterization, but the Court agrees that defendants' one-paragraph, two-sentence, four-line argument citing a single 65-year-old authority provides a superficial-and, as it turns out, incorrect-analysis.

FN44. In *Kinzli,* plaintiff had asserted, inter alia, a sixth "claim" for breach of contract and an alternative sixteenth claim for promissory estoppel.

FN45. In *Jablon,* a physician brought an action against the government for breach of his enlistment contract with the air force and a separate claim for promissory estoppel. The Ninth Circuit-implicitly assuming the doctrine of promissory estoppel is a separate cause of action-held that the government had not waived its sovereign immunity with respect to such claim "because it is not an 'express or implied-in fact contract' theory". 657 F.2d at 1070.

FN46. First Amended Complaint, ¶¶ 90-91 (fifteenth cause of action).

FN47. *Id.,* ¶¶ 92-93 (sixteenth cause of action).

FN48. Defendants' Brief, at p. 18.

FN49. Plaintiff's Opposition Brief, at p. 6.

FN50. The request to strike references to "marital communities" is denied as moot inasmuch as Dr. Chabra's wife, Karin Chabra, has withdrawn herself as a co-plaintiff. *See* Footnote 26 and accompanying text hereinabove.

N.D.Cal.,1994.

Chabra v. Southern Monterey County Memorial Hosp., Inc.
Not Reported in F.Supp., 1994 WL 564566 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.