IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS COMPUTER RESEARCH, LLC., <br>     *Plaintiff and Counterclaim Defendant*, <br><br>         v. <br><br> FISH & RICHARDSON P.C., <br>     *Defendant, Counterclaimant Third-Party* <br>     *Plaintiff and Counterclaim Defendant,* <br><br>         v. <br><br> SCOTT C. HARRIS, MEMORY CONTROL <br> ENTERPRISE, LLC, BARTEX RESEARCH, LLC, <br> INNOVATIVE BIOMETRIC TECHNOLOGY, LLC, <br> PARKER INNOVATIVE TECHNOLOGIES, LLC, <br> VIRGINIA INNOVATIVE TECHNOLOGY, LLC, <br> INNOVATIVE PATENTED TECHNOLOGY, LLC <br> AND ANY JOHN DOE SHELL ENTITIES, <br>     *Third-Party Defendants-Counterclaimants,* <br><br>         *V.* <br><br> FISH & RICHARDSON, P.C.*,* <br>     *Counterdefendant.* | Civil Action No. 07 C 5081 <br><br> Honorable Rebecca R. Pallmeyer <br><br> Magistrate-Judge Maria Valdez |

## ANSWER AND AFFIRMATIVE DEFENSES TO FISH & RICHARDSON'S AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT AND COUNTERCLAIMS AGAINST FISH & RICHARDSON

Plaintiff, Illinois Computer Research, LLC ("ICR"), and the third-party defendants,

Scott C. Harris ("Harris"), Memory Control Enterprise, LLC ("MCE"), Innovative

Biometric Technology, LLC ("IBT"), Parker Innovative Technologies, LLC ("PIT"),

Virginia Innovative Technology, LLC ("VIT") and Innovative Patented Technology, LLC

(IPT"), answer the Amended Counterclaim and Third-Party Complaint as set forth below

and, together with Harris and ICR, further assert their own counterclaims against Fish & Richardson ("Fish").

## Answer

1.      Denied.

2.      Denied.  At Fish's direction, Mr. Harris sought to place a value on his patents in order to sell them, which can only be done by identifying actual and potential users of the patented technology and the magnitude of such use and then communicating that information to third parties interested in buying.

3.      Denied.  The third-party defendants also state that the reference to "shell entities" is offensive, scandalous and inappropriate and should be stricken.

4.      Denied. Indeed, Fish's Director of Ethics instructed Mr. Harris to form a corporation into which his rights would be assigned.  Mr. Harris also informed Fish that he was contractually required to cooperate in the prosecution of infringement actions on patents transferred to MCE and gave copies of his agreements with MCE to Fish.

5.      It is admitted that the firm of Niro, Scavone, Haller & Niro ("the Niro Firm") represents ICR and that ICR, MCE and IPT have sued entities identified as Fish clients as well as other infringers.

6.      Denied.

7.      Denied.

8.      Denied.

9.      Denied.

10.      Admitted, except with respect to the size and status of Fish about which ICR, et al., lack knowledge sufficient to form a belief.

11.     Admitted, with the exception of the statement about the "resignation" of Mr. Harris.  In actuality, Fish forced Harris to terminate his employment.

12.     Admitted, except it is denied that Mr. Harris "purportedly" assigned patent rights to ICR; there was nothing "purported" about the assignment.

13-18.   Denied that MCE, IBT, IPT, PIT or VIT are shell entities.  Bartex is not answering; it separately has moved to dismiss.

19.     Denied.

20.     Denied.

21.     Admitted.

22.     Admitted.

23.     Admitted, with the following exceptions:  Fish deemed Mr. Harris "an employee" at all times and it was Mr. Harris's legal skills, and not firm resources, which gained him a national reputation.

24.     The first sentence of Paragraph 24 is admitted; the second sentence is denied.

25.     The quoted language appears in the Agreement; Fish's characterization of that language is denied.

26.     The quoted language appears in the Agreement.  It is denied that the Agreement prohibited Mr. Harris from receiving compensation from the licensing of his personal inventions.

27.     Admitted that the stated language is contained in the Agreement.

28.     Admitted that the stated language is contained in the Agreement.

29.     Admitted that the stated language is contained in the Agreement.  Denied

that Mr. Harris was precluded from obtaining patents on his own inventions. Indeed, Fish knew of and authorized such activities, and a number of other Fish lawyers (including the managing partner of Fish's San Diego office) obtained patents on their own inventions as well.

30. Admitted, with the exception of the statement that Mr. Harris was a "principal".

31. Denied.

32. Admitted that Mr. Harris prosecuted his own patents; denied that such activity was in any way wrongful or that Harris did not devote adequate time and attention to his clients.

33. Denied.

34. The first sentence of Paragraph 34 is admitted; the second is denied.

35. Denied. Under the Patent Statute, Mr. Harris had a right to exclude others from practicing his inventions; patents are personal property.

36. Denied (client A is not identified); denied that any patent of Mr. Harris is the property of Fish.

37-41. Denied since client A is not identified.

42. Denied.

43. The first sentence of Paragraph 43 is admitted; the second is denied. Fish was aware of the website.

44. Admitted.

45. Admitted that the Niro firm has been on the opposite side of cases with Fish and further that Fish and its law firm, Jenner & Block ("the Jenner Firm"),

apparently harbor animosity toward the Niro Firm because of its success in representing its clients; Fish and the Jenner Firm consider the Niro Firm a competitor and have been looking for a way to disparage the Niro Firm and its lawyers.

46.     Denied.

47.     Admitted that Mr. Harris sought to retain the Niro Firm to represent him; denied that Mr. Harris breached any contractual or fiduciary obligation.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.  No rights were "purported."

53.     Denied.

54.     Denied.

55.     Admitted that letters were sent offering licenses to users of the inventions covered by the Harris patents; Denied that they were "threatening."

56-58.    Denied without the identity of client B.

59.     Denied.  There was no "scheme."

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Admitted.

65.     The first two sentences of paragraph 65 are admitted; everything else is

denied.

66.     Denied.

67.     Denied.

68-72.  Denied; no sales were "purported."

73.     Denied.

74.     Denied.

75.     Denied without the identity of clients C and D.

76.     Denied.

77.     Denied.

78.     The first sentence of paragraph 78 is admitted; the remaining allegations

are denied.

79-80.  Denied without the identity of client E.

81.     Denied.

## COUNT I

82.     Responses 1-81 are incorporated as well.

83.     Admitted.

84-87.  Denied.

## COUNT II

88.     Responses 1-87 are incorporated as well.

89-93.  Denied.

## COUNT III

94.     Responses 1-93 are incorporated as well.

95-97.  Denied.

## COUNT IV

98.     Responses 1-97 are incorporated as well.

99-102.  Denied.

## Affirmative Defenses

1.     Fish has failed to state any claim upon which relief can be granted.

2.     Fish's claims are barred by the doctrine of unclean hands.

3.     Fish's claims are barred by the doctrines of equitable and promissory estoppel.

4.     Fish's ownership claims are barred under 35 U.S.C. § 261.

5.     Fish's claims are contrary to the public policy of the States of California and Illinois and are objectively baseless.

6.     Personal jurisdiction does not exist for Bartex because it has no contacts with and does no business in Illinois or this judicial district.

## Claims and Counterclaims

1.     The third-party defendants Scott C. Harris ("Harris"), Memory Control Enterprise, LLC ("MCE"), Innovative Biometric Technology, LLC ("IBT"), Parker Innovative Technologies, LLC ("PIT"), Virginia Innovative Technology, LLC ("VIT"), and Innovative Patented Technology, LLC (IPT"), as well as plaintiff, Illinois Computer Research, LLC ("ICR"), individually and separately assert the following claims and counterclaims against Fish:  slander to title; fraud; interference with contractual relations; interference with business relations, promissory estoppel, negligent misrepresentation, defamation, wrongful withholding of sums due and declaratory judgment.

## **Nature of the Claims**

2.     The claims and counterclaims relate to the false claims of ownership to patents now owned by one or more of the third-party defendants and, in some cases, by Scott Harris or his designees, and to the threats against and efforts to intimidate Harris and ICR and the demands made that each of the third-party defendants turn over the Harris patents they purchased to Fish and its clients.  The ownership claims and threats were made for the purpose of pressuring Scott Harris into abandonment of his rights and obligations and are contrary to California and Illinois statutes and the public policies of those states.  Further, the ownership claims were not recorded and are objectively baseless.  Further, the ownership claims have been made for an improper purpose and, on information and belief, were created by the Jenner Firm for the purpose of pressuring Harris and the companies to whom he sold his patents so they could not enjoy the full benefits of the property they purchased.

3.     Fish, based upon the sworn testimony of John Steele and others, allegedly believed that it had acquired an ownership interest in the inventions and patents of Scott Harris by May 2007.  Yet, despite a long-standing policy of both asserting and recording ownership claims in patents, Fish concealed its purported ownership claims from Mr. Harris and, instead, demanded that he sell his patents in order to keep his position as an attorney-employee of Fish. These demands were made in April and May 2007.  At the time, Fish also concluded that it would deliberately not give notice to the public of any adverse claim, as required by 35 U.S.C. § 261, and as it had done previously in asserting and recording liens against its own clients' patents.

4.     As set forth above, despite an alleged belief that it had acquired ownership rights in Harris' patents, Fish deliberately failed to record any such ownership right or to give the public notice of any such right.  Harris and each of the third-party defendants, with the exception of MCE, relied upon Fish's failure to record by making their own title searches at or about the time that a decision was made to acquire patents from Mr. Harris.

5.     As directed by Fish, Harris sold his patents and, with Fish's knowledge, has retained a financial interest in recoveries from licensing and enforcement only if those recoveries come from non-clients of Fish or from clients of Fish for whom Harris performed no legal services.  Some of the patents have never been asserted at all, much less against Fish clients

## Jurisdiction and Venue

6.     Jurisdiction over the subject matter of the counterclaims exists under 28 U.S.C. §§1332(a) and 1367; venue is proper under 28 U.S.C. §1391.

## Background Facts

7.     Harris began the commercial exploitation of his patents in April 2006 when he entered into an exclusive license agreement with MCE under four of his patents. MCE was responsible for the licensing and enforcement of those exclusively licensed Harris patents and the payment of all legal fees and expenses in connection with such licensing and enforcement efforts.

8.     Harris' exclusive licensee, MCE, initially contacted various alleged clients of Fish in June 2006, including Samsung, LG, Nokia, Amazon, Kyocera and others, offering licenses under the Harris patents.  No one at Fish ever complained; no Fish

client expressed concern or suggested any impropriety in being contacted by an entity that was authorized to assert the Harris patents.

9.      In December 2006, months before any contact from Fish or any complaint or expression of concern by Fish or its clients, Harris purchased a controlling interest in MCE.

10.     Months later (in March 2007), MCE and Harris filed suit on the Harris '791 patent against alleged Fish clients GM and Dell and non-Fish client Panasonic.

11.     Based upon an inquiry from Dell, in March 2007, Fish demanded Harris remove his name from the complaint against Dell and sell his interest in his patents to third parties.  Harris immediately sought to do both.  Fish's Director of Ethics, John Steele, also advised Harris to form a corporation and transfer his patent rights into that holding corporation.  Harris immediately took steps to comply with that directive and so advised Steele.  Harris also filed a motion to dismiss himself from the Dell complaint; he sold his '791 patent to MCE; he abandoned any right to receive payments or compensation on any matter that involved a Fish client for whom he had performed legal services.

12.     In March, April and May of 2007, Fish did not assert any claim of ownership over the Harris patents.  It did not make any such claim to Harris; it made no public announcement of any such claim and, on information and belief, it never even contemplated making such a claim of ownership, except in its statements to Dell reassuring it that the matter would be resolved.

13.     In April 2007, Harris took steps to sell his entire patent portfolio as Fish demanded.  He contacted a publicly traded company, Acacia Research Corporation, to

attempt such a sale. As requested by Fish, he contacted Intellectual Ventures. He also contacted Altitude Capital Partners and others who are in the business of acquiring patents from inventors like Mr. Harris for purposes of licensing and enforcing them.

14. Patents are nearly always valued by determining whether the patented inventions they cover are being used and whether or not such use is authorized. Harris made such analyses as part of his effort to value and sell his patents and, in doing so, identified various Fish clients for whom he did no work as a lawyer at Fish as potential unauthorized users of his patented inventions. That was done for the purpose of placing a value on and ultimately selling his patents, as well as for the later purpose, if sold, of enforcing and licensing them. Harris is not aware of any authority indicating that a company had the right to infringe his patents merely because that company happens to be a client of Fish, and Fish has never identified any such authority to Harris. At no time did Harris use any confidential information in such analyses.

15. By May 2, 2007, Fish had known about the Dell lawsuit for more than a month, yet still made no claim to Harris that it owned any Harris patent. Instead, Fish continued to demand that Harris sell his patents and do so quickly, even if that meant selling them at prices well below their actual value. At the same time, Fish sought advice from outside counsel who eventually told Fish (and, in turn, Harris) that Harris had violated no ethical rules nor had he done anything improper. Harris was told there was little governing precedent on the issue of Harris' right to pursue efforts to license or enforce his patents against Fish clients and that ABA Model Rule 1.10 cleared him of any possible wrongdoing. Fish continues to conceal such advice and to prevent its full

disclosure in this lawsuit, since it would undermine Fish's ownership and breach of fiduciary duty claims as orchestrated by the Jenner Firm.

16.     In May 2007 (at Fish's request), Harris provided Fish with copies of the various agreements he had with MCE, including the agreements showing that he purchased 99% of MCE in December 2006 and had abandoned his right to receive any part of any recoveries from the licensing and enforcement of his patents against clients of the Fish firm for whom he performed legal services.    After receiving such agreements, Fish still made no claim of ownership to Harris, though, on information and belief, it did assure Dell that it would promptly resolve the matter, suggesting, of course, that it could do so by exercising the rights of ownership.

17.     Fish nevertheless continued to pressure Harris.    Among other things, it told him he would likely be charged with inequitable conduct (a serious offense that could result in disbarment or even criminal penalties).    He was also told that Dell might accuse him of improperly accessing its files. Such statements were false and had absolutely no basis in fact.    Indeed, they were made by Fish solely to force Harris to abandon any claims against Dell and to sell his patents to third parties.

18.     In May 2007, Harris continued to seek guidance from Fish.    He was told Fish appreciated his efforts to sell his patents.    He was told he could testify as a fact witness in legal proceedings enforcing his patents.    He was told that such testimony would not make him adverse to any Fish client.    Again, however, Fish never asserted any claim of ownership against Harris but, instead, misled Harris into believing he could and should sell his patents free of any claim by Fish.    Fish's employee, Steele, testified that Fish told either Harris or third parties it had an ownership interest in his patents in

the April-May 2007 time frame. Since Harris was not told, according to every other Fish witness, it is apparent Fish did make ownership claims to third parties like Dell.

19.     At no time before hiring the Jenner Firm did Fish tell Harris it owned his patents. At no time before hiring the Jenner Firm did it write Harris making such a claim. At no time before hiring the Jenner Firm did Fish tell Harris that a condition of any sale was that any prospective purchaser had to agree not to contact, license or enforce his patents against Fish clients. In May 2007, Harris advised Fish that he was continuing his efforts to sell his patents and Fish never raised the issue again with Harris until September 2007, as addressed below.

20.     By the end of May 2007, Fish led Harris to believe the entire matter had been resolved to its satisfaction. Fish was satisfied Harris could properly sell his patents. In late May 2007, Fish President Peter Devlin even took Harris to lunch. He never mentioned Dell or MCE or any aspect of the issue of Harris obtaining patents, selling them to third parties and being compensated for such sales.

21.     Having already sold his '791 patent to MCE, Harris continued his efforts to sell his remaining patents in June 2007, initially to Acacia and then to Altitude Partners. Fish, in turn, continued to remain silent, not once telling Harris that it had an ownership interest or any claim of ownership.

22.     In early July 2007, Harris also contacted J. Beauregard Parker, the owner of all the third-party defendants, except MCE, and began negotiating the terms of a sale of his patents to ICR, IBT, PIT, VIT and IPT. Parker, an attorney experienced in real estate law, in turn, did title searches of the PTO assignment records to see if anyone had recorded adverse ownership rights in the relevant Harris patents his companies

sought to purchase. No record of any adverse ownership claims existed, including any claims by Fish. On July 30, 2007 and August 6, 2007, the non-MCE third-party defendants ICR, IBT, PIT, VIT and IPT purchased the Harris patents, each of whom relied upon the absence of any adverse claims ownership.

23. Nearly a month later, on August 29, 2007, ICR sent a letter to Google requesting consideration of a license under the Harris '252 patent that ICR had purchased. A few days later, Fish told Harris that unidentified people were unhappy with him and demanded a videoconference call on September 6, 2007. In that call, Steele threatened Harris that his life would be made miserable, that Fish would claim he copied ideas from Fish clients, that Harris would be charged with ethical violations and potentially illegal misrepresentations to the PTO and that Fish would claim Harris misused firm resources. On September 6, 2007, Fish also demanded Harris' resignation; only after that was Google sued for infringement by ICR; only after that did Fish formally announce its belief that it had an ownership interest in the Harris patents. On information and belief, the Jenner Firm created the ownership claim to maximize pressure on Harris.

24. In September 2007, Fish also began threatening Harris through his employment counsel, Lynne Lasry. It threatened a claim of ownership, it demanded Harris have the third-party defendants grant free licenses to its clients; it told Harris his life would be made miserable; it claimed he would be charged with inequitable conduct and, thus, potentially with criminal conduct; it demanded Harris pressure the law firm of Niro, Scavone, Haller & Niro to coerce its clients into dropping their infringement claims against Fish clients. This was all done for the purpose and with the effect of keeping

Harris from satisfying his obligations to the entities to whom he had sold his patent and to force those third parties to abandon any claims against Fish clients.

25.     Fish has now falsely claimed that Harris' sale of his patents was not authorized, that it was unaware he had obtained patents on his own inventions and, as orchestrated by the Jenner Firm, that Fish somehow even owned the Harris patents. Fish's threatened and asserted ownership claims are objectively baseless.  Fish could not have a reasonable belief in the merits of its belated claims of ownership, yet nevertheless threatened and then brought claims of ownership in bad faith, intending to harass and burden Harris, ICR and each of the bona fide purchasers.

26.     Fish attorneys communicated with Fish clients about the employment of Scott Harris and the fact that he or companies to whom he had sold or exclusively licensed his patents had asserted claims for infringement against such clients.  These clients included at least Dell and Google and, on information and belief, may at one time have also included Amazon, General Motors, LG, Samsung, Nokia, Kyocera and others.

27.     On information and belief, in the course of such communications, Fish assured such clients that the Harris infringement claims would be resolved because of Harris ' employment by Fish and the rights Fish perceived that it had as a result of such employment.

## COUNT I
## SLANDER AND FALSE CLAIM TO TITLE

28.     The allegations of paragraphs 1-27 above are repeated and incorporated herein by reference.

29.     MCE, IBT, PIT, VIT, IPT and ICR own various Harris patents under written agreements with Harris.  Title to all such patents have been properly recorded in the Patent and Trademark Office ("PTO") as required by 35 U.S.C. § 261.

30.     Fish, as directed by the Jenner Firm, has fabricated an objectively baseless claim to ownership and title to all the Harris patents.  Such claims are contrary to both California and Illinois statutes, are contrary to public policy and have not been recorded as required by 35 U.S.C. § 261.

31.     The Fish claims of ownership are false and malicious and have been published to Harris and others both orally and in writing.  Fish's claim of title also is disparaging towards each of the counterclaimants' claim to title for the respective patents they have purchased from Harris.

32.     Each counterclaimant has been damaged in that third parties with whom they have sought to license and against whom they have sought to enforce the Harris patents they purchased have either refused such licenses, have presented defenses based upon the false claims of ownership or have drastically reduced amount of monies they agreed to pay for a license.  Each counterclaimant has, therefore, been unable to realize the full value of the Harris patents they acquired and have been required to indemnify and defend third parties, and to expend monies in defense of the false and malicious claims of ownership.

## COUNT II
## FRAUD ON HARRIS

33.     The allegations of paragraphs 1-32 above are repeated and incorporated herein by reference.

16

34. Fish concealed from Harris in the Spring of 2007 its purported belief that it had any claims of ownership in his patents. It purportedly knew (or should have known) it had such claims, but deliberately concealed them, instead, demanding that Harris sell his patents to innocent third parties.

35. Fish's statements to Harris were false in that they suggested and implied that he could sell his patents without facing ownership claims from Fish and should do so quickly. Fish also omitted material facts, such as any claim to ownership or any conditions that it now claims should have been attached to any such sale, e.g., a condition that no Fish client be required to accept a license or be sued for infringement.

36. Fish's statements and omissions were made with the intent to induce Harris to sell his patents. Harris relied on Fish's misrepresentations and omissions that he could sell his patents without any adverse claims to title or conditions on such sale.

37. Harris has been injured by Fish's misrepresentations and omissions in that he was forced to sell his patents for less than their real value and now has to defend his right to have done so. Harris has been injured in that the price for the sale of his patents has been unreasonable diminished, the value of his patents unreasonably reduced and the magnitude of any licensing fees and recoveries diminished all as a consequence of Fish's improper acts.

**COUNT III**
**FRAUD ON IPT, ICR, VIT, IBT, PIT**
**AND VIT (THE "BONA FIDE PURCHASERS")**

38. The allegations of paragraphs 1-37 above are repeated and incorporated hereby by reference.

39.     Fish concealed from Harris and from the bona fide purchasers its purported claims of ownership in the patents they ultimately purchased.  Fish also deliberately failed to record any claim of title or ownership, thus, concealing its claim from the public and from prospective purchasers.  Fish knew that prospective purchasers were evaluating the Harris patents; it also knew that its purported ownership claims would be material to such prospective purchasers.

40.     The bona fide purchasers relied upon the fact that no adverse claim to title was recorded and went forward with their decisions to purchase the Harris patents on that basis.

41.     Fish's false statements and omissions of material facts were made for the purpose of inducing Harris to sell his patents to unsuspecting parties who Fish knew or should have known would reasonably rely upon Fish's failure to record any adverse claim in making a decision to purchase.

42.     Each of the bona fide purchasers have been injured by their reliance on Fish's false statements and omissions and by its failure to record any claim of ownership in that they acquired the Harris patents in good faith and have now been required not only to defend adverse claims of ownership but to delay and/or reduce their efforts at licensing and enforcement.  Further, the bona fide purchasers have not realized the full-market value of the patents they acquired and their efforts at licensing and enforcement have been permanently and irreparably damaged.

**COUNT IV**
**INTERFERENCE WITH CONTRACT BETWEEN**
**HARRIS AND THE BONA FIDE PURCHASERS**

43.     The allegations of paragraphs 1-42 above are repeated and incorporated herein by reference.

44.     The bona fide purchasers have valid and enforceable contracts with Harris in which they acquired certain Harris patents.  Fish is not only aware that Harris sold his patents, it demanded he do so without any requirement of conditions and without making any adverse claims of ownership to Harris or the purchasers.  Harris cannot now fully perform his obligations under his agreements for the sale of his patents to the bona fide purchasers in that he has been threatened with adverse consequences by Fish, with inequitable conduct, with misuse of confidential information and more.  Further, Harris warranted title and ownership which, based upon Fish's claims, would be invalid.

45.     Harris breach of his obligations under the patent purchase agreements has been caused by Fish's wrongful conduct in improperly claiming an ownership interest in the relevant patents and in threatening Harris, making it more difficult, if not impossible, for him to satisfy his obligations under the agreements.  The bona fide purchasers have been damaged by Fish's conduct in that they have not had the full benefit of Harris' cooperation, they have not enjoyed the full benefit of the patents they purchased nor have they been able to fully monetize and realize the total licensing and enforcement potential of such patents.

**COUNT V**
**INTERFERENCE WITH BUSINESS RELATIONS**
**AND PROSPECTIVE ECONOMIC ADVANTAGE**

46.     The allegations of paragraphs 1-45 above are repeated and incorporated herein by reference.

47.     The bona fide purchasers (IPT, ICR, VIT, IBT, PIT and VIT) had a reasonable expectation that they could purchase patents from Harris and that they could license and enforce the patents they had purchased free from any interference with the named inventor of the patents and free from any false claims of ownership. The purchasers also expected cooperation and support from Harris, the named inventor.  VIT, IBT, PIT and VIT have had no success in licensing the acquired patents; IPT and ICR have had only modest success, well below the real value of the patents they acquired.

48.     Fish knew and still knows that the entities purchasing the Harris patents would expect cooperation from Harris and would expect to license and enforce the acquired patents free from any adverse claim of ownership or threats and intimidation of the named inventor.

49.     Fish has interfered in the bona fide purchasers' licensing and enforcement efforts and their legitimate expectations to negotiate licenses or to sell or transfer rights under or to monetize the patents they purchased by doing, among other things:  (a) threatening and attempting to intimidate Mr. Harris; (b) demanding Mr. Harris get his patents back and requiring the bona fide purchasers not to seek licenses from or enforce the Harris patents against Fish clients; and (c) making false claims of ownership to third parties, to Harris and to the bona fide purchasers.

50.     Fish knew that purchasers of Harris patents would be seeking to enforce such patents against infringers, and Fish sought to interfere with such expectancy by asserting ownership claims against the Harris patents.

51.     Fish's wrongful conduct specifically includes the filing of ownership claims in the lawsuit in bad faith and with malicious intent.   Under established precedent, bringing a civil suit in bad faith or with malicious intent is recognized as a wrongful means upon which a privilege is destroyed and upon which a claim for tortious interference may be based.

52.     The bona fide purchasers have been injured by such interference in that it has been made more difficult (if not impossible) for them to realize the full value of the patents they purchased, to license and enforce them and to gain the business opportunities they expected.

### COUNT VI
### PROMISSORY ESTOPPEL – HARRIS

53.     The allegations of paragraphs 1-52 above are repeated and incorporated herein by reference.

54.     Fish made an unambiguous and unconditional promise to Harris (indeed, a demand) that he sell his patents quickly at less than their market value, if necessary, as a condition of keeping his job.  Harris did so.

55.     Indeed, Harris relied on Fish's promise and such reliance was both expected and foreseeable.   As a consequence, Harris sought to sell his patents to numerous entities, ultimately selling them to the bona fide purchasers in July-August 2007.

56.     Fish has reneged on its promise, claiming that Harris cannot and could not sell his patents to third parties, without any condition that Fish's clients would obtain perpetual, paid-up royalty-free licenses under all Harris patents.

57.     Harris has been injured by Fish's promise in that he sold his patents expecting royalties and recoveries from licensing and enforcement which have not been realized and Fish is estopped to now demand ownership or unreasonable conditions on sales it both permitted and requested.

## COUNT VII
## NEGLIGENT MISREPRESENTATION – HARRIS

58.     The allegations of paragraphs 1-57 above are repeated and incorporated herein by reference.

59.     Fish misrepresented the fact of its alleged ownership of the Harris patents.

60.     Fish made the misepresentations (omissions) by telling Harris to sell his patents and did so without, in fact, knowing whether it had or could even make a legitimate claim of ownership of the Harris patents.  Fish should have known that it could not make a legitimate ownership claim.

61.     Fish intended to induce Harris to sell his patents.

62.     Harris relied upon Fish's misrepresentations and omissions and its failure to claim ownership or to place conditions on any sale.  Harris was injured by relying upon Fish's negligent misrepresentations and omissions.

## COUNT VIII
## DEFAMATION – HARRIS

63.     Mr. Harris restates paragraphs 1-62 of his earlier counterclaim against Fish, including the allegations that Fish damaged Mr. Harris' reputation and the value of his patent portfolio (Docket No. 27).

64.     Fish's statements to the press and other third parties were false and Fish knew them to be false.

65.     Fish made the statements with actual malice.

66.     Fish's statements constitute defamation *per se* and Mr. Harris' professional reputation has been damaged.

67.     If Fish followed through with its stated intention to claim that Mr. Harris copied his inventions from firm clients (to Google, for example), that, too, constitutes defamation *per se.*  Mr. Harris does not yet know precisely what Fish told the Patent Resources Group that prompted his termination from the PRG faculty, but such statements also were likely defamatory and false and Mr. Harris already has been damaged thereby.

## COUNT IX
## WRONGFUL WITHHOLDING OF SUMS DUE – HARRIS

68.     The allegations of Paragraphs 1-67 above are repeated and incorporated herein by reference.

69.     Fish has wrongfully withheld sums due Harris as part of its effort to harm him.

**COUNT X**
**DECLARATORY JUDGMENT AGAINST FISH BY MCE, ICR, IBT, PIT AND VIT**

70.     The allegations of paragraphs 1-69 above are repeated and incorporated herein by reference.

71.     An actual controversy exists between MCE, ICR, IBT, PIT and VIT, on the one hand, and Fish, on the other hand, regarding Fish's claims of an ownership interest in the patents acquired and owned by those third-party defendants under their agreements with Harris.   Such claims have thwarted the legitimate licensing and enforcement of patents rights under such patent purchase and exclusive license agreements.

72.     The indicated third-party defendant-counterclaimants, therefore, seek a declaration that:  (1) they are the rightful owners of the Harris patents they purchased; and (2) Fish's ownership claims to the contrary are invalid.

**Prayer For Relief**

WHEREFORE, the third-party defendants-counterclaim-plaintiffs Harris, MCE, IBT, PIT, VIT and IPT and plaintiff ICR respectfully request this Court to enter judgment against defendant Fish & Richardson, and against its successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with them, granting the following relief:

A.     A declaratory judgment that the counterclaimants are the rightful owners of the Harris patents they purchased and Fish's claims to the contrary are invalid;

B.     Compensatory damages in an amount in excess of the jurisdictional limit sufficient to redress the harm caused from Fish's slander to title, fraud,

tortious interference with contract and with business relations, promissory estoppel, defamation, negligent misrepresentation and wrongful withholding of money due;

C.     Punitive damages, where appropriate;

D.     Costs of suit; and

E.     Any other and further relief deemed appropriate by the jury and the Court.

### Jury Demand

Claimants and Counterclaimants demand a trial by jury on all issues presented in their claims and counterclaims.

/s/ Paul K. Vickrey
Raymond P. Niro
Paul K. Vickrey
Richard B. Megley, Jr.
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602-4365
(312) 236-0733
Fax:  (312) 236-3137

ATTORNEYS FOR ILLINOIS COMPUTER
RESEARCH, LLC.,  SCOTT C. HARRIS,
MEMORY CONTROL ENTERPRISE, LLC,
INNOVATIVE BIOMETRIC TECHNOLOGY,
LLC, PARKER INNOVATIVE
TECHNOLOGIES, LLC, VIRGINIA
INNOVATIVE TECHNOLOGY, LLC,
INNOVATIVE PATENTED TECHNOLOGY,
LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **ANSWER TO FISH & RICHARDSON'S AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT AND COUNTERCLAIMS AGAINST FISH & RICHARDSON** was electronically filed with the Clerk of Court using CM/ECF system, which will send notification by electronic mail to the following::

> David J. Bradford
> Eric A. Sacks
> Daniel J. Weiss
> Terrence J. Truax
> Jenner & Block LLP
> 330 N. Wabash Avenue
> Chicago, IL  60611
> (312) 222-9350
> **Counsel for Fish & Richardson, P.C.**

on May 12, 2008.

/s/  Paul K. Vickrey